# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARTER W. PAGE,

████████████████ ,

     Plaintiff,

    v.

JAMES COMEY

████████████████ ,

ANDREW McCABE

████████████████

KEVIN CLINESMITH

████████████████ ,

PETER STRZOK

████████████████

LISA PAGE

████████████████ ,

JOE PIENTKA III

████████████████

STEPHEN SOMMA,
FBI Agent,
c/o FBI - New York Field Office
26 Federal Plaza
New York , NY 10278,

BRIAN J. AUTEN

████████████████ ,

DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001,

CIVIL NO.:20-cv-3460-KBJ

**JURY TRIAL DEMANDED**

FEDERAL BUREAU OF INVESTIGATON,

935 Pennsylvania Ave NW,

Washington, DC 20535,


UNITED STATES OF AMERICA,
 950 Pennsylvania Avenue, NW

Washington, DC 20530-0001,


JOHN DOES 1-10, and

JANE DOES 1-10,
                              Defendants.

## **COMPLAINT**

1.      On November 10, 2020, Defendant Andrew McCabe testified in front of the Senate Judiciary Hearing that "any material misrepresentation or error in a FISA application is unacceptable. Period. The FBI should be held to the standard of scrupulous accuracy that the [FISA] court demands."  When pushed to explain "Who is responsible for ruining Mr. Carter Page's life?" McCabe finally responded, "We are all responsible for the work that went into that FISA."  This lawsuit seeks that accountability and damages against the individuals and agencies who wronged Plaintiff, Carter W. Page ("Dr. Page").

2.      Specifically, Dr. Page seeks relief herein for Defendants' multiple violations of his Constitutional and other legal rights in connection with unlawful surveillance and investigation of him by the United States Government. Dr. Page was targeted because of his lawful association with the 2016 Presidential campaign of Donald Trump. Dr. Page is entitled to relief for Defendants' unjustified and illegal actions (including violations of federal criminal law), which violated federal statutes enacted to prevent unlawful spying on United States persons, as well as the Constitution.

3.     The complained of misconduct occurred in connection with the submission of four false and misleading warrant applications to engage in electronic surveillance of Dr. Page, ostensibly pursuant to the Foreign Intelligence Surveillance Act ("FISA"). Four separate Article III judges unwittingly approved the false applications, submitted in October 2016, January 2017, April 2017, and June 2017, thereby unlawfully resulting in spying on Dr. Page. As has now been admitted by (i)  the U.S. Department of Justice ("DOJ"), (and (ii) the Federal Bureau of Investigation ("FBI"), and/or has been acknowledged by (iii) the Foreign Intelligence Surveillance Court ("FISC"), the *four separate applications* for FISA warrants and renewals (collectively, the "FISA Warrants"[1]) to surveil Dr. Page were submitted despite there being <u>no</u> probable cause to suspect that Dr. Page was acting as a Foreign Agent of Russia. Consequently, the Defendants' unlawful actions allowed them to illegally spy (domestically and internationally) on Dr. Page, a patriotic American citizen.

4.     The Defendants' conduct, which began not later than August 2016, and continued through at least September 2017, constituted a fraud on the FISC and violated the Constitutional and other rights of Dr. Page.

I.     <u>**OVERVIEW OF THE VIOLATIONS**</u>

5.     On July 31, 2016, the FBI opened a counterintelligence investigation named Operation Crossfire Hurricane, putatively concerning the Foreign Agent Registration Act (FARA), to determine whether "individual(s) associated with the Trump campaign are witting of and/or

---

[1] For clarity, the four separate FISA Warrants when discussed individually are referred to herein in the order of the application submitted to the FISC. For example, the October 2016 FISA application is the "First FISA Warrant", and first renewal submitted in January 2017 is referenced as the "Second FISA Warrant", while  the April and June 2017 FISA renewal applications are referenced as the "Third FISA Warrant" and "Fourth FISA Warrant," respectively.

coordinating activities with the Government of Russia." Soon thereafter, Dr. Page and three other individuals with whom he had little or no relationship were targeted by the FBI in the Crossfire Hurricane investigation.

6.      The FBI investigation soon devolved into an effort to obtain from the FISC a FISA warrant authorizing spying and electronic surveillance on Dr. Page.

7.      The FBI did not have probable cause to lawfully obtain a FISA warrant.  Instead, the FBI used documents furnished by Christopher Steele, a Confidential Human Source ("CHS"). As the Crossfire Hurricane team knew, CHS Steele had been paid by the Democratic Party and/or the Hillary Clinton presidential campaign to perform "political opposition research" and dig up dirt on a connection between the Trump campaign and Russia in order to divert attention from the investigation of Clinton's email practices while she was Secretary of State.

8.      In accordance with core principles of the U.S. Constitution, reinforced by the nation's legal and cultural aversion to spying on its citizens, Congress and the executive branch have enacted rigorous requirements that must be met before electronic surveillance of a U.S. citizen is legally permitted.  To surveil an American citizen, the FISA requires that there be probable cause that the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities."  In short, to legitimately obtain a FISA warrant against Dr. Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

9.      On August 17, 2016, shortly after the inception of the Crossfire Hurricane investigation, the Central Intelligence Agency ("CIA"), provided information regarding Dr. Page to members of the Crossfire Hurricane team. This information established that Dr. Page had been a CIA "operational contact" from 2008 – 2013 (and had similar interactions with the FBI).

Dr. Page had assisted the CIA in combatting intelligence-related activities pursued by Russia and other foreign countries *against* the United States' interests. Further, the CIA's employee had given a positive assessment of Dr. Page's candor. Further, on September 7, 2016, the CIA sent an investigative referral to FBI Director James Comey and Deputy Assistant Director of Counterintelligence Peter Strzok advising them that Hillary Clinton had approved a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server. (Letter of Director of National Intelligence, dated September 29, 2020.)

10.     During this same investigative phase, the FBI used a second CHS to surreptitiously ask Dr. Page about his activities.  In this monitored conversation,  Dr. Page denied that he either: (i) knew anything about improper or unlawful communications or activities between Russian and American citizens, or (ii) had engaged in any improper—much less illegal—activity with any individual that was harmful to the interests of the United States.  This conversation was recorded without Dr. Page's knowledge and was provided to the FBI.

11.     On September 19, 2016, as referenced above, the FBI received information regarding Dr. Page from CHS Steele.  In particular, two documents, prepared by CHS Steele, falsely alleged unlawful communications and activities involving Dr. Page and two Russians with close ties to Russian President Vladimir Putin.  The FBI "focused on" these two documents from Steele to base its claim that there was probable cause to obtain a FISA warrant against Dr. Page.

12.     On September 23, 2016, an article was published in Yahoo! News alleging meetings between Dr. Page and the same two Russian individuals.  The FBI treated this article as corroboration for CHS Steele's claims when, in fact, Steele was also the source for the Yahoo article.  Further, on September 25, 2016, Dr. Page sent a letter to then-FBI Director Comey in

which he categorically denied that he had any such communications with the Russian individuals and documented his previous cooperation with the CIA and the FBI to combat Russian spying. These false allegations against Dr. Page made by CHS Steele were not investigated by the FBI in accordance with its own manuals and procedures. For the FBI to disregard its procedures was particularly egregious in this case because the FBI knew that CHS Steele: (a) was being paid to provide political "opposition research" on this topic; (b) was essentially the exclusive source of information supporting probable cause for the FISA warrant applications, and (c) the CIA had warned the FBI of a potential political scheme involving false reporting of collaboration between the Trump campaign and Russians.

13.     The more fundamental problem was that the FBI was so intent on obtaining a FISA warrant to enable it to spy on the Trump campaign that it did not fully and accurately disclose to the FISC the evidence it had obtained as to whether Dr. Page was a Russian agent.  To persuade the FISC that there was probable cause to believe that Dr. Page was a Russian agent, the Defendants provided false or misleading information to the FISC.

14.     The FBI did not advise the FISC that Page had been for many years an "operational contact" of the CIA.  The FBI did not advise the FISC that CHS Steele had been paid by the Democrat party and/or the Clinton campaign to provide opposition research on Donald Trump. The FBI did not advise the FISC that Steele's source ("Primary Sub-source") of information against Dr. Page had himself been investigated for attempting to recruit Americans to help spy for Russia.  The FBI did not advise the FISC that Steele's Primary Sub-source contradicted critical information that Steele attributed to him.  Instead, the FBI represented to the FISC that the Primary Sub-source was "credible," without disclosing to the FISC that what the Primary Sub-Source had

"credibly" reported to the FBI was that the information Steele attributed to him was inaccurate and misleading.

15.     Ultimately an FBI attorney altered an email from the CIA in order to falsely deny that Dr. Page had been a CIA source serving for many years as an operational contact.

16.     In reality, there was no "probable cause" to support surveillance of Dr. Page. If FBI procedures had been followed and an honest and thorough investigation conducted, and if the FBI had fully and accurately reported what it knew, the FISA warrants against Dr. Page would neither have been sought nor issued.

17.     The individual Defendants fabricated or intentionally disregarded critical evidence, and misled the FISC, in order to obtain the FISA warrants. This case is about holding accountable the entities and individuals who are responsible for the most egregious violation and abuse of the FISA statute since it was enacted over forty years ago.

## II.   **PARTIES**

18.     Plaintiff Carter W. Page is a natural person who is a United States citizen. Dr. Page is a graduate of the United States Naval Academy who served on active duty in the United States Navy (including deployments at sea and other assignments worldwide, many in intelligence-related billets) from 1993 until 1998, reaching the rank of Lieutenant. After completing his active military service, Dr. Page served as an International Affairs Fellow at the Council on Foreign Relations and focused his research on energy-related developments in the strategically important Caspian Sea region. Dr. Page earned a Master of Arts degree in National Security from Georgetown University while on active duty, and subsequently completed the MBA program at New York University ("NYU") in 2001. This led to a position as an investment banker with Merrill

Lynch. Dr. Page eventually became the Chief Operating Officer of Merrill Lynch's energy and power group in New York. In 2012, Dr. Page was awarded his Ph.D. degree from SOAS University of London (School of Oriental and African Studies). He ran the Globalization and International Affairs program at Bard College in New York, and subsequently returned to NYU to teach courses on energy and politics. During the 2016 U.S. Presidential election, Dr. Page was a volunteer member of an informal foreign policy advisory committee to then-candidate Donald J. Trump's election campaign.  Although a campaign volunteer, Dr. Carter never met or spoke to then-candidate Trump.

### A.      Entity Defendants

19.      Defendant United States of America is sued for Dr. Page's injuries caused by the wrongful acts of its employees acting within the scope or office of their employment.

20.      Defendant Federal Bureau of Investigation is a bureau within the United States Department of Justice with offices at 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535. References to any actions taken by FBI in this Complaint encompass its officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

21.      Defendant United States Department of Justice is an executive agency of the United States with offices at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530, and includes its Office of Inspector General ("DOJ OIG"). References to any actions taken by DOJ or DOJ OIG in this Complaint encompass their officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

### B.      Individual Defendants

22.      The individuals named herein have responsibility and liability for the legal claims identified herein, as set forth above and below. In addition, individuals as yet unidentified or

unknown to Plaintiff are also responsible and liable for the legal claims set forth herein. Because of the clandestine and classified or "law enforcement sensitive" protected nature of the actions taken in pursuit of the Crossfire Hurricane investigation and the FISA warrant applications, and the protection given to the identity of individuals by the DOJ OIG in the Horowitz Report, Plaintiff is as yet unable to identify by name these additional individuals.

23.     Defendant James Comey was the Director of the FBI from September 2013 to May 2017. Defendant verified under penalty of perjury three false FISA warrant affidavits regarding Dr. Page in October 2016, January 2017, and April 2017. He was dismissed by the President of the United States on May 9, 2017. He is sued in his individual capacity.

24.     Defendant Andrew McCabe was the Deputy Director of the FBI from February 2016 to January 2018. He was an original and primary participant in the Crossfire Hurricane investigation. Defendant McCabe was the FBI's lead signatory of the final FISA renewal affidavit against Dr. Page in June 2017. He is sued in his individual capacity.

25.     Defendant Kevin Clinesmith was an Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel from July 2015 to September 2019.  In August 2020, Mr. Clinesmith "pleaded guilty . . . in the U.S. District Court for the District of Columbia to a false statement offense based on intentionally altering an email in connection with the submission of the FISA renewal application against Dr. Page." (DOJ Press Release, Aug. 19, 2020).  See Information, *U.S.A. v. Clinesmith*, No. 20-cr-00165-JEB (D.D.C. Aug. 14, 2020).  He is sued in his individual capacity.

26.     Defendant Peter Strzok was a career FBI agent until August 2018 and served as Deputy Assistant Director of Counterintelligence.  He supervised the investigation of Dr. Page until approximately January 2017.  He is sued in his individual capacity.

27.     Defendant Lisa Page is a former lawyer at the FBI.  She is sued in her individual capacity.

28.     Joe Pientka III, during the relevant period, served as a Supervisory Special Agent of a Foreign Counterintelligence Squad at the FBI's Washington Field Office.  He is sued in his individual capacity.

29.     Stephen Somma, a.k.a. "Steve Holt," is an FBI agent. (He originally presented himself as "Steve Holt" to Dr. Page during a series of meetings in March 2017.) According to the DOJ OIG, Mr. Somma is "primarily responsible for some of the most significant errors and omissions in the FISA applications" against Dr. Page."  He is sued in his individual capacity.

30.     Brian J. Auten was an FBI Supervisory Intelligence Analyst.  He is sued in his individual capacity.

31.     John Does #1 – 10, individuals whose identities or specific involvement in the conduct alleged in this Complaint may not yet be known to the Plaintiff, are sued in their respective individual capacities.

32.     Jane Does #1 – 10, individuals whose identities or specific involvement in the conduct alleged in this Complaint may not yet be known to the Plaintiff, are sued in their respective individual capacities.


III.     **JURISDICTION AND VENUE**

33.     This Court has original subject matter jurisdiction over Dr. Page's federal claims under 28 U.S.C. §§ 1331 and 1346(b)(1) because they arise under federal law and because the United States is a defendant.

34.     This Court has personal jurisdiction over the individual defendants who reside outside the District of Columbia, pursuant to D.C. Code § 13-423(a)(3), as Plaintiff's claims for relief arise from their acts, directly or by an agent, causing tortious injury in the District of Columbia by an act or omission in the District of Columbia.

35.     This Court has personal jurisdiction over the federal government defendants pursuant to 18 U.S.C. § 2712, 28 U.S.C. § 2674, 5 U.S.C. § 552a(g)(1)(D), and 5 U.S.C. § 552a(4)(B).

36.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because this is where a substantial part of the events or omissions giving rise to the claims occurred and this is where the government entities are located.

## IV.     THE FISA APPLICATIONS AND WARRANTS

### A.     The FISA Warrants Were Unlawful - Admissions and Rulings

37.     The four FISA warrants to surveil Dr. Page were obtained unlawfully because there was not probable cause to seek them.   The warrants were issued only because of the FBI's omissions and misrepresentations to the FISC.

38.     The December 2019 report entitled *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* issued by the DOJ OIG ("Horowitz Report"), the analysis from the Senate Select Committee on Intelligence, findings in Special Counsel Mueller's Report, and rulings of the FISC establish that there is not and never was any evidence that Dr. Page acted in concert with Russia or its agents—because he did not—and that the four FISA warrants to surveil him were unlawful.

39.     The Horowitz Report established numerous material failures by the FBI to follow the Woods Procedures and other DOJ and FBI policies. Among other things, the FBI failed to verify the accuracy of information included in the warrant applications. In many instances, the FBI either had no supporting documentation, misrepresented what the supporting documentation stated, or the supporting documentation showed that the factual assertion made in the application was incorrect. In total, the Horowitz Report found 17 distinct, significant errors and omissions in the FISA Warrant applications submitted regarding Dr. Page.

40.     Since not a single proven fact ever established complicity with Russia involving Dr. Page, there never was probable cause to seek or obtain the FISA Warrants targeting him on this basis.  The DOJ now assesses, and has formally admitted to the FISC, that with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

41.     In this vein, two Deputy Attorney Generals, Sally Yates and Rod Rosenstein, who signed and approved FISA warrant applications regarding Dr. Page, have testified they would not have signed the applications had they known of the misrepresentations and omissions at the time they signed the applications.

42.     Further, the DOJ has admitted in letters submitted to the FISC, under FISC Rule 13(a), that there were material omissions and misstatements in the FISA warrants applications. These letters include but are not limited to, the following:  *Preliminary Supplemental Rule 13(a) letter regarding applications submitted to the Court targeting Carter W Page in Docket Numbers 2016-1182, 2017-0052, 2017-0375, and 2017-0679* (Oct. 25, 2019); *Supplemental Rule 13(a) letter regarding applications submitted to the Court targeting Carter W. Page in Docket Numbers 2016-1182, 2017-0052, 2017-0375, and 2017-0679* (Nov. 27, 2019); *Additional Rule 13(a) letter*

*regarding applications submitted to the Court targeting Carter W. Page in Docket Numbers 2016-1182, 2017-0052, 2017-0375, and 2017-0679* (Dec. 9, 2019).

43.     In addition, the FISC has issued several rulings, (authored by the former FISC chief, the Honorable Rosemary M. Collyer, and the current FISC Chief, the Honorable James E. Boasberg), finding that the warrants to surveil Dr. Page contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully obtained.

44.     For example, by order dated December 17, 2019 at page 3, the FISC stated: "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable."

45.     And, by Order of Jan. 7, 2020 Regarding Handling and Disposition of Information, the FISC states: "The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations in Docket Numbers 17-375 and 17-679 were not valid. The government apparently does not take a position on the validity of the authorizations in Docket Numbers 16-1182 and 17-52, but intends to sequester information acquired pursuant to those dockets in the same manner as information acquired pursuant to the subsequent dockets."

46.     In an order dated March 5, 2020, the FISC said: "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Dr. Page]." The FISC then said: "The frequency and seriousness of these errors in a case that, given its sensitive nature, had an unusually high level of review at both DOJ and the Federal

Bureau of Investigation have called into question the reliability of the information proffered in other FBI applications."

47.      Further, in an order dated June 25, 2020 (declassified on September 11, 2020), the FISC said: "The government acknowledges that there were material omissions, and the Court has found violations of the government's duty of candor, in all four applications [regarding Dr. Page]." In analyzing what lawful use may now be made of the results of the surveillance of Dr. Page (such as Dr. Page using them as proof in a lawsuit against the government) the FISC observed: "[50 U.S.C.] §§ 1809(a)(2) and 1827(a)(2) specifically address the circumstances of this case, *where we already know that information was obtained through unlawful surveillance and search*, . . ." (emphasis added).

48.      While the DOJ admitted to the FISC that the third and fourth FISA warrants were not valid, neither was it prepared to defend the first and second warrants.  As the FISC noted in its order of June 25, 2020:

> As noted above, the government admits that at least the third and fourth Page applications lacked adequate factual support. See Dec. 9, 2019, Letter at 2, 19. It further admits that "the restrictions on use or disclosure in Sections 1809 and 1827 apply at least" to information acquired under color of the third and fourth dockets, without addressing whether they apply to information acquired under color of the first two dockets. See Feb. 5, 2020, Resp. at 28. In fact, in response to the Court's directive to explain why retaining the Page FISA information "in the manner intended by the government, and any contemplated use or disclosure of it," comport with §§ 1809(a)(2) and 1827(a)(2), Jan. 7, 2020, Order at 2, the government declined to argue, even alternatively, that those provisions do not apply (or apply differently) to information obtained under the first two dockets. See Feb. 5, 2020, Resp. at 28-29. Under the circumstances, the Court will assume that §§ 1809(a)(2) and 1827(a)(2) apply to information acquired under color of the first and second dockets just as, per the government's admission, they apply to information acquired under color of the third and fourth.

**B.**     **The FISA Warrants Were Unlawful - Federal Laws and Procedures Violated**

49.     To obtain these unlawful warrants, the Defendants, known and unknown, violated numerous laws, rules, regulations, policies, and procedures.

50.     To surveil an American citizen, the FISA requires that there be probable cause establishing two elements. First, that the person is acting on behalf of a foreign power. And second, that the American citizen is engaged, in their capacity as a foreign agent, in one of five specified activities: current or future criminal conduct, sabotage, terrorism, using a false identity, or abetting someone engaged these activities. (50 USC 1801(b)(2)).

51.     Moreover, the FISA requires that certain information be represented to the FISC to obtain an initial warrant and to obtain a renewal of a warrant. (50 USC §§ 1804; 1805.)

52.     The Defendants, known and unknown, failed in numerous and material ways to comply with the requirements of the FISA, made misstatements and misrepresentations, and omitted relevant and necessary information in seeking the FISA warrants against Dr. Page.

53.     The FISC also has a set of rules governing the presentation of warrant applications to it. Significantly, one of these rules, Rule 13a, requires the government to *immediately correct* any misstatement or omission of material fact in a warrant application.

54.     FISC Rule 13 provides:

> **Correction of Material Facts**. If the government discovers that a submission to the Court contained a misstatement or omission of material fact, the government, in writing, must immediately inform the Judge to whom the submission was made of:
> (1) the misstatement or omission;
> (2) any necessary correction;
> (3) the facts and circumstances relevant to the misstatement or omission;
> (4) any modifications the government has made or proposes to make in how it will implement any authority or approval granted by the Court; and
> (5) how the government proposes to dispose of or treat any information obtained as a result of the misstatement or omission.

55. Defendants, known and unknown, did not comply with the FISC rules, made misstatements and misrepresentations, and omitted relevant and necessary information in seeking the FISA warrants against Dr. Page.

56. In addition, Defendants, known and unknown, were required to follow the FBI's own policies and procedures for conducting investigations (criminal and counterintelligence), but failed to do so in numerous and material ways in the investigation of Dr. Page.

57. Defendants, known and unknown, were required to comply with the "Woods Procedures," dated April 5, 2001 (as amended), which are a set of procedures designed to ensure the accuracy of the factual assertions in an application for a FISA Warrant.   Each warrant application submitted with respect to Dr. Page included a certification to the FISC that "The FBI has reviewed this verified application for accuracy in accordance with its April 5, 2001 procedures …."  But Defendants, known and unknown, failed in numerous and material ways to comply with the Woods Procedures, as explained in the Horowitz Report and DOJ letters and filings to the FISC.

58. As a result of their failure to follow these laws, rules, regulations, policies and procedures, and as a result of the way they conducted these investigations, and the way they misrepresented, misstated and omitted information, Defendants, known and unknown, violated Dr. Page's right under the Fourth Amendment to the U.S. Constitution to be free of unreasonable searches and seizures.

## V.     THE FOUR FISA WARRANTS

This complaint discusses some, but not all, of the material misrepresentations and omissions infecting each of the FISA Warrants.

### A.     The First FISA Warrant

59.     On or about August 17, 2016, the CIA delivered materials to "certain members" of the Crossfire Hurricane team documenting that Carter Page was an "operational contact."

60.     On September 7, 2016, the CIA sent an investigation referral to FBI Director James Comey and Deputy Assistant Director of Counterintelligence Strzok regarding "U.S. Presidential candidate Hillary Clinton's approval of a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server."

61.     In August 2016, then-Associate Attorney General Bruce Ohr, whose wife worked for political opposition research firm Fusion GPS, briefed Steele's accusations regarding Dr. Page to Andrew McCabe and his counsel, Lisa Page.

62.     On or about September 19, 2016, Steele gave six reports to the FBI, with two of these reports mentioning Dr. Page by name. These reports alleged improper or unlawful communications or activities between Dr. Page and two sanctioned Russians with close ties to Russian President Vladimir Putin.  Michael Gaeta, the FBI Agent assigned to "handle" Steele as a CHS, said that it was "obvious" Steele's work was "politically motivated."

63.     The FBI did not conduct any meaningful investigation of Steele's allegation- that there was a "well-developed conspiracy of cooperation between the Trump Campaign and Russia," utilizing Dr. Page as an intermediary.

64.     Pursuant to the terms of his CHS agreement with the FBI, Steele was prohibited from talking to the media about the allegations in the Steele Reports. A September 23, 2016 YAHOO! NEWS article alleged that meetings had occurred between Dr. Page and two sanctioned Russian individuals according to a "well-placed Western Intelligence source." Yet the FBI did not ask Steele if he was the source referenced in this article.  Instead, the FBI cited the Yahoo! News article in the warrant application as independent corroboration of the allegations in the Steele reports.

65.     Furthermore, on September 25, 2016, Dr. Page sent Defendant Comey a letter denying communications with any sanctioned Russian officials.  Dr. Page stated in the letter that he had a decades' long record of interactions with the CIA and FBI.  This was consistent with the prior CIA reports provided to the FBI involving Dr. Page, which established that he had such a record. Comey received this letter and distributed it to the Crossfire Hurricane team, including its supervisor Peter Strzok.

66.     In addition, CHS Steele was also found to be offering his "Dossier" to the State Department, conduct that was against FBI protocol, which required Steele to deal with his FBI Handling Agent solely.

67.     Kathleen Kavalec, then the Deputy Assistant Secretary of State, met with Steele on October 11, 2016, and forwarded her notes of the meeting to the FBI. During the meeting, Steele admitted he was encouraged by his client to get his research out before the 2016 election, signaling a political motivation. Kavalec's notes also show she found flaws with Steele's allegations and cast doubt on his credibility.

68.     On or about September 29, 2016, FBI agent Stephen Somma provided "incomplete, inaccurate, and in certain respects contrary [information] to the information the [CIA] provided to

the Crossfire Hurricane team" when an DOJ Office of Intelligence (OI) attorney asked whether Dr. Page had been a "source" for the CIA. The FBI then knew that Dr. Page had been a CIA "operational contact" from 2008-2013, which was the time period relevant to the Crossfire Hurricane investigation and the FISA Warrants.

69.    Other witness interviews conducted by the FBI were wholly inconsistent with the allegations against Dr. Page in the two documents Steele provided, but the FBI purposefully withheld this information from the DOJ.

70.    In monitored communications between Dr. Page and another CHS (Stefan Halper), Dr. Page repeatedly denied that he had any involvement with Russia on behalf of the Trump campaign before, during, and after his affiliation with the Trump campaign. This relevant and exculpatory information was never disclosed by the FBI to DOJ attorneys.

71.    Similarly, statements made by George Papadopoulos in FBI-monitored conversations with a CHS that took place in September and October 2016, denied that anyone involved in the Trump Campaign was coordinating with Russia. This exculpatory information was not disclosed in the First FISA Warrant application.

72.    According to a document circulated among FBI Crossfire Hurricane team members and supervisors in early October 2016, Igor Danchenko – CHS Steele's Primary Sub-Source for the allegations against Dr. Page -- had historical contact with persons and entities suspected of being linked to Russian Intelligence. Yet the FBI did not follow up by interviewing Danchenko before proceeding to seek the First FISA Warrant against Dr. Page. Nor did the FBI disclose its failure to verify the information provided by Steele in its application for the First FISA Warrant in October 2016.

73.     On October 7, 2016, DOJ attorney Stuart Evans asked the FBI whether Steele was affiliated with a political campaign.  On October 10, 2016, FBI agent Stephen Somma provided an answer that was only partially responsive.  On October 11, Evans learned that Steele had been performing political opposition research and expressed concerns about Steele's reliability due to his political bias and its impact on information provided to the FBI.  On October 12, Peter Strzok and other FBI personnel briefed Comey and McCabe about Evans' concerns.  The FBI brushed aside those concerns and pressed the DOJ to proceed with the warrant application.

74.     DOJ then held up the warrant application because of concerns that Steele's bias may need to be disclosed to the FISC.  Ultimately a footnote was added to the application which stated that:

> Source #1 [Steele], who now owns a foreign business/financial intelligence firm, was approached by an identified U.S. person, who indicated to Source #1 that a U.S.-based law firm had hired the identified U.S. person to conduct research regarding Candidate #1's ties to Russia (the identified U.S. person and Source #1 have a long-standing business relationship). The identified U.S. person hired Source #1 to conduct this research. The identified U.S. person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. person was likely looking for information that could be used to discredit Candidate #1's campaign.

75.     This misleading footnote ignores the fact that Steele was being paid with Democratic National Committee funds, which its law firm, Perkins Coie, funneled to CHS Steele through the political opposition research firm Fusion GPS.  The FBI knew that fully and accurately disclosing the motivations behind Steele's critical allegations on which it was relying would undermine any finding of probable cause and would prevent it from obtaining a warrant.

76.     The First FISA Warrant application was submitted to the FISC on October 21, 2016.  It asserted that "the FBI has learned that Page met with at least two Russian officials during [a trip to Russia in July 2016]," relying on CHS Steele's allegations.  But it did not fully disclose

Steele's bias and motives.  Nor did it disclose the information provided by the CIA to the FBI, either that Dr. Page had been an operational contact for many years, or the cautionary warning about politically motivated false reports alleging connections between Russian individuals and U.S. citizens.

77.     Neither the First FISA Warrant application nor any of the subsequent renewal applications disclosed or referenced any role that the Democratic National Committee or any party/campaign had in funding the efforts by Steele, even though those efforts were known to senior DOJ and FBI officials.

78.      The application for the First FISA Warrant also falsely represented that "The FBI has reviewed this verified application for accuracy in accordance with its April 5, 2001 procedures [the Woods Procedures], which include sending a copy of the draft to the appropriate field office(s)."

79.     There was insufficient evidence to support issuance of a warrant against Dr. Page when the application for the First FISA Warrant was submitted to the FISC.

80.     The application for the First FISA warrant was false and misleading.

81.     If the application for the First FISA warrant had not been false and misleading, the warrant would not have been issued by the FISC.

### B.     The Second FISA Warrant

82.     On October 31, 2016, an article appeared in Mother Jones titled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump." The sub-headline asked, "Has the bureau investigated this material?"  FBI Agent Michael Gaeta, who was the assigned "handler" for CHS Steele, was convinced Steele was the source for the article and confronted him about it. Steele admitted he was behind the Mother Jones story.

83.     Agent Gaeta's reaction to CHS Steele's behavior was surprise and disbelief. Gaeta thought that Steele's actions and attitude were not just "crazy source-related stuff," but "one of the craziest" he had seen in two decades of handling sources.

84.     On or about November 1, 2016, Agent Gaeta advised Steele that he must cease collecting information for the FBI, and it was unlikely that the FBI would continue a relationship with him because of this serious violation of the CHS protocols.

85.     Agent Gaeta reported Steele's misbehavior to FBI supervisors, including William Priestap, and on November 17, 2016, the FBI officially closed Steele as a source for cause.

86.     In November 2016, Priestap and Peter Strzok went to London to assess Steele's credibility by gathering the opinions of persons who previously had professional contacts with Steele. They found some who described Steele as "smart" and a "person of integrity." But several lamented Steele's "poor judgment" or "lack of judgment" and his habit of "pursuing people [with] political risk but no intel value."

87.     On November 21, 2016, DOJ official Bruce Ohr met with Lisa Page, Peter Strzok, Joe Pientka, and other FBI officials to discuss "Steele's background and reliability as a source and to identify his source network."  Ohr advised them that Steele "was desperate that Donald Trump not get elected and was passionate about him not becoming the U.S. president."  He also said that Steele had been hired by "a lawyer who does opposition research" and the information about Trump and Russia was being relayed to Hillary Clinton's presidential campaign.

88.     Thereafter, Ohr communicated with the FBI on 13 separate occasions in a successful effort to provide information he received from former CHS Steele, as well as information received from Glenn Simpson of Fusion GPS, and also a thumb drive of opposition research created by Ohr's wife, who was a Fusion GPS employee. In essence, Ohr became a go-

between by which the FBI maintained ongoing contact with former CHS Steele and continued to rely on his allegations notwithstanding that Steele had been fired and supposedly terminated as a source of reliable information.

89.     Another back-channel by which the FBI continued to gather new "reporting" by Steele was David Corn, the Mother Jones reporter who had written the article about Steele's accusations. Corn was a longtime friend of then-FBI General Counsel James Baker.  Corn gave Steele memos to Baker and then Baker passed them on to Priestap.

90.     An FBI liaison informed the Crossfire Hurricane team (at a minimum Agents Joe Pientka and Stephen Somma) in late November 2016 that Deputy Assistant Secretary of State Kavalec had met with Steele, she had taken notes of their meeting, the liaison could obtain information from Kavalec about the meeting, and, according to Kavalec, the information from Steele's reporting about a Russian consulate being located in Miami was inaccurate. But the FBI liaison received no directives from the Crossfire Hurricane team to gather information from Kavalec regarding *her* contact with Steele. The FBI did continue to receive information from Steele even though he had been terminated as a CHS source - for cause.

91.     In December 2016, the FBI learned that Steele's primary sub-source was "Igor Danchenko," who had been the subject of an investigation by the FBI in 2009-2010 as a "National Security Threat" and possible Russian spy.  In 2010 the FBI had initiated a request for FISA surveillance of Danchenko but withdrew the request after Danchenko left the United States.  The FBI was to consider reopening the investigation if Danchenko ever returned to the United States. In addition, in late December 2016, Mr. Ohr told the FBI that he had met with Glenn Simpson of Fusion GPS and that Simpson had assessed that Igor Danchenko was a Russian intelligence officer who was central in connecting Trump to Russia.

92.     The application for the Second FISA Warrant was submitted to the FISC on January 12, 2017.  It asserted that its relationship with Steele had been "suspended" (not terminated) because of his unauthorized disclosure of information to the press.  Nonetheless, the FBI assessed that Steele's information was still reliable because previous information he had reported to the FBI had been verified and used in criminal proceedings.  This was not true.

93.     The FBI also failed to include relevant information provided to the FBI in November and December 2016 related to Steele's motivations and reliability, which undermined his credibility and the trustworthiness of the information he provided.

94.     Nor did the application disclose the evidence that Danchenko, the ultimate source of the allegations against Dr. Page, might well be a Russian intelligence officer.

95.      Notably, the application did not outline any foreign intelligence information that had been gathered during the first three months.  Instead, the application contained the misleading conclusory statement that the requested warrant would "continue to produce foreign intelligence information."

96.     On information and belief, the initial three months of FISA surveillance of Dr. Page had produced no foreign intelligence information and revealed no evidence at all of Dr. Page acting as a foreign agent of Russia.

97.     There was insufficient evidence to support issuance of a warrant against Dr. Page when the application for the Second FISA Warrant was submitted to the FISC.

98.     The application for the Second FISA Warrant was false and misleading.

99.     If the application for the Second for the FISA Warrant had not been false and misleading, the warrant would not have been issued by the FISC.

C.       **The Third FISA Warrant**

100.     The Department of Justice has conceded to the FISC that there was insufficient evidence to support a finding of probable cause when it sought the Third FISA Warrant.

101.     The FBI interviewed Igor Danchenko over the course of three days, from January 24-26, 2017.  Danchenko gave the FBI information that contradicted or undermined the allegations about Dr. Page that Steele attributed to him. He said Steele's reporting was "misstated or exaggerated," and some of Danchenko's information was based on "rumor and speculation"; Danchenko "never expected Steele to put [Danchenko's] statements in reports or present them as facts"; Danchenko "made it clear to Steele that he/she had no proof to support the statements from [his] sub-sources and that 'it was just talk'"; Danchenko's information was "word of mouth and hearsay"; "conversations that [he] had with friends over beers"; statements made in '"jest."

102.     These inconsistencies were not disclosed to the FISC in the application for the Third FISA Warrant.  Rather, the application stated that Danchenko had been interviewed and found to be "truthful and cooperative."  This was deliberately misleading because it invoked Danchenko's apparent credibility to buttress the allegations attributed to him in the two previous applications when, in fact, the information he provided undercut those allegations.

103.     In March 2017, two FBI agents conducted an "ambush interview" of Dr. Page, who spoke freely with them, without the benefit of counsel.  These two agents subsequently interviewed Dr. Page four additional times during March 2017. These interviews lasted a total of approximately ten hours. Dr. Page was candid and cooperative with the agents, and his answers undermined any contention that he was acting as an agent of a foreign power. An attorney advising Dr. Page then spoke to FBI attorney (and now defendant) Kevin Clinesmith about the FBI's interest in Dr. Page. Clinesmith was (unbeknownst to Dr. Page) assigned to provide support to FBI personnel working

25

on Crossfire Hurricane. One topic they discussed was Evgeny Buryakov, a Russian spy who had posed as a New York banker. Dr. Page had cooperated with the FBI's investigation of Buryakov, who was convicted and sentenced to prison. Buryakov had just completed his sentence and was about to be deported to Russia. Further, Dr. Page's role as an FBI informant against the Russians in that case had recently been publicly revealed which meant that Dr. Page was certain to be contacted by the media for comment. Media reports of Dr. Page's comments would highlight that Dr. Page was a loyal American and not a Russian agent.  Clinesmith told Dr. Page's attorney that he would prefer Dr. Page not comment or else hold off comment. Several days later, on April 7, 2017, the application for the Third FISA Warrant was submitted.

104.    The FBI again asserted that the requested warrant would "continue to produce foreign intelligence information" although the prior six months of FISA surveillance of Dr. Page had  revealed no evidence at all of Dr. Page acting as a foreign agent of Russia.

105.    There was insufficient evidence to support issuance of a warrant against Dr. Page when the application for the Third FISA Warrant was submitted to the FISC.

106.    The application for the Third FISA Warrant was false and misleading.

107.    If the application for the Third FISA Warrant had not been false and misleading, the warrant would not have been issued by the FISC.

**D.**    **The Fourth FISA Warrant**

108.    The Department of Justice has conceded to the FISC that there was insufficient evidence to support a finding of probable cause when it sought the Fourth FISA Warrant.

109.    The previous three FISA Warrant applications had concealed the fact that Dr. Page had been a CIA "operational contact."

110.    Prior to the submission of the application for the Fourth FISA Warrant, Dr. Page had publicly stated that he had assisted the U.S. government in the past. During the preparation of the application, an FBI Supervisory Special Agent ("SSA") who would be the affiant for the application, asked Clinesmith to inquire of the CIA whether Dr. Page had ever been a source (operational contact) for the CIA.

111.    Clinesmith knew that *if* Dr. Page had been a source for the CIA, that information must be disclosed to the FISC.  However, disclosing this exculpatory fact now would expose the material omission of this same information from the prior three FISA Warrants. On June 15, 2017, Clinesmith sent a disingenuous email to a CIA liaison inquiring whether Dr. Page had ever been a source for the CIA, and the CIA liaison responded by email that Dr. Page had been a CIA source. The CIA liaison directed Clinesmith's attention to the August 17, 2016 memorandum and supporting materials that CIA had previously provided to the FBI.

112.    On June 19, 2017, in response to further inquiry from the SSA who was designated to sign the Fourth FISA Warrant on behalf of the FBI, Clinesmith falsely advised the SSA that Dr. Page had been a "sub source" but was "never a source" for the CIA.  The SSA asked whether the FBI had this representation in writing and Clinesmith falsely stated that it did and that he would forward the document to the SSA. To conceal the exculpatory fact that Dr. Page had been a CIA source, and the omission of that fact from the prior three FISA Warrant applications, Clinesmith altered the email from the CIA liaison to falsely state that Dr. Page was "not a source" for the CIA.

113.    In reliance on the email altered by Clinesmith, the SSA designated to sign the Fourth FISA Warrant application did so.

114.    On June 29, 2017, the application for the Fourth FISA Warrant was submitted to the FISC.

115.    The application for the Fourth FISA Warrant, like the three preceding applications, did not advise the FISC that Dr. Page had been an operational contact for the CIA, although the FBI Crossfire Hurricane team had this information in its possession since August 2016.

116.    The application for the Fourth FISA Warrant again stated that Steele's primary sub-source, Danchenko, had been interviewed and found to be "truthful and cooperative."  This was deliberately misleading because it invoked Danchenko's apparent credibility to buttress the allegations attributed to him in the three previous applications when, in fact, the information he provided undercut those allegations.

117.    The FBI again asserted that the requested warrant would "continue to produce foreign intelligence information" although the prior nine months of FISA surveillance of Dr. Page had  revealed no evidence at all of Dr. Page acting as a foreign agent of Russia.

118.    There was insufficient evidence to support issuance of a warrant against Dr. Page when the application for the Fourth FISA Warrant was submitted to the FISC.

119.    The application for the Fourth FISA Warrant was false and misleading.

120.    If the application for the Fourth FISA Warrant had not been false and misleading, the warrant would not have been issued by the FISC.

121.    Having unlawfully obtained the four warrants to surveil Dr. Page, the individual Defendants and other FBI personnel, both known and unknown to Dr. Page, used the warrants to engage in surveillance of him in the manner and for the time periods prescribed in the four warrants.

122.    Pursuant to each of the FISA warrants and all of them collectively, Defendants, known and unknown to Dr. Page, obtained Dr. Page's electronic communications, both written and oral, in the manner and for the time periods prescribed in the four warrants.

123.    Having obtained communications pursuant to each of the four FISA Warrants, the Defendants, both known and unknown, thereafter used and disclosed those communications, to among other things, obtain the subsequent FISA Warrants, unlawfully pursue investigative ends, and for unlawful leaks to the media and others.

## VI.    INDIVIDUAL DEFENDANTS' ACTIONS, OMISSIONS AND MISREPRESENTATIONS

### A.    James Comey

124.    On or about August 17, 2016, FBI Director Comey received information from the CIA establishing that Dr. Page was an "operational contact" for the CIA during the period of 2008-2013.  This information was consistent with the FBI's records from briefing Dr. Page about his reporting to the CIA on an ongoing basis.

125.    On or about September 7, 2016, a senior CIA official forwarded an investigative referral to Comey and Peter Strzok about a potential plan to divert attention from presidential candidate Hillary Clinton's alleged mis-use of a private email server when she was Secretary of State by alleging the existence of collaboration between the Trump campaign and Russian hackers to interfere in the election.

126.    Dr. Page subsequently wrote to Comey on September 25, 2016 denying that he participated in any collaboration with Russians on behalf of the Trump campaign. He also referred to his long-term interactions with the CIA and FBI.

127.    Dr. Page's letter to Comey was received and shared with the Crossfire Hurricane team. "At a minimum, the letter provides us a pretext to interview," Peter Strzok wrote to Lisa Page on Sept. 26, 2016.

128.    Comey approved the FBI's monitoring and surveillance of Dr. Page by CHS Stefan Halper and, on information and belief, was advised about the results of the conversation in which Dr. Page refuted the allegations that he was an agent of Russia.

129.    Despite the foregoing, the FBI did not interview Dr. Page before applying for the First FISA Warrant. And the application did not advise the FISC that Dr. Page had been a source for the CIA.

130.    Nonetheless, Comey signed the first three FISA Warrant applications to surveil Dr. Page. Comey signed the application for the First FISA Warrant that was submitted to the FISC on October 21, 2016. He signed the application for the Second FISA Warrant that was submitted on January 12, 2017.  In that same month, Comey described the information from CHS Steele — which was relied on by the FBI for the 'probable cause" required in order to obtain the FISA Warrants—as "unverified" in a conversation with President Trump.  On or about April 7, 2017, Comey signed the application for the Third FISA Warrant. Comey's endorsement of these applications falsely assured the FISC that the Woods Procedures had been followed.

**B.    Andrew McCabe**

131.    McCabe served as the deputy director of the FBI under Comey and was involved in decisions to surveil Dr. Page from early in the Crossfire Hurricane investigation.

132.    In August 2016, then-Associate Attorney General Bruce Ohr briefed McCabe about Steele's accusations regarding Dr. Page. On or about August 25, 2016, McCabe directed a supervisor working on the Crossfire Hurricane investigation to contact the FBI New York Field Office for information that could assist the Crossfire Hurricane investigation. At that time, agents in the New York Field Office had possession of Steele's reports.

133.    On information and belief, McCabe approved the Crossfire Hurricane team's use of Steele in the investigation. McCabe ignored warnings that more information about Steele's motives was needed before relying on his allegations. Specifically, DOJ Principal Deputy Attorney General Mary McCord told McCabe during a phone call that the FISA application needed more information about who hired Steele.

134.    On October 11, 2016, Strzok messaged Lisa Page that the FISA application to surveil Dr. Page could not gain approval at DOJ without a call from McCabe.

135.    On October 12, 2016, Strzok and others briefed McCabe and Comey about the concerns of DOJ attorney Stuart Evans had about Steele.  Evans wanted more scrutiny of Steele's motives, and believed that before pursuing a surveillance warrant against someone associated with a presidential campaign, leadership of both the FBI and DOJ should explicitly sign off on the request.  McCabe and Comey were "supportive" and approved moving forward with the FISA warrant application without further scrutiny of CHS Steele, from whom the FBI's "probable cause" information was received.

136.    McCabe approved the application for the Second FISA Warrant, including the assertion that the three-month surveillance of Dr. Page, pursuant to the First FISA Warrant, had been "very productive" although the surveillance had yielded no evidence of any coordination between Dr. Page and Russian officials.

137.    McCabe signed the application for the Fourth FISA Warrant.

**C.    Peter Strzok**

138.    Peter Strzok was the FBI Deputy Assistant Director for Counterintelligence and performed a supervisory role for the Crossfire Hurricane investigation.

139.    Strzok was aware that, in August 2016, the CIA had confirmed that Carter Page was an "operational contact" for that agency.

140.    Strzok was a recipient of the September 7, 2016, investigation referral from the CIA regarding "U.S. Presidential candidate Hillary Clinton's approval of a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server."

141.    In October 2016, as the FBI Crossfire Hurricane team was attempting to complete the application for the First FISA Warrant, DOJ attorney Stuart Evans expressed reluctance to proceed with the application.  Evans wanted more scrutiny of Steele's motives, and believed that before pursuing a surveillance warrant against someone associated with a presidential campaign, leadership of both the FBI and DOJ should sign off on the request.  In messages to Lisa Page, he said, "Currently fighting with Stu for this fisa" and "Hey-The FISA will probably not go forward without a call from [McCabe]."

142.    Strzok and the FBI Crossfire Hurricane team assumed the Hillary Clinton campaign or the Democratic Party was paying for Steele's research.

143.    On October 12, 2016, Strzok briefed McCabe and Comey about Evans' concerns and pushed to proceed with the application without further scrutiny of Steele.

144.    Strzok made typewritten annotations to/comments on a February 14, 2017 New York Times article about alleged Russian intelligence ties to the Trump campaign. These comments show that Strzok and others in the FBI were well aware of the issues with the Steele reports that had been revealed by the FBI's January 2017 interview with Steele's primary sub-source, Igor Danchenko.  Strzok commented that "[r]ecent interviews and investigation, however, reveal Steele may not be in a position to judge the reliability of his sub-source network."

145.     The document further shows that the FBI's assertion to the FISC that "the FBI believes that Russia's efforts to influence U.S. policy were likely being coordinated between the RIS [Russian Intelligence Services] and Page, and possibly others" was a knowing misrepresentation. This is evident from comments on the Times article made by Strzok in which he asserted that "[w]e have not seen evidence of any individuals affiliated with the Trump team in contact with IOs [Intelligence Officials] . . . We are unaware of ANY Trump advisors engaging in conversations with Russian intelligence officials.

**D.**     **Brian Auten**

146.     Brian Auten served as a supervisory intelligence analyst in the FBI. He also worked as an adjunct professor and writer on spying ethics.

147.     Auten was assigned to the Crossfire Hurricane investigation from its inception in July 2016 and supervised its analytical efforts throughout 2017. He played a key supportive role for the agents preparing the FISA applications, including reviewing the probable-cause section of the applications and providing the agents with information about Steele's sub-sources noted in the applications. He also helped prepare and review the renewal drafts.

148.     Auten assisted the case agents in providing information on the reliability of Steele and his sources and reviewing for accuracy their information cited in the body of the applications, as well as all the footnotes. His job was also to fill gaps in the FISA applications or bolster weak areas.

149.     Auten falsely enhanced the credibility of Steele. While most of Steele's past reporting as an informant for the FBI had not been corroborated and had never been used in a criminal proceeding, Auten wrote that it had in fact been "corroborated and used in criminal proceedings."

150.     Auten failed to disclose to the FISC negative feedback from British Intelligence Service colleagues of Steele. They told Auten during a visit he made to London in December 2016 that Steele exercised "poor judgment" and pursued as sources "people with political risk but no intel value."

151.     Auten determined that some of the allegations in Steele's reports were inaccurate, such as the allegation that Paul Manafort used Dr. Page as an intermediary. But he did not include this information in any of the applications for the FISA Warrants.

152.     Auten also identified issues with Steele's sub-sources. Auten knew of, and met, with Steele's Primary Sub-source, Igor Danchenko. Auten knew that Danchenko was based in the United States, yet intentionally mispresented or failed to correct the statement in the applications for the Third and Fourth FISA Warrants that Danchenko was Russia-based. While Auten found Danchenko to be truthful and cooperative, he also found that Danchenko contradicted key claims in Steele's reports.  Even though Auten knew Steele was working for the Clinton campaign by early January 2017, he did not seek to include this information in the applications for the Third and Fourth FISA Warrants.

### E.     <u>Kevin Clinesmith</u>

153.     Kevin Clinesmith served with the FBI as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. Clinesmith was responsible for providing legal support to FBI personnel working on Crossfire Hurricane. He was one of the FBI personnel who communicated with the CIA with respect to the Crossfire Hurricane investigation.

154.    Clinesmith also provided support to FBI personnel working with the National Security Division of the DOJ to prepare FISA applications to obtain authority from the FISC to conduct surveillance on Dr. Page.

155.    On June 15, 2017, Clinesmith sent an email to a CIA liaison inquiring whether Dr. Page was a CIA source in any capacity because the FBI would need to disclose that on the next FISA application.

156.    The CIA liaison responded the same day and included a list of documents that the CIA previously provided to members of the Crossfire Hurricane team that provided the answer and also confirmed that Dr. Page "was or is" a source for the CIA. Clinesmith acknowledged the email, stated he was examining the documents, and thanked the CIA liaison for the information.

157.    The FBI SSA who would be the affiant for the application for the Fourth FISA Warrant followed up with Clinesmith a few days later and asked whether Clinesmith had confirmed if Dr. Page was a CIA source. During a series of instant messages, Clinesmith reported that Dr. Page was a "sub-source" and "was never a source." Clinesmith further stated that the CIA confirmed explicitly that Dr. Page was never a source. The SSA asked if they had that representation in writing and Clinesmith agreed to forward the email from the CIA liaison.

158.    On June 19, 2017, after this instant message exchange, Clinesmith forwarded an altered version of the CIA liaison's email to the SSA. Clinesmith altered the original text of the email to read that Dr. Page was "not a 'source.'"

159.    Clinesmith had expressed dismay at the prospect of having to write a "terrible footnote" apprising the FISC that such a salient fact – that Dr. Page had been a source for the CIA -- was only at this late date being brought to the Court's attention.

160.    Consequently, information about Dr. Page's history or status as a CIA operational contact was not included in the application for the Fourth FISA Warrant.  Clinesmith was subsequently criminally charged on August 14, 2020, with one count of making false statements in violation of 18 U.S.C. § 1001(a)(3) for his actions in misleading the SSA and altering the email regarding Dr. Page's status as an operational contact of the CIA.

### F.    Lisa Page

161.    Lisa Page was an FBI attorney and was Special Counsel to Andrew McCabe.  She facilitated the leaks of information about the FBI's FISA warrants regarding Dr. Page.

### G.    Joe Pientka III

162.    Joe Pientka served as an FBI supervisory special agent on Crossfire Hurricane. He signed an authorization to submit the application for the First FISA Warrant. Pientka was responsible for compliance with the Woods Procedures by confirming the completion of the Woods File for the warrant application, and for double checking the factual accuracy review to confirm that the file contained appropriate documentation for each of the factual assertions in the FISA application. Contrary to Pientka's representation, the Woods File was inaccurate, incomplete, or unsupported by appropriate documentation.

163.    Among other things, Pientka failed to verify and correct the false statement in the application for the First FISA Warrant that Steele's reporting had been corroborated and used in criminal proceedings. Pientka also disregarded a requirement in the Woods Procedure to confirm that Steele's Handling Agent, Michael Gaeta, had reviewed and approved the content in the application for the First FISA Warrant.

### H.   **Stephen Somma**

164.    Stephen Somma was an FBI counterintelligence investigator in the New York Field Office and was referred to as "Case Agent 1" in the Horowitz Report. He was one of the original team members of Crossfire Hurricane who had primary responsibility over the investigation of Dr. Page.

165.    He opened the case file on Page, and he first proposed surveillance on Page.  In approximately August 2016, Somma contacted FBI's Office of the General Counsel (OGC) about the possibility of seeking FISA authority targeting Dr. Page to conduct electronic surveillance.

166.    On August 15, 2016, the FBI's OGC told Somma that he needed more to establish probable cause for a FISA warrant targeting Dr. Page.  Thereafter, Somma seized on the allegations about Dr. Page provided by CHS Steele as a basis to obtain a FISA Warrant. Somma was also the FBI handler for Stefan Halper, a longtime confidential human source who was tasked with meeting Page and other associates of the Trump campaign. He failed to disclose exculpatory statements that both Page and George Papadopoulos made to Halper during secretly recorded conversations before the 2016 election. Page told Halper that he had no communications with Paul Manafort and denied the alleged meetings with Sechin and Divyekin (the two sanctioned Russians with close ties to Russian President Vladimir Putin).

167.    Somma also received information from the CIA in August 2016 that Page had a longstanding relationship with that agency. He did not fully and accurately divulge that information to others at the FBI.

168.    When Somma was explicitly asked in late September 2016 by a DOJ attorney assisting on the FISA application about Page's prior relationship with the CIA, Somma did not accurately describe the nature and extent of the information the FBI received from the CIA. Somma

advised the attorney that Dr. Page did meet with a U.S. government agency, but that the interactions took place while Dr. Page was in Moscow (which was between 2004 and 2007) and were "outside scope." Based upon this response, the attorney did not include information about Dr. Page's prior interactions with the CIA in the application for the First FISA Warrant.

169.    In seeking the First FISA Warrant, Somma mischaracterized the extent to which the FBI had previously relied on CHS Steele's prior reporting.  This resulted from his failure to seek review and approval from Steele's handling agent, as the Woods Procedures required.

170.    Somma also sought to hide from DOJ attorneys the political bias that made Steele's reports about Dr. Page suspect.  Stuart Evans asked whether Steele "is affiliated with either campaign and/or has contributed to either campaign." On October 7, 2016, the DOJ Unit Chief this question was emailed to the Crossfire Hurricane team. On October 10, 2016, Somma responded but addressed only the second part of the question, stating that Steele was most likely a foreign national and therefore unable to contribute to either campaign. Because he did not fully address the question, the Unit Chief asked him again, on October 11, 2016, whether Steele was affiliated with and/or had contributed to either presidential campaign. Again, Somma answered only the second part of the question, confirming that Steele had not contributed to any campaign and was not a U.S. person. Evans was frustrated and annoyed by this answer and asked the question a third time.  At that point, the FBI finally responded that they assumed Steele had been paid to develop political opposition research.

171.    Somma's handwritten notes from a December 2016 team meeting reflect that the Crossfire Hurricane team was told that Steele "may have some judgment problems," but this information was never disclosed in subsequent applications to renew the FISA Warrant.

172.    Somma participated in the FBI's January 2017 interview of Igor Danchenko, the Primary Sub-Source in the Steele reports for the allegations about Dr. Page. During this interview, Danchenko gave the FBI information that contradicted assertions made in the initial application for the FISA Warrant. But Somma withheld this development from the FISC in the applications for the Third and Fourth FISA Warrants.

173.    In March 2017, Somma and another FBI agent conducted an "ambush interview" of Dr. Page.  Dr. Page spoke freely to them, without the benefit of counsel. Somma and the second agent subsequently interviewed Dr. Page four additional times during March 2017. These interviews lasted a total of approximately ten hours. Dr. Page was completely honest with the agents, and his answers undermined any contention that he was acting as an agent of a foreign power.

## VII.    CONGRESSIONAL INVESTIGATIONS

174.    After the FISA abuse targeting Dr. Page was exposed, there were various Congressional investigations. Defendants Comey, McCabe, and others were questioned under oath during those investigations and made significant admission that the FISA Warrant application process - which they conducted – was flawed, while nevertheless trying to avoid responsibility for it.

175.    On September 30, 2020, Comey testified before the Senate Judiciary Committee Hearing on the Oversight of the Crossfire Hurricane Investigation, as follows:

**Senator Graham**:

> One last question to you, Director Comey, and I'll turn it over to Senator Lee. Knowing then what you know now about all the things that we've come to find, would you have still signed the warrant application against Carter Page in October, January, and April?

**Comey**:

> No. I would want a much more complete understanding of what we-

. . .

**Comey**:

> My answer was no, not without a much fuller discussion of how they were thinking about their disclosure obligations to the court.

176.    On November 10, 2020, McCabe testified in front of the Senate Judiciary Hearing on the Oversight of the Crossfire Hurricane Investigation, and in his opening statement testified:

> "To me, any material misrepresentation or error in a FISA application is unacceptable. Period. The FBI should be held to the standard of scrupulous accuracy that the court demands. FISA remains one of the most important tools in our country's efforts to protect national security."

177.    Senator Graham questioned McCabe about the FISA warrants:

**Senator Graham**:

> If you knew then what you know now, would you have signed the warrant application in June of 2017 against Carter Page?

**McCabe**:

> No, sir.

178.    Senator Graham further questioned McCabe:

**Senator Graham:**

> Okay. Finally, who is responsible for ruining Mr. Carter Page's life? If it's not you, if not Rosenstein, if it's not Comey, if it's not Sally Yates, who's responsible for putting together the information provided to the FISA court that was completely devoid of the truth, lacking material facts, completely misrepresented what Mr. Page did and how he did it, who we look to for that responsibility?

**McCabe:**

Well, sir, I don't agree with the way that you've characterized the entirety of the-

**Senator Graham:**

That's what the court said.

**McCabe:**

I think as the IG pointed out in the conclusions of their report, that-

**Senator Graham:**

Who's responsible, Mr. McCabe?

**McCabe:**

Everyone who … Every person who played a role-

. . .

**Senator Graham:**

Okay. The question is who's responsible?

**McCabe:**

And I think that we are all responsible for the work that went into that FISA. I am certainly responsible as a person in a leadership position with oversight over these matters. I accept that responsibility fully. I cannot-

**Senator Graham:**

Did you mislead the FISA court?

**McCabe:**

I signed a package that included numerous factual errors or failed to include information that should have been brought to the court.

179.    Senator Cornyn also questioned McCabe

**<u>Senator Cornyn:</u>**

Mr. McCabe, who should be held accountable for the submission of a foreign intelligence surveillance act application that contained a lie about Carter Page with regard to his activities on behalf of another agency of the federal government? And who should be held accountable for relying on the now discredited Steele dossier? I think that's the question people would like an answer to. Who should be held accountable?

**<u>McCabe:</u>**

Senator, I think all of the people involved in this work should be and have been held accountable. I feel like the oversight process that we're engaged in now, the participation and cooperation and the efforts of the inspector general, I think all of these elements of the work that the FBI has done internally to address everything from individuals to processes involved, I think those are all essential steps to ensure that these errors are fixed and that we take appropriate steps not to make them in the future.

180.    Senator Kennedy also questioned McCabe

**<u>Senator Kennedy:</u>**

Thank you, Mr. Chairman. Mr. McCabe, who is responsible for the misbehavior outlined by an Inspector General Horowitz in his report about [sic] Misfire Hurricane?

**<u>McCabe:</u>**

Well, it depends on what you're referring to, Senator. If you're referring to the intentional misconduct committed by Mr. Clinesmith, quite obviously, Mr. Clinesmith's responsible for that. I think from a command perspective, Director Comey and myself and our subordinate leaders are all responsible for the failures in that package that we allowed to go forward

.  .  .

VIII.  **UNLAWFUL DISCLOSURES OF PROTECTED INFORMATION AND FAILURE TO PERMIT REVIEW AND AMENDMENT OF GOVERNMENT RECORDS**

A.  **Unlawful disclosure of FISA and Privacy Act protected records and information**

181.   Defendants, known and unknown to Dr. Page, unlawfully leaked FISA and Privacy Act protected records and information concerning Dr. Page to the media.

182.   Defendants, known and unknown to Dr. Page, possessed this information concerning Dr. Page from the Crossfire Hurricane investigation, the FISA Warrant applications, and the results of the FISA surveillance.

183.   On Monday**,** April 10, 2017, Peter Strzok texted Lisa Page to discuss a "media leak strategy," stating "I had literally just gone to find this phone to tell you I want to talk to you about media leak strategy with DOJ before you go."

184.   On Tuesday**,** April 11, 2017, the Washington Post broke the story about the FISA Warrants targeting Dr. Page, including that a FISA warrant had been issued in 2016 and had been renewed at least once.  The article included the following statements:

    a.  The FBI and the Justice Department obtained the warrant targeting Carter Page's communications after convincing a Foreign Intelligence Surveillance Court judge that there was probable cause to believe Page was acting as an agent of a foreign power, in this case Russia, according to the officials.

    b.  The counterintelligence investigation into Russian efforts to influence U.S. elections began in July, officials have said. The FBI also began investigating Page in July as part of the probe, officials said.

    c.  The government's application for the surveillance order targeting Page included a lengthy declaration that laid out investigators' basis for believing that Page was an agent of the Russian government and knowingly engaged in clandestine intelligence activities on behalf of Moscow, officials said.

    d.  In July, Page traveled to Moscow, where he delivered a speech harshly critical of the United States' policy toward Russia.

    e.   While there, Page allegedly met with Igor Sechin, a Putin confidant and chief executive of the energy company Rosneft, according to a dossier compiled by a former British intelligence officer and cited at a congressional hearing by Rep. Adam B. Schiff (Calif.), the ranking Democrat on the House Intelligence Committee. Officials said some of the information in the dossier has been verified by U.S. intelligence agencies, and some of it hasn't, while other parts are unlikely to ever be proved or disproved.

    f.   Page is the only American to have had his communications directly targeted with a FISA warrant in 2016 as part of the Russia probe, officials said.

185.    On Wednesday**,** April 12, 2017, Peter Strzok texted Lisa Page to warn her that two media articles were coming out about her "namesake" Carter Page and one was worse than the other.

186.    On Saturday, April 22, 2017, Peter Strzok sent another text to Lisa Page stating that the "article is out!"  congratulating her on a job well done, saying "Well done, Page."

187.    That same day the New York Times published a lengthy article entitled "Comey Tried to Shield the F.B.I. From Politics.  Then He Shaped an Election."  Much of this article focused on the investigation of Hillary Clinton's emails but the article then turned to Dr. Page and included the following statements:

    a.   Days after Mr. Comey's news conference, Carter Page, an American businessman, gave a speech in Moscow criticizing American foreign policy. Such a trip would typically be unremarkable, but Mr. Page had previously been under F.B.I. scrutiny years earlier, as he was believed to have been marked for recruitment by Russian spies. And he was now a foreign policy adviser to Mr. Trump.

    b.   In late July, the F.B.I. opened an investigation into possible collusion between members of Mr. Trump's campaign and Russian operatives. Besides Mr. Comey and a small team of agents, officials said, only a dozen or so people at the F.B.I. knew about the investigation. Mr. Strzok, just days removed from the Clinton case, was selected to supervise it.

    c.   In late August, Mr. Comey and his deputies were briefed on a provocative set of documents about purported dealings between shadowy Russian figures and Mr. Trump's campaign. One report, filled with references to secret meetings, spoke ominously of Mr. Trump's "compromising relationship with the Kremlin" and threats of "blackmail."

    d.   The reports came from a former British intelligence agent named Christopher Steele, who was working as a private investigator hired by a firm working for a Trump opponent. He provided the documents to an F.B.I. contact in Europe on the same day as Mr. Comey's news conference about Mrs. Clinton. It took weeks for this information to land with Mr. Strzok and his team.

    e.   Mr. Steele had been a covert agent for MI6 in Moscow, maintained deep ties with Russians and worked with the F.B.I., but his claims were largely unverified. It was increasingly clear at the F.B.I. that Russia was trying to interfere with the election.

188.    On information and belief, Strzok and Lisa Page collaborated to disclose protected information regarding Dr. Page to the media and sought and obtained approval to do so from McCabe.

189.    On information and belief, Defendants, known and unknown to Dr. Page, but including but not limited to, Comey, McCabe, Strzok, and Page, leaked information and records concerning Dr. Page that were protected from disclosure under the FISA and the Privacy Act to media outlets, including the New York Times, the Washington Post, and Yahoo News, among others.

190.    The FISA warrant applications targeting Dr. Page identify him by name. The applications are retrievable by Dr. Page's name in DOJ and FBI record systems.

191.    On information and belief, the results obtained from the FISA Warrants approving surveillance of Dr. Page identify him by name and are retrievable by Dr. Page's name in an FBI records system.

**B.**    **<u>DOJ OIG Investigation</u>**

192.    The DOJ OIG began an investigation into the FBI and DOJ's handling of the FISA Warrants targeting Dr. Page in March 2018.

193.    The Horowitz Report was released on December 9, 2019.

194.    In the Fall of 2019, in advance of its release, the Horowitz Report was provided by the DOJ OIG to various Defendants and others for review and comment.

195.    Dr. Page was not contacted about or afforded an opportunity for review and comment, however, in advance of the report's release.

196.    At that time, it was evident that the release of the Horowitz Report was forthcoming, but no date had been publicly set for its release, and the release could have come at any time.

197.    On September 13, 2019, IG Horowitz wrote to members of Congress to advise them that his office had nearly concluded its work and would be entering the review and comment phase of its investigation.

198.    Both before and immediately upon publication of IG Horowitz's letter, Dr. Page sent emails to DOJ and DOJ OIG seeking his right to review and amend the forthcoming report pursuant to the Privacy Act. Dr. Page sent no fewer than two emails in September asserting his rights, but received no reply to them.

199.    Media reports in early October 2019 began to describe the release of the Horowitz Report as imminent.

200.    Thus, on October 10, 2019, Dr. Page requested the right to view and amend the Horowitz Report pertaining to the FISA warrants to surveil him, citing his rights to do so under the Privacy Act.  He made these requests by email to the DOJ Office of Privacy and Civil Liberties and copied IG Horowitz and Mr. Durham.

201.    DOJ OIG did not respond to Dr. Page's requests of October 10, 2019.

202.    On October 16, 2019, Dr. Page inquired into the status of his requests to view and amend the Horowitz Report. He made this inquiry by email to the DOJ Office of Privacy and Civil

Liberties, and copied IG Horowitz, Mr. Durham, and Peter A. Winn, the Acting Chief Privacy and Civil Liberties Officer of the DOJ.

203.    On October 16, 2019, Mr. Winn replied that they were reviewing Dr. Page's email request. This response did not constitute the "prompt" reply to Dr. Page's request to review and amend records required by the Privacy Act.

204.    On October 21, 2019, Dr. Page wrote a third time to DOJ OIG demanding his right to review and amend the Horowitz Report and advising that he would promptly file suit if he was not afforded these rights. He emailed this demand to Mr. Winn and IG Horowitz and copied the DOJ Office of Privacy and Civil Liberties.

205.    Dr. Page's repeated demands for his rights to review and amend the Horowitz Report constituted exhaustion of his administrative remedies under the Privacy Act and DOJ regulations.

206.    DOJ OIG failed to comply with the Privacy Act and its own regulations regarding administrative remedies in response to Dr. Page's requests.

207.    DOJ OIG never complied with its obligations under the Privacy Act or with Dr. Page's rights under the Privacy Act to review and amend information contained in the Horowitz Report.

208.    On October 21, 2019, Dr. Page filed suit against the DOJ in the U.S. District Court for the District of Columbia for violation of his rights under the Privacy Act under docket no. 1:19-cv-03149.

209.    On November 12, 2019, Dr. Page received a letter from Jonathan Malis, General Counsel for DOJ OIG, in response to his request to view and amend the Horowitz Report. This letter does not address his requests under the Privacy Act, but instead informs Dr. Page that he

would not be contacted for an OIG interview. Dr. Page has had no further communication from DOJ regarding his request to view and amend the Horowitz Report.

210.    The Horowitz Report contains numerous errors that Dr. Page has a right to have amended to reflect accurate information.

211.    On September 11, 2020, Dr. Page filed a stipulation dismissing without prejudice the Privacy Act case, docket no. 1:19-cv-03149, in the U.S. District Court for the District of Columbia.

212.    The Horowitz Report is a record which identifies Dr. Page by name. The report contains many approximately 558 references to Dr. Page and the subject of the report is the unlawful surveillance of Dr. Page by Defendants.

213.    The Horowitz Report is contained in a system of records which is retrievable by personal identifiers and the agency in practice retrieves records from the system this way.


## IX.    DAMAGES TO DR. PAGE

214.    As a result of Defendants' actions, Dr. Page has suffered the following kinds of harm and damages, among others:

   a.  Receiving death and kidnapping threats;

   b.  Inability to travel safely and freely, either domestically or internationally;

   c.  Irreparable damage to his reputation;

   d.  Economic losses, (past, present and future) from the destruction of his ability to continue conducting any kind of business through his own companies, because for example, persons, governments and entities would not contract with him, including banks and other business entities with whom he had previously worked;

e.  Economic losses (past, present and future), from being rendered effectively unemployable;

f.  Economic losses due to previously unnecessary expenses directly caused from having to relocate and travel and other security measures in response to death and kidnapping threats;

g.  Economic losses due to the otherwise unnecessary expenses of responding to government investigations and being involved in litigation, including document preparation, costs, expenses, expert fees, and attorneys' fees, for this and other cases,

h.  Pain and suffering damages – anxiety, stress, etc., for himself, and in response to the effects on close family members of death and kidnapping threats against him.

## X.    PENDING ADMINISTRATIVE CLAIM UNDER THE PATRIOT ACT

215.    Dr. Page also has a claim against the United States under the Patriot Act.  18 USC § 2712.  Dr. Page has submitted that claim to DOJ through the administrative claims process as required by the Act.  If that claim is denied, Dr. Page will move to amend this Complaint to add that cause of action.

**<u>CAUSES OF ACTION</u>**

**FIRST CAUSE OF ACTION
FOREIGN INTELLIGENCE SURVEILLANCE ACT
(OCTOBER 21, 2016 FISA WARRANT – ORIGINAL)
(Against All Individual Defendants)**

216.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-215 above, as if fully set forth herein.

217.    It is a criminal offense to "intentionally . . . (1) engage[ ] in electronic surveillance under color of law except as authorized by" identified statutory provisions, or "(2) disclose[ ] or use[ ] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by FISA or another "express statutory authorization."  50 U.S.C. § 1809(a)(2); 18 U.S.C. § 2.

218.    Surveillance is not authorized when the authorization for it has been obtained by false and misleading statements.  As the Supreme Court stated in *Franks v. Delaware*, "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing." 438 U.S. 154, 164-165 (1978) (internal quotation omitted, alteration and emphasis in original).

219.    The FISA provides that "[a]n aggrieved person . . . who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation."  50 U.S.C. § 1810.

220.    As set forth above, pursuant to the First FISA Warrant issued on October 21, 2016, which was procured on the basis of false and misleading information provided to the FISC, the individual Defendants and others, known and unknown to Dr. Page, engaged in electronic surveillance against Dr. Page that was not lawfully authorized by FISA, and disclosed or used

information obtained by that electronic surveillance knowing or having reason to know that the information was obtained through electronic surveillance not lawfully authorized by FISA, and aided and abetted one another in doing so.

221.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

222.     As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

## SECOND CAUSE OF ACTION
## FOREIGN INTELLIGENCE SURVEILLANCE ACT
## (JANUARY 12th, 2017 FISA WARRANT – FIRST RENEWAL)
## (Against All Individual Defendants)

223.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-222 above, as if fully set forth herein.

224.    As set forth above, pursuant to the Second FISA Warrant issued on January 12, 2017, which was procured on the basis of false and misleading information provided to the FISC, the individual Defendants and others, known and unknown to Dr. Page, engaged in electronic surveillance against Dr. Page that was not lawfully authorized by FISA, and disclosed or used information obtained by that electronic surveillance knowing or having reason to know that the information was obtained through electronic surveillance not lawfully authorized by FISA, and aided and abetted one another in doing so.

225.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

226.    As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

**THIRD CAUSE OF ACTION**
**FOREIGN INTELLIGENCE SURVEILLANCE ACT**
**(APRIL 7th, 2017 FISA WARRANT – SECOND RENEWAL)**
**(Against All Individual Defendants)**

227.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-226 above, as if fully set forth herein.

228.    As set forth above, pursuant to the Third FISA Warrant issued on April 7, 2017, which was procured on the basis of false and misleading information provided to the FISC, the individual Defendants and others, known and unknown to Dr. Page, engaged in electronic surveillance against Dr. Page that was not lawfully authorized by FISA, and disclosed or used information obtained by that electronic surveillance knowing or having reason to know that the information was obtained through electronic surveillance not lawfully authorized by FISA, and aided and abetted one another in doing so.

229.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

230.    As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

### FOURTH CAUSE OF ACTION
### FOREIGN INTELLIGENCE SURVEILLANCE ACT
### (JUNE 29th, 2017 FISA WARRANT – THIRD RENEWAL)
### (Against All Individual Defendants)

231.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-230 above, as if fully set forth herein.

232.    As set forth above, pursuant to the Fourth FISA Warrant issued on June 29th, 2017, which was procured on the basis of false and misleading information provided to the FISC, the individual Defendants and others, known and unknown to Dr. Page, engaged in electronic surveillance against Dr. Page that was not lawfully authorized by FISA, and disclosed or used information obtained by that electronic surveillance knowing or having reason to know that the information was obtained through electronic surveillance not lawfully authorized by FISA, and aided and abetted one another in doing so.

233.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

234.    As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

### FIFTH CAUSE OF ACTION
### FEDERAL TORT CLAIMS ACT
### (Against Defendant United States of America)

235.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-234 above, as if fully set forth herein.

236.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

237.    Plaintiff has exhausted his administrative remedies under 28 U.S.C. § 2675 of the Federal Tort Claims Act as a prerequisite to instituting a claim against the United States for money damages for injury or loss of property or personal injury caused by the negligent or wrongful act or omission of any employee of the United States Government while acting within the scope of his or her office or employment.

238.    By letter dated May 1, 2020, Plaintiff presented his administrative claim to DOJ. By letter dated May 26, 2020, DOJ issued a final denial of the claim.  The May 26, 2020 letter also states that it constitutes DOJ's issuance to Dr. Page of a "right-to-sue" letter.

239.    The individual Defendants, known and unknown to Dr. Page, are investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

240.    The individual Defendants, known and unknown to Dr. Page, committed an abuse of process because they acted with an ulterior motive in using the FISA warrant process to accomplish an end unintended and not permitted by law, to wit, to spy on the Trump presidential campaign by unlawfully invading the privacy of Dr. Page without probable cause.

241.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

242.     As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely branded as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

## SIXTH CAUSE OF ACTION
### *BIVENS* CLAIM
### (Against All Individual Defendants)

243.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-242 above, as if fully set forth herein.

244.    The Fourth Amendment to the United States Constitution "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971).

245.    The individual Defendants knowingly and intentionally, or with reckless disregard for the truth, made or caused to be made false and misleading statements in the applications for the FISA Warrants against Dr. Page, and those false statements were necessary to the finding of probable cause.

246.    Reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could not have believed that probable cause existed for a FISA warrant to issue against Dr. Page.

247.    A Plaintiff is entitled to damages for injuries resulting from a violation of Fourth Amendment rights by federal officers. *See Bivens*, 403 U.S. at 395-96.

248.    The individual Defendants' acts were willful, knowing, deliberate and malicious.

249.    Plaintiff is entitled to damages, including punitive damages, for these violations of Plaintiff's rights under the United States Constitution.

250.    As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to

suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

## SEVENTH CAUSE OF ACTION
## PRIVACY ACT
### (Failure to Amend)
### (Against Defendant Department of Justice)

251.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-250 above, as if fully set forth herein.

252.    The Privacy Act provides that when an agency makes a determination not to amend an individual's record in accordance with his request, or fails to make appropriate review of that request, "the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct" and "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed"  5 U.S.C. § 552a(g)(1)(A), (g)(2).

253.    Dr. Page requested the right to review the Horowitz Report and his corollary right to request the Report be amended upon the identification of errors multiple times in September and October 2019. The agency did not amend the report or conduct a review as required under the Privacy Act.

254.    In addition, under 5 U.S.C. § 552a(d)(3)(A), this Court may order appropriate relief including injunctive relief against any action by an officer of the United States or any agency thereof, or mandamus to compel a federal officer or employee to perform a duty required by the Privacy Act.

255.    Plaintiff in this action is therefore entitled to injunctive relief compelling Defendant DOJ to amend inaccurate records concerning him.

256.     Plaintiff is also entitled to the costs of asserting his rights under the Privacy Act in this and his earlier litigation against the DOJ, including reasonable attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**PRIVACY ACT**
**(Unlawful Disclosures)**
**(Against Defendants Department of Justice and Federal Bureau of Investigation)**

257.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-256 above, as if fully set forth herein.

258.     The Privacy Act provides a civil action when an agency discloses "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(d)(3)(D); 5 U.S.C. § 552a(b).

259.     If the agency acted in an intentional or willful manner in violation of either 5 U.S.C. § 552a(d)(3)(D), the individual is entitled to the sum of "actual damages sustained by the individual as a result of the refusal or failure . . . and the costs of the action together with reasonable attorney fees as determined by the court" 5 U.S.C. § 552a(d)(4).

260.     Defendants' acts were willful, knowing, deliberate and malicious.

261.     Plaintiff is entitled to damages for Defendants' willful violation of Plaintiff's rights under 5 U.S.C. § 552a(d)(3)(D).

262.     As a direct and proximate result of Defendants' actions, Dr. Page suffered harm. He was falsely portrayed as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, and has suffered and will continue to suffer mental and emotional pain for his lifetime, in addition to other pecuniary harms such as costs, fees, attorneys' fees and other losses.

263.     Plaintiff is also entitled to the costs of asserting his rights under the Privacy Act in this and his earlier litigation against Defendant DOJ together with reasonable attorney fees.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.     An award of compensatory and special damages, including liquidated damages, in appropriate amounts to be established at trial and as prescribed by the relevant operative statutes alleged herein, but in no event in an amount less than $75,000,000.00;

2.     An award of punitive damages, as determined by a jury or the Court, as prescribed by the relevant operative statutes alleged herein and for his action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971);

3.     An award of all costs and fees associated with this action and Plaintiff's prior action of 1:19-cv-03149 in the District Court for the District of Columbia;

4.     An award of attorneys' fees, as provided by statute and by common law rights;

5.     Injunctive relief requiring Defendant Department of Justice to amend records as required under the Privacy Act;

6.     Any further injunctive relief as the Court may deem just and proper; and

7.     Any such other and further relief as the Court may deem just and proper.


## <u>JURY DEMAND</u>

Plaintiff demands a jury trial on all claims and issues so triable.

Dated: November 27, 2020                  Respectfully Submitted,

**MCADOO GORDON & ASSOCIATES, P.C.**

By: ___/s/ Leslie McAdoo Gordon
Bar# 456781
1140 19th Street, N.W.
Suite 602
Washington, DC  20036
(202) 293-0534
leslie.mcadoo@mcadoolaw.com

**PIERCE BAINBRIDGE P.C.**

By: ___/s/ John M. Pierce (pro hac vice pending)
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071
Telephone: (213) 262-9333
jpierce@piercebainbridge.com

**MILLER KEFFER & PEDIGO PLLC**

By: ___/s/ K. Lawson Pedigo
Bar ID: TX0186
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone: (214) 696-2050
klpedigo@mkp-law.net

**PARLATORE LAW GROUP, LLP**

By: ___/s/ Timothy C. Parlatore
Bar ID: NY0332
One World Trade Center, Suite 8500
New York, NY 10007
(212) 679-6312
timothy.parlatore@parlatorelawgroup.com

*Attorneys for Plaintiff Carter Page*