## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARTER PAGE,

           Plaintiff,

       v.

JAMES COMEY, ANDREW
MCCABE, KEVIN CLINESMITH,
PETER STRZOK, LISA PAGE, JOE
PIENTKA III, STEPHEN SOMMA,
BRIAN J. AUTEN, DEPARTMENT OF
JUSTICE, FEDERAL BUREAU OF
INVESTIGATION, UNITED STATES
OF AMERICA, JOHN DOES 1-10,
JANE DOES 1-10,

           Defendants.

No. 20-cv-3460 (KBJ)

## KEVIN E. CLINESMITH'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

William Pittard (#482949)
Christopher C. Muha (#987116)
Sarah Fink (#166663)
KAISERDILLON PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
wpittard@kaiserdillon.com
cmuha@kaiserdillon.com
sfink@kaiserdillon.com

*Attorneys for Kevin E. Clinesmith*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.   Statutory and Regulatory Background .................................................................2

    A.   The Foreign Intelligence Surveillance Act ...............................................2

        1.   Congress Authorizes Electronic Surveillance to Acquire Foreign Intelligence Information ..................................................2

        2.   Congress Provides for Civil and Criminal Liability for Certain FISA Violations ..........................................................4

        3.   Congressional Oversight of FISA Activity .................................5

    B.   Other Relevant Statutes ..........................................................................6

II.   The Complaint's Allegations .................................................................................8

        1.   The Initial FISA Application .......................................................9

        2.   The Second FISA Application ...................................................10

        3.   The Third FISA Application ......................................................11

        4.   The Fourth FISA Application ....................................................11

        5.   Causes of Action ......................................................................13

STANDARD OF REVIEW....................................................................................................14

ARGUMENT........................................................................................................................14

I.   The *Bivens* Claim (Count 6) Must Be Dismissed as Untimely and Because It Would Impermissibly Extend *Bivens* To A New Context.................................15

    A.   Page Fails to Plead a Timely *Bivens* Claim..........................................17

        1.   A One-Year Statute of Limitations Governs the *Bivens* Claim.....................18

        2.   The Complaint Fails to Plead a Timely Claim. .............................21

B.      A *Bivens* Claim Should Not Be Extended to This New Context............................23

1.    Page's *Bivens* Claim Arises in a "New Context." .........................................23

2.    Special Factors Counsel Hesitation. ..............................................................25

a.    A *Bivens* Remedy is Incompatible With the Comprehensive
Statutory Scheme That Congress Has Enacted........................................26

a.    National Security and Intelligence Concerns Counsel Hesitation. .........29

C.      Adequate Alternative Remedies Preclude Extension of *Bivens*. ............................32

D.      Even if Page May Pursue the *Bivens* Claim, the Complaint Does Not
Allege Clinesmith's Personal Participation in a Fourth Amendment
Violation. ..................................................................................................................33

II.   The FISA Claims (Counts 1-4) Must Be Dismissed. .........................................................38

A.      Page's FISA Claims Are Untimely. ........................................................................38

B.      The Complaint Does Not Allege That Clinesmith Engaged in Electronic
Surveillance or Used Information Obtained From Such Surveillance. .................39

III.  Clinesmith Is Entitled to Qualified Immunity Because Page Cannot Show a
Violation of Clearly Established Fourth Amendment and FISA Rights. .........................43

CONCLUSION .........................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A & S Council Oil Co., Inc. v. Lader,*
 56 F.3d 234 (D.C. Cir. 1995) .............................................................. 19

*Al-Haramain Islamic Found., Inc. v. Obama,*
 705 F.3d 845 (9th Cir. 2012) ............................................................. 39

*Annappareddy v. Pascale,*
 2021 WL 1603987 (4th Cir. Apr. 26, 2021) ......................................... 25

*Arar v. Ashcroft,*
 585 F.3d 559 (2d Cir. 2009) (en banc) ................................... 26, 30-31

*Ashcroft v. al-Kidd,*
 563 U.S. 731 (2011) ...................................................................... 43-44

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) .............................................................. 14, 16, 33

*Attkisson v. Holder,*
 925 F.3d 606 (4th Cir. 2019) .......................................................24, 28

*Attkisson v. Holder,*
 No. 17-cv-364, 2017 WL 5013230 (E.D. Va. Nov. 1, 2017) .............39, 41

*Banneker Ventures, LLC v. Graham,*
 798 F.3d 1119 (D.C. Cir. 2015) .......................................................... 8

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007) ......................................................................... 14

**Berman v. Crook,*
 293 F. Supp. 3d 48 (D.D.C. 2018) .......................... 20, 21, 22, 34-35, 36

*Berman v. Crook,*
 No. 1:16-cv-2123 (RCL) (D.D.C. Apr. 18, 2017) .................................20

*Berry v. Funk,*
 146 F.3d 1003 (D.C. Cir. 1998) ..........................................................45

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,*
 403 U.S. 388 (1971) .................................................................*passim*

*Broidy Cap. Mgmt. LLC v. Muzin*,
    No. 19-cv-150, 2020 WL 1536350 (D.D.C. Mar. 31, 2020)..............................................41, 42

*Brunoehler v. Tarwater*,
    743 F. App'x 740 (9th Cir. 2018)...........................................................................................28

*Bush v. Lucas*,
    462 U.S. 367 (1983) ...............................................................................................................16

*CAIR Action Network, Inc. v. Gaubatz*,
    891 F. Supp.2d 13 (D.D.C. 2013)..........................................................................................42

*Carlson v. Green*,
    446 U.S. 14 (1980) ...........................................................................................................16, 24

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994) ...............................................................................................................42

*Chappell v. Wallace*,
    462 U.S. 296 (1983) ...............................................................................................................16

*Church of Scientology v. Foley*,
    640 F.2d 1335 (D.C. Cir. .1981)......................................................................................18, 19

*City of Escondido v. Emmons*,
    139 S. Ct. 500 (2019) (per curiam).......................................................................................44

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) ...............................................................................................................29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................................2-3

*Cleveland v. United States*,
    531 U.S. 12 (2000) .................................................................................................................42

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) .................................................................................................................16

*Corsi v. Mueller*,
    422 F. Supp. 3d 51 (D.D.C. 2019)...................................................................................24, 33

*Davis v. Billington*,
    681 F.3d 377 (D.C. Cir. 2012)...............................................................................................28

*Davis v. Passman*,
    442 U.S. 228 (1979) ..........................................................................................................15-16

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,*
    135 F.3d 837 (2d Cir. 1998) ................................................................................42

*District of Columbia v. Wesby,*
    138 S. Ct. 577 (2018) .......................................................................................44

*Doe v. Rumsfeld,*
    683 F.3d 390 (D.C. Cir. 2012)................................................................ 26,  29-30

\*\**Doe v. U.S. Dep't of Justice,*
    753 F.2d 1092 (D.C. Cir. 1985).....................................................................17, 18, 19

*Elkins v. District of Columbia,*
    636 F. Supp. 2d 29 (D.D.C. 2009)...........................................................................37

*Farah v. Weyker,*
    926 F.3d 492 (8th Cir. 2019) ..............................................................................25

\*\**Fazaga v. FBI,*
    965 F.3d 1015 (9th Cir. 2020) ....................................................................*passim*

*FDIC v. Meyer,*
    510 U.S. 471, 114 S. Ct. 996 (1994) ......................................................................16

*Franks v. Delaware,*
    438 U.S. 154 (1978) .........................................................................................44

*Graham Cty. Soil & Water Conservation Dist. v. U.S.* ex rel. *Wilson,*
    545 U.S. 209 (2005) .........................................................................................38

*Greenpeace, Inc. v. Dow Chemical Co.,*
    97 A.3d 1053 (D.C. 2014) .............................................................................20, 38

*Haig* v. *Agee,*
    453 U.S. 280 (1981) .....................................................................................26, 30

*Hampton v. Comey,*
    No. 14-cv-1607 (ABJ), 2016 WL 471277 (D.D.C.. Feb. 8, 2016).......................... 17-18, 20

*Hansen v. Cannon,*
    122 F. App'x 265 (7th Cir. 2004) ..........................................................................33

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) .........................................................................................43

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020)........................................................................16, 17, 25, 32

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012)..............................................................14

*Jefferson v. Harris*,
   170 F. Supp. 3d 194 (D.D.C. 2016)..................................................18, 19

*Kapinski v. City of Albuquerque*,
   964 F.3d 900 (10th Cir. 2020) ...........................................................45

*Kelley v. FBI*,
   67 F. Supp. 3d 240 (D.D.C. 2014)....................................................28, 33

*Lampon-Paz v. Dep't of Justice*,
   No. 16-cv-9071, 2019 WL 2098831 (D.N.J. May 14, 2019) .................................39

*Lane v. District of Columbia*,
   211 F. Supp. 3d 150 (D.D.C.. 2016)......................................................36

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ....................................................26, 30, 31

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ......................................................................42

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*,
   881 F.3d 912 (D.C. Cir. .2018)..........................................................32

\*\**Loumiet v. United States*,
   948 F.3d 376 (D.C. Cir.)............................................................*passim*

*Melton v. Phillips*,
   875 F.3d 256 (5th Cir. 2017) ...........................................................44

*Meshal v. Higgenbotham*,
   804 F.3d 417 (D.C. Cir. 2015)......................................................26, 30

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ....................................................................16

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) ....................................................................27

*Mullenix v. Luna*,
   577 U.S. 7 (2015) (per curiam)..........................................................44

*Ortiz-Contreras v. Holder*,
   126 F. Supp. 3d 127 (D.D.C. 2015)..................................................33, 38

*Pierce v. Mattis*,
    256 F. Supp. 3d 7 (D.D.C. 2017)......................................................................35

*Richardson v. Sauls*,
    319 F. Supp. 3d 52 (D.D.C. 2018)....................................................................21

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) .........................................................................................16

*Simpkins v. D.C. Gov't*,
    108 F.3d 366 (D.C. Cir. 1997)....................................................................33, 34

*Skilling v. United States*,
    561 U.S. 358 (2010) .........................................................................................42

*Smith v. Robinson*,
    468 U.S. 992 (1984) .........................................................................................29

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) (en banc).........................................................27

*Tenet v. Doe*,
    544 U.S. 1 (2005) .............................................................................................31

*Toumazou v. Turkish Republic of N. Cyprus*,
    71 F. Supp. 3d 7 (D.D.C. 2014).......................................................................43

*United States v. Cardoza*,
    713 F.3d 656 (D.C. Cir. 2013)..........................................................................36

*United States v. Clinesmith*,
    No. 20-cr-165 (D.D.C. Aug. 19, 2020).............................................................12

*United States v. Gilman*,
    347 U.S. 507 (1954) .........................................................................................30

*United States v. Koyomejian*,
    946 F.2d 1450 (9th Cir. 1991) ..........................................................................40

*United States v. Lanier*,
    520 U.S. 259 (1997) .........................................................................................42

*United States v. Stanley*,
    483 U.S. 669 (1987) .........................................................................................16

*Wallace v. Kato*,
    549 U.S. 384 (2007) ...............................................................................17, 18, 21

*Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.,*
 335 F. Supp. 3d 772 (D. Md. 2018)............................................................39

*Wilkie v. Robbins,*
 551 U.S. 537 (2007) ................................................................................16, 25

*Wilson v. Libby,*
 535 F.3d 697 (D.C. Cir. 2008)..........................................................26, 31, 32

*Wormley v. United States,*
 601 F. Supp. 2d 27 (D.D.C. 2009)....................................................19, 20, 32

\*\**Ziglar v. Abbasi,*
 137 S. Ct. 1843 (2017)..........................................................................*passim*

## STATUTES AND RULES

18 U.S.C. § 1001(a)(3) ....................................................................................14

18 U.S.C. § 2511(1)(a) ................................................................................7, 24

18 U.S.C. § 2515 .............................................................................................. 7

18 U.S.C. § 2516 ......................................................................................7, 8, 23

50 U.S.C. § 2517 .............................................................................................. 8

18 U.S.C. § 2520(a) ..................................................................................7, 24, 28

18 U.S.C. § 2520(d) ...................................................................................8, 38

18 U.S.C. § 2520(e) ....................................................................................7, 25

18 U.S.C. § 2520(f) ....................................................................................8, 24

18 U.S.C. § 2701(a) .......................................................................................... 8

18 U.S.C. § 2707(a) ........................................................................................28

18 U.S.C. § 2707(d) ...................................................................................8, 24

18 U.S.C. § 2707(e) ...................................................................................8, 38

18 U.S.C. § 2707(f) ....................................................................................8, 25

18 U.S.C. § 2707(g) ...................................................................................8, 24

18 U.S.C. § 2709 .............................................................................................. 8

18 U.S.C. § 2712 .................................................................................9, 16, 24

18 U.S.C. § 2712(a) ......................................................................................28

18 U.S.C. § 2712(b) ......................................................................................25

18 U.S.C. § 2712(b)(1) ...................................................................................9

18 U.S.C. § 2712(b)(2) ...................................................................................9

18 U.S.C. § 2712(c) ........................................................................................9

50 U.S.C. § 1801(f) ......................................................................................33

50 U.S.C. § 1801(k) ........................................................................................6

50 U.S.C. § 1802(a)(1) ...................................................................................3

50 U.S.C. § 1802(a)(1)(A) ..............................................................................3

50 U.S.C. § 1802(a)(1)(B) ..............................................................................3

50 U.S.C. § 1802(a)(1)(C) ..............................................................................3

50 U.S.C. § 1803 ..........................................................................................25

50 U.S.C. § 1803(a) ...................................................................................3, 23

50 U.S.C. § 1803(b) ........................................................................................3

50 U.S.C. § 1804 .....................................................................................23, 25

50 U.S.C. § 1804(a) ........................................................................................4

50 U.S.C. § 1804(a)(1)-(9) ..............................................................................4

50 U.S.C. § 1805 ..........................................................................................25

50 U.S.C. § 1805(a) ......................................................................................23

50 U.S.C. § 1805(a)(1) ...................................................................................4

50 U.S.C. § 1805(a)(2) ...................................................................................4

50 U.S.C. § 1805(a)(2)(A) ..............................................................................4

50 U.S.C. § 1805(a)(3) ...................................................................................5

50 U.S.C. § 1805(a)(4) ...................................................................................5

50 U.S.C. § 1805(c)(2)(A) ........................................................................................5

50 U.S.C. § 1805(d)(1) ............................................................................................5

50 U.S.C. § 1805(d)(2) ............................................................................................5

50 U.S.C. § 1805(d)(3) ............................................................................................5

50 U.S.C. § 1806 .....................................................................................................5

50 U.S.C. § 1806(e) .................................................................................................6

50 U.S.C. 1807 ........................................................................................................7

50 U.S.C. § 1808 .....................................................................................................7

50 U.S.C. § 1808(a)(1) ...........................................................................................23

50 U.S.C. § 1809 ..........................................................................................23, 34, 35

50 U.S.C. § 1809(a) ......................................................................................36, 37, 38

50 U.S.C. § 1809(a)(1) ..................................................................................2, 5, 37, 41

50 U.S.C. § 1809(a)(2) ........................................................................................6, 33

50 U.S.C. § 1809(b) ..........................................................................................*passim*

50 U.S.C. § 1809(c) .................................................................................................6

50 U.S.C. § 1810 ..............................................................................................*passim*

50 U.S.C. § 1811 .....................................................................................................3

50 U.S.C. § 1813 .....................................................................................................5

50 U.S.C. § 1827 .....................................................................................................6

50 U.S.C. § 1827(a) .................................................................................................6

50 U.S.C. § 1827(b) .................................................................................................6

50 U.S.C. § 1827(c) .................................................................................................6

50 U.S.C. § 1828 .....................................................................................................6

50 U.S.C. § 1842 .....................................................................................................8

50 U.S.C. § 1845(e) .................................................................................................6

50 U.S.C. § 1871 ...............................................................................................................7

50 U.S.C. § 1873(a)(1) ......................................................................................................7

50 U.S.C. § 1873(b) ..........................................................................................................7

50 U.S.C. § 1881-1881g ....................................................................................................5

Pub. L. 90-351, § 801, 82 Stat. 197, 223 (1968) ............................................................38

Pub. L. 95-511, § 109(b), 92 Stat. 1783 (1978) ..............................................................38

Pub. L. 99-508, § 103, 100 Stat. 1848 (1986) ................................................................38

Fed. R. Civ. P. 12(b)(6) ...................................................................................................16

Fed. R. Civ. P. 8 ..............................................................................................................36

D.C. Code § 12-301(a)(4) ..................................................................................18, 20, 38

## LEGISLATIVE AUTHORITIES

H.R. Rep. No. 95-1283, pt. 1 (1978) ...............................................................................38

H.R. Rep. No. 95-1720 (1978) ...................................................................................33, 34

S. Select Comm. to Study Governmental Operations with Respect to Intelligence
   Activities *Book II: Intelligence Activities and the Rights of Americans*, S. Rep.
   No. 94-755 (1976) .........................................................................................................2

Senate Resol. 21, Jan. 27, 1975, Sec. 1 ...........................................................................3

## OTHER AUTHORITIES

Department of Justice Office of the Inspector General, *Review of Four FISA
   Applications and Other Aspects of the FBI's Crossfire Hurricane
   Investigation* (Revised Dec. 2019) .......................................................................*passim*

Charlie Savage, *Carter Page FISA Documents Are Released by Justice
   Department*, N.Y. Times, July 21, 2018, *available at* https://www.nytimes.
   com/2018/07/21/us/politics/carter-page-fisa.html ......................................................33

Merriam-Webster's Online Dictionary .............................................................................40

*U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, Yahoo!
   News (Sept. 23, 2016), https://www.yahoo.com/news/u-s-intel-officials-
   probe-ties-between-trump-adviser-and-kremlin-175046002.html (last accessed
   Feb. 14, 2021) ..............................................................................................................37

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327
(4th ed. 2014) ............................................................................................................8

## **INTRODUCTION**

In July 2016, the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ") began investigating whether individuals associated with the Donald J. Trump for President Campaign were coordinating with the Russian government's interference in the 2016 presidential election.  The FBI and DOJ later opened a separate but related investigation into whether Carter Page, an advisor to Donald Trump, was acting as a foreign agent of Russia.  DOJ ultimately filed four applications with the Foreign Intelligence Surveillance Court ("FISC") seeking authority for the FBI to conduct surveillance of Page under the Foreign Intelligence Surveillance Act ("FISA").  Page now asserts claims premised on misstatements and omissions in the FISA applications.

As to Kevin Clinesmith, he was a lawyer in the FBI's Office of General Counsel and, as such, played a "support[ing]" role in the FBI's request that DOJ seek the FISA warrants, Am. Compl. ¶103.  Page now asserts against Clinesmith claims under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* and FISA.  Those claims fail as a matter of law.

The *Bivens* claim is time-barred, and, in any event, court after court for the past forty years has refused to expand the availability of that claim to new contexts, as this undoubtedly would be. They have particularly refused to do so where, as here, Congress has created a web of alternative remedies and where the issues involve sensitive matters of national security and intelligence. Judicial intrusion into, and disruption of, the regulatory scheme that Congress has adopted would violate the separation of powers.  Particularly here, where the issues are so high-profile in nature and already have gained extensive Congressional attention—a fact that the Complaint records in some detail—any further remedies should be left to Congress.  As the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), makes clear, recognition of the *Bivens* remedy under these circumstances is impermissible.

Page's FISA claims are equally flawed.  They, too, are time-barred, and Page in any event does not allege that Clinesmith personally "engage[d] in electronic surveillance" or "disclosed or used" the fruits of such surveillance.  50 U.S.C. § 1809(a)(1)-(2).  But a claim under section 1810 (which premises civil liability on violations of section 1809) requires just that.  Its plain text, its consistent interpretation by courts across the country, and the presumption against reading secondary liability into statutes all point to that same conclusion.

Even if *Bivens* or FISA remedies were otherwise available here (as they are not), Clinesmith would be entitled to qualified immunity on all counts.  The Amended Complaint should be dismissed, at least insofar as it alleges claims against Clinesmith.

## BACKGROUND

I.    **Statutory and Regulatory Background**

A.    **The Foreign Intelligence Surveillance Act**

In 1975, a congressional task force known as the Church Committee was formed to investigate possible abuses during federal intelligence operations.  *See* Senate Resol. 21, Jan. 27, 1975, Sec. 1.  The Church Committee ultimately recommended that Congress "enact[] . . . a comprehensive legislative charter" that would "cover[] the field" of domestic electronic surveillance.  S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 297 (1976).  The Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq.*, was that "comprehensive legislative charter."

1.    *Congress Authorizes Electronic Surveillance to Acquire Foreign Intelligence Information*

Congress enacted FISA "to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes."  *Clapper v. Amnesty Int'l USA*,

2

568 U.S. 398, 402 (2013).  The statute thus permits the government to employ electronic surveillance in pursuit of "foreign intelligence information."  In all but a subset of cases not relevant here, such surveillance must be authorized by a court order.  *See* 50 U.S.C. § 1802(a)(1) (articulating circumstances where surveillance may occur without a court order).  To consider applications for such surveillance, Congress created a specialized court—the Foreign Intelligence Surveillance Court ("FISC")—to be staffed by Article III judges.  *Id*. § 1803(a).  Congress also created a specialized appellate tribunal—the Foreign Intelligence Surveillance Court of Review— to review any denials by the FISC of applications for electronic surveillance.  *Id.* § 1803(b).

Congress established detailed procedures for obtaining a court order authorizing foreign intelligence electronic surveillance.  To obtain a surveillance order, a federal officer, having first obtained approval from the Attorney General, must apply for an order from one of the FISC judges.  50 U.S.C. § 1804(a).  The application must detail: (1) the identity of the target of surveillance; (2) the information the government relied on to determine that the target is a "foreign power" or an "agent of a foreign power"; (3) evidence that the foreign power or its agent uses, or is about to use, the place where the surveillance will occur; (4) the minimization procedures to be employed; (5) a description of the type of information sought and the type of communications subject to surveillance; (6) certification that the information sought is "foreign intelligence information"; (7) a summary of how the surveillance will be conducted; (8) a statement of all prior related applications; and (9) a statement about the time period for the surveillance.  *Id.* § 1804(a)(1)-(9).

Congress also set forth, in detail, the findings that a FISC judge must make before authorizing surveillance.  First, the FISC judge must find that the application was made by a federal officer and approved by the Attorney General.  50 U.S.C. § 1805(a)(1).  Second, the FISC judge must find probable cause to believe *both* that the target of the surveillance is a foreign power or an

agent of a foreign power, *and* that a foreign power or agent of a foreign power is using, or is about to use, each of the facilities or places at which electronic surveillance will be directed. *Id.* § 1805(a)(2). Additionally, if a United States person is the surveillance target, the FISC judge must find that he or she is not being considered an agent of a foreign power based only on activities protected by the First Amendment. *Id.* § 1805(a)(2)(A). The FISC judge must also conclude that the proposed minimization procedures meet certain statutory requirements, and that the application contains all statements and certifications required by the FISA statute. *Id.* § 1805(a)(3)-(4).

The FISC may approve electronic surveillance "for the period necessary to achieve its purpose, or for ninety days, whichever is less." 50 U.S.C. § 1805(d)(1). Surveillance of a foreign power or an agent of a foreign power can last for up to one year. *Id.* "Extensions of an order . . . may be granted on the same basis as an original order upon an application for an extension and new findings made in the same manner as required for an original order." *Id.* § 1805(d)(2). Among other things, the FISC's order must "direct" "that the minimization procedures be followed." *Id.* § 1805(c)(2)(A). The judge issuing the order may "assess compliance with the minimization procedures" while the surveillance is happening or after it has ended. *Id.* § 1805(d)(3). Congress also set forth—in detail—how information acquired through FISA-authorized electronic surveillance may be used. 50 U.S.C. § 1806.

> 2.    *Congress Provides for Civil and Criminal Liability for Certain FISA Violations*

Congress expressly provided for civil and criminal liability arising from certain FISA violations. Significantly, Congress specifically defined the scope of each civil and criminal cause of action it created in FISA.

Section 1809 imposes criminal liability in two situations. First, a person may not intentionally "engage[] in electronic surveillance under color of law except as authorized" by FISA

and certain other federal statutes.  50 U.S.C. § 1809(a)(1).  Second, a person may not intentionally "disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by the same federal statutes.  *Id.* § 1809(a)(2).  Congress also created a statutory defense to prosecution under section 1809 for a "law enforcement or investigative officer engaged in the course of his official duties" when the "electronic surveillance was authorized by and conducted pursuant to a search warrant."  *Id.* § 1809(b).

Section 1810, in turn, creates a civil cause of action for certain violations of § 1809 against the "person who committed such violation."  50 U.S.C. § 1810.

Congress created numerous other remedies for violations of FISA's provisions.  For example, section 1827 criminalized certain unauthorized physical searches executed for the purpose of obtaining foreign intelligence information as well as the disclosure or use of information obtained from such a search.  50 U.S.C. § 1827(a); *see also id.* § 1827(b)-(c) (creating statutory defense and delineating penalties)*.*  Section 1828 provides a civil remedy for certain violations of section 1827.  And evidence unlawfully obtained in violation of FISA's provisions may be the subject of a motion to suppress.  *See, e.g.*, *id.* §§ 1806(e), 1845(e).

### 3.   *Congressional Oversight of FISA Activity*

In addition to providing civil remedies and criminal liability, Congress provided other mechanisms for maintaining accountability over the government's exercise of FISA authority.  The Director of the Administrative Office of the United States Courts, for example, must submit detailed annual reports to no fewer than three congressional committees, 50 U.S.C. § 1873(a)(1), and the Director of National Intelligence must publish annual reports on its website, *id.* § 1873(b).  The Attorney General, meanwhile, must submit various reports to Congress and the Administrative

Office of the U.S. Courts covering a host of topics related to the government's use of FISA authority. *See id.* §§ 1807, 1808, 1871.

Thus, in FISA, Congress comprehensively regulated the field of foreign intelligence surveillance, carefully setting forth the scope of permissible surveillance, and the procedures and standards by which such surveillance must be authorized. It established carefully calibrated remedies to address instances where individuals run afoul of FISA's provisions. And it envisioned a role for all three branches of government in furthering FISA's goals and enforcing the statutory limits that Congress imposed.

### B.   Other Relevant Statutes

FISA is not Congress's only word on electronic surveillance. Numerous other statutes regulate the government's use of electronic surveillance. Like FISA, they contain carefully calibrated civil and criminal remedies.

*The Wiretap Act.* With the Wiretap Act, Congress made it a crime to intentionally intercept "any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). It also restricted the use of intercepted communications as evidence, *id.* § 2515, and set forth the process and standards by which federal law enforcement can obtain "an order authorizing or approving the interception of wire or oral communications," *id.* § 2516.

To deter unlawful surveillance, Congress created a civil cause of action against individuals who violated the Wiretap Act's provisions, 18 U.S.C. § 2520(a), subject to a two-year statute of limitations, *id.* § 2520(e). Congress also gave defendants "a complete defense" if they relied in "good faith" on "a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization." *Id.* § 2520(d). Finally, Congress required agencies, upon a finding of a Wiretap Act violation, to consider whether the employee responsible for the violation should be subject to administrative discipline. *Id.* § 2520(f).

*The Stored Communications Act.*    The Stored Communications Act, in amended form, made it a crime to "intentionally access[]" electronic communications without permission or in excess of granted permission.  18 U.S.C. § 2701(a).  Other sections authorized the FBI to access certain wire or electronic communications, set forth the process for doing so, and provided for judicial review of any such request.  *Id.* § 2709.

The Stored Communications Act also created a civil cause of action against any "person or entity, other than the United States," who unlawfully accessed an electronic communication or disclosed certain information acquired via electronic surveillance.  18 U.S.C. § 2707(a), (g).  As in the Wiretap Act, Congress imposed a two-year statute of limitations, *id.* § 2707(f), and gave defendants "a complete defense" if they relied in "good faith" on "a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization," *id.* § 2707(e).  Also like the Wiretap Act, Congress required the agency to consider whether any employee found to be responsible for a violation should be subject to administrative discipline.  *Id.* § 2707(d).

*The Patriot Act.*    Following the 9/11 terrorist attacks, Congress granted the FBI and other agencies new power to intercept electronic communications relating to terrorism, 18 U.S.C. § 2516, authorized law enforcement agencies to share information with each other, *id.* § 2517, and reinvigorated FISA and other statutes regulating electronic surveillance, *e.g.*, 50 U.S.C. § 1842.

Having granted federal law enforcement new electronic surveillance powers, the Patriot Act also created a new civil cause of action against the United States for money damages arising from certain violations of statutes governing the use of electronic surveillance.  18 U.S.C. § 2712. Before pursuing any claim under section 2712, the aggrieved person must present the claim to the appropriate department or agency under the procedures of the Federal Tort Claims Act.  *Id.* § 2712(b)(1).  Like similar statutes, the claim is subject to a two-year limitations period, *id.* §

2712(b)(2), and agencies must consider whether to impose administrative discipline on employees found responsible for a violation, *id.* § 2712(c).

## II.   The Complaint's Allegations[1]

Plaintiff Carter Page is a former foreign-policy advisor to Donald J. Trump's 2016 campaign.   Am. Compl. ¶18.   He alleges that he got swept up in the FBI's investigation into whether individuals tied to the Trump campaign helped Russia interfere with the 2016 election. *Id.* ¶5.   As a result, Page says, the government unlawfully surveilled him after illegally obtaining FISA warrants.   *Id.* ¶121.   The FBI, DOJ, and several individuals, Page claims, withheld material information from and otherwise misled the FISC to obtain those warrants in violation of FISA and Page's Fourth Amendment rights.[2]   *See, e.g.*, *id.* ¶¶69, 172.   Clinesmith was then an Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of the General Counsel; he was assigned to support the FBI agents working on the investigation.   *Id.* ¶25.

Shortly after opening the investigation—codenamed "Crossfire Hurricane"—the FBI sought authorization from the FISC to conduct electronic surveillance of Page.   *Id.* ¶6.   To establish the necessary probable cause, Page alleges, the FBI relied on information from Christopher Steele,

---

[1] For present purposes, Clinesmith accepts, as he must, the allegations in the Amended Complaint. Many of the allegations, however, are false, and Clinesmith intends to disprove them should any of Page's claims against him survive his motion to dismiss.

[2] Page repeatedly references and relies upon information contained in a Department of Justice Office of the Inspector General Report titled "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation" (Revised Dec. 2019) (the "IG Report"), *see* Am. Compl. ¶¶38, 39, 57, 193, and at least one cause of action turns on the DOJ's alleged refusal to allow Page to review the report before the DOJ publicly released it, *id.* ¶253.   This Court may thus consider the entirety of the IG Report without converting this motion into one for summary judgment. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("Incorporation by reference can also amplify pleadings where the document is not attached by the plaintiff, but is referred to in the Amended Complaint and integral to the plaintiff's claim." (alterations and quotations omitted)); Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 (4th ed. 2014).

a confidential source for the FBI.  *Id.* ¶7.  Steele provided the FBI with certain reports that alleged Page had improper or unlawful communications with two Russians with close ties to Russian President Vladimir Putin.  *Id.* ¶62.  Page alleges that Steele was "politically motivated" and that the FBI did not treat the information he provided with a sufficiently jaundiced eye.  *Id.* ¶¶62, 63.

The FBI and DOJ ultimately prepared and submitted four FISA applications to conduct electronic surveillance of Page—the initiation application and three renewal applications.  Am. Compl. ¶3.  All four applications were granted by the FISC.  *Id.*

1. *The Initial FISA Application*

The FBI filed the initial FISA application for surveilling Page in October 2016.  *Id.* ¶76. That first application grew out of information the FBI had received from Steele linking Page to certain Russians affiliated with Vladimir Putin.  *Id.* ¶62.  As part of the investigation into Page, the CIA[3] gave members of the Crossfire Hurricane team an August 17, 2016, memorandum (the "August 2016 memorandum") detailing Page's relationship with that agency.  *Id.* ¶59.  The memorandum stated that Page had been an "operational contact" for the CIA.  *Id.*  About a month later, a news article alleged that Page had held meetings with the same two Russian individuals. *Id.* ¶64.  In response, Page sent a letter to the FBI Director in which he claimed, among other things, that he had "a decades' long record of interactions with the CIA and FBI."  *Id.* ¶65.

Shortly after Page's letter, a particular DOJ attorney—who was assigned to draft the initial FISA application as well as the renewals—asked the relevant FBI case agent whether Page had in fact been a "source" for the CIA as Page's letter claimed.  *Id*. ¶68.  The case agent responded that Page had met with another government agency but that that contact was "dated," "outside scope,"

---

[3] The Amended Complaint identifies the other government agency involved in this matter as the CIA.  We do so as well for that reason.

and—in his opinion—need not be included in the FISA application.  *Id.* ¶168; *see also* IG Report at 157.  The Complaint says the case agent's answer was incomplete, inaccurate, and in some ways contrary to the information the CIA had given the Crossfire Hurricane team.  Am. Compl. ¶68.

The Complaint alleges other problems with the first FISA application.  It alleges that it omitted statements by Page and others that Page was not coordinating with Russia, Am. Compl. ¶71, and it maintains that the FBI gave insufficient scrutiny to Steele's potential motives in providing damaging information about the Trump campaign, *id.* ¶73.  This initial application was submitted in late October 2016.  *Id.* ¶76.  The FISC later issued the first FISA warrant.  *Id.* ¶81.

The Complaint nowhere alleges that Clinesmith was involved with the initial FISA application in any way; the allegations concerning that application do not mention Clinesmith at all.  *See id*. ¶¶59-81.

### 2.     *The Second FISA Application*

The application for the second FISA warrant was submitted in early 2017.  *Id*. ¶92.  As with the first FISA application, the Amended Complaint highlights omissions and misstatements in the second application but attributes none of them to Clinesmith.  *Id.* ¶¶92-95.  It says that Steele ultimately was terminated as a confidential source with the FBI for not following directions about refraining from discussing his reporting with the press.  *Id.* ¶¶64, 69, 84-85.  It also alleges that Steele's primary sub-source—from whom he collected information that he later passed on to the Crossfire Hurricane team—had himself been investigated by the FBI as a possible Russian spy.  *Id.* ¶91.  It alleges that even though Steele's relationship with the FBI had been "suspended" and that Steele's primary sub-source "might well be a Russian intelligence officer," *id.* ¶94; *see also id.* ¶¶91, 92, the second FISA application was submitted to the FISC in January 2017, *id.* ¶92.  The FISC later issued the second FISA warrant.  *Id.* ¶99.  The Amended Complaint again alleges no involvement at all by Clinesmith in the FBI obtaining this warrant.  Am. Compl. ¶¶82-99.

3.    *The Third FISA Application*

According to the Complaint, the first six months of surveillance conducted under the first two FISA warrants revealed no evidence that Page was acting as a foreign agent of Russia.  Am. Compl. ¶104.  The application for the third FISA warrant was submitted in April 2017.  Am. Compl. ¶103.  As with the first two FISA applications, the Complaint alleges, the third application was false and misleading.  *Id.* ¶106.  The Complaint alleges that, before submitting the third application, the FBI had received information that "contradicted or undermined the allegations" about Page in the first two FISA applications but did not disclose those things.  *Id.* ¶¶101-02.

As with the first two, the Amended Complaint alleges no involvement at all by Clinesmith in drafting this warrant application.  It alleges only one thing as to Clinesmith—that he told Page he would prefer if he did not speak to the media about "Evgeny Buryakov, a Russian spy who had posed as a New York banker."  *Id.* ¶103.  The FISC issued the third FISA warrant.  *Id.* ¶107.

4.    *The Fourth FISA Application*

The application for the fourth FISA warrant was submitted in June 2017.  *Id.* ¶114.  The fourth application, like its predecessors, allegedly concealed information that the FBI had received from the CIA—namely, that Page had been an "operational contact" for the CIA.  *Id.* ¶109.

Before filing the fourth application, an FBI Supervisory Special Agent ("SSA") sought to once again clarify what, if any, relationship Page had with the CIA.  Am. Compl. ¶110.  (The DOJ attorney who handled all four FISA applications had particularly looked into that the year before in connection with the initial FISA application.  *See* pp. 9-10, *supra*.)  The SSA, who would be the affiant for the fourth application, asked Clinesmith to help resolve the issue.  *Id.*  On June 15, Clinesmith did as instructed and asked the CIA whether Page ever had been a source.  *Id.* ¶111.  According to Page, a CIA employee responded via email the same day, saying that Page had been

a source[4] and directing Clinesmith's attention to reports previously prepared by the CIA and provided to the FBI.  *Id.*  One of the reports listed in the email was the August 17, 2016, memorandum the CIA had provided to the FBI at the inception of the Crossfire Hurricane investigation that detailed Page's relationship with the CIA.  *Id.*; *see* p. 9, *supra*.

Page alleges that, four days after receiving the email from the CIA, Clinesmith falsely advised the SSA that Page "had been a 'sub source,' but was 'never a source' for the CIA."  Am. Compl. ¶112.  Page asserts that the SSA asked Clinesmith whether Clinesmith had that representation in writing, and he further maintains that Clinesmith "falsely stated" that he did.  *Id.* He alleges that Clinesmith altered the June 15 email from the CIA to falsely state that Page was "not a source" for the CIA and forwarded the altered email to the SSA.  *Id.*[5]  The Complaint further alleges that Clinesmith altered the email in an effort to "conceal … exculpatory" information about Page.  *Id.*  Significantly, the Complaint does not allege that Clinesmith deleted anything from the

---

[4] While the email indicates that Page "provide[d] reporting to" the CIA, it makes no direct reference to Page being a "source."  IG Report at 250.  As the Court is aware, nearly all federal law enforcement and intelligence agencies cultivate relationships with individuals who are in a position to provide useful information.  Different agencies, however, use different terms to refer to those individuals.  The term "source" (formally known as "Confidential Human Source") is, within the FBI, a term of art and has a specialized meaning.  An FBI source may be "tasked," *i.e.*, the FBI can directly ask a source to collect specific information and then debrief the source about the information he collected.  Page, on the other hand, served as an "operational contact" which, as that term is used by the CIA, is an individual who may ***not*** be tasked.

[5] As a result of altering the email, Clinesmith pleaded guilty to making a false statement in violation of 18 U.S.C. § 1001(a)(3).  *United States v. Clinesmith*, No. 20-cr-165 (D.D.C. Aug. 19, 2020), Dkt. 8.  The false statement was Clinesmith's false representation, in forwarding the email, that the original email contained the additional words "not a source" when he knew it did not.  The veracity of Clinesmith's belief that Page was not, in fact, a source was not a part of Clinesmith's plea and allocution.  Indeed, in sentencing Clinesmith to probation, Judge Boasberg noted that "Clinesmith likely believed that what he said about Page was true, namely that he was a subsource but not a source."  Sentencing Tr. 51:11-15, *United States v. Clinesmith*, No. 20-cr-165 (D.D.C. Jan. 29, 2021), Dkt. 22 (hereafter "Sentencing Tr.").  Based on the evidence, the court concluded that Clinesmith had "no active intent to harm," and that, "[b]y altering the e-mail, he was saving himself some work and taking an inappropriate shortcut" but was not "attempting to achieve an end he knew was wrong."  *Id.* at 51:9-10, 15-18.

June 15 email.  *Id.*  Thus, the email that the SSA received continued to reference the August 2016 memorandum that had been provided to the FBI before issuance of the first warrant and "document[ed] that Carter Page was an 'operational contact.'"  Am. Compl. ¶¶59, 111-112.[6]

The Complaint alleges that the fourth FISA application, "like the three preceding applications, did not advise the FISC that Page had been an operational contact for the CIA, although the FBI Crossfire Hurricane team had this information in its possession since August 2016."  Am. Compl. ¶115.  The Complaint does not explain how, if this information had been excluded from the three prior applications despite being in the FBI and DOJ's possession, receiving it a fourth time (this time from Clinesmith) would have altered the content of the final FISA application.  The FISC later issued the fourth FISA warrant.  *Id.* ¶120.

> 5.    *Causes of Action*

Page alleges eight causes of action.  Four counts assert FISA violations against the eight individual defendants, one for each FISA application.  Am. Compl. ¶¶216-234 (Counts 1-4). Another count seeks damages from the individual defendants for Fourth Amendment violations under the implied cause of action first recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*.  *Id.* ¶¶243-250 (Count 6).  The rest are asserted against the United States under the Federal Tort Claims Act, Am. Compl. ¶¶235-242 (Count 5), and the Privacy Act, *id.* ¶¶251-263 (Counts 7 and 8).  Page also has filed an administrative claim against the United

---

[6] While the Amended Complaint ignores the events between June 15 (when Clinesmith received the email from the CIA liaison) and June 19 (when he forwarded the altered email to the SSA), the IG Report does not.  Those events, as reported by the Inspector General, make clear that Clinesmith had no intention of "concealing" anything.  For example, the same day that Clinesmith received the email from the CIA, he forwarded the CIA's email—without alteration—to the relevant FBI case agent and that agent's acting supervisor.  IG Report at 250.  The next day, Clinesmith also forwarded the CIA's response—again without alteration, but without Clinesmith's initial email to the CIA liaison—to the DOJ attorney responsible for drafting the FISA renewal.  IG Report at 251. Those actions are not consistent with a desire to "conceal" Page's relationship with the CIA.

States under the Patriot Act, 18 U.S.C. § 2712, and states that he intends to amend the Complaint

to add that cause of action if the Department of Justice denies his administrative claim.  *Id.* ¶215.

## STANDARD OF REVIEW

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), a

complaint must "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court

must accept as true all well-pled facts and draw all inferences from them in the plaintiff's favor.

*Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  But the factual allegations "must

still 'be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550

U.S. at 555).  A plaintiff must do more than just allege "labels and conclusions"; "a formulaic

recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## ARGUMENT

Each of Page's claims against Clinesmith is legally deficient and should be dismissed.[7]

First, his *Bivens* claim is untimely, and in any event asks this Court to do what the Supreme

Court has not done in over 40 years: create an implied damages remedy in a new context.  Doing

so is highly disfavored, and the Court should decline the invitation for several reasons, including

because Congress has comprehensively regulated the area of electronic surveillance, because FISA

applications involve sensitive national security considerations, and because alternative remedies

exist for plaintiffs subjected to unlawful electronic surveillance.  Any one of those things, by itself,

would counsel against recognition of a new *Bivens* remedy; collectively they weigh

overwhelmingly against it.  Indeed, they suggest that Congress—which already has enacted

---

[7] Clinesmith incorporates by reference the arguments of his co-defendants that apply to him, particularly (1) those explaining that intent is required to be pled as to every element of a FISA claim, and (2) those concerning the traceability of damages to the conduct alleged.

comprehensive regulation, which is better suited to craft remedies in sensitive contexts, and which already has created other remedies for similarly-affected individuals—should be the entity to create any further remedies in this context.  That is especially true here, where Page acknowledges the significant recent attention this matter already has drawn from Congress.  Crafting a new judicial remedy in the context of a claim against Clinesmith would be especially unwarranted where Page never even alleges that Clinesmith personally violated his Fourth Amendment rights.

Second, Page's FISA claims fare no better, both because they are untimely and because he fails plausibly to allege that Clinesmith personally "engaged in electronic surveillance" or "disclosed or used" the fruits of that surveillance, as required by FISA's plain text and its consistent interpretation by courts.  Given his role as an OGC attorney who merely "provide[d] support" to investigative personnel, *see* Am. Compl. ¶103, it is no surprise that Page is unable to allege either.

And, third, even if Page adequately had alleged either a *Bivens* or a FISA claim, Clinesmith would be entitled to qualified immunity.  Page has not alleged conduct by Clinesmith himself that any reasonable government officer would have recognized amounted to a "search," let alone a search that violated the Fourth Amendment or FISA.  In other words, existing precedent has not put the relevant statutory or constitutional question beyond debate.  Not even close.

For these reasons and more, the claims against Clinesmith must be dismissed.

I.    **The *Bivens* Claim (Count 6) Must Be Dismissed as Untimely and Because It Would Impermissibly Extend *Bivens* to a New Context.**

The Supreme Court first created an implied damages action under the Constitution 50 years ago in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), when it permitted a claim for Fourth Amendment violations arising from an unlawful, warrantless search.  Since then, the Supreme Court has recognized an implied damages action under the Constitution only twice—once for gender discrimination under the Fifth Amendment,

*Davis v. Passman*, 442 U.S. 228 (1979), and once against prison officials under the Eighth Amendment for failure to provide adequate medical care, *Carlson v. Green*, 446 U.S. 14 (1980). Those three cases are "the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

Over the last four decades, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Loumiet v. United States*, 948 F.3d 376, 381 (D.C. Cir.), *cert. denied*, 141 S. Ct. 180 (2020). It has declined to extend *Bivens* to First Amendment violations arising in the federal employment context, *Bush v. Lucas*, 462 U.S. 367 (1983); constitutional claims of military personnel arising from activity incident to service, *United States v. Stanley*, 483 U.S. 669 (1987); *Chappell v. Wallace*, 462 U.S. 296 (1983); due-process violations in the Social Security context, *Schweiker v. Chilicky*, 487 U.S. 412 (1988); suits against federal agencies, *FDIC v. Meyer*, 510 U.S. 471, 114 S. Ct. 996 (1994); suits against private prison corporations and their employees, *Malesko*, 534 U.S. 61; *Minneci v. Pollard*, 565 U.S. 118 (2012); retaliation against the exercise of ownership rights, *Wilkie v. Robbins*, 551 U.S. 537 (2007); Fourth and Fifth Amendment claims arising from the detention of aliens following the September 11th terrorist attacks, *Abbasi*, 137 S. Ct. 1843; and Fourth and Fifth Amendment violations resulting from the cross-border shooting of a child by a border patrol agent, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020). Indeed, in recent years "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675).

Before recognizing a *Bivens* claim, courts must consider whether the claim "arises in a 'new context.'" *Hernandez*, 140 S. Ct. at 743 (quoting *Malesko*, 534 U.S. at 68). A context is "new" if it "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme]

Court." *Abbasi*, 137 S. Ct. at 1859.  If the context is new, courts will not extend *Bivens* to that context if "any special factors . . . counsel hesitation." *Hernandez*, 140 S. Ct. at 743 (brackets and quotation marks omitted); *see also Abbasi*, 137 S. Ct. at 1857.  Special factors aside, the existence of adequate alternative remedies "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858; *see Hernandez*, 140 S. Ct. at 750 & n.12.

Page indisputably asks this Court to recognize a new *Bivens* context, as argued below. Even if that request were timely,  plenty of special factors counsel against it.  The availability of other remedies to Page make a judicially-manufactured damages action improper.  Even if Page otherwise could pursue his *Bivens* claim, it fails as to Clinesmith because Page has not alleged that Clinesmith personally participated in the Fourth Amendment violation.

### A.    Page Fails to Plead a Timely *Bivens* Claim.

As a threshold matter, the Complaint fails to plead a timely *Bivens* claim as to Clinesmith. *Bivens* claims have no fixed statute of limitations; like claims brought under 42 U.S.C. § 1983, they borrow from the limitations period of the most analogous state law cause of action.  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985).  "'However, while state law provides the applicable statute of limitations, federal law controls when a *Bivens* claim accrues.'" *Hampton v. Comey*, No. 14-cv-1607 (ABJ), 2016 WL 471277, at *13 (D.D.C. Feb. 8, 2016) (quoting *Loumiet v. United States*, 968 F. Supp. 2d 142, 150 (D.D.C. 2013)); *cf. Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law.").  Accrual occurs "'when the plaintiff has a complete

and present cause of action.'"  *Hampton v. Comey*, 2016 WL 471277, at \*13 (quoting *Wallace*, 549 U.S. at 388) (Fourth Amendment false seizure claim accrued upon moment of detention)).

As explained below, Page's *Bivens* claim is governed by a one-year statute of limitations, and his claim accrued no later than the time he learned Clinesmith had engaged in alleged misconduct in connection with the FISA warrants.  Because he fails to plead when he learned of that misconduct, and because the Complaint suggests he would have learned of it more than a year before he filed suit, his claim must be dismissed as time-barred.

### 1.     A One-Year Statute of Limitations Governs the *Bivens* Claim.

In analyzing which state law cause of action is analogous to the constitutional violation alleged to underlie a *Bivens* claim, it is the character of the conduct, not the constitutional provision allegedly violated, that governs the analysis.  And when a defendant is alleged to have made false statements that others have used to engage in constitutional violations, courts analogize the claim to one for libel or slander and apply D.C.'s one-year limitations period for such claims.  *See* D.C. Code § 12-301(a)(4).  In *Doe v. Department of Justice*, for instance, the D.C. Circuit held that a fired employee's constitutional due process claims were barred by D.C.'s one-year limitations period for libel and slander because "[t]he gist of Doe's claims against the individual defendants is that they disseminated false and defamatory statements to other attorneys" which "destroyed her reputation."  *Doe v. Dep't of Justice*, 753 F.2d at 1114; *see also Jefferson v. Harris*, 170 F. Supp. 3d 194, 213 (D.D.C. 2016) (applying one-year libel limitations period to *Bivens* claims based on due process violations).  And in *Church of Scientology v. Foley*, 640 F.2d 1335 (D.C. Cir. 1981), it again applied a one-year limitations period to *Bivens* claims (there based on First and Fifth Amendment violations) because they effectively amounted to defamation claims.

The analysis is no different when the false statements play a role in another person's commitment of an alleged Fourth Amendment violation.  In *Wormley v. United States*, another court in this District held that a plaintiff's claim that she was unlawfully detained because of false statements in a "Notice of Escape" from a halfway house was governed by D.C.'s one-year limitations period for defamation.  "To the extent that plaintiff's claims stem from false statements in the Notice of Escape," the court held, "they are analogous to libel or defamation." *Wormley v. United States*, 601 F. Supp. 2d 27, 35 (D.D.C. 2009).  As in other parts of the *Bivens* analysis, what mattered was the character of the conduct, not the constitutional provision it was alleged to have violated. *Cf. A & S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (holding, as to "alternative remedies" prong of *Bivens* analysis, that "plaintiffs' claim that the wrong originated in some statutory violation does not strip the case of its contractual character").

As in *Doe v. Department of Justice*, *Church of Scientology*, *Harris*, and *Wormley*, the allegations against Clinesmith sound squarely in defamation.  The allegation as to Clinesmith is not that he signed the warrant or surveilled Page, but that he libeled Page to others who then used the libel to obtain surveillance of him.  In the words of *Doe v. Department of Justice*, Page alleges that Clinesmith "disseminated [the] false and defamatory statement[]" that he had never been a CIA source "to other[s]" who then used it to commit a constitutional violation, thereby "destroy[ing] [his] reputation." *Doe v. Dep't of Justice*, 753 F.2d at 1114.  That is defamation, no matter the constitutional provision it is said to violate.

Indeed, the Complaint writ large—and not just as to Clinesmith—sounds in defamation as well.  It does not allege harm from the *acquisition* of any information obtained from the allegedly unauthorized surveillance, but instead centers on how the *existence* of the surveillance (and what it reflected about his potential ties to Russia) tarnished his reputation, thereby causing him to lose

business and to be subjected to threatening and inexcusable behavior. *See, e.g.*, Am. Compl. ¶ 214 (alleging "[i]rrepearable damage to his reputation," "[e]conomic losses" because "governments and entities" will no longer "contract with him," and [e]conomic losses" from "being rendered effectively unemployable").[8]  Both the misconduct Page alleges as to Clinesmith and the harms he claims to have suffered from that misconduct sound squarely in libel.

Counsel for Clinesmith is aware of one court in this District that has applied D.C.'s residual three-year limitations period to a *Bivens* claim premised on a warrant containing allegedly false statements.  *See Berman v. Crook*, 293 F. Supp. 3d 48, 56 (D.D.C. 2018).  Unlike here, neither "the gist" of that case nor the harms alleged there sounded in defamation.  *See Berman v. Crook*, No. 1:16-cv-2153 (RCL), ECF No. 1 (Apr. 18, 2017).  But even if that case were on all fours with the *Bivens* claim here, the Court ought to reject its approach given the anomaly it would create.  Adopting it would mean that *Bivens* claims based on unconstitutional Fourth Amendment *searches* would have a three-year limitations period even though claims based on unconstitutional Fourth Amendment *seizures* would not.   *See* D.C. Code § 12-301(a)(4) (one-year limitations periods for "false arrest" and "false imprisonment"); *Wormley*, 601 F. Supp. 2d at 35 ("Fourth Amendment search and seizure claim is analogous to false arrest"); *Hampton v. Comey*, 2016 WL 471277 at *3 (same).  The Court should avoid creating that kind of anomaly.

In sum, Clinesmith's alleged misconduct is in the nature of libel, and the harms Page claims primarily to have endured are those that stem from libel.  His claim as to Clinesmith is properly subject to D.C.'s one-year statute of limitations for such claims.

---

[8] Because it alleges harm from the mere existence of that surveillance, as opposed to what was collected from it, it also is closely analogous to an invasion of privacy claim, yet another state law claim with a one-year limitations period.  *See Greenpeace, Inc. v. Dow Chemical Co.*, 97 A.3d 1053, 1061-62 (D.C. 2014).

## 2.     The Complaint Fails to Plead a Timely Claim.

Because Page filed this suit on November 27, 2020, his *Bivens* claim against Clinesmith is timely only if it accrued on or after November 28, 2019.  But as noted above, under federal law a claim accrues when "the plaintiff has a complete and present cause of action."  *Wallace*, 549 U.S. at 388.  Because the alleged Fourth Amendment violation underlying his *Bivens* claim consisted in his being surveilled without proper authorization, Page had "a complete and present cause of action" when he learned of that surveillance.  *Berman*, 293 F. Supp. 3d at 56 (holding that plaintiff's claim "accrued in 2000 when he learned of the search of his office," even though he as yet had no knowledge of the allegedly false statements in the affidavit supporting the search warrant).  As the Complaint makes clear, Page knew he was being surveilled in April 2017, long before November 28, 2019.  *See, e.g.*, Am. Compl. ¶184 (detailing April 11, 2017 *Washington Post* story about issuance of multiple FISA warrants as to Page).  Page thus knew of the surveillance more than three years before he filed suit.  Even if a three-year limitations period applied (it doesn't, for the reasons stated above), the claim would still be untimely.

Even if the *Bivens* claim against Clinesmith did not accrue until Page knew of his specific conduct, the claim must still be dismissed as untimely.  The Complaint fails to plead, even in conclusory fashion, that Page learned of Clinesmith's misconduct less than a year before he filed suit; even less does it plead facts that would make that conclusion plausible.  *Richardson v. Sauls*, 319 F. Supp. 3d 52, 68 (D.D.C. 2018) (dismissing *Bivens* claim where plaintiff "fail[ed] to specify the date on which he asserts he learned the necessary facts" but instead made only a "broad and conclusory statement that he only learned of relevant details after the statute of limitations had passed").  That requires dismissal, particularly in light of the public record evidence showing that

Clinesmith's conduct was known at least by November 23, 2019—five days before the latest date on which this claim would be timely.

By November 23, well-known media outlets were reporting that the soon-to-be-released IG Report would detail wrongdoing by Clinesmith.  The *New York Post* reported on that date that he "made significant additions to an email that was included in an application to renew a surveillance order against" Page.[9]  *The New York Times* likewise reported on that date that the report would state that "a low-level lawyer, Kevin Clinesmith, altered an email that officials used to prepare to seek court approval to renew the wiretap," and even that Inspector General Horowitz "referred his findings about Clinesmith to prosecutors for a potential criminal charge."[10]  It even specified how he had altered the email—that he "took an email from an official at another federal agency that contained several factual assertions, then added material to the bottom that looked like another assertion from the email's author, when it was instead his own understanding."[11]

It is no defense that Page did not know the full extent of Clinesmith's actions then; it is enough that he knew Clinesmith had altered a document in the process of the government obtaining what Page believed to be a wholly unsupported warrant.  *See Berman*, 293 F. Supp. 3d at 56 (claim accrued no later than date when plaintiff obtained partial knowledge of contents of allegedly false affidavit supporting unwarranted search, notwithstanding that plaintiff later received full unredacted copy).  Indeed he knew far more than that—he knew the precise manner in which the

---

[9]   *See*   https://nypost.com/2019/11/23/fbis-resistance-lawyer-under-fire-in-upcoming-watchdog-report/ (last visited May 18, 2021).

[10]   *See*   https://www.nytimes.com/2019/11/22/us/politics/russia-investigation-inspector-general-report.html (last visited May 18, 2021).

[11] *Id.*

email had been altered, the role that the altered email played in the renewal process, and the fact that the violation was serious enough that it had been referred for potential criminal prosecution.

The Complaint makes clear that Page was highly attuned to media coverage of the FBI's surveillance of him, as well as its coverage of the imminent release of the IG Report.  *See* Am. Compl. ¶184 (detailing *Washington Post* story in April 2017 about his surveillance); *id.* ¶199 (alleging media stories on October 10, 2019 about imminent release of IG Report).  It was incumbent upon him to plead facts establishing that his claim was timely.  He failed to do so, undoubtedly because of media reports like the ones highlighted above.  His *Bivens* claim against Clinesmith should be dismissed as untimely.

### B.      A *Bivens* Claim Should Not Be Extended to This New Context.

Even if the Complaint pleaded a timely *Bivens* claim, it would be wrong as a matter of law to recognize a *Bivens* claim here.  Page's claim indisputably seeks to extend *Bivens* to a "new context" even though robust remedial schemes already exist to protect his rights, and even though numerous other special considerations counsel against that extension.  That attempt must be rejected under well-settled law.

### 1.      Page's *Bivens* Claim Arises in a "New Context."

Page claims that "[t]he individual Defendants" violated his Fourth Amendment rights by making misleading statements in the lead up to the applications for FISA warrants for surveilling Page.  Am. Compl. ¶245.  But the Supreme Court has never recognized a *Bivens* action for Fourth Amendment violations arising from a FISA application.  Page's claim thus arises in a new context.

A context is new if it "is different in a meaningful way from" the cases in which the **Supreme Court** has recognized a *Bivens* claim.  *Abbasi*, 137 S. Ct. at 1859; *see also Loumiet*, 948

F.3d at 382 ("[T]he new-context analysis may consider only Supreme Court decisions approving

*Bivens* actions.").  Such "meaningful" differences include, but are not limited to:

> the constitutional right at issue; the generality or specificity of the official action;
> the extent of judicial guidance as to how an officer should respond to the problem
> or emergency to be confronted; the statutory or other legal mandate under which
> the officer was operating; the risk of disruptive intrusion by the Judiciary into the
> functioning of other branches; or the presence of potential special factors that
> previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859-60.  Under these criteria, "even a modest extension is still an extension"

and thus "the new-context inquiry is easily satisfied."  *Id.* at 1864-65.

Page's claim presents much more than a "modest extension" from each of the three

Supreme Court cases that have previously recognized a *Bivens* claim.  Two of those cases—*Davis*

and *Carlson*—did not even concern the Fourth Amendment.  *See Davis*, 442 U.S. at 228 (Fifth

Amendment); *Carlson*, 446 U.S. at 14 (Eighth Amendment).  Because the "constitutional right at

issue" in those two cases was not the Fourth Amendment, they are meaningfully different from

Page's claim.  *Abbasi*, 137 S. Ct. at 1860.

That leaves *Bivens* itself, a case involving run-of-the-mill warrantless search-and-seizure

claims under the Fourth Amendment.  403 U.S. at 389.  There, too, meaningful differences abound:

- Page's claim involves electronic surveillance under FISA.  *Bivens* did not.  A "claim based
  on unlawful electronic surveillance presents wildly different facts and a vastly different
  statutory framework from a warrantless search and arrest."  *Attkisson v. Holder*, 925 F.3d
  606, 621-22 (4th Cir. 2019); *see also Abbasi*, 17 S. Ct. at 1860; *Corsi v. Mueller*, 422 F.
  Supp. 3d 51, 66 (D.D.C. 2019), *aff'd*, 819 F. App'x 6 (D.C. Cir. 2020) (dismissing Fourth
  Amendment *Bivens* claim against Robert Mueller premised on alleged FISA violation
  because claim arose in a "new context").

- Page's claim also involves high-ranking officials—the Director and Deputy Director of the
  FBI, to name a few.  Am. Compl. ¶¶23-24.  *Bivens* did not.  The "rank of the officers
  involved" also presents a meaningful difference that renders this context new.  *Abbasi*, 137
  S. Ct. at 1860.

- Page's claim further involves a "new category of defendants" in a *Bivens* action given that
  Clinesmith is an OGC attorney, yet another reason this context is new under controlling

law.  *Loumiet*, 948 F.3d at 382 ("new category of defendants" suffices to establish "new context," and "defendants in *Bivens* were federal narcotics agents" whereas the defendants in *Loumiet* were "OCC officials").

- Page's claim additionally involves a different "legal mandate" than in *Bivens*.  *Bivens* "involved the enforcement of federal drug laws"; the claim here involves FISA's electronic surveillance requirements.  *Abbasi*, 137 S. Ct. at 1860 (finding new context *vis-à-vis Bivens* because case involved "enforcement of federal banking laws under FIRREA").

- Page's claim also arises in the context of a national-security investigation into whether individuals associated with a presidential campaign were coordinating with the Russian government to unlawfully influence the 2016 presidential election.  *Bivens* did not.  Such national security considerations themselves render Page's claim meaningfully different from those in *Bivens*.  *See Abbasi*, 137 S. Ct. at 1860 (claims challenging high-level executive policy following major terrorist attack "bear little resemblance" to facts of *Bivens*).

- Finally, *Bivens* involved a warrantless search; "this case, by contrast, involves searches and seizures conducted *with* a warrant" and "thus implicates a distinct Fourth Amendment guarantee . . . governed by different legal standards."  *Annappareddy v. Pascale*, 2021 WL 1603987, at *9 (4th Cir. Apr. 26, 2021) (emphasis in original).  That renders it a new context for *Bivens* purposes.  *Id.*

The *only* similarity between Page's claim and *Bivens* is that both claims take root in the Fourth Amendment.  But "once [the Court] look[s] beyond the constitutional provisions invoked in *Bivens* . . . and the present case, it is glaringly obvious that [Page's] claims involve a new context, *i.e.*, one that is meaningfully different*."  Id.* at 743-44; *see also Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019) (Fourth Amendment *Bivens* claim against officer who misled investigators and grand jury was "new context").

## 2.    Special Factors Counsel Hesitation.

The Supreme Court has instructed courts to "'pay[] particular heed'" not to expand *Bivens* to new contexts if "'special factors counsel[] hesitation.'"  *Wilkie*, 551 U.S. at 550.  Because Page "assert[s] claims that arise in a new context," the Court "must proceed to the next step and ask whether there are special factors that counsel hesitation."  *Hernandez*, 140 S. Ct. at 744.  "[S]eparation-of-powers principles" are "central" to the special-factors analysis.  *Abbasi*, 137 S.

Ct. at 1857.  The analysis thus considers "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58.  A "special factor counseling hesitation" is a factor that "cause[s] a court to hesitate before answering that question in the affirmative." *Id.* at 1858.  That threshold is "remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc).

The relevant factors here should not merely cause "hesitation"; they should prompt the Court to slam the emergency breaks.  First, Congress has enacted a comprehensive statutory regime to govern electronic surveillance by law enforcement officers.  Where Congress has so exercised its legislative judgment, the judiciary should not superimpose its own remedy onto that statutory regime—particularly one in conflict with the remedies that Congress did provide. Second, courts will not expand *Bivens* to matters touching on "national security[] or intelligence." *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012); *see, e.g.*, *Abbasi*, 137 S. Ct. at 1861; *Meshal v. Higgenbotham*, 804 F.3d 417, 425-27 (D.C. Cir. 2015); *Lebron v. Rumsfeld*, 670 F.3d 540, 549-50 (4th Cir. 2012).  In those areas, Congress's competence to balance the competing considerations that bear on whether to permit a civil damages remedy is at its apogee, and the judiciary's at its nadir.  *Doe v. Rumsfeld*, 683 F.3d at 394; *see Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to . . . national security are rarely proper subjects for judicial intervention.").

     a.     *A Bivens Remedy Is Incompatible With the Comprehensive Statutory Scheme That Congress Has Enacted.*

The existence of a comprehensive statutory scheme is a "'special factor' that precludes creation of a *Bivens* remedy." *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008).  When Congress has comprehensively legislated in an area, courts should not override Congress's judgment by grafting a judicially created damages remedy onto the comprehensive statutory scheme that Congress has enacted.  Courts thus "must withhold their power to fashion damages

remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (per curiam).  Those principles control this case.

Over the past fifty years, "Congress has enacted legislation comprehensively regulating the field of electronic surveillance." *Mitchell v. Forsyth*, 472 U.S. 511, 542 (1985) (Stevens, J., concurring in the judgment).  FISA represents Congress's comprehensive effort "'to regulate foreign intelligence surveillance in the domestic context.'" *Fazaga v. FBI*, 965 F.3d 1015, 1046 (9th Cir. 2020).  Through that statute, Congress "'set out in detail roles for all three branches of government.'" *Id.* (brackets omitted).  It made the FISC the exclusive body to authorize warrants for foreign intelligence surveillance within the United States.  50 U.S.C. § 1803(a).  Congress carefully delineated the procedures for submitting a FISA application.  *See id.* § 1804; p. 3, *supra*. And Congress also precisely specified the findings required to issue a FISA warrant.  *Id.* § 1805(a); pp. 3-4, *supra*.  Moreover, Congress established numerous mechanisms for policing the Executive's use of FISA and protecting the public against abuses.  Congress created numerous civil and criminal penalties for specific, carefully delineated violations of FISA.  *E.g.*, *id.* §§ 1809, 1810; *see* pp. 4-5, *supra*.  And it reserved for itself a significant oversight role, requiring the submission of various reports from the Attorney General, the Director of National Intelligence, and the Administrative Office of the U.S. Courts, *see* pp. 5-6, *supra*, to ensure that Congress remained "fully inform[ed]" about "all electronic surveillance," *id.* § 1808(a)(1).

FISA itself qualifies as a comprehensive statutory scheme that counsels hesitation.  But there's more:  Other statutes govern the use of electronic surveillance outside the context of foreign intelligence-gathering operations.  The Wiretap Act provides processes for federal officials to

obtain court authorization to conduct electronic surveillance, 18 U.S.C. § 2516, criminalizes unlawful surveillance, *id.* § 2511(1)(a), creates a civil cause of action against individuals who violate the statutory protections, *id.* § 2520(a), and establishes a process for administrative discipline, *id.* § 2520(f). The Stored Communications Act creates another civil cause of action to remedy statutory violations, *id.* §§ 2707(a), (g), and adds another process to discipline government employees for misconduct, *id.* § 2707(d). And, after 9/11, Congress bolstered the statutory scheme concerning electronic surveillance by enacting the Patriot Act and adding ***yet another*** civil cause of action against the United States for violations of the surveillance laws. *Id.* § 2712.

In short, Congress has crafted a complex scheme governing electronic surveillance and any resulting abuses. That scheme reflects "a considered congressional judgment about which remedies should be available for claims that fall within its ambit." *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012). And by "legislat[ing] extensively in the area of electronic surveillance . . . without authorizing damages for a Fourth Amendment violation," *Attkisson*, 925 F.3d at 621, Congress repeatedly has decided that a *Bivens*-type remedy was unnecessary. Congress's decision was "'more than inadvertent' and strongly counsels hesitation before creating such a remedy" by judicial proclamation. *Id.* (quoting *Abbasi*, 137 S. Ct. at 1862). That is why courts repeatedly have refused to extend *Bivens* to the electronic-surveillance context. *See id.* at 621-22; *Brunoehler v. Tarwater*, 743 F. App'x 740, 742-43 (9th Cir. 2018) (declining to extend *Bivens* to an alleged illegal wiretap in part because the Wiretap Act provides an alternative structure); *Kelley v. FBI*, 67 F. Supp. 3d 240, 270-72 (D.D.C. 2014) (same with the Stored Communications Act).

Appending an extra-statutory, judicially-crafted remedy onto the remedies that Congress enacted would be particularly inappropriate here: The judicially-crafted remedy would not merely supplement the statutory remedies, it would be at war with them. A *Bivens* remedy, for example,

would eviscerate the Patriot Act's procedures requiring plaintiffs to present their claims in writing to the relevant government agency before suing the United States.  18 U.S.C. § 2712(b).  A plaintiff could evade those requirements entirely simply by suing the government official under *Bivens.*  To extend *Bivens* here would erase limitations that Congress, exercising its own legislative judgment, believed were necessary.  *Cf. Smith v. Robinson*, 468 U.S. 992, 1011 (1984) (allowing handicapped children "to go directly to court with an equal protection claim" when Congress had legislated "comprehensive" procedures for redress would "render superfluous" those legislated remedies and "run counter to Congress' view" on how to "best accommodate[]" those concerns).  As the Supreme Court has stressed, statutory limits on relief "are deliberate and are not to be evaded" through judicial innovation.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124 (2005).

In the end, Congress left no room for Page's *Bivens* action as to Clinesmith.  It crafted a comprehensive scheme governing electronic surveillance to acquire foreign intelligence information.  Page's claim falls in the heartland of that detailed scheme.  He accuses Clinesmith and the other defendants of misleading the FISC into issuing the FISA warrants against him.  Am. Compl. ¶245.  The existence of the FISC, the warrant-application process Clinesmith and the others supposedly abused, and even the allegedly erroneous "finding of probable cause," *id.*, are all governed by FISA, *see* 50 U.S.C. §§ 1803-1805.  Dissatisfied with the options Congress has provided, Page asks this Court to topple Congress's scheme by creating a damages remedy that Congress has declined to provide.  Under Supreme Court and D.C. Circuit precedent, that is a request the Court must decline.  *See Bush*, 462 U.S. at 390; *Davis*, 681 F.3d at 383.

>       b.       *National Security and Intelligence Concerns Counsel Hesitation.*

Judicial inquiry into "sensitive issues of national security" also raises separation of powers concerns that counsel hesitation, particularly when "the judicial inquiry comes in the context of a claim seeking money damages."  *Abbasi*, 137 S. Ct. at 1861; *Doe v. Rumsfeld*, 683 F.3d at 394

(courts will not imply a *Bivens* action touching on "military, national security, or intelligence" matters). That is because "[n]ational-security policy is the prerogative of the Congress and the President." *Abbasi*, 137 S. Ct. at 1861; *see also Lebron*, 670 F.3d at 549-50; *cf. Haig*, 453 U.S. at 292 ("Matters intimately related to . . . national security are rarely proper subjects for judicial intervention."). Thus, judicial deference to the political branches is at its height when considering matters of national security and intelligence. That deference "is quite relevant to the *Bivens* inquiry." *Lebron*, 670 F.3d at 549; *see also Doe v. Rumsfeld*, 683 F.3d at 394. It demonstrates that questions concerning the creation of a damages remedy in matters involving national security and intelligence are "'more appropriate[] for those who write the laws, rather than for those who interpret them.'" *Lebron*, 670 F.3d at 552 (quoting *United States v. Gilman*, 347 U.S. 507, 513 (1954)); *see also Arar*, 585 F.3d at 575. Courts therefore must "tread carefully before recognizing *Bivens* causes of action . . . within the national security arena." *Meshal*, 804 F.3d at 421.

Page's claim—which involves a national security investigation into allegations of foreign interference with a presidential election—presents precisely the sort of national-security and intelligence concerns that have led court after court to refuse extension of *Bivens*. *Abbasi*, 137 S. Ct. at 1861; *Meshal*, 804 F.3d at 421; *Doe v. Rumsfeld*, 683 F.3d at 394; *Lebron*, 670 F.3d at 552; *Arar*, 585 F.3d at 575. Litigation of a *Bivens* claim would inevitably require judicial intrusion into sensitive matters of national security and intelligence. Litigating the merits of such allegations would require the courts to sift through mountains of sensitive intelligence concerning the evidence available to the Crossfire Hurricane team and discussions concerning the content of the FISA applications. To be sure, "courts can—with difficulty and resourcefulness—consider state secrets and even reexamine judgments made in the foreign affairs context, *when they must*," because

30

Congress has vested the courts with statutory authority to consider such questions.  *Arar*, 585 F.3d at 575-76.  But that is not the case with the constitutional damages remedy that Page seeks.

Other concerns permeate national security cases as well.  For one thing, the relevant evidence likely would include classified information that cannot be introduced into the public record.  *Arar*, 585 F.3d at 577; *see also Wilson*, 535 F.3d at 710.  "This should provoke hesitation, given the strong preference in the Anglo–American legal tradition for open court proceedings." *Arar*, 585 F.3d at 577.  "The preference for open rather than clandestine court proceedings is a special factor that counsels hesitation in extending *Bivens*" to the FISA context.  *Id.*  The likelihood that relevant evidence might include classified information "would also make [the government] vulnerable to 'graymail,' *i.e.*, individual lawsuits brought to induce the [government] to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information."  *Tenet v. Doe*, 544 U.S. 1, 11 (2005).  "The risk of graymail is itself a special factor which counsels hesitation in creating a *Bivens* remedy."  *Arar*, 585 F.3d at 579.

Given the concerns attendant in cases involving matters of national security and intelligence, Congress is in a "far better position than a court to evaluate the impact of a new species of litigation," *Lebron*, 670 F.3d at 553, and to weigh the benefits and risks of permitting civil damages liability for constitutional violations.  Especially in a case as high profile as this one, which the Amended Complaint notes has garnered significant Congressional attention, Congressional action or inaction should remain the last word.

                    *              *              *

Ultimately, there are plenty of reasons why this Court should hesitate before expanding *Bivens* to this new context, as Page would have it do.  The Court's *Bivens* analysis need go no further to dismiss the *Bivens* claim.

**C.      Adequate Alternative Remedies Preclude Extension of *Bivens*.**

Even if no special factors counseled hesitation, the existence of "alternative methods of relief" precludes expansion of *Bivens* into this new context.  *Abbasi*, 137 S. Ct. at 1863; *see Hernandez*, 140 S. Ct. at 750 n.12 ("existence of alternative remedies" is "a further reason not to create *Bivens* liability" apart from special-factors analysis).  "[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."  *Abbasi*, 137 S. Ct. 1863.  In determining whether such remedies exist, courts are to "consider[] the full constellation of statutes and regulations" available. *Loumiet v. U.S.*, 948 F.3d 376, 385 (D.C. Cir. 2020) (internal quotation marks omitted). The alternative remedies need not be strong in order to preclude *Bivens* relief.  *Wormley*, 601 F. Supp. 2d 27, 37 (D.D.C. 2009) (even "weak remedy" available to plaintiff through Privacy Act barred her *Bivens* claims based on false statements in "Notice of Escape' leading to unlawful detention).  Even when available remedial schemes "leave gaps in the remedies available . . . , the presence of significant legislated remedies in this arena counsels against the recognition of a judicially created *Bivens* remedy."  *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 920 (D.C. Cir. 2018).  They even do so when the available alternative remedy specifically precludes relief against a plaintiff's particular defendants, leaving that plaintiff with no remedy against them.  *Wilson*, 535 F.3d at 706-08 (Privacy Act barred *Bivens* claims against defendants even though Act exempted them from liability and thus afforded no remedy against them).

The remedies available to those subjected to unlawful electronic surveillance easily exceed the bar required to preclude a *Bivens* remedy in this context.  Page recognizes actually pleads some of them.  The Patriot Act, for example, authorizes "money damages" and "litigation costs" against the United States for any "willful violation of" certain provisions of FISA and any violation of the Wiretap Act.  18 U.S.C. § 2712(a).  Page is pursuing such relief.  Am. Compl. ¶215.  And the Wiretap Act and the Stored Communications Act similarly provide a remedy for individuals who

have wrongfully been subjected to electronic surveillance.   18 U.S.C. §§ 2707(a), 2520(a). Numerous courts have invoked the remedies in those very statutes in refusing to extend *Bivens* to the FISA context.  *See, e.g.*, *Brunoehler*, 743 F. App'x at 742; *Kelley*, 67 F. Supp. 3d at 270; *Corsi*, 422 F. Supp. 3d at 66.[12]  This Court should do the same.

### D.      Even if Page May Pursue the *Bivens* Claim, the Complaint Does Not Allege Clinesmith's Personal Participation in a Fourth Amendment Violation.

Even if Page could pursue his *Bivens* claim, he has not pled facts that "'nudge[]'" his Fourth Amendment claim "'across the line from conceivable to plausible'" as to Clinesmith.  *Iqbal*, 556 U.S. at 680.  "[A] *Bivens* claim is brought against the individual officer for his or her own acts, not the acts of others." *Abbasi*, 137 S. Ct. at 1860.  Thus, "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added); *see also Hansen v. Cannon*, 122 F. App'x 265, 269 (7th Cir. 2004) ("[L]iability attaches only when officials intervene and actively participate in the seizure."); *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (defendant must have been "personally involved in the illegal conduct"); *Ortiz-Contreras v. Holder*, 126 F. Supp. 3d 127, 130 (D.D.C. 2015) (dismissing action against individual defendants in part because the complaint "alleged no facts that would support a claim that any of these Defendants were individually involved in the constitutional violations Plaintiff alleges"); *Corsi*, 422 F. Supp. 3d at 65-66 (same).

---

[12] To be clear, none of these claims is viable against Clinesmith.  The Patriot Act does not authorize a claim against individuals, and the two-year statute of limitations has run on claims under the Wiretap Act and the Stored Communications Act.  Page knew or should have known of the alleged violations no later than July 2018, when the Department of Justice released his FISA records.  *See* Charlie Savage, *Carter Page FISA Documents Are Released by Justice Department*, N.Y. Times, July 21, 2018, *available at* https://www.nytimes.com/2018/07/21/us/politics/carter-page-fisa.html.  The two-year limitations period thus lapsed in July 2020.

Page has not alleged that Clinesmith, through his own actions, violated Page's Fourth Amendment rights.  Clinesmith's name does not appear even once in the allegations concerning the first two FISA applications.  *Id.* ¶¶59-81 (discussing other specific defendants' alleged involvement but not mentioning Clinesmith); *id.* ¶¶82-99 (same for second application).  And Clinesmith's alleged tangential involvement in the third application was limited to a statement that he "prefer" Page not speak to the media, *id.* ¶103, which Page does not connect to the issuance of that warrant.  It is not plausible to infer, as Page seems to want to suggest, that if Page had spoken to the media, that warrant somehow would not have issued, particularly where DOJ previously had informed the FISC of Page's protestations.  Am. Compl. §§ 126-27.  Nor can Clinesmith be said to have engaged in misconduct merely by stating his "prefer[ence]" on that issue.  Page has plainly failed to allege that Clinesmith "was personally involved in the illegal conduct" he says underlay the first three applications.  *Simpkins*, 108 F.3d at 369.

The allegations concerning the fourth FISA application—that it impermissibly omitted that Page "had been an operational contact for the CIA" and that Clinesmith "conceal[ed] the exculpatory fact that Page had been a CIA source," Am. Compl. ¶¶112-1—fare no better.  Those allegations fail to state a Fourth Amendment violation against Clinesmith for at least four reasons.

*First*, those allegations do not amount to Clinesmith himself conducting surveillance of Page.  He himself did not engage in conduct that purportedly violated the Fourth Amendment.  As an OGC attorney, his role was a "to provide support to FBI personnel."  Am. Compl. ¶103.  Any allegation or suggestion that he himself authorized or engaged in surveillance would be implausible given his role, which is surely why Page alleges no such thing.

*Second*, the Complaint does not plausibly plead that Clinesmith *knew* that Page was not a source at the time he altered the email.  *See, e.g.*, *Berman*, 293 F. Supp. 3d at 55 (statement must

be knowingly false at time it was included in affidavit to violate Fourth Amendment); *Pierce v. Mattis*, 256 F. Supp. 3d 7, 14 (D.D.C. 2017) (same).  The closest that the Complaint comes to alleging that is to say that he "conceal[ed] the exculpatory fact that Page had been a CIA source." *Id.* ¶112.  But simply alleging that a fact is exculpatory, and was concealed, isn't enough; the question is whether Clinesmith *knew* that it was exculpatory and *knew* that it was false.  And the evidence on *that* point, both in the Amended Complaint and the IG Report that it incorporates, consistently goes the other way:

- Within hours of receiving the email on June 15, Clinesmith forwarded it— unaltered—to the relevant FBI case agent and that agent's supervisor.  IG Report at 250.

- Clinesmith also forwarded it—unaltered—to the relevant DOJ attorney.  *Id.* at 251-52.

- As acknowledged in the Complaint, Clinesmith openly told the SSA that he believed Page was in fact a "sub-source," a relationship he would not acknowledge if his intentional goal were to "conceal . . . exculpatory fact[s]."  Am. Compl. ¶112.

- As also acknowledged in the Amended Complaint, the FBI had access to the CIA documents revealing Page's status as a source since August 2016, and was provided those same documents again in June 2017, leaving Clinesmith or anyone else little reason to think Page's status could be hidden from anyone.

- Not surprisingly therefore, Judge Boasberg—after hearing the full array of evidence on the question whether Clinesmith was intentionally lying when he altered the email— concluded that "Clinesmith likely believed that what he said about Page *was true*, namely that he was a subsource but not a source of the Other Government Agency. . . .  I do not believe that he was attempting to achieve an end he knew was wrong."[13]

    *Third*, the Complaint fails to plead facts showing that Clinesmith's actions *caused* the

omission of the designated information from the fourth application.  As noted above, the August

---

[13] Sentencing Tr. at 51:12-18 (emphasis added).  The Court may take judicial notice of this transcript. *Dupree v. Jefferson*, 666 F.2d 606, 608 n. 1 (D.C. Cir. 1981) (taking judicial notice of record in related civil case "pursuant to [its] authority to judicially notice related proceedings in other courts"); *Nat'l R.R. Passsenger Corp. v. Consol. Rail Corp.*, 698 F.  Supp. 951, 953 (D.D.C. 1988), *vacated on other grounds*, 892 F.2d 1066 (D.C. Cir. 1990) (taking judicial notice "of the transcript of the plea of guilty hearing" in a Maryland court); *Xydas v. United States*, 445 F.2d 660, 668 (D.C. Cir. 1971) (taking judicial notice of trial transcript).

2016 memo which disclosed Page's relationship with the CIA had long been in the FBI's possession, *id.* ¶115, and the DOJ attorney and FBI case agent responsible for drafting the initial application previously concluded that Page's relationship with the CIA need not be disclosed, *id.* ¶68.  Consequently, his status as a former CIA "operational contact" was left out of the first three applications as well.[14]   The Complaint fails to plead a causal link between Clinesmith's actions and the omission of that information.

*Fourth and finally*, the Complaint fails to allege that probable cause would not have existed if Clinesmith had not acted as he did.   To state a Fourth Amendment violation based on false statements in a search warrant affidavit, a complaint must plead that the false statements were "necessary to the probable cause finding."  *Berman*, 293 F. Supp. 3d at 55.  Doing so requires that one "excise any information that is allegedly false and include any information allegedly omitted, thus creating a 'hypothetical, redacted affidavit,'" and to then "ask whether that affidavit 'still established probable cause.'"  *Id.* (quoting *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016), and *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013)).  Doing all of that "is a question of law" appropriate on a motion to dismiss.  *Crook*, 293 F. Supp. 3d at 55 (citing *Cardoza*, 713 F.3d at, 659).

---

[14] One need not guess what the FBI (or DOJ) would have done if it were aware of the unaltered email.  As noted above, by the next day Clinesmith had forwarded it—unaltered—to the relevant FBI case agent, the agent's supervisor, and the DOJ attorney responsible for drafting the application.  IG Report at 250-252.  FBI and DOJ personnel involved in preparing the Fourth Application were therefore aware of the unaltered email, yet Page's prior relationship with the CIA was not disclosed.  That is unsurprising: The SSA was focused on whether Page had been "tasked by another agency," IG Report at 249, and "operational contacts" for the CIA cannot be tasked.  *See* p. 12 n. 4, *supra*.  Thus, as the SSA acknowledged, the unaltered email "doesn't really answer the question" that he was focused on: whether Page had been tasked.  *Id.* at 249-50, 254-55. So, while the unaltered email clearly revealed *some* relationship between Page and the CIA, it did not trigger disclosure because it did not show a *taskable* relationship between Page and the CIA.

Page fails to plead, even in conclusory fashion, that the fourth FISA warrant would not have issued had Clinesmith not engaged in the conduct he alleges. Indeed, the allegations in the Complaint that are on point suggest the opposite. As the Amended Complaint notes, Clinesmith expected that the FBI would still conclude that probable cause existed even knowing that Page had years ago been a CIA source, because he expected the team would write a "terrible footnote" disclosing that in the fourth application if it was true. Am. Compl. ¶159.[15] Even Page's cherry-picked items of Congressional testimony show that those interviewed would not have simply trashed the fourth warrant application out of hand, but instead would have done such things as have "a much fuller discussion" of the issues. *Id.* ¶175 (Testimony of James Comey).[16]

Ultimately, Clinesmith's alleged conduct is too far removed from the warrant application process and the resulting surveillance to constitute a Fourth Amendment violation. *See Elkins v. District of Columbia*, 636 F. Supp. 2d 29, 33 (D.D.C. 2009) (no Fourth Amendment violation where defendant "not involved in the decision to seek a search warrant, in preparing the warrant application, in searching the house, or in seizing the documents"). As even Page must admit, his role was "to provide support to FBI personnel," not to prepare or execute warrants—much less to

---

[15] Indeed, Judge Boasberg—presently, the Presiding Judge of the FISC—reached just that conclusion when he sentenced Clinesmith in the criminal case. "[E]ven if Clinesmith had been accurate about Page's relationship with the [CIA]," Judge Boasberg said, "*the warrant may well have been signed and the surveillance authorized.*" Sentencing Tr. 52:10-13 (emphasis added).

[16] Page alleges that he functioned as an operational contact for the CIA *only* between 2008 and 2013, Am. Compl. ¶9—*years before* the July 2016 meetings between Page and the two sanctioned Russian individuals as reported in the *Yahoo! News* article, years before Page's interactions with Russians while serving on the Trump Campaign, and years before the subject of the Crossfire Hurricane investigation. *See* Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, Yahoo! News (Sept. 23, 2016), https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html (last accessed May 18, 2021); Am. Compl. ¶¶11, 12, 64; IG Report at vii, 200-01, 221-22 (explaining that the FISA applications were driven in large part by information unrelated to Page's conduct as an operational contact with the CIA). While Page's status as an operational contact may have been relevant to the FISA application, it was not dispositive as to whether there was probable cause for the warrant.

actually review any documents or information obtained.  *See* Am. Compl. ¶103.  Page has alleged "no facts that would support a claim that" Clinesmith was "individually involved in the constitutional violations Plaintiff alleges." *Ortiz-Contreras*, 126 F. Supp. 3d at 130.

## II.     The FISA Claims (Counts 1-4) Must Be Dismissed.

Page also asserts four FISA claims against Clinesmith under 50 U.S.C. § 1810.  Am. Compl. ¶¶216-234.  That provision reads:  "An aggrieved person . . . who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation."  To state a claim against Clinesmith under section 1810, Page plausibly must allege: (1) that he is an "aggrieved person[]"; (2) that he was "subjected to an electronic surveillance"; and (3) that Clinesmith violated section 1809. *Farzaga*, 965 F.3d at 1050.  Page's claims under that statute are untimely, and in any event fail to plausibly plead those elements.  Each of his FISA claims against Clinesmith must be dismissed.

### A.     Page's FISA Claims Are Untimely.

FISA contains no limitations period of its own.  When "a cause of action created by a federal statute" has no limitations period, courts "generally 'borrow' the most closely analogous state limitations period," and "[i]n the rare case" borrow "analogous federal limitations periods." *Graham Cty. Soil & Water Conservation Dist. v. U.S.* ex rel. *Wilson,* 545 U.S. 409, 414-15 (2005). Page's FISA claims are barred under either approach.  As to the former, there are numerous closely analogous state law claims—libel, slander, and invasion of privacy—with one-year limitations periods, giving the Court ample reason to adopt that period here.  D.C. Code 12-301(a)(4) (libel and slander); *Greenpeace, Inc.,* 97 A.3d at 1061-62 (invasion of privacy).  As explained above, Page knew of the surveillance more than a year before he filed suit and even knew of Clinesmith's alleged misconduct then.  *See* pp. 21-22, *supra*.

Even if the Court were inclined to adopt the two-year limitations period from the Wiretap Act or the Stored Communications Act, the claims are still time-barred because Page had a present cause of action, if at all, when the surveillance occurred. It both occurred and was known to Page more than two years before he filed suit. *See* p. 21, *supra*. The FISA claims are untimely.

### B.   The Complaint Does Not Allege That Clinesmith Engaged in Electronic Surveillance or Used Information Obtained from Such Surveillance.

The FISA claims also fail on their merits. A civil cause of action "under § 1810 is predicated on a violation of § 1809." *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 851 (9th Cir. 2012). Congress intended "civil liability of intelligence agents under [§ 1810] [to] coincide with the criminal liability [under § 1809]." H.R. Rep. No. 95-1720, at 34 (1978). The text does just that; it gives a cause of action only to those who have been "subjected to an electronic surveillance or about whom information obtained by electronic surveillance . . . has been disclosed or used in violation of section 1809." 50 U.S.C. § 1810. As a result, a plaintiff can recover under § 1810 only if he plausibly alleges that the defendant violated § 1809. *Fazaga*, 965 F.3d at 1030.[17]

Section 1809 imposes liability only on someone who (1) "engages in electronic surveillance" unless authorized by other provisions of FISA, the Wiretap Act, or the Stored Communications Act. 50 U.S.C. § 1809(a)(1); or (2) "discloses or uses information . . . obtained through electronic surveillance" that the person knew was not properly authorized. Thus, to recover against Clinesmith under that statute, Page must allege that Clinesmith "engage[d] in"

---

[17] *See also Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 335 F. Supp. 3d 772, 784 (D. Md. 2018) ("[T]he civil cause of action in § 1810 is premised upon *the individual agent's* 'violation of section 1809'") (emphasis added) (quoting *Al-Haramain*, 705 F.3d at 854); *Lampon-Paz v. Dep't of Justice*, No. 16-cv-9071, 2019 WL 2098831, at *7 (D.N.J. May 14, 2019) (liability under § 1810 "must be premised on a prior criminal conviction under [FISA]"); *Attkisson v. Holder*, No. 17-cv-364, 2017 WL 5013230, at *12 (E.D. Va. Nov. 1, 2017) (cause of action lies "against any person who committed a violation of § 1809.") (quotation marks omitted).

surveillance or "disclose[d] or use[d]" its fruits.  But Page's Complaint manifestly fails to allege the latter—all of its allegations as to Clinesmith are centered on his role in assisting the FBI in *obtaining* the FISA warrants.  And those allegations, for a host of reasons, fail to plead that Clinesmith "engage[d] in electronic surveillance" as well.

FISA's text and history require a narrow reading of the phrase "engages in electronic surveillance."   The statute defines "electronic surveillance" to mean "the acquisition" of information "by an electronic, mechanical, or other surveillance device" and "the installation or use of an electronic, mechanical, or other surveillance device."  50 U.S.C. § 1801(f).  By its plain terms, a person "engages in electronic surveillance" only if he or she participates in the actual "acquisition" of intelligence or "the installation or use of" devices to collect intelligence.  That is the plain meaning of what it is to "engage in" something.  *See, e.g.*, MERRIAM-WEBSTER'S ONLINE DICTIONARY (defining "engage in" as (1) "to do" or (2) "to cause (someone) to take part in (something)").[18]   Page does not allege that Clinesmith "did" the surveilling or "caused" the personnel he was "supporting" to do so.  As noted, he fails even to plead that the warrants would not have issued but for Clinesmith's actions.  It fails to plead that he "engaged in" surveillance.

Courts have long read section 1809 according to those plain terms.  Thirty years ago, the Ninth Circuit explained that the phrase "engages in electronic surveillance" "is best understood as subjecting to criminal liability anyone who *performs* electronic surveillance" without statutory authorization.  *United States v. Koyomejian*, 946 F.2d 1450, 1459 n. 16 (9th Cir. 1991) (emphasis added).  And last year, that court affirmed dismissal of FISA claims against FBI officers whose supervisees engaged in wrongdoing but who neither "ordered [n]or arranged for" the "planting of

---

[18]  https://www.merriam-webster.com/dictionary/engage%20in?src=search-dict-box  (last visited May 14, 2021).

the recording devices" at issue.  *Fazaga*, 965 F.3d at 1039.  Other courts have also dismissed FISA claims where a complaint failed to "plausibly allege that [a defendant] actually engaged in the alleged unauthorized surveillance" because it did not allege that the defendant "personally engaged in the alleged surveillance."  *Attkisson*, 2017 WL 5013230, at *12; *cf. Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-150, 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020) (reading similar language in the Stored Communications Act as applying to only those defendants who "themselves accessed [plaintiff's] computer systems").

The Act's safe harbor from liability in situations where a warrant eventually issues confirms that the Act is meant to apply only to those directly involved in conducting the surveillance.  Under section 1809(b) "[i]t is a defense to a prosecution under subsection (a) that the defendant was *a law enforcement or investigative officer* engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant[.]"  (Emphasis added.)  As the emphasized words show, the exemption concerns those directly involved in conducting and using surveillance—"law enforcement or investigative officer[s]."  It would be odd to exempt from liability those primarily responsible for properly obtaining and executing a search warrant but not those whose lesser role is "to provide support" to them.  Am. Compl. ¶103.  The exemption's express focus on "law enforcement [and] investigative officer[s]" illustrates who it is who "engages in surveillance" under the meaning of the statute.  Section 1809's focus is, as Congress wanted, on the individual "intelligence agents" conducting the surveillance, not persons tangentially involved behind the scenes in a support role.  H.R. Rep. No. 95-1720, at 34 (1978).

That approach is consistent with the rule that courts aren't to presume that Congress intends secondary liability to be available when it creates statutory causes of action and fails to specify it.

"[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank, N.A. v. First Interstate Bank*, N.A., 511 U.S. 164, 182 (1994). "The same principle applies to bar recovery from coconspirators, . . . because Congress knows how to provide private plaintiffs with an action for secondary liability when it sees fit." *Broidy Cap. Mgmt. LLC*, 2020 WL 1536350, at *11 (citing *CAIR Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 27 (D.D.C. 2013), and *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998)). Its failure to do so here, in conjunction with the plain language of the statute, is dispositive. *See id.* (finding no secondary liability under Stored Communication Act's cause of action for "intentionally accessing without authorization" electronic communications facilities).

To the extent there is any ambiguity at all in the phrase "engages in electronic surveillance," that "'ambiguity concerning the ambit of [a] criminal statute[] should be resolved in favor of lenity.'" *Skilling v. United States*, 561 U.S. 358, 410 (2010) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). By construing criminal statutes to apply "only to conduct clearly covered," the rule of lenity ensures that individuals have "fair warning" of what the law forbids. *United States v. Lanier*, 520 U.S. 259, 266 (1997). These principles apply even where, as here, the statute "has both criminal and noncriminal applications." *Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n. 8 (2004). The rule of lenity thus requires that the phrase "engages in electronic surveillance" be narrowly construed to require personal participation in the surveillance itself.

Nothing in the Amended Complaint suggests that Clinesmith ever "engaged in electronic surveillance" as that phrase is used in the FISA statute. Any such claims would lack all plausibility given his "support[ing]" role as an OGC Attorney. Am. Compl. ¶103. Nor can Page save these

claims through conclusory, collective allegations that "the individual Defendants . . . engaged in electronic surveillance." *Id*. ¶¶220, 224, 228, 232.  A plaintiff cannot evade "Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct."[19] *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (quotation marks omitted).  The FISA claims must be dismissed.

## III.   Clinesmith Is Entitled to Qualified Immunity Because Page Cannot Show a Violation of Clearly Established Fourth Amendment and FISA Rights.

Even if Page had alleged violations of the Fourth Amendment and FISA, Clinesmith would be entitled to qualified immunity.  Qualified immunity shields government officials from suit "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Page stumbles at both steps of the qualified-immunity analysis.

To start, Page has failed to plead even that Clinesmith violated his rights under the Fourth Amendment, as explained above.  But even if Page has done so, he cannot show that the "right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735.  A right is not clearly established unless "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *Id.* at 741.  "[I]f a reasonable officer might not have known for certain that the conduct was unlawful"—here, that the conduct violated the Fourth Amendment or FISA— "then the officer is immune from liability." *Abbasi*, 137 S. Ct. at 1867; *see al-Kidd*, 563 U.S. at 741 (to defeat qualified immunity, "every reasonable official" in defendant's position must have

---

[19] Furthermore, to the extent that Clinesmith's actions are (improperly) construed as engaging in surveillance, he becomes entitled to the exemption from liability enjoyed by those who actually engage in surveillance—"law enforcement [and] investigative officer[s]."  50 U.S.C. § 1809(b).

known conduct was unlawful).  Courts must not define "clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742.  Rather, the right at issue "must be defined with specificity."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  It is a plaintiff's burden to satisfy the "demanding standard" showing that a particular right was clearly established.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

Page cannot meet that demanding standard here.  Clearly established law did not put the Fourth Amendment question Clinesmith faced "beyond debate."  *See al-Kidd*, 563 U.S. at 741.  Viewed at the required level of specificity, the question Clinesmith confronted was whether "provid[ing] support" to foreign intelligence investigators charged with making probable cause determinations meant that he himself was engaging in a search.  *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("[S]pecificity is especially important in the Fourth Amendment context[.]").  And, while *Franks v. Delaware*, 438 U.S. 154 (1978), may have established that lying in a warrant affidavit violates the Fourth Amendment, *id.* at 171, that is not what the Complaint alleges Clinesmith did; it alleges he sent an altered email to someone else who signed the FISA application, who did not include the altered statement in the application, and who had access to the same underlying documents as did Clinesmith.  *See* Am. Compl. ¶¶110-113.

Indeed, other cases have drawn precisely this distinction.  *See Melton v. Phillips*, 875 F.3d 256, 266 (5th Cir. 2017) ("*Franks* expressly requires a falsehood to be included in the warrant application for there to be a Fourth Amendment violation."); *Weyker*, 984 F.3d at 569 (explaining that an officer's "provid[ing] allegedly false information to another officer" was distinct from "a *Franks*-type violation").  After all, others at the FBI and DOJ had looked into whether Page was "a 'source' for the CIA" nearly a full year before and considered that information unworthy of disclosure.  Am. Compl. ¶68.  That makes it impossible to say that "every reasonable official"

would know that altering the email would proximately cause a Fourth Amendment violation, let alone that it could somehow mean that Clinesmith had thereby engaged in a search. *Cf. Kapinski v. City of Albuquerque*, 964 F.3d 900, 909-12 (10th Cir. 2020) (not clearly established that material omissions in warrant application violated Fourth Amendment).

Nor did existing precedent clearly establish that Clinesmith's conduct violated Page's rights under FISA. *See Fazaga*, 965 F.3d at 1039 (defendants "entitled to qualified immunity on the FISA claim"); *id.* at 1031 ("Plaintiffs accept[ed] that qualified immunity can apply under FISA.").[20]  As explained above, FISA's text—and the court decisions interpreting it—gives no hint that a lawyer who provides behind-the-scenes support in an investigation "engages in electronic surveillance" as required for criminal and civil liability. 50 U.S.C. § 1809(a)(1); *see* pp. 40-43, *supra*.  Perhaps that is why *not even one case* suggests that a lawyer in a support role who alters an email that was not even used in a warrant affidavit somehow "engages in electronic surveillance."  Nor is there any case holding that an official who engages in surveillance that was authorized by a FISC warrant—even one later deemed defective—violates FISA.  Uncertainty and novelty are the opposite of clearly established.  Clinesmith is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, all claims against Kevin Clinesmith should be dismissed with prejudice.

---

[20] Even if FISA's safe harbor provision limits the availability of qualified immunity under FISA, *see Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) (no qualified immunity under Title III because of safe harbor provision in that statute), FISA's safe harbor provision does not apply to Clinesmith because he was not a "law enforcement or investigative officer," as explained above. 18 § U.S.C. 1809(b).  Qualified immunity is therefore available here.

Dated:   May 18, 2021

Respectfully submitted,

/s/ William Pittard
William Pittard (#482949)
Christopher C. Muha (#987116)
Sarah Fink (#166663)
KAISERDILLON PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
wpittard@kaiserdillon.com
cmuha@kaiserdillon.com
sfink@kaiserdillon.com

*Attorneys for Kevin Clinesmith*