# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CARTER PAGE, | |
|       Plaintiff, | |
|       v. | No. 20-cv-3460 |
| JAMES COMEY, ANDREW MCCABE, KEVIN CLINESMITH, PETER STRZOK, LISA PAGE, JOE PIENTKA III, STEPHEN SOMMA, BRIAN J. AUTEN, DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, UNITED STATES OF AMERICA, JOHN DOES 1-10, JANE DOES 1-10, | |
|       Defendants. | |

## KEVIN E. CLINESMITH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

William Pittard (#482949)
Christopher C. Muha (#987116)
Sarah Fink (#166663)
KAISERDILLON PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
wpittard@kaiserdillon.com
cmuha@kaiserdillon.com
sfink@kaiserdillon.com

*Attorneys for Kevin E. Clinesmith*

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.     Statutory and Regulatory Background ...................................................................2

       A.     The Foreign Intelligence Surveillance Act ................................................2

             1.     Congress Authorizes Electronic Surveillance to Acquire Foreign Intelligence Information ...........................................................3

             2.     Congress Provides for Civil and Criminal Liability for Certain FISA Violations .......................................................................4

             3.     Congressional Oversight of FISA Activity ................................5

       B.     Other Relevant Statutes ............................................................................6

II.     The Second Amended Complaint's Allegations ...................................................8

             1.     The Initial FISA Application ......................................................9

              2.     The Second FISA Application ...................................................10

              3.     The Third FISA Application.......................................................11

              4.     The Fourth FISA Application .....................................................11

              5.     Causes of Action .......................................................................13

STANDARD OF REVIEW................................................................................................13

ARGUMENT......................................................................................................................14

I.     The FISA Claims (Counts 1-4) Must Be Dismissed. .........................................14

       A.     Page's FISA Claims Are Untimely. ........................................................14

             1.     Page's Claims Are Barred Under Numerous Closely Analogous D.C. Limitations Periods........................................................15

2.    Page's Claims Are Barred Under the Limitations Periods of the Most
      Closely Analogous Federal Laws as Well. ...................................................18

B.    The SAC Does Not Allege That Clinesmith Engaged In Electronic
      Surveillance or Used Information Obtained From Such Surveillance.. ...............18

      1.    Clinesmith Manifestly Engaged In No Surveillance. ....................................19

      2.    The SAC Fails To Identify Anyone's "Use" or "Dsclosure" of Any
            Fruits of the Warrants.. ................................................................................22

II.   The *Bivens* Claim (Count 6) Must Be Dismissed as Untimely and Because It
      Would Impermissibly Extend *Bivens* to a New Context. ..................................24

A.    Page Fails to Plead a Timely *Bivens* Claim. .........................................................25

      1.    A One-Year Statute of Limitations Governs the *Bivens* Claim. ....................26

      2.    The Second Amended Complaint Fails to Plead a Timely Claim. ................27

B.    A *Bivens* Claim Should Not Be Extended to This New Context. ..........................31

      1.    Page's *Bivens* Claim Arises in a "New Context." .........................................31

      2.    Special Factors Counsel Hesitation.. .............................................................33

            a.    A *Bivens* Remedy is Incompatible With the Comprehensive
                  Statutory Scheme That Congress Has Enacted. ........................................33

            a.    National Security and Intelligence Concerns Counsel Hesitation. .........36

C.    Adequate Alternative Remedies Preclude Extension of *Bivens*. ...........................38

D.    Even if Page Could Pursue a *Bivens* Claim, the SAC Still Does Not Allege
      Clinesmith's Personal Participation in a Fourth Amendment Violation. ..............39

III.  Clinesmith Is Entitled to Qualified Immunity Because Page Cannot Show a
      Violation of Clearly Established Fourth Amendment and FISA Rights. .........................43

CONCLUSION ..................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Al-Haramain Islamic Found., Inc. v. Obama*,
  705 F.3d 845 (9th Cir. 2012) .......................................................................... 18-19

*Allen v. Brown*,
   435 F. Supp. 3d 16, 24 (D.D.C. 2020)....................................................................16

*Amobi v. D.C. Dep't of Corr.*,
   755 F.3d 980, 994 (D.C. Cir. 2014)........................................................................30

*Annappareddy v. Pascale*,
  2021 WL 1603987 (4th Cir. Apr. 26, 2021) ..........................................................33

*Arar v. Ashcroft*,
  585 F.3d 559 (2d Cir. 2009) (en banc) ............................................................33, 37

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ......................................................................................... 43-44

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................13, 25, 39

*Attkisson v. Holder*,
  925 F.3d 606 (4th Cir. 2019) ............................................................................32, 35

*Attkisson v. Holder*,
  No. 17-cv-364, 2017 WL 5013230 (E.D. Va. Nov. 1, 2017) .................................20

*Bame v. Dillard*,
  No. CV 05-1833 (RMC), 2008 WL 11515525 (D.D.C. Mar. 28, 2008)................20

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015)...............................................................................8

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................13

\*\*Berman v. Crook,
  293 F. Supp. 3d 48 (D.D.C. 2018)..............................................26, 27, 30, 40, 42

*Berman v. Crook*,
  No. 1:16-cv-2123 (RCL) (D.D.C. Apr. 18, 2017) .................................................26

*Berry v. Funk,*
   146 F.3d 1003 (D.C. Cir. 1998)................................................................................................45

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) .................................................................................................*passim*

*Broidy Cap. Mgmt. LLC v. Muzin,*
   No. 19-cv-150, 2020 WL 1536350 (D.D.C. Mar. 31, 2020)............................................20, 21

*Brunoehler v. Tarwater,*
   743 F. App'x 740 (9th Cir. 2018)........................................................................................35, 39

*Bush v. Lucas,*
   462 U.S. 367 (1983) ............................................................................................................25, 36

*CAIR Action Network, Inc. v. Gaubatz,*
   891 F. Supp. 2d 13 (D.D.C. 2013)............................................................................................21

*Carlson v. Green,*
   446 U.S. 14 (1980) ..............................................................................................................24, 32

*Cent. Bank, N.A. v. First Interstate Bank, N.A.,*
   511 U.S. 164 (1994) ....................................................................................................................21

*Cf. County of Hudson v. Janiszewski,*
   520 F. Supp. 2d 631, 643 (D.N.J. 2007).....................................................................................30

*Cf. Kapinski v. City of Albuquerque,*
   964 F.3d 900,909-12 (10th Circ. 2020)......................................................................................45

*Church of Scientology v. Foley,*
   640 F.2d 1335 (D.C. Cir. .1981)..........................................................................................15, 26

*City of Escondido v. Emmons,*
   139 S. Ct. 500 (2019) (per curiam)............................................................................................44

*City of Rancho Palos Verdes v. Abrams,*
   544 U.S. 113 (2005) ....................................................................................................................36

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .......................................................................................................................3

*Cleveland v. United States,*
   531 U.S. 12 (2000) ......................................................................................................................21

*Corr. Servs. Corp. v. Malesko,*
   534 U.S. 61 (2001) ................................................................................................................24, 25

*Corsi v. Mueller,*
    422 F. Supp. 3d 51 (D.D.C. 2019) ..................................................................................... 32, 39

*Davis v. Billington,*
    681 F.3d 377 (D.C. Cir. 2012) ......................................................................................... 35,36

*Davis v. Passman,*
    442 U.S. 228 (1979) ......................................................................................................... 24, 32

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,*
    135 F.3d 837 (2d Cir. 1998) ................................................................................................... 21

*District of Columbia v. Wesby,*
    138 S. Ct. 577 (2018) ............................................................................................................. 44

*Doe v. Rumsfeld,*
    683 F.3d 390 (D.C. Cir. 2012) ......................................................................................... 36, 37

\*\**Doe v. U.S. Dep't of Justice,*
    753 F.2d 1092 (D.C. Cir. 1985) ................................................................................. 15, 25, 26

*Dupree v. Jefferson,*
    666 F.2d 606, 608 n.1 (D.C. Cir. 1981) ................................................................................ 41

*Farah v. Weyker,*
    926 F.3d 492 (8th Cir. 2019) ........................................................................................... 33, 45

\*\**Fazaga v. FBI,*
    965 F.3d 1015 (9th Cir. 2020) ........................................................................................ *passim*

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ............................................................................................................... 25

*Francis v. Miligan,*
    510 F. App'x 138 (3d Cir. 2013) ........................................................................................... 27

*Franks v. Delaware,*
    438 U.S. 154 (1978) ............................................................................................................... 44

*Graham Cty. Soil & Water Conservation Dist. v. U.S.* ex rel. *Wilson,*
    545 U.S. 209 (2005) ......................................................................................................14,15,18

*Greenpeace, Inc. v. Dow Chemical Co.,*
    97 A.3d 1053 (D.C. 2014) ..................................................................................................... 15

*Haig* v. *Agee,*
    453 U.S. 280 (1981) ............................................................................................................... 38

*Hampton v. Comey*,
  No. 14-cv-1607 (ABJ), 2016 WL 471277 (D.D.C. Feb. 8, 2016) .............................. 14, 25, 27

*Hansen v. Cannon*,
  122 F. App'x 265 (7th Cir. 2004) ........................................................................... 39

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................................................... 43

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) ........................................................................... 25, 31, 33, 37. 38

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) ................................................................................ 13

*Jefferson v. Harris*,
  170 F. Supp. 3d 194 (D.D.C. 2016) ........................................................................ 26

*Kapinski v. City of Albuquerque*,
  964 F.3d 900 (10th Cir. 2020) ................................................................................ 45

*Kelley v. FBI*,
  67 F. Supp. 3d 240 (D.D.C. 2014) ..................................................................... 35, 39

*Lane v. District of Columbia*,
  211 F. Supp. 3d 150 (D.D.C. 2016) ........................................................................ 42

*Lebron v. Rumsfeld*,
  670 F.3d 540 (4th Cir. 2012) ........................................................................... 36, 37

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) .................................................................................................... 21

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*,
  881 F.3d 912 (D.C. Cir. 2018) ................................................................................ 38

**Loumiet v. United States*,
  948 F.3d 376 (D.C. Cir. 2016) ......................................................................... *passim*

*Melton v. Phillips*,
  875 F.3d 256 (5th Cir. 2017) ................................................................................. 44

*Meshal v. Higgenbotham*,
  804 F.3d 417 (D.C. Cir. 2015) ................................................................................ 37

*Minneci v. Pollard*,
  565 U.S. 118 (2012) ............................................................................................... 25

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) .................................................................................................. 34

*Mullenix v. Luna*,
    577 U.S. 7 (2015) (per curiam)................................................................................... 44

*Nat'l R.R. Passenger Corp. v. Consol. Rail Corp*,
    698 F. Supp. 951 (D.D.C. 1988) ................................................................................ 41

*Ortiz-Contreras v. Holder*,
    126 F. Supp. 3d 127 (D.D.C. 2015)...................................................................... 33, 38

*Page v. Oath, Inc.*,
    No. 1:17-cv-6990-LGS, ECF Mo. 42 at 1-2 (S.D.N.Y. Feb 5, 2018) ..................... 17

*Pierce v. Mattis*,
    256 F. Supp. 3d 7 (D.D.C. 2017)............................................................................... 40

*Richardson v. Sauls*,
    319 F. Supp. 3d 52 (D.D.C. 2018)............................................................................. 29

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) .................................................................................................. 25

*Simpkins v. D.C. Gov't*,
    108 F.3d 366 (D.C. Cir. 1997).............................................................................. 39, 40

*Skilling v. United States*,
    561 U.S. 358 (2010) .................................................................................................. 21

*Smith v. Robinson*,
    468 U.S. 992 (1984) .................................................................................................. 35

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) (en banc) .................................................................. 34

*Tenet v. Doe*,
    544 U.S. 1 (2005) ...................................................................................................... 31

*Toumazou v. Turkish Republic of N. Cyprus*,
    71 F. Supp. 3d 7 (D.D.C. 2014)........................................................................... 22, 24

*United States v. Cardoza*,
    713 F.3d 656 (D.C. Cir. 2013)................................................................................... 42

*United States v. Clinesmith*,
    No. 20-cr-165 (D.D.C. Aug. 19, 2020)...................................................................... 12

*United States v. Gilman,*
   347 U.S. 507 (1954) ......................................................................................37

*United States v. Koyomejian,*
   946 F.2d 1450 (9th Cir. 1991) .....................................................................19

*United States v. Stanley,*
   483 U.S. 669 (1987) ......................................................................................25

*Wallace v. Kato,*
   549 U.S. 384 (2007) ...............................................................................16,27

*Western Center for Journalism v. Cederquist,*
   235 F.3d1153 (9th Cir. 2000) ......................................................................27

*Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.,*
   335 F. Supp. 3d 772 (D. Md. 2018)..............................................................18

*Wilkie v. Robbins,*
   551 U.S. 537 (2007) ......................................................................................25

*Wilson v. Libby,*
   535 F.3d 697 (D.C. Cir. 2008).............................................................33, 37,38

*Wormley v. United States,*
   601 F. Supp. 2d 27 (D.D.C. 2009).............................................15, 26, 27, 38

\*\**Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017)...........................................................................*passim*

## STATUTES AND RULES

18 U.S.C. § 1001(a)(3) ..........................................................................................14

18 U.S.C. § 2511(1)(a) .....................................................................................7, 24

18 U.S.C. § 2515 ......................................................................................................7

18 U.S.C. § 2516 .............................................................................................7, 8, 23

18 U.S.C. § 2520(a) ......................................................................................7, 24, 28

18 U.S.C. § 2520(d) ..........................................................................................8, 38

18 U.S.C. § 2520(e) ..........................................................................................7, 25

18 U.S.C. § 2520(f) ..........................................................................................8, 24

18 U.S.C. § 2701(a) .................................................................................................8

18 U.S.C. § 2707(a) .................................................................................................... 28

18 U.S.C. § 2707(d) ............................................................................................... 8, 24

18 U.S.C. § 2707(e) ............................................................................................... 8, 38

18 U.S.C. § 2707(f) ................................................................................................ 8, 25

18 U.S.C. § 2707(g) ............................................................................................... 8, 24

18 U.S.C. § 2709 ............................................................................................................ 8

18 U.S.C. 2712 ................................................................................................. 9, 16, 24

18 U.S.C. § 2712(a) .................................................................................................... 28

18 U.S.C. § 2712(b) .................................................................................................... 25

18 U.S.C. § 2712(b)(1) ................................................................................................. 9

18 U.S.C. § 2712(b)(2) ................................................................................................. 9

18 U.S.C. § 2712(c) ...................................................................................................... 9

50 U.S.C. § 1801(f) .................................................................................................... 33

50 U.S.C. § 1801(k) ...................................................................................................... 6

50 U.S.C. § 1802(a)(1) .................................................................................................. 3

50 U.S.C. § 1802(a)(1)(A) ............................................................................................ 3

50 U.S.C. § 1802(a)(1)(B) ............................................................................................ 3

50 U.S.C. § 1802(a)(1)(C) ............................................................................................ 3

50 U.S.C. § 1803 ........................................................................................................ 25

50 U.S.C. § 1803(a) ................................................................................................. 3, 23

50 U.S.C. § 1803(b) ...................................................................................................... 3

50 U.S.C. § 1804 ................................................................................................... 23, 25

50 U.S.C. § 1804(a) ...................................................................................................... 4

50 U.S.C. § 1804(a)(1)-(9) ........................................................................................... 4

50 U.S.C. § 1805 ........................................................................................................ 25

50 U.S.C. § 1805(a) ...................................................................................................23

50 U.S.C. § 1805(a)(1) ................................................................................................4

50 U.S.C. § 1805(a)(2) ................................................................................................4

50 U.S.C. § 1805(a)(2)(A) ...........................................................................................4

50 U.S.C. § 1805(a)(3) ................................................................................................5

50 U.S.C. § 1805(a)(4) ................................................................................................5

50 U.S.C. § 1805(c)(2)(A) ...........................................................................................5

50 U.S.C. § 1805(d)(1) ................................................................................................5

50 U.S.C. § 1805(d)(2) ................................................................................................5

50 U.S.C. § 1805(d)(3) ................................................................................................5

50 U.S.C. § 1806 ........................................................................................................5

50 U.S.C. § 1806(e) ....................................................................................................6

50 U.S.C. § 1807 ........................................................................................................7

50 U.S.C. § 1808 ........................................................................................................7

50 U.S.C. § 1808(a)(1) ..............................................................................................23

50 U.S.C. § 1809 ...........................................................................................23, 34, 35

50 U.S.C. § 1809(a) .......................................................................................36, 37, 38

50 U.S.C. § 1809(a)(1) ...........................................................................2, 5, 37, 41

50 U.S.C. § 1809(a)(2) .........................................................................................6, 33

50 U.S.C. § 1809(b) ..........................................................................................*passim*

50 U.S.C. § 1809(c) ....................................................................................................6

50 U.S.C. § 1810 ..............................................................................................*passim*

50 U.S.C. § 1811 ........................................................................................................3

50 U.S.C. § 1813 ........................................................................................................5

50 U.S.C. § 1827 ........................................................................................................6

50 U.S.C. § 1827(a) ........................................................................................................6

50 U.S.C. § 1827(b) ........................................................................................................6

50 U.S.C. § 1827(c) ........................................................................................................6

50 U.S.C. § 1828 .............................................................................................................6

50 U.S.C. § 1842 .............................................................................................................8

50 U.S.C. § 1845(e) ........................................................................................................6

50 U.S.C. § 1871 .............................................................................................................7

50 U.S.C. § 1873(a)(1) ....................................................................................................7

50 U.S.C. § 1873(b) ........................................................................................................7

50 U.S.C. § 1881-1881g ..................................................................................................5

50 U.S.C. § 2517 .............................................................................................................8

Pub. L. 90-351, § 801, 82 Stat. 197, 223 (1968) ..........................................................38

Pub. L. 95-511, § 109(b), 92 Stat. 1783 (1978) ............................................................38

Pub. L. 99-508, § 103, 100 Stat. 1848 (1986) ..............................................................38

Fed. R. Civ. P. 8 .............................................................................................................36

Fed. R. Civ. P. 12(b)(6) ..................................................................................................16

D.C. Code § 12-301(a)(4) ....................................................................................18, 20, 38

## LEGISLATIVE AUTHORITIES

H.R. Rep. No. 95-1283, pt. 1 (1978) ..............................................................................38

H.R. Rep. No. 95-1720 (1978) ..................................................................................33, 34

S. Select Comm. to Study Governmental Operations with Respect to Intelligence
   Activities *Book II: Intelligence Activities and the Rights of Americans*, S. Rep.
   No. 94-755 (1976) ........................................................................................................2

Senate Resol. 21, Jan. 27, 1975, Sec. 1 ..........................................................................3

## OTHER AUTHORITIES

Department of Justice Office of the Inspector General, *Review of Four FISA
    Applications and Other Aspects of the FBI's Crossfire Hurricane
    Investigation* (Revised Dec. 2019) ................................................................*passim*

Charlie Savage, *Carter Page FISA Documents Are Released by Justice
    Department*, N.Y. Times, July 21, 2018, *available at* https://www.nytimes.
    com/2018/07/21/us/politics/carter-page-fisa.html ................................................33

Merriam-Webster's Online Dictionary ...........................................................40

*U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, Yahoo!
    News (Sept. 23, 2016), https://www.yahoo.com/news/u-s-intel-officials-
    probe-ties-between-trump-adviser-and-kremlin-175046002.html (last accessed
    Feb. 14, 2021)..........................................................................................37

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327
    (4th ed. 2014) ...............................................................................................8

**INTRODUCTION**

In July 2016, the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ") began investigating whether individuals associated with the Donald J. Trump for President Campaign were coordinating with Russia's interference in the 2016 presidential election.  The FBI and DOJ later opened a separate but related investigation into whether Carter Page, an advisor to Donald Trump, was acting as a foreign agent of Russia.  DOJ ultimately filed four applications with the Foreign Intelligence Surveillance Court ("FISC") seeking authority for the FBI to conduct surveillance of Page under the Foreign Intelligence Surveillance Act ("FISA"). Page now asserts claims premised on misstatements and omissions in the FISA applications.

As to Kevin Clinesmith, he was a lawyer in the FBI's Office of the General Counsel and, as such, played a "support[ing]" role in the FBI's request that DOJ seek the FISA warrants.  Sec. Am. Compl. ¶122 (June 8, 2021) (ECF No. 73) ("SAC").   Page now asserts claims against Clinesmith under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* and FISA.  Those claims fail as a matter of law.

Page's FISA claims are time-barred, and in any event fail on their merits.  Page does not allege that Clinesmith personally "engage[d] in electronic surveillance" or "disclosed or used" the fruits of such surveillance.  50 U.S.C. § 1809(a)(1)-(2).  But a claim under section 1810 (which premises civil liability on violations of section 1809) requires just that.  Its plain text, its consistent interpretation by courts across the country, and the presumption against reading secondary liability into statutes all point to that same conclusion.

The *Bivens* claim is also time-barred, and, in any event, court after court for the past forty years has refused to expand the availability of that claim to new contexts, as this undoubtedly would be.  They have particularly refused to do so where, as here, Congress has created a web of alternative remedies and where the issues involve sensitive matters of national security and

intelligence.  Judicial intrusion into that kind of Congressional regulatory scheme would violate the separation of powers.  Especially when the issues are as high-profile as these and already have gained extensive Congressional attention—a fact that the SAC records in some detail—any further remedies should be left to Congress.  As the Supreme Court recently made clear, a *Bivens* remedy under these circumstances is impermissible.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

Even if *Bivens* or FISA remedies were otherwise available here (as they are not), Clinesmith would be entitled to qualified immunity on all counts.  Page has not alleged conduct by Clinesmith himself that any reasonable government officer would have recognized amounted to a "search," let alone a search that violated the Fourth Amendment or FISA.  In other words, existing precedent has not put the relevant statutory or constitutional question beyond debate.  Not even close.  For these reasons and more, the claims against Clinesmith must be dismissed.

## BACKGROUND

### I.     Statutory and Regulatory Background

#### A.     The Foreign Intelligence Surveillance Act

In 1975, a congressional task force known as the Church Committee was formed to investigate possible abuses during federal intelligence operations.  *See* Senate Resol. 21, Jan. 27, 1975, Sec. 1.  The Church Committee ultimately recommended that Congress "enact[] . . . a comprehensive legislative charter" that would "cover[] the field" of domestic electronic surveillance.  S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 297 (1976).  The Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq.*, was that "comprehensive legislative charter."

2

1.    *Congress Authorizes Electronic Surveillance to Acquire Foreign Intelligence Information*

Congress enacted FISA "to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).  It permits the government to employ electronic surveillance in pursuit of "foreign intelligence information."   In all but a subset of cases not relevant here, such surveillance must be authorized by a court order.  *See* 50 U.S.C. § 1802(a)(1) (articulating circumstances where surveillance may occur without a court order).  To consider applications for such surveillance, Congress created a specialized court—the Foreign Intelligence Surveillance Court ("FISC")—to be staffed by Article III judges.  *Id*. § 1803(a).  Congress also created an appellate tribunal—the Foreign Intelligence Surveillance Court of Review, also staffed by Article III judges—to review denials by the FISC of applications for electronic surveillance.  *Id.* § 1803(b).

Congress established detailed procedures for obtaining a court order authorizing foreign intelligence electronic surveillance.  To obtain a surveillance order, a federal officer, having first obtained approval from the Attorney General, must apply for an order from one of the FISC judges.  50 U.S.C. § 1804(a).  The application must detail nine separate requirements as defined by the statute.  *Id.* § 1804(a)(1)-(9).

Congress also set forth, in detail, the findings that a FISC judge must make before authorizing surveillance.  First, the FISC judge must find that the application was made by a federal officer and approved by the Attorney General.  50 U.S.C. § 1805(a)(1).  Second, the FISC judge must find probable cause to believe *both* that the target of the surveillance is a foreign power or an agent of a foreign power, *and* that a foreign power or agent of a foreign power is using, or is about to use, each of the facilities or places at which electronic surveillance will be directed.  *Id.* § 1805(a)(2).  Additionally, if a United States person is the surveillance target, the FISC judge

must find that he or she is not being considered an agent of a foreign power based only on activities protected by the First Amendment.  *Id.* § 1805(a)(2)(A).  The FISC judge must also conclude that the proposed minimization procedures meet certain statutory requirements, and that the application contains all statements and certifications required by the FISA statute.  *Id.* § 1805(a)(3)-(4).

The FISC may approve electronic surveillance "for the period necessary to achieve its purpose, or for ninety days, whichever is less."  50 U.S.C. § 1805(d)(1).  Surveillance of a foreign power or an agent of a foreign power can last for up to one year.  *Id.*  "Extensions of an order . . . may be granted on the same basis as an original order upon an application for an extension and new findings made in the same manner as required for an original order."  *Id.* § 1805(d)(2).  Among other things, the FISC's order must "direct" "that the minimization procedures be followed."  *Id.* § 1805(c)(2)(A).  The judge issuing the order may "assess compliance with the minimization procedures" while the surveillance is happening or after it has ended.  *Id.* § 1805(d)(3).  Congress also set forth—in detail—how information acquired through FISA-authorized electronic surveillance may be used.  50 U.S.C. § 1806.

> ### 2.   *Congress Provides for Civil and Criminal Liability for Certain FISA Violations*

Congress expressly provided for civil and criminal liability arising from certain FISA violations.  Significantly, Congress specifically defined the scope of each civil and criminal cause of action it created in FISA.

Section 1809 imposes criminal liability in two situations.  First, a person may not intentionally "engage[] in electronic surveillance under color of law except as authorized" by FISA and certain other federal statutes.  50 U.S.C. § 1809(a)(1).  Second, a person may not intentionally "disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not

authorized" by the same federal statutes. *Id.* § 1809(a)(2). Congress also created a statutory defense to prosecution under section 1809 for a "law enforcement or investigative officer engaged in the course of his official duties" when the "electronic surveillance was authorized by and conducted pursuant to a search warrant." *Id.* § 1809(b).

Section 1810, in turn, creates a civil cause of action for certain violations of § 1809 against the "person who committed such violation." 50 U.S.C. § 1810.

Congress created numerous other remedies for violations of FISA's provisions. For example, section 1827 criminalized certain unauthorized physical searches executed for the purpose of obtaining foreign intelligence information as well as the disclosure or use of information obtained from such a search. 50 U.S.C. § 1827(a); *see also id.* § 1827(b)-(c) (creating statutory defense and delineating penalties). Section 1828 provides a civil remedy for certain violations of section 1827. And evidence unlawfully obtained in violation of FISA's provisions may be the subject of a motion to suppress. *See, e.g.*, *id.* §§ 1806(e), 1845(e).

### 3.   *Congressional Oversight of FISA Activity*

In addition to providing civil remedies and criminal liability, Congress provided other mechanisms for maintaining accountability over the government's exercise of FISA authority. The Director of the Administrative Office of the United States Courts, for example, must submit detailed annual reports to no fewer than three congressional committees, 50 U.S.C. § 1873(a)(1), and the Director of National Intelligence must publish annual reports on its website, *id.* § 1873(b). The Attorney General, meanwhile, must submit various reports to Congress and the Administrative Office of the U.S. Courts covering a host of topics related to the government's use of FISA authority. *See id.* §§ 1807, 1808, 1871.

\*      \*      \*

5

Thus, in FISA, Congress comprehensively regulated the field of foreign intelligence surveillance, carefully setting forth the scope of permissible surveillance and the procedures and standards by which such surveillance must be authorized.  It established carefully calibrated remedies to address instances where individuals run afoul of FISA's provisions.  And it envisioned a role for all three branches of government in furthering FISA's goals and enforcing the statutory limits that Congress imposed.

### B.    Other Relevant Statutes

FISA is not Congress's only word on electronic surveillance.  Numerous other statutes regulate the government's use of electronic surveillance.  Like FISA, they contain carefully calibrated civil and criminal remedies.

*The Wiretap Act.*  With the Wiretap Act, Congress made it a crime to intentionally intercept "any wire, oral, or electronic communication."  18 U.S.C. § 2511(1)(a).  It also restricted the use of intercepted communications as evidence, *id.* § 2515, and it set forth the processes and standards by which federal law enforcement officials can obtain "an order authorizing or approving the interception of wire or oral communications," *id.* § 2516.

To deter unlawful surveillance, Congress created a civil cause of action against individuals who violated the Wiretap Act's provisions, 18 U.S.C. § 2520(a), subject to a two-year statute of limitations, *id.* § 2520(e).  Congress also gave federal officials "a complete defense" if they relied in "good faith" on "a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization."  *Id.* § 2520(d).  Finally, Congress required agencies, upon a finding of a Wiretap Act violation, to consider whether the official responsible for the violation should be subject to administrative discipline.  *Id.* § 2520(f).

*The Stored Communications Act.*  The Stored Communications Act, in amended form, made it a crime to "intentionally access[]" electronic communications without permission or in

excess of granted permission.  18 U.S.C. § 2701(a).  Other sections authorized the FBI to access certain wire or electronic communications, set forth the process for doing so, and provided for judicial review of any such request.  *Id.* § 2709.

The Stored Communications Act also created a civil cause of action against any "person or entity, other than the United States," who unlawfully accessed an electronic communication or disclosed certain information acquired via electronic surveillance.  18 U.S.C. § 2707(a), (g).  As in the Wiretap Act, Congress imposed a two-year statute of limitations, *id.* § 2707(f), and gave defendants "a complete defense" if they relied in "good faith" on "a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization," *id.* § 2707(e).  Also like the Wiretap Act, Congress required the agency to consider whether any employee found to be responsible for a violation should be subject to administrative discipline.  *Id.* § 2707(d).

*The Patriot Act.*  After the 9/11 terrorist attacks, Congress granted the FBI and other agencies new powers to intercept electronic communications, 18 U.S.C. § 2516, expanded the authorization of law enforcement agencies to share information with each other, *id.* § 2517, and reinvigorated FISA and other statutes regulating electronic surveillance, *e.g.*, 50 U.S.C. § 1842.

Having granted federal law enforcement new electronic surveillance powers, the Patriot Act also created a new civil cause of action against the United States for money damages arising from certain violations of statutes governing the use of electronic surveillance.  18 U.S.C. § 2712.  Before pursuing any claim under section 2712, the aggrieved person must present the claim to the appropriate department or agency under the procedures of the Federal Tort Claims Act.  *Id.* § 2712(b)(1).  Like similar statutes, the claim is subject to a two-year limitations period, *id.* § 2712(b)(2), and agencies must consider whether to impose administrative discipline on employees found responsible for a violation, *id.* § 2712(c).

## II.       The Allegations of the Second Amended Complaint[1]

Plaintiff Carter Page is a former foreign-policy advisor to Donald J. Trump's 2016 presidential campaign. SAC ¶21. He alleges that he got swept up in the FBI's investigation into whether individuals tied to the Trump campaign helped Russia interfere with the 2016 election. *Id.* ¶5. As a result, Page says, the government unlawfully surveilled him after illegally obtaining FISA warrants. *Id.* ¶140. DOJ, the FBI, and several individuals, Page claims, withheld material information from and otherwise misled the FISC to obtain those warrants in violation of FISA and Page's Fourth Amendment rights.[2] *See, e.g., id.* ¶¶47, 85. Clinesmith was then an Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of the General Counsel; he was assigned to support the FBI agents working on the investigation. *Id.* ¶28.

Shortly after opening the investigation—codenamed "Crossfire Hurricane"—the FBI sought authorization from the FISC to conduct electronic surveillance of Page. *Id.* ¶8. To establish the necessary probable cause, Page alleges, the FBI relied on information from Christopher Steele, a confidential source for the FBI. *Id.* ¶9. Steele provided the FBI with certain reports that alleged Page had improper or unlawful communications with two Russians with close ties to Russian President Vladimir Putin. *Id.* ¶14. Page alleges that Steele was "politically motivated" and that the FBI did not treat the information he provided with a sufficiently jaundiced eye. *Id.* ¶74.

---

[1] For present purposes, Clinesmith accepts, as he must, the allegations in the Second Amended Complaint. Many of the allegations, however, are false.

[2] Page repeatedly references and relies upon information contained in a Department of Justice Office of the Inspector General Report titled "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation" (Revised Dec. 2019) (the "IG Report"), *see* SAC ¶¶38, 39, 57, 193, and at least one cause of action turns on DOJ's alleged refusal to allow Page to review the report before DOJ publicly released it, *id.* ¶253. This Court may thus consider the entirety of the IG Report without converting this motion into one for summary judgment. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

The FBI and DOJ ultimately prepared and submitted four FISA applications to conduct electronic surveillance of Page—the initial application and three renewal applications.  SAC ¶3. All four applications were granted by the FISC.  *Id.*

> 1.   *The Initial FISA Application*

In October 2016, DOJ submitted the application for the initial FISA surveillance of Page. SAC ¶150.  That first application grew out of information the FBI had received from Steele linking Page to certain Russians affiliated with Vladimir Putin.  *Id.* ¶74.  As part of the investigation into Page, the CIA[3] gave members of the Crossfire Hurricane team an August 17, 2016, memorandum (the "August 2016 memorandum") detailing Page's relationship with that agency.  *Id.* ¶72.  The memorandum stated that Page had been an "operational contact" for the CIA.  *Id.*  About a month later, a news article alleged that Page had held meetings with the same two Russian individuals. *Id.* ¶76.  In response, Page sent a letter to the FBI Director in which he claimed, among other things, that he had "a decades' long record of interactions with the CIA and FBI."  *Id.* ¶81.

Shortly after Page's letter, a particular DOJ attorney—who was assigned to draft the initial FISA application as well as the renewals—asked the relevant FBI case agent whether Page had in fact been a "source" for the CIA as Page's letter claimed.  *Id.* ¶84.  The case agent responded that Page had met with another government agency but that that contact was dated, "outside scope," and—in his opinion—need not be included in the FISA application.  *Id.* ¶205; *see also* IG Report at 157.  The SAC says the case agent's answer was incomplete, inaccurate, and in some ways contrary to the information the CIA had given the Crossfire Hurricane team.  SAC ¶84.

---

[3] The Second Amended Complaint alleges the "Other Government Agency" involved in this matter is the CIA.  We do so as well for only that reason.

The SAC alleges other problems with the first FISA application.  It alleges that the FBI gave insufficient scrutiny to Steele's potential motives in providing damaging information about the Trump campaign, *id.* ¶¶159, 168.  This initial application was submitted in late October 2016. *Id.* ¶150.  The FISC later issued the first FISA warrant.  *Id.* ¶3.

The SAC nowhere alleges that Clinesmith was involved with the initial FISA application; the allegations about that application do not mention Clinesmith in the least.  *See id*. ¶¶70-100.

### 2.    The Second FISA Application

In early 2017, DOJ submitted an application for a second FISA warrant.  SAC ¶111.  As with the first, the SAC highlights alleged omissions and misstatements in the second but attributes none of them to Clinesmith.  *Id.* ¶¶111-14.  It says that Steele was "suspended" as a confidential source with the FBI because of unauthorized disclosures to the press.  *Id.* ¶111.  It also alleges that Steele's primary sub-source—from whom he collected information that he later passed on to the Crossfire Hurricane team—had been investigated as a possible Russian spy.  *Id.* ¶110.  It alleges that even though Steele's relationship with the FBI had been "suspended" and that Steele's primary sub-source "might well be a Russian intelligence officer," *id.* ¶¶111, 113, DOJ still submitted the second application to the FISC.  The FISC later issued the second FISA warrant.  *Id.* ¶3.

The SAC again alleges no involvement at all by Clinesmith in DOJ submitting this application.  *Id.* ¶¶101-18.

### 3.    The Third FISA Application

In April 2017, DOJ submitted the application for a third FISA warrant.  SAC ¶122. According to the SAC, the first six months of surveillance conducted under the first two FISA warrants had revealed no evidence that Page was acting as a foreign agent of Russia.  *Id.* ¶123.  As with the first two FISA applications, the SAC alleges the third application was false and misleading.  *Id.* ¶125.  The SAC further alleges that, before DOJ submitted the third application,

the FBI had received information that "contradicted or undermined the allegations" about Page in the first two FISA applications, but DOJ failed to disclose those things. *Id.* ¶¶120-21.

As with the first two applications, the SAC alleges no involvement by Clinesmith in DOJ's drafting of this application. It alleges only one thing as to him—that he told Page's attorney that he would prefer if Page did not speak to the media about "Evgeny Buryakov, a Russian spy who had posed as a New York banker." *Id.* ¶122. The FISC issued the third FISA warrant. *Id.* ¶3.

### 4. *The Fourth FISA Application*

In June 2018, DOJ submitted the application for the fourth FISA warrant. SAC ¶133. The fourth application, like its predecessors, allegedly concealed information that the FBI had received from the CIA—namely, that Page had been an "operational contact" for the CIA. *Id.* ¶131.

Before filing the fourth application, an FBI Supervisory Special Agent ("SSA") sought to again clarify what, if any, relationship Page had with the CIA. *Id.* ¶129. (As noted above, the DOJ attorney who handled all four FISA applications had specifically inquired about that the year before in connection with the initial FISA application. *See* p. 9, *supra*.) The SSA, who would be the affiant for the fourth application, asked Clinesmith to help resolve the issue. SAC ¶129. On June 15, Clinesmith did as instructed and asked the CIA whether Page ever had been a source. *Id.* ¶130. According to Page, a CIA employee responded via email the same day, saying that Page had been a source and directing Clinesmith's attention to reports previously prepared by the CIA and provided to the FBI. *Id.* One of the reports listed in the email was the August 17, 2016, memorandum the CIA had provided to the FBI at the inception of the Crossfire Hurricane investigation that detailed Page's relationship with the CIA. *Id.*; *see* p. 9, *supra*.[4]

---

[4] While the CIA email indicates that Page "provide[d] reporting to" the CIA, it makes no direct reference to Page being a "source." IG Report at 250. The term "source" (formally known as "Confidential Human Source") is, within the FBI, a term of art with a specialized meaning. An

Page alleges that, four days after receiving the email from the CIA, Clinesmith falsely advised the SSA that Page "had been a 'sub source,' but was 'never a source' for the CIA." SAC ¶131. Page asserts that the SSA asked whether Clinesmith had that representation in writing, and he further maintains that Clinesmith "falsely stated" that he did. *Id.* He alleges that Clinesmith altered the June 15 email from the CIA to falsely state, expressly, that Page was "not a source" for the CIA and forwarded the altered email to the SSA. *Id.*[5] The SAC further alleges that Clinesmith altered the email in an effort to "conceal … exculpatory" information about Page. *Id.* Significantly, the SAC does not allege that Clinesmith deleted anything from the June 15 email. *Id.* Thus, the email that the SSA received continued to reference the August 2016 memorandum that had been provided to the FBI before issuance of the first warrant and "document[ed] that Carter Page was an 'operational contact.'" *Id.* ¶72.[6]

---

FBI source may be "tasked," i.e., the FBI can directly ask a source to collect information and then debrief the source about it. Page, on the other hand, served as an "operational contact" which, as that term is used by the CIA, is an individual who may ***not*** be tasked. *Id.* at 6 n. 8. In other words, Page was definitively not a "source" within the FBI's meaning of the term.

[5] As a result of altering the email, Clinesmith pleaded guilty to making a false statement in violation of 18 U.S.C. § 1001(a)(3). *United States v. Clinesmith*, No. 20-cr-165 (D.D.C. Aug. 19, 2020), Dkt. 8. The false statement was Clinesmith's representation, in forwarding the email, that the original email contained the words "not a source" when he knew it did not contain those words. In sentencing Clinesmith to probation, Judge Boasberg – who at the time was also the Presiding Judge of the FISC – noted that "Clinesmith likely believed that what he said about Page was true, namely that he was a subsource but not a source." Sentencing Tr. 51:11-15, *United States v. Clinesmith*, No. 20-cr-165 (D.D.C. Jan. 29, 2021), Dkt. 22 (hereafter "Sentencing Tr."). Based on the evidence, the court concluded that Clinesmith had "no active intent to harm," and that, "[b]y altering the e-mail, he was saving himself some work and taking an inappropriate shortcut" but was not "attempting to achieve an end he knew was wrong." *Id.* at 51:9-10, 15-18.

[6] While the SAC ignores the events between June 15 (when Clinesmith received the email from the CIA liaison) and June 19 (when he forwarded the altered email to the SSA), the IG Report does not. The same day Clinesmith received the email from the CIA, he forwarded it—without alteration—to the relevant FBI case agent and that agent's supervisor. IG Report at 250. The next day he also forwarded the CIA's response—again without alteration, but without his initial email

The SAC alleges that the fourth application, "like the three preceding applications, did not advise the FISC that Page had been an operational contact for the CIA, although the FBI Crossfire Hurricane team had this information in its possession since August 2016." *Id.* ¶134. The SAC does not explain how receiving that information again (this time from Clinesmith) would have altered the content of the fourth application given that it had been excluded from the first three (despite being in DOJ and FBI possession). The FISC issued the fourth FISA warrant. *Id.* ¶13.

### 5. Causes of Action

Page alleges five causes of action against Clinesmith. Four counts assert FISA violations against the eight individual defendants, one for each FISA application. SAC ¶¶256-74 (Counts 1-4). A fifth seeks damages from the individual defendants for Fourth Amendment violations under the implied cause of action first recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics. Id.* ¶¶283-89 (Count 6).

## STANDARD OF REVIEW

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), a complaint must "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept as true all well-pled facts and draw all inferences from them in the plaintiff's favor. *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). But the factual allegations "must still 'be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). A plaintiff must do more than just allege "labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

---

to the CIA liaison—to the DOJ attorney responsible for drafting the FISA renewal. *Id.* at 251. Those actions are in no way consistent with a desire to "conceal" Page's relationship with the CIA.

## ARGUMENT

Each of Page's claims against Clinesmith is legally deficient and should be dismissed.[7]  All five of his claims are time-barred because Page was aware of his surveillance—and even Clinesmith's role in it—before the latest date on which any claim could be timely.  They also plainly fail on their merits.

### I.      The FISA Claims (Counts 1-4) Must Be Dismissed.

Page asserts four FISA claims against Clinesmith under 50 U.S.C. § 1810.  SAC ¶¶256-274.  As explained above, that provision provides for civil liability for violations of section 1809, which is violated when a person "engages in" unauthorized electronic surveillance or "discloses or uses" its fruits. 50 U.S.C. § 1809(1)-(2); *see Fazaga v. FBI*, 965 F.3d 1015, 1050 (9th Cir. 2020) 965 F.3d at 1050.  Page's FISA claims are untimely, and in any event fail on their merits.

#### A.      Page's FISA Claims Are Untimely.

As a threshold matter, the SAC fails to plead timely FISA claims as to Clinesmith.  FISA contains no limitations period of its own.  When "a cause of action created by a federal statute" has no limitations period, courts "generally 'borrow' the most closely analogous state limitations period," and "[i]n the rare case" borrow "analogous federal limitations periods."  *Graham Cty. Soil & Water Conservation Dist. v. U.S.* ex rel. *Wilson,* 545 U.S. 409, 414-15 (2005).  Although "[s]tate law dictates the statute of limitations, . . . the timing of the accrual of [plaintiff]'s claims is a question of federal law."  *Loumiet v. United States*, 828 F.3d 935, 947 (D.C. Cir. 2016).  Under federal law, accrual occurs "when the plaintiff has a complete and present cause of action,'"  *Hampton v. Comey*, 2016 WL 471277, at *13 (quotation marks omitted), which occurs "when the

---

[7] Clinesmith incorporates by reference the arguments of his co-defendants that apply to him, particularly (1) those explaining that intent is required to be pled as to every element of a FISA claim, and (2) those concerning the traceability of damages to the conduct alleged.

factual and legal prerequisites for filing suit are in place," *Loumiet*, 828 F.3d at 947.  Page's claims are time-barred under any available limitations period.

        **1.**      **Page's Claims Are Barred Under Numerous Closely Analogous D.C. Limitations Periods.**

    First, Page's FISA claims are time-barred under the approach courts "generally' take— applying the most closely analogous state law limitations period.  *Graham Cty. Soil & Water Conservation Dist.*, 545 U.S. at 414-15.  The most closely analogous state law claims—libel, slander, and invasion of privacy—all have one-year limitations periods, giving the Court ample reason to adopt that period here.  D.C. Code 12-301(a)(4) (libel and slander); *Greenpeace, Inc. v. Dow Chemical Co.*, 97 A.3d 1053, 1061-62 (D.C. 2014) (invasion of privacy).  When courts borrow limitations periods from state law, they look to "the gist" of the alleged conduct—not the legal provision the conduct is alleged to have violated—to determine the most closely analogous limitations period.  *See, e.g.*, *Doe v. Department of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985) (holding that *Bivens* claim alleging due process violations was barred by D.C.'s one-year limitations period for libel because "[t]he gist of Doe's claims against the individual defendants is that they disseminated false and defamatory statements to other attorneys" which "destroyed her reputation"); *Church of Scientology v. Foley*, 640 F.2d 1335 (D.C. Cir. 1981) (one-year limitations period applied to *Bivens* claims alleging First and Fifth Amendment violations because they effectively amounted to defamation claims); *Wormley v. United States*, 601 F. Supp. 2d 27, 35 (D.D.C. 2009) (applying one-year limitations period to *Bivens* claim alleging unlawful detention caused by false statements in "Notice of Escape" from halfway house).  And "the gist" of Page's claims here sound squarely in libel and defamation.  The allegation as to Clinesmith is not that he signed the warrant application or surveilled Page, but that he libeled Page to others who then used the libel to obtain surveillance.  In the words of *Doe v. Department of Justice*, Page alleges that

Clinesmith "disseminated [the] false and defamatory statement[]" that Page had never been a CIA source "to other[s]" who then used it to commit a constitutional violation, thereby "destroy[ing] [his] reputation." 753 F.2d at 1114. In fact the SAC writ large—and not just as to Clinesmith— sounds in defamation as well.[8]  Both the misconduct Page alleges as to Clinesmith and the harms he claims to have suffered from that misconduct sound squarely in libel.  D.C.'s one-year limitations period for such claims appropriately applies to Page's FISA's claims.

Given that limitations period, Page's FISA claims are clearly time-barred.  Page had a present cause of action, if at all, when the surveillance occurred.  *Allen v. Brown*, 435 F. Supp. 3d 16, 24 (D.D.C. 2020) ("two-year statute of limitations" in wiretapping statute "requires that recordings *took place*" within two years of filing of claim) (emphasis added); *Wallace*, 549 U.S. at 388 (Fourth Amendment false seizure claim accrued upon moment of detention).  That is when Page "had a complete and present cause of action," *Wallace*, 549 U.S. at 388, *i.e.*, "when the factual and legal prerequisites for filing suit [we]re in place," *Loumiet*, 828 F.3d at 947.  But as the SAC— and public facts of which this Court should take judicial notice—make abundantly clear, Page both knew he was being surveilled and believed it to be unfounded long before November 28, 2019. The SAC itself acknowledges that on April 11, 2017, *The Washington Post* ran a story about the issuance of multiple FISA warrants as to Page, which detailed part of the proffered justification for the first warrant.  SAC ¶221.  What the SAC fails to acknowledge is that Page himself is quoted in the article, stating that the surveillance "*confirms all of my suspicions about unjustified,*

---

[8] The SAC centers on how the *existence* of the surveillance (and what it reflected about his potential ties to Russia) tarnished his reputation, thereby causing him to lose business and to be subjected to threatening and inexcusable behavior.  *See, e.g.*, SAC ¶214 (alleging "[i]rreparable damage to his reputation," "[e]conomic losses" because "governments and entities" will no longer "contract with him," and [e]conomic losses" from "being rendered effectively unemployable").

*politically motivated government surveillance.*"[9]   That article alone proves Page was aware of the surveillance, aware of part of its purported basis, and disputed its validity by April 2017.

But there is more.  The next month, May 2017, Page wrote a letter to the House Permanent Select Committee on Intelligence (HPSCI) concerning "the illegitimate FISA warrants" filed against him.[10]   Then in November 2017 he testified before HPSCI in person, where he characterized his surveillance as "baseless domestic interference in our democracy."[11]   And then, three months later, in February 2018, President Trump de-classified the "Nunes Memo," which detailed many of the issues with the warrants that Page alleges here, including its alleged reliance on the Steele Dossier, alleged failure to disclose Steele's purported political motivations, and the alleged fact that Steele was the source of the Yahoo! News article that purported to corroborate the dossier.[12]   Page was acutely aware of the memo's release—he issued a response to it that same day, describing his surveillance as an "unprecedented abuse of process."[13]   He again described it as an "abuse of process" in a court filing three days later.   *Page v. Oath, Inc.*, No. 1:17-cv-6990-LGS, ECF No. 42 at 1-2 (S.D.N.Y. Feb. 5, 2018).

---

[9] *See* https://www.washingtonpost.com/world/national-security/fbi-obtained-fisa-warrant-to-monitor-former-trump-adviser-carter-page/2017/04/11/620192ea-1e0e-11e7-ad74-3a742a6e93a7_story.html (emphasis added), attached as Ex. 1.

[10] *See* Testimony of Carter Page (May 22, 2017) at 4-5, *available at* https://docs.house.gov/meetings/IG/IG00/20171102/106559/HHRG-115-IG00-Transcript-20171102.pdf (attached as Ex. 2).

[11] *See* Testimony of Carter Page (Nov. 2, 2017) at 35, *available at* https://docs.house.gov/meetings/IG/IG00/20171102/106559/HHRG-115-IG00-Transcript-20171102.pdf (attached as Ex. 3).

[12] *See* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-SD001.pdf (attached as Ex. 4).

[13] *See* https://twitter.com/ABC/status/959482517291196417 (attached as Ex. 5).

Thus, more than ***three years*** before he filed suit, Page knew of the surveillance.  And more than two years before he also knew much of its purported basis and had publicly characterized it as "baseless," an "abuse of process," and politically motivated.  His FISA claims are time-barred.

> **2.      Page's Claims Are Barred Under the Limitations Periods of the Most Closely Analogous Federal Laws As Well.**

Even if the Court were inclined to make this the "rare case" where an "analogous federal limitations period" is applied, *Graham Cty. Soil & Water Conservation Dist.*, 545 U.S. at 414-15, the claims would still be untimely because the Wiretap Act and the Stored Communications Act both contain a two-year limitations period.  *See* 18 U.S.C. § 2520(e) (Wiretap Act); 18 U.S.C. § 2707(f) (Stored Communications Act).  As explained above, Page knew of, and had publicly commented on, his surveillance more than two years before he filed suit.  Even if the Court were to borrow a limitations period from federal analogues, the FISA claims would still be untimely.

> **B.      The SAC Does Not Allege That Clinesmith Engaged in Electronic Surveillance or Used Information Obtained from Such Surveillance.**

The FISA claims also fail on their merits.  As noted above, a civil cause of action "under § 1810 is predicated on a violation of § 1809." *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 851 (9th Cir. 2012).  Congress intended "civil liability of intelligence agents under [§ 1810] [to] coincide with the criminal liability [under § 1809]."  H.R. Rep. No. 95-1720, at 34 (1978)  A plaintiff must therefore show that the individual defendant himself or herself violated section 1809 by "intentionally" "engag[ing] in" electronic surveillance or "disclos[ing] or us[ing]" its fruits.  50 U.S.C. § 1809(a)(1)-(2); *Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 335 F. Supp. 3d 772, 784 (D. Md. 2018) ("[T]he civil cause of action in §  1810 is premised upon *the*

*individual agent's* 'violation of section 1809'") (emphasis added) (quoting *Al-Haramain*, 705 F.3d at 854)).  The SAC fails to plausibly plead that Clinesmith did either one.[14]

### 1.    Clinesmith Manifestly Engaged in No Surveillance.

FISA's text and history require a narrow reading of the phrase "engages in electronic surveillance."   The statute defines "electronic surveillance" to mean "the acquisition" of information "by an electronic, mechanical, or other surveillance device" and "the installation or use of an electronic, mechanical, or other surveillance device."  50 U.S.C. § 1801(f).  By its terms, a person "engages in electronic surveillance" only if he or she participates in the actual "acquisition" of intelligence or "the installation or use of" devices to collect intelligence.  That is the plain meaning of what it is to "engage in" something. *See, e.g.*, MERRIAM-WEBSTER'S ONLINE DICTIONARY (defining "engage in" as (1) "to do" or (2) "to cause (someone) to take part in (something)").[15]   Page does not allege that Clinesmith "did" the surveilling or "caused" the personnel he was "support[ing]" to do so.  As explained below, Page fails even to plausibly plead that the warrants would not have issued but for Clinesmith's actions.

Courts have long read section 1809 according to its plain terms.  Thirty years ago, the Ninth Circuit explained that the phrase "engages in electronic surveillance" "is best understood as subjecting to criminal liability anyone who *performs* electronic surveillance" without statutory authorization.  *United States v. Koyomejian*, 946 F.2d 1450, 1459 n. 16 (9th Cir. 1991) (emphasis

---

[14] Clinesmith incorporates by reference Section III.A. of the Somma brief regarding the SAC's failure to adequately plead intent under FISA.  The SAC pleads no facts suggesting 'a conscious objective or desire' to commit a violation" by Clinesmith.  H.R. Rep. No. 95-1283, Pt. I, at 97 (1978); *see also id.* ("What is proscribed is an intentional violation of an order or one of the specified provisions, not just intentional conduct.").

[15] https://www.merriam-webster.com/dictionary/engage%20in?src=search-dict-box (last visited Sept. 17, 2021).

added).  And last year, that court affirmed dismissal of FISA claims against FBI officers whose supervisees engaged in wrongdoing but who neither "ordered [n]or arranged for" the "planting of the recording devices" at issue.  *Fazaga*, 965 F.3d at 1039.  Other courts have also dismissed FISA claims where a complaint failed to "plausibly allege that [a defendant] actually engaged in the alleged unauthorized surveillance" because it did not allege that the defendant "personally engaged in the alleged surveillance."  *Attkisson*, 2017 WL 5013230, at *12; *cf. Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-150, 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020) (reading similar language in the Stored Communications Act as applying to only those defendants who "themselves accessed [plaintiff's] computer systems").

FISA's safe harbor from liability in situations where a warrant eventually issues confirms that the Act is meant to apply only to those directly involved in conducting the surveillance.  Under section 1809(b), "[i]t is a defense to a prosecution under subsection (a) that the defendant was *a law enforcement or investigative officer* engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant[.]" (Emphasis added.)  As the emphasized words show, the exemption concerns those directly involved in conducting and using surveillance—"law enforcement or investigative officer[s]."  It would be odd to exempt from liability those with chief responsibility for properly obtaining and executing a search warrant but not those whose lesser role is "to provide support" to them.  SAC ¶122.  The exemption's express focus on "law enforcement [and] investigative officer[s]" illustrates who it is who "engages in surveillance" under the meaning of the statute.  Section 1809's intentional focus is on the individual "intelligence agents" conducting the surveillance, not persons tangentially involved behind the scenes in a support role.  H.R. Rep. No. 95-1720, at 34 (1978).

That approach is consistent with the rule that courts aren't to presume that Congress intends secondary liability to be available when it creates statutory causes of action and fails to specify it. "[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank, N.A. v. First Interstate Bank*, N.A., 511 U.S. 164, 182 (1994). "The same principle applies to bar recovery from coconspirators, . . . because Congress knows how to provide private plaintiffs with an action for secondary liability when it sees fit." *Broidy Cap. Mgmt. LLC*, 2020 WL 1536350, at *11 (citing *CAIR Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 27 (D.D.C. 2013), and *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998)). Its failure to do so here, in conjunction with the plain language of the statute, is dispositive. *See id.* (finding no secondary liability under Stored Communication Act's cause of action for "intentionally accessing without authorization" electronic communications facilities).[16]

Nothing in the SAC suggests that Clinesmith ever "engaged in electronic surveillance" as that phrase is used in the FISA statute. Any such claims would lack all plausibility given his "support[ing]" role as an OGC Attorney. SAC ¶122. Nor can Page save these claims through conclusory, collective allegations that "the individual Defendants . . . engaged in electronic surveillance." *Id.* ¶¶260, 264, 268, 272. A plaintiff cannot evade "Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual

---

[16] Even if there were ambiguity in the phrase "engages in electronic surveillance," that "'ambiguity concerning the ambit of [a] criminal statute[] should be resolved in favor of lenity.'" *Skilling v. United States*, 561 U.S. 358, 410 (2010) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). That is true even where, as here, the statute "has both criminal and noncriminal applications." *Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n. 8 (2004). Here, it means narrowly construing the phrase to require personal participation in the surveillance itself.

basis to distinguish their conduct."[17] *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (quotation marks omitted).

### 2. The SAC Fails to Identify Anyone's "Use" or "Disclosure" of Any Fruits of the Warrants.

The SAC also fails to plausibly plead that any information obtained from the four FISA warrants was "used" or "disclosed" by Clinesmith, or any other defendant for that matter.  The First Amended Complaint failed to plead, even in conclusory fashion, that Clinesmith or anyone else used or disclosed any of the information obtained from the warrants, a fact that Clinesmith noted in his motion to dismiss that complaint.  *See* ECF No. 60-1 at 39-40.  The SAC tries to remedy that defect by alleging that the defendants "thereafter used and disclosed those communications" for three things:  "[i] [to] obtain the subsequent FISA Warrants, [ii] [to] unlawfully pursue investigative ends, and [iii] for unlawful leaks to the media and others."  SAC ¶142.  But its allegations as to the first two are purely conclusory—the SAC says literally nothing about how any of the defendants (let alone any particular defendant like Clinesmith) used any fruits of the surveillance to "obtain the subsequent FISA warrants" or "unlawfully pursue investigative ends."  *See, e.g.*, *id.* ¶230 (baldly alleging "[o]n information and belief" that fruits of the warrants were used to "obtain or justify additional investigative measures" and to "request investigative assistance" without pleading a single fact in support).

The only time the SAC tries to plead "use" or "disclosure" with any particularity is with respect to the third category: "unlawful leaks to the media and others."  *See, e.g.*, *id.* ¶¶221 (identifying six purportedly leaked items in a *Washington Post* story); 224 (identifying five

---

[17] Furthermore, to the extent that Clinesmith's actions are (improperly) construed as engaging in surveillance, he becomes entitled to the exemption from liability enjoyed by those who actually engage in surveillance—"law enforcement [and] investigative officer[s]."  50 U.S.C. § 1809(b).

purportedly leaked items in a *New York Times* story).  And there it utterly fails.  Those allegations

identify literally no *fruits* of the actual warrants being disclosed to the media.  As for the *Post*

story, three of the six items concern the mere *existence* of the surveillance:

- That the government "obtained the warrant" on the basis that Page was believed to be "acting as an agent of a foreign power, in this case Russia" (*id.* ¶221a.);
- That the investigation "began in July" (*id.* ¶221b.); and
- That Page was "the only American to have had his communications directly targeted" (*id.* ¶221f.).

The other three concern the purported *contents* of the first warrant, not any of its fruits:

- That the surveillance application "included a lengthy declaration" explaining why Page was thought to be a Russian agent (*id.* ¶221c.);
- That "Page traveled to Moscow" and delivered a speech "harshly critical" of U.S. foreign policy "[i]n July" (*id.* ¶221d.); and
- That the Steele Dossier alleged that Page "met with Igor Sechin, a Putin confidant," while there (*id.* ¶221e.).

The same is true of the *Times* story.  One of its five items concern only the *existence* of the

surveillance:

- That the FBI began investigating Page "[i]n late July" and "only a dozen or so people at the F.B.I. knew of the investigation" (*id.* ¶224b.).

The other four concern the purported basis of the first warrant, not its fruits:

- That Page "gave a speech in Moscow criticizing American foreign policy" (*id.* ¶224a.);
- That "Mr. Comey and his deputies" were briefed on the Steele Dossier "[i]n late August" (*id.* ¶224c.);
- That Steele had been working for a Trump opponent (*id.* ¶224d.); and
- That Steele "had been a covert agent for MI6 in Moscow . . . but his claims were largely unverified." (*id.* ¶221e.).

None of the 11 points identified in the two stories concern a single alleged *fruit* of any of

the surveillance; they *all* concern things purportedly learned by the government prior to, or outside

of, any such surveillance.  On the only category of "use" or "disclosure" that Page even tries to

plead with any particularity, he fails to identify a single instance of such "use" or "disclosure."

Even if the SAC had identified any actual fruit of the surveillance, it identifies no role whatsoever played by Clinesmith himself in any of this inadequately-pled "use" or "disclosure" of those fruits. It either lumps all of "the Defendants" together for these allegations, *see, e.g.*, *id.* ¶142, or singles out two other defendants for the purported media leaks, *see, e.g.*, *id.* ¶¶220-23. As explained above, group pleading of that nature does not suffice to state a claim. *Toumazou*, 71 F. Supp. 3d at 21. Even if the SAC plausibly alleged "use" or "disclosure" by some other defendant (it does not), the FISA claims still would have to be dismissed as to Clinesmith.

## II. The *Bivens* Claim (Count 6) Must Be Dismissed as Untimely and Because It Would Impermissibly Extend *Bivens* to a New Context.

The Supreme Court first created an implied damages action under the Constitution 50 years ago in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), when it permitted a claim for Fourth Amendment violations arising from an unlawful, warrantless search by low-level federal narcotics officers to proceed. Since then, the Supreme Court has recognized an implied damages action under the Constitution only twice—once for gender discrimination under the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and once against prison officials under the Eighth Amendment for failure to provide adequate medical care, *Carlson v. Green*, 446 U.S. 14 (1980). Those three cases are "the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

In the more than 40 years that have now passed since *Carlson*, the Supreme Court instead has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Loumiet v. United*

*States*, 948 F.3d 376, 381 (D.C. Cir.), *cert. denied*, 141 S. Ct. 180 (2020).[18]  As those repeated refusals illustrate, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *Abbasi*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675).

For a host of reasons, *Bivens* should not be extended to cover the "new context" and "new category of defendants" Page has brought before this Court.  That would be so even if his *Bivens* claim were timely, which it is not.

### A.       Page Fails to Plead a Timely *Bivens* Claim.

As a threshold matter, Page's *Bivens* claim is not timely.  *Bivens* claims have no fixed statute of limitations; like claims brought under 42 U.S.C. § 1983, they borrow from the limitations period of the most analogous state law cause of action.  *Doe v. U.S. Dep't of Justice*, 753 F.2d at 1114.  And for reasons explained above, "federal law controls when a *Bivens* claim accrues." *Hampton v. Comey*, No. 14-cv-1607 (ABJ), 2016 WL 471277, at \*13 (D.D.C. Feb. 8, 2016) (quotation marks omitted); *see also Loumiet*, 828 F.3d at 947.  Page's *Bivens* claim is time-barred because the SAC shows that Page knew of the surveillance well over a year before he filed suit and even would have known of Clinesmith's alleged wrongdoing well before then as well.

---

[18] The Supreme Cuort has declined to extend *Bivens* to First Amendment violations arising in the federal employment context, *Bush v. Lucas*, 462 U.S. 367 (1983); constitutional claims of military personnel arising from activity incident to service, *United States v. Stanley*, 483 U.S. 669 (1987); due-process violations in the Social Security context, *Schweiker v. Chilicky*, 487 U.S. 412 (1988); suits against federal agencies, *FDIC v. Meyer*, 510 U.S. 471 (1994); suits against private prison corporations and their employees, *Malesko*, 534 U.S. 61; *Minneci v. Pollard*, 565 U.S. 118 (2012); retaliation against the exercise of ownership rights, *Wilkie v. Robbins*, 551 U.S. 537 (2007); Fourth and Fifth Amendment claims arising from the detention of aliens following the 9/11 terror attacks, *Abbasi*, 137 S. Ct. 1843; and Fourth and Fifth Amendment violations resulting from the cross-border shooting of a child by a border patrol agent, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020).

### 1.    A One-Year Statute of Limitations Governs the *Bivens* Claim.

As explained above, when a plaintiff asserts a *Bivens* claim based on a defendant having

allegedly made false statements that others have used to engage in constitutional violations, courts

analogize the claim to one for libel or slander and apply D.C.'s one-year limitations period for

such claims. *See* D.C. Code § 12-301(a)(4). *See, e.g., Doe v. Department of Justice*, 753 F.2d at

1114 (fired employee's constitutional due process claims barred by D.C.'s one-year limitations

period); *Jefferson v. Harris*, 170 F. Supp. 3d 194, 213 (D.D.C. 2016) (applying one-year libel

limitations period to *Bivens* claims based on due process violations); *Church of Scientology v.

Foley*, 640 F.2d 1335 (D.C. Cir. 1981) (*Bivens* claims based on First and Fifth Amendment

violations barred by one-year limitations period because they effectively amounted to defamation

claims). The analysis is no different when the alleged false statements play a role in another person

allegedly committing a Fourth Amendment violation. In *Wormley v. United States*, another court

in this District held that a plaintiff's claim (that she was unlawfully detained because of false

statements in a "Notice of Escape" from a halfway house) was governed by D.C.'s one-year

limitations period for defamation. "To the extent that plaintiff's claims stem from false statements

in the Notice of Escape," the court held, "they are analogous to libel or defamation." 601 F. Supp.

2d 27, 35 (D.D.C. 2009). So, too, are Page's claims as to Clinesmith.

Counsel for Clinesmith is aware of one court in this District that has applied D.C.'s residual

three-year limitations period to a *Bivens* claim premised on a warrant containing allegedly false

statements. *See Berman v. Crook*, 293 F. Supp. 3d 48, 56 (D.D.C. 2018). Unlike here, neither

"the gist" of that case nor the harms alleged there sounded in defamation. *See Berman v. Crook*,

No. 1:16-cv-2153 (RCL), ECF No. 1 (Apr. 18, 2017). But even if that case were on all fours with

the *Bivens* claim here (it is not), the Court ought to reject its approach given the anomaly it would

create.  Adopting it would mean that *Bivens* claims based on unconstitutional Fourth Amendment *searches* would have a three-year limitations period even though claims based on unconstitutional Fourth Amendment *seizures* would not.  *See* D.C. Code § 12-301(a)(4) (one-year limitations periods for "false arrest" and "false imprisonment"); *Wormley*, 601 F. Supp. 2d at 35 ("Fourth Amendment search and seizure claim is analogous to false arrest"); *Hampton v. Comey*, 2016 WL 471277 at *3 (same).  The Court should avoid creating that kind of anomaly.

In sum, Clinesmith's alleged misconduct is in the nature of libel, and the harms Page claims primarily to have endured are those that stem from libel.  His claim as to Clinesmith is properly subject to D.C.'s one-year statute of limitations for such claims.

### 2. The Second Amended Complaint Fails to Plead a Timely Claim.

As noted above, under federal law a claim accrues when "the plaintiff has a complete and present cause of action," *Wallace*, 549 U.S. at 388, which occurs "when the factual and legal prerequisites for filing suit are in place." *Loumiet*, 828 F.3d at 947.  Because the alleged Fourth Amendment violation underlying Page's *Bivens* claim consisted in his being surveilled without proper authorization, those prerequisites were in place when the surveillance occurred, and certainly no later than when Page learned of it.  *Berman*, 293 F. Supp. 3d at 56 (holding that plaintiff's *Bivens* claim "accrued in 2000 when he learned of the search of his office," even though he as yet had no knowledge of the allegedly false statements in the affidavit supporting the search warrant).[19]  Because Page knew of the surveillance long before November 28, 2019, his *Bivens* claim is time-barred.

---

[19] *See also Francis v. Miligan*, 530 F. App'x 138, 139 (3d Cir. 2013) (plaintiff on notice when he learned his car had been searched without consent, even if "he did not know he was injured, i.e., that the search and seizure were allegedly illegal" at the time); *Western Center For Journalism v. Cederquist*, 235 F.3d 1153, 1157 (9th Cir. 2000) ("[A]s long as a plaintiff has notice of the

The same would be true even if the *Bivens* claim against Clinesmith did not accrue until Page knew of Clinesmith's specific conduct. The SAC, and the public record evidence described above, make clear that Page was highly attuned to media coverage of the FBI's surveillance of him, as well as its coverage of the imminent release of the IG Report. *See, e.g.*, SAC ¶221 (detailing *Washington Post* story in April 2017 about his surveillance); *id.* ¶240 (alleging media stories in October 2019 about imminent release of IG Report). The public record evidence also shows that by November 23, 2019—five days before the latest date on which this claim would be timely—the nation's most well-known media outlets were reporting that the soon-to-be-released IG Report would detail wrongdoing by Clinesmith in the procurement of the fourth warrant against Page. The *New York Post* reported on that date that Clinesmith "made significant additions to an email that was included in an application to renew a surveillance order against" Page.[20] *The New York Times* likewise reported on that date that the report would state that "a low-level lawyer, Kevin Clinesmith, altered an email that officials used to prepare to seek court approval to renew the wiretap," and even that Inspector General Horowitz "referred his findings about Clinesmith to prosecutors for a potential criminal charge."[21] *The New York Times* even specified how Clinesmith had altered the email—that he "took an email from an official at another federal agency that contained several factual assertions, then added material to the bottom that looked like another

---

wrongful conduct, it is not necessary that it have knowledge of all of the details or all of the persons involved in order for the cause of action to accrue."); *Bame v. Dillard*, No. CV 05-1833 (RMC), 2008 WL 11515525, at *3 (D.D.C. Mar. 28, 2008) (dismissing claims because plaintiffs could have filed earlier and thereby "ascertain[ed] the identities of the 'unknown' defendants well before the limitations period ran").

[20]   *See*   https://nypost.com/2019/11/23/fbis-resistance-lawyer-under-fire-in-upcoming-watchdog-report/ (attached as Ex. 6).

[21]   *See*   https://www.nytimes.com/2019/11/22/us/politics/russia-investigation-inspector-general-report.html (attached as Ex. 7).

assertion from the email's author, when it was instead his own understanding."[22]  The *Washington Examiner* provided still more detail, reporting on November 22 that Clinesmith "was found to have altered an email that was used by officials as they prepared an application renewal . . . to obtain a warrant to electronically surveil Carter Page," then gave it "to a fellow FBI official who was preparing an affidavit for the Page case."[23]   *The Wall Street Journal* likewise reported on Clinesmith's actions on November 23.[24]

Clinesmith noted much of this early public record evidence of his role in his motion to dismiss the First Amended Complaint.  *See* ECF No. 60-1 at 22 (discussing *Times* and *Post* stories and Page's demonstrated attention to media coverage of his surveillance).  Despite that, *Page nowhere asserts in the SAC that he was unaware of Clinesmith's alleged wrongdoing until on or after November 28, 2019.  See Richardson v. Sauls,* 319 F. Supp. 3d 52, 68 (D.D.C. 2018) (dismissing Bivens claim where plaintiff "fail[ed] to specify the date on which he asserts he learned the necessary facts").  Page's only response in the SAC is to allege that the IG Report, which came out in December, was "the first official authoritative source to disclose that the FISA warrants in their entirety lacked probable cause and due to material errors were unlawfully obtained."  SAC ¶233.  He nowhere asserts he was unaware of Clinesmith's actions, or the fact he had been referred for criminal prosecution, until the IG Report came out.  That is all but an affirmative admission that Page in fact was aware of the widespread media coverage in late November of Clinesmith's role.  And as Clinesmith already noted in his first motion to dismiss, it is no defense that Page did

---

[22]  *Id.*

[23]  *See*   https://www.washingtonexaminer.com/news/mueller-lawyer-with-anti-trump-bias-is-ex-fbi-official-facing-fisa-criminal-investigation (attached as Ex. 8).

[24]  *See*   https://www.wsj.com/articles/inspector-general-alleges-fbi-lawyer-altered-email-related-to-russia-probe-11574437554 (attached as Ex. 9).

not know the full extent of Clinesmith's actions then; it is enough that he knew Clinesmith had intentionally altered a document that was used in the FBI's internal deliberative process to obtain what Page believed to be a wholly unsupported warrant.  *See Berman*, 293 F. Supp. 3d at 56 (claim accrued no later than date when plaintiff obtained partial knowledge of contents of allegedly false affidavit supporting unwarranted search, notwithstanding that plaintiff later received full unredacted copy).  Even where—unlike here—a discovery rule delays the time at which a claim accrues, it typically does so only until "*some* evidence of wrongdoing" is uncovered—not until all or most such evidence is uncovered.  *See, e.g., Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (holding, as to D.C. defamation claim: "At the latest . . . a cause of action accrues for limitations purposes when the plaintiff knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of *some* evidence of wrongdoing." (emphasis added)).  Page manifestly had "some evidence" of Clinesmith's actions by November 23:  He knew, from multiple highly reputable media sources, the precise manner in which the email had been altered, the role that the altered email played in the renewal process, and the fact that the violation was serious enough that it had been referred for potential criminal prosecution.  *Cf. County of Hudson v. Janiszewski*, 520 F. Supp. 2d 631, 643 (D.N.J. 2007) (plaintiff was on inquiry notice of fraudulent scheme no later than day it was reported in three media outlets).

In short, the SAC shows Page was highly attuned to media coverage of his surveillance. Reputable media widely reported Clinesmith's wrongdoing more than a year before Page filed suit.  Clinesmith noted that reporting in his first motion to dismiss.  And Page, in the SAC, does not deny being aware of it, nor otherwise claim he was unaware of Clinesmith's role before November 28, 2019, undoubtedly because of media reports like the ones highlighted above.  His *Bivens* claim against Clinesmith should be dismissed as untimely.

### B.   A *Bivens* Claim Should Not Be Extended to This New Context.

Even if the SAC pleaded a timely *Bivens* claim, it would be wrong as a matter of law to recognize that claim here.  Page's claim indisputably seeks to extend *Bivens* to a "'new context,'" which may only be done if no special factors counsel against it.  *Hernandez*, 140 S. Ct. at 743 (quoting *Malesko*, 534 U.S. at 68).  Here, several such factors indisputably do.  What's more, the existence of adequate alternative remedies "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action," *Abbasi*, 137 S. Ct. at 1858, and such remedies exist here.  And even if neither of the foregoing were true, Page has not alleged that Clinesmith personally participated in any Fourth Amendment violation—yet another reason requiring dismissal.

### 1.   Page's *Bivens* Claim Arises in a "New Context."

Before recognizing a *Bivens* claim, courts must first consider whether the claim "arises in a 'new context.'"  *Hernandez*, 140 S. Ct. at 743 (quoting *Malesko*, 534 U.S. at 68).  A context is "new" if it "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court."  *Abbasi*, 137 S. Ct. at 1859; *see also Loumiet*, 948 F.3d at 382 ("[T]he new-context analysis may consider only Supreme Court decisions approving *Bivens* actions.").  Such "meaningful" differences include, but are not limited to:

> the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859-60.  Under these criteria, "even a modest extension is still an extension" and thus "the new-context inquiry is easily satisfied."  *Id.* at 1864-65.

Page alleges that "[t]he individual Defendants" violated his Fourth Amendment rights by making misleading statements in the lead up to the applications for FISA warrants for surveilling

31

Page.  SAC ¶245.  But the Supreme Court has never recognized a *Bivens* action for Fourth

Amendment violations arising from a FISA application, and Page's claim seeks much more than

a "modest extension" of the three Supreme Court cases that have recognized a *Bivens* claim.  Two

of those cases—*Davis* and *Carlson*—did not even concern the Fourth Amendment.  *See Davis*,

442 U.S. at 228 (Fifth Amendment); *Carlson*, 446 U.S. at 14 (Eighth Amendment).  Because the

"constitutional right at issue" in those two cases was not the Fourth Amendment, they necessarily

are meaningfully different from Page's claim.  *Abbasi*, 137 S. Ct. at 1860.

That leaves *Bivens* itself, a case involving run-of-the-mill warrantless search-and-seizure

claims under the Fourth Amendment.  403 U.S. at 389.  There, too, meaningful differences abound:

- Page's claim involves electronic surveillance under FISA.  *Bivens* did not.  A "claim based on unlawful electronic surveillance presents wildly different facts and a vastly different statutory framework from a warrantless search and arrest."  *Attkisson v. Holder*, 925 F.3d 606, 621-22 (4th Cir. 2019); *see also Abbasi*, 17 S. Ct. at 1860; *Corsi v. Mueller*, 422 F. Supp. 3d 51, 66 (D.D.C. 2019) (dismissing Fourth Amendment *Bivens* claim against Robert Mueller premised on alleged FISA violation because claim arose in a "new context").

- Page's claim also involves high-ranking officials, including the Director and Deputy Director of the FBI.  SAC ¶3.  *Bivens* did not.  The "rank of the officers involved" is a meaningful difference that renders this context new.  *Abbasi*, 137 S. Ct. at 1860.

- Page's claim further involves a "new category of defendants" in a *Bivens* action given that Clinesmith is an OGC attorney.  That, too, makes it a new context. *Loumiet*, 948 F.3d at 382 (noting that defendants in case were "OCC officials" and that "new category of defendants" suffices to establish "new context").

- Page's claim additionally involves a different "legal mandate" than in *Bivens*.  *Bivens* "involved the enforcement of federal drug laws"; the claim here involves FISA's electronic surveillance requirements.  *Abbasi*, 137 S. Ct. at 1860 (finding new context *vis-à-vis Bivens* because case involved "enforcement of federal banking laws under FIRREA").

- Page's claim also arises in the context of an unprecedented national security investigation into foreign efforts to influence the 2016 presidential election.  *Bivens* did not.  Such national security considerations themselves render Page's claim meaningfully different from those in *Bivens*.  *See Abbasi*, 137 S. Ct. at 1860 (claims challenging high-level executive policy following major terror attack "bear little resemblance" to facts of *Bivens*).

- Finally, *Bivens* involved a warrantless search; "this case, by contrast, involves searches and seizures conducted *with* a warrant" and "thus implicates a distinct Fourth Amendment guarantee . . . governed by different legal standards." *Annappareddy v. Pascale*, 2021 WL 1603987, at *9 (4th Cir. Apr. 26, 2021) (emphasis in original).  That renders it a new context for *Bivens* purposes.  *Id.*

The *only* similarity between Page's claim and *Bivens* is that both invoke the Fourth Amendment.  But "once [the Court] look[s] beyond the constitutional provisions invoked . . . it is glaringly obvious that [Page's] claims involve a new context." *Hernandez*, 140 S. Ct. at 743-44; *see also Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019) (Fourth Amendment *Bivens* claim against officer who misled investigators/grand jury was "new context").

### 2.    Special Factors Counsel Hesitation.

Once it is determined that a plaintiff seeks to extend *Bivens* to a new context, the Court "proceed[s] to the second step and ask[s] whether there are any 'special factors' [that] counse[l] hesitation about granting the extension." *Hernandez*, 140 S. Ct. at 743 (citations and quotation marks omitted).  "If there are—that is, if we have reason to *pause* before applying *Bivens* in a new context or to a new class of defendants—we reject the request." *Id.* (emphasis added).  Put differently, a "special factor" is a factor that "cause[s] a court to hesitate before answering that question in the affirmative." *Id.* at 1858.  That threshold is "remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc).   Here, those factors do not merely cause "hesitation"; they should prompt the Court to slam the emergency brakes.

### a.    *A Bivens Remedy Is Incompatible with the Comprehensive Statutory Scheme That Congress Has Enacted.*

First, the existence of a comprehensive statutory scheme is a "'special factor' that precludes creation of a *Bivens* remedy." *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008).  Courts "must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages

remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (per curiam). Those principles control this case.

Over the past fifty years, "Congress has enacted legislation comprehensively regulating the field of electronic surveillance." *Mitchell v. Forsyth*, 472 U.S. 511, 542 (1985) (Stevens, J., concurring in the judgment). FISA is Congress's comprehensive effort "to regulate foreign intelligence surveillance in the domestic context." *Fazaga*, 965 F.3d at 1046 (quotation omitted). Through that statute, Congress "'set out in detail roles for all three branches of government.'" *Id.* (quotation and brackets omitted). It made the FISC the exclusive body to authorize warrants for foreign intelligence surveillance within the United States. 50 U.S.C. § 1803(a). It delineated procedures for submitting a FISA application. *See id.* § 1804; p. 3, *supra*. It precisely specified the findings required to issue a FISA warrant. *Id.* § 1805(a); pp. 3-4, *supra*. It established mechanisms for policing the Executive's use of FISA and protecting the public against abuses. It created civil and criminal penalties for specific, carefully delineated violations of FISA. *E.g.*, *id.* §§ 1809, 1810; *see* pp. 4-5, *supra*. And it reserved for itself a significant oversight role, requiring the submission of various reports from the Attorney General, the Director of National Intelligence, and the Administrative Office of the U.S. Courts, *see* pp. 5-6, *supra*, to ensure that it remained "fully inform[ed]" about "all electronic surveillance," *id.* § 1808(a)(1).

FISA itself qualifies as a comprehensive statutory scheme that counsels hesitation. But it does not stand alone. The Wiretap Act provides processes for federal officials to obtain court authorization to conduct electronic surveillance, 18 U.S.C. § 2516, criminalizes unlawful surveillance, *id.* § 2511(1)(a), creates a civil cause of action against individuals who violate the statutory protections, *id.* § 2520(a), and establishes a process for administrative discipline, *id.* §

34

2520(f).  The Stored Communications Act creates another civil cause of action to remedy statutory violations, *id.* §§ 2707(a), (g), and adds another process to discipline government employees for misconduct, *id.* § 2707(d).  And, after 9/11, Congress bolstered the statutory scheme concerning electronic surveillance by enacting the Patriot Act and adding *yet another* civil cause of action against the United States for violations of the surveillance laws.  *Id.* § 2712.

Congress has crafted a complex scheme governing electronic surveillance and any resulting abuses.  That scheme reflects "a considered congressional judgment about which remedies should be available for claims that fall within its ambit."  *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012).  And by "legislat[ing] extensively in the area of electronic surveillance . . . without authorizing damages for a Fourth Amendment violation," *Attkisson*, 925 F.3d at 621, Congress repeatedly has decided that a *Bivens*-type remedy was unnecessary.  Congress's decision was "'more than inadvertent' and strongly counsels hesitation before creating such a remedy" by judicial proclamation.  *Id.* (quoting *Abbasi*, 137 S. Ct. at 1862).  That is why courts repeatedly have refused to extend *Bivens* to the electronic-surveillance context.  *See id.* at 621-22; *Brunoehler v. Tarwater*, 743 F. App'x 740, 742-43 (9th Cir. 2018) (declining to extend *Bivens* to an alleged illegal wiretap in part because the Wiretap Act provides an alternative structure); *Kelley v. FBI*, 67 F. Supp. 3d 240, 270-72 (D.D.C. 2014) (same with the Stored Communications Act).

A judicially-crafted remedy here would not merely supplement the many statutory remedies listed above; it would be at war with them.  A *Bivens* remedy, for example, would eviscerate the Patriot Act's procedures requiring plaintiffs to present their claims in writing to the relevant government agency before suing the United States.  18 U.S.C. § 2712(b).  A plaintiff could evade those requirements entirely simply by suing the government official under *Bivens. Cf. Smith v. Robinson*, 468 U.S. 992, 1011 (1984) (holding that allowing handicapped children "to go

directly to court with an equal protection claim" when Congress had legislated "comprehensive" procedures for redress would "render superfluous" those legislated remedies and "run counter to Congress' view" on how to "best accommodate[]" those concerns).  As the Supreme Court has stressed, statutory limits on relief "are deliberate and are not to be evaded" through judicial innovation.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124 (2005).

In short, Congress crafted a comprehensive scheme governing electronic surveillance to acquire foreign intelligence information, and Page's claim falls in the heartland of that detailed scheme.  He accuses Clinesmith and others of misleading the FISC into issuing the FISA warrants against him.  *See, e.g.,* SAC ¶134.  The existence of the FISC, the warrant-application process the defendants supposedly abused, and even the allegedly erroneous "finding of probable cause," *id.*, are all governed by FISA, *see* 50 U.S.C. §§ 1803-1805.  Dissatisfied with the options Congress has provided, Page asks this Court to rewrite them.  Under well-established precedent, that is a request the Court must decline.  *See Bush*, 462 U.S. at 390; *Davis*, 681 F.3d at 383.

### b.   National Security and Intelligence Concerns Counsel Hesitation.

Judicial inquiry into "sensitive issues of national security" raises separation of powers concerns, and such concerns are "central" to the special factors analysis and counsel hesitation. *Abbasi*, 137 S. Ct. at 1857.  That is especially true when "the judicial inquiry comes in the context of a claim seeking money damages," *id.* at 1861.  The reason is that "[n]ational-security policy is the prerogative of the Congress and the President."  *Abbasi*, 137 S. Ct. at 1861; *see also Lebron*, 670 F.3d at 549-50; *cf. Haig*, 453 U.S. at 292 ("Matters intimately related to . . . national security are rarely proper subjects for judicial intervention."). Judicial deference to the political branches is thus at its height when considering matters of national security and intelligence, and that deference "is quite relevant to the *Bivens* inquiry."  *Lebron*, 670 F.3d at 549; *see also Doe v. Rumsfeld*, 683 F.3d at 394.  Questions concerning the creation of a damages remedy in matters

involving national security and intelligence are thus "'more appropriate[] for those who write the laws, rather than for those who interpret them.'"  *Lebron*, 670 F.3d at 552 (quoting *United States v. Gilman*, 347 U.S. 507, 513 (1954)); *see also Doe v. Rumsfeld*, 683 F.3d at 394 (courts will not imply a *Bivens* action touching on "military, national security, or intelligence" matters); *Arar*, 585 F.3d at 575.  Courts therefore must "tread carefully before recognizing *Bivens* causes of action . . . within the national security arena." *Meshal*, 804 F.3d at 421.

Page's claim involves a national security investigation into allegations of foreign interference with a presidential election.  It presents precisely the sort of national-security and intelligence concerns that have led court after court to refuse to extend *Bivens*.  *Abbasi*, 137 S. Ct. at 1861; *Meshal*, 804 F.3d at 421; *Doe v. Rumsfeld*, 683 F.3d at 394; *Lebron*, 670 F.3d at 552; *Arar*, 585 F.3d at 575.  Litigating a *Bivens* claim would inevitably require judicial intrusion into sensitive matters of national security and intelligence, including by requiring courts to sift through mountains of sensitive intelligence about the evidence available to the Crossfire Hurricane team and discussions concerning the content of the FISA applications.  That is enough to give any court "pause," and therefore to reject the claim.  *Hernandez*, 140 S. Ct. at 743.  Additionally, the relevant evidence likely would include classified information that cannot be introduced into the public record.  *Arar*, 585 F.3d at 577; *see also Wilson*, 535 F.3d at 710.  "This should provoke hesitation, given the strong preference in the Anglo–American legal tradition for open court proceedings." *Arar*, 585 F.3d at 577.  "The preference for open rather than clandestine court proceedings is a special factor that counsels hesitation in extending *Bivens*" to the FISA context.  *Id.*

Given these concerns, Congress is in a "far better position than a court to evaluate the impact of a new species of litigation," *Lebron*, 670 F.3d at 553, and to weigh the benefits and risks of permitting civil damages liability for constitutional violations.  Especially in a matter as high

profile as this one, which has already garnered significant Congressional attention, SAC ¶¶211-17, Congressional action or inaction should remain the last word. *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to . . . national security are rarely proper subjects for judicial intervention."). The national security issues implicated here warrant dismissal.

### C.     Adequate Alternative Remedies Preclude Extension of *Bivens*.

Even if no special factors counseled hesitation, the existence of "alternative methods of relief" separately precludes expansion of *Bivens* into this new context. *Abbasi*, 137 S. Ct. at 1863; *see Hernandez*, 140 S. Ct. at 750 n.12 ("existence of alternative remedies" is "a further reason not to create *Bivens* liability" apart from special-factors analysis). "[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 137 S. Ct. 1863. In determining whether such remedies exist, courts are to "consider[] the full constellation of statutes and regulations" available. *Loumiet v. U.S.*, 948 F.3d 376, 385 (D.C. Cir. 2020) (quotation marks omitted). The alternative remedies need not be strong in order to preclude *Bivens* relief. *Wormley*, 601 F. Supp. 2d 27, 37 (D.D.C. 2009) (even "weak remedy" available to plaintiff through Privacy Act barred her *Bivens* claims based on false statements in "Notice of Escape" leading to unlawful detention). Indeed, even when available remedial schemes "leave gaps in the remedies available . . . , the presence of significant legislated remedies in this arena counsels against the recognition of a judicially created *Bivens* remedy." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 920 (D.C. Cir. 2018). They even do so when the available alternative remedy precludes relief against a plaintiff's particular defendants, leaving that plaintiff with no remedy against them. *Wilson*, 535 F.3d at 706-08 (Privacy Act barred *Bivens* claims against defendants even though Act exempted them from liability and thus afforded no remedy against them).

The remedies available to those subjected to unlawful electronic surveillance exceed the bar required to preclude a *Bivens* remedy in this context. The Patriot Act, for example, authorizes

"money damages" and "litigation costs" against the United States for any "willful violation of" certain provisions of FISA and any violation of the Wiretap Act.  18 U.S.C. § 2712(a).  Page himself is pursuing such relief.  SAC ¶¶303-11.  And the Wiretap Act and the Stored Communications Act similarly provide a remedy for those wrongfully subjected to electronic surveillance.  18 U.S.C. §§ 2707(a), 2520(a).  Numerous courts have invoked the remedies in those very statutes in refusing to extend *Bivens* to the FISA context.  *See, e.g.*, *Brunoehler*, 743 F. App'x at 742; *Kelley*, 67 F. Supp. 3d at 270; *Corsi*, 422 F. Supp. 3d at 66.[25]  This Court should, too.

**D.      Even if Page Could Pursue a *Bivens* Claim, the SAC Still Does Not Allege Clinesmith's Personal Participation in a Fourth Amendment Violation.**

Even if Page could pursue his *Bivens* claim, he has not pled facts that "'nudge[]'" his Fourth Amendment claim "'across the line from conceivable to plausible'" as to Clinesmith.  *Iqbal*, 556 U.S. at 680.  "[A] *Bivens* claim is brought against the individual officer for his or her own acts, not the acts of others."  *Abbasi*, 137 S. Ct. at 1860.  Thus, "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution."  *Iqbal*, 556 U.S. at 676 (emphasis added).[26]

---

[25] None of these claims is viable against Clinesmith.  The Patriot Act does not authorize a claim against individuals, and the two-year statute of limitations has run under the Wiretap Act and the Stored Communications Act because Page knew of the alleged violations no later than July 2018, when the Department of Justice released his FISA records.  *See* Charlie Savage, *Carter Page FISA Documents Are Released by Justice Department*, N.Y. Times, July 21, 2018, *available at* https://www.nytimes.com/2018/07/21/us/politics/carter-page-fisa.html.

[26] *See also Hansen v. Cannon*, 122 F. App'x 265, 269 (7th Cir. 2004) ("[L]iability attaches only when officials intervene and actively participate in the seizure."); *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (defendant must have been "personally involved in the illegal conduct"); *Ortiz-Contreras v. Holder*, 126 F. Supp. 3d 127, 130 (D.D.C. 2015) (dismissing action because complaint "alleged no facts that would support a claim that any of these Defendants were individually involved in the constitutional violations"); *Corsi*, 422 F. Supp. 3d at 65-66 (same).

Page has not alleged that Clinesmith, through his own actions, violated the Fourth Amendment.  Clinesmith's name appears nowhere in the allegations concerning the first two applications.  SAC ¶¶70-100 (alleging other defendants' involvement but not mentioning Clinesmith); *id.* ¶¶101-18 (same for second application).  And his alleged involvement in the third was limited to saying he would "prefer" Page not speak to the media.  *Id.* ¶122. Page does not connect that preference to the issuance of the warrant, nor is it plausible to infer that if Page had spoken to the media, the warrant somehow would not have issued—particularly where DOJ previously had informed the FISC of Page's protestations.  Clinesmith did not violate the Fourth Amendment by stating his "prefer[ence]."  Page fails to allege that Clinesmith "was personally involved in the illegal conduct" at issue in the first three applications. *Simpkins*, 108 F.3d at 369.

The allegations concerning the fourth FISA application—that it impermissibly omitted that Page "had been an operational contact for the CIA" and that Clinesmith "conceal[ed] the exculpatory fact that Page had been a CIA source," SAC ¶¶131, 134—fare no better.  Those allegations fail to state a Fourth Amendment violation against Clinesmith for at least four reasons.

*First*, those allegations do not amount to Clinesmith himself surveilling Page.  He did not engage in conduct that purportedly violated the Fourth Amendment.  His role was "to provide support to FBI personnel" as an attorney.  *Id.* ¶122.  Any suggestion that he himself authorized or engaged in surveillance is implausible given his role, which is why Page nowhere alleges it.

*Second*, the SAC does not plausibly plead that Clinesmith *knew* that Page was not a source at the time he altered the email.  *See, e.g.*, *Berman*, 293 F. Supp. 3d at 55 (statement must be knowingly false at time it was included in affidavit to violate Fourth Amendment); *Pierce v. Mattis*, 256 F. Supp. 3d 7, 14 (D.D.C. 2017) (same).  It baldly alleges, with no underlying support, that Clinesmith did so "in order to falsely deny that Dr. Page had been a CIA source."  SAC ¶18.

That allegation not only is conclusory, it is overwhelmingly contradicted by the rest of the SAC and the IG Report that it incorporates:

- Within hours of receiving the email on June 15, Clinesmith forwarded it— unaltered—to Page's FBI case agent requesting the FISA and that agent's supervisor.  IG Report at 250.

- Clinesmith also forwarded it—unaltered—to the relevant DOJ attorney drafting the FISA renewal.  *Id.* at 251-52.

- As acknowledged in the SAC, Clinesmith openly told the SSA that he believed Page was in fact a "sub-source," a relationship he would not acknowledge if his intentional goal were to "conceal . . . exculpatory fact[s]." *Id.* ¶191.

- As also acknowledged in the SAC, the FBI had access to the CIA documents revealing Page's status since August 2016, and was provided those same documents again in June 2017, leaving Clinesmith little reason to think Page's status could be hidden from anyone.

- Not surprisingly therefore, Judge Boasberg—after hearing the full array of evidence on the question whether Clinesmith was intentionally lying when he altered the email— concluded that "Clinesmith likely believed that what he said about Page *was true*, namely that he was a subsource but not a source of the Other Government Agency. . . .  I do not believe that he was attempting to achieve an end he knew was wrong."[27]

*Third*, the SAC fails to plead facts showing that Clinesmith's actions *caused* the omission of the designated information from the fourth application.  As noted, the August 2016 memo which disclosed Page's relationship with the CIA had long been in the FBI's possession, *id.* ¶134, and the individuals responsible for drafting the initial application previously concluded that Page's relationship with the CIA need not be disclosed, *id.* ¶205.  Page's status as a former CIA

---

[27] Sentencing Tr. at 51:12-18 (emphasis added).  The Court may take judicial notice of this transcript. *Dupree v. Jefferson*, 666 F.2d 606, 608 n. 1 (D.C. Cir. 1981) (taking judicial notice of record in related civil case "pursuant to [its] authority to judicially notice related proceedings in other courts"); *Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 698 F.  Supp. 951, 953 (D.D.C. 1988), *vacated on other grounds*, 892 F.2d 1066 (D.C. Cir. 1990) (taking judicial notice "of the transcript of the plea of guilty hearing" in a Maryland court).

"operational contact" was thus left out of the first three applications as well.[28]  The SAC fails to

plead a causal link between Clinesmith's actions and the omission of that information.[29]

*Fourth and finally*, the SAC fails to plausibly allege that probable cause would not have

existed if Clinesmith had not acted as he did.  To state a Fourth Amendment violation based on

false statements in a search warrant affidavit, a complaint must plead that the false statements were

"necessary to the probable cause finding."  *Berman*, 293 F. Supp. 3d at 55.  Doing so requires that

one "excise any information that is allegedly false and include any information allegedly omitted,

thus creating a 'hypothetical, redacted affidavit,'" and to then "ask whether that affidavit 'still

established probable cause.'"  *Id.* (quoting *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173

(D.D.C. 2016), and *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013)).  Doing all of

that "is a question of law" appropriate on a motion to dismiss.  *Crook*, 293 F. Supp. 3d at 55.

Page fails to plausibly plead that the fourth FISA warrant would not have issued had

Clinesmith not acted as alleged.  The SAC actually suggests the opposite.  It alleges that Clinesmith

expected the FBI would still conclude that probable cause existed even knowing that Page had

years ago been connected to the CIA; Clinesmith expected the team would write a "terrible

footnote" disclosing that in the fourth application if it was true.  SAC ¶193.[30]  Even Page's cherry-

---

[28] One need not guess what the FBI (or DOJ) would have done if it were aware of the unaltered email.  As noted above, by the next day Clinesmith had forwarded it—unaltered—to Page's FBI case agent, the agent's supervisor, and the DOJ attorney responsible for drafting the application. IG Report at 250-252.  FBI and DOJ personnel involved in preparing the Fourth Application were thus aware of the unaltered email, yet Page's prior relationship with the CIA was not disclosed.

[29] This lack of causal connection is fatal to Page's FISA claims as well.  *See* Section IV. of the Somma Brief.

[30] Indeed, Judge Boasberg—until recently, the Presiding Judge of the FISC—reached just that conclusion when he sentenced Clinesmith in the criminal case.  "[E]ven if Clinesmith had been accurate about Page's relationship with the [CIA]," Judge Boasberg said, "*the warrant may well have been signed and the surveillance authorized.*"  Sentencing Tr. 52:10-13 (emphasis added).

picked items of congressional testimony show that those interviewed would not have simply trashed the fourth warrant application out of hand, but instead would have done such things as have "a much fuller discussion" of the issues.  *Id.* ¶212 (Testimony of James Comey).[31]

Ultimately, Clinesmith's alleged conduct in "provid[ing] support to FBI personnel," SAC ¶122, is too far removed from the warrant application process and the resulting surveillance to constitute a Fourth Amendment violation.  Page has alleged "no facts that would support a claim that" Clinesmith was "individually involved in the constitutional violations Plaintiff alleges." *Ortiz-Contreras*, 126 F. Supp. 3d at 130.

## III.   Clinesmith Is Entitled to Qualified Immunity Because Page Cannot Show a Violation of Clearly Established Fourth Amendment and FISA Rights.

Even if Page had alleged violations of the Fourth Amendment and FISA, Clinesmith would be entitled to qualified immunity.  Qualified immunity shields government officials from suit "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Page stumbles at both steps of the qualified-immunity analysis.

To start, Page has failed to plead even that Clinesmith violated his rights under the Fourth Amendment, as explained above.  *See* pp. 39-43, *supra*.  But even if Page had done so, he cannot show that the "right was 'clearly established' at the time of the challenged conduct."  *al-Kidd*, 563 U.S. at 735.  A right is not clearly established unless "existing precedent . . . place[s] the statutory

---

[31] Page alleges that he functioned as an operational contact for the CIA *only* between 2008 and 2013, SAC ¶9—*years before* Page's purported meetings with Russians, and the government's investigation took place. *See* IG Report at vii, 200-01, 221-22 (FISA applications driven in large part by information unrelated to Page's conduct as operational contact).  Page's status as an operational contact was far from dispositive on the question of probable cause.

or constitutional question beyond debate." *Id.* at 741. "[I]f a reasonable officer might not have known for certain that the conduct was unlawful"—here, that the conduct violated the Fourth Amendment or FISA—"then the officer is immune from liability." *Abbasi*, 137 S. Ct. at 1867; *see al-Kidd*, 563 U.S. at 741 (to defeat qualified immunity, "every reasonable official" in defendant's position must have known conduct was unlawful). Courts must not define "clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Rather, the right at issue "must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). It is a plaintiff's burden to satisfy the "demanding standard" showing that a particular right was clearly established. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

Page cannot meet that demanding standard. Clearly established law did not put the Fourth Amendment question Clinesmith faced "beyond debate." *See al-Kidd*, 563 U.S. at 741. Viewed at the required level of specificity, the question he confronted was whether "provid[ing] support" to counterintelligence investigators charged with making probable cause determinations meant that he himself was engaging in a search. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("[S]pecificity is especially important in the Fourth Amendment context[.]"). While *Franks v. Delaware*, 438 U.S. 154, 171 (1978), may have established that lying in a warrant affidavit violates the Fourth Amendment, that is not what the SAC alleges Clinesmith did; it alleges he sent an altered email to someone else who signed the FISA application, who did not include the altered statement in the application, and who had access to the same underlying documents as Clinesmith (which Clinesmith provided to the SSA more than once). *See* SAC ¶¶110-113.

Indeed, other cases have drawn precisely this distinction. *See Melton v. Phillips*, 875 F.3d 256, 266 (5th Cir. 2017) ("*Franks* expressly requires a falsehood to be included in the warrant application for there to be a Fourth Amendment violation."); *Ahmed v. Weyker*, 984 F.3d 564, 569

(8th Cir. 2020) (explaining that an officer's "provid[ing] allegedly false information to another officer" was distinct from "a *Franks*-type violation").  What's more, others at the FBI and DOJ had looked into whether Page was "a 'source' for the CIA" nearly a full year before and considered that information unworthy of disclosure.  SAC ¶68.  That makes it impossible to say that "every reasonable official" would know that altering the email would proximately cause a Fourth Amendment violation, let alone that it could somehow mean that Clinesmith had thereby engaged in a search.  *Cf. Kapinski v. City of Albuquerque*, 964 F.3d 900, 909-12 (10th Cir. 2020) (not clearly established that material omissions in warrant application violated Fourth Amendment).

Nor did existing precedent clearly establish that Clinesmith's conduct violated Page's rights under FISA.  *See Fazaga*, 965 F.3d at 1039 (defendants "entitled to qualified immunity on the FISA claim"); *id.* at 1031 ("Plaintiffs accept[ed] that qualified immunity can apply under FISA.").[32]  As explained above, FISA's text—and the court decisions interpreting it—gives no hint that a lawyer who provides behind-the-scenes support in an investigation "engages in electronic surveillance" as required for criminal and civil liability.  50 U.S.C. § 1809(a)(1); *see* pp. 19-22, *supra*.  Nor does any case suggest that a lawyer in a support role who altered an email that was *not used* in a warrant affidavit somehow "engages in electronic surveillance."  Uncertainty and novelty are the opposite of clearly established.  Clinesmith is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, all claims against Kevin Clinesmith should be dismissed with prejudice.

---

[32] Even if FISA's safe harbor provision limits the availability of qualified immunity under FISA, *see Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) (no qualified immunity under Title III because of safe harbor provision in that statute), FISA's safe harbor provision does not apply to Clinesmith because he was not a "law enforcement or investigative officer," as explained above. 18 § U.S.C. 1809(b); *see* p. 20, *supra*.  Qualified immunity is therefore available here.

Dated:    September 17, 2021                 Respectfully submitted,


                                            /s/ William Pittard
                                            William Pittard (#482949)
                                            Christopher C. Muha (#987116)
                                            Sarah Fink (#166663)
                                            KAISERDILLON PLLC
                                            1099 14th St. N.W.
                                            8th Floor West
                                            Washington, D.C. 20005
                                            Phone:  (202) 640-2850
                                            Fax:  (202) 280-1034
                                            wpittard@kaiserdillon.com
                                            cmuha@kaiserdillon.com
                                            sfink@kaiserdillon.com


                                            *Attorneys for Kevin E. Clinesmith*

46