UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
CARTER W. PAGE,                           )
                                          )
          Plaintiff,                      )
                                          )          CIVIL NO.: 20-cv-3460-DLF
v.                                        )
                                          )
JAMES COMEY, ET AL,                       )
                                          )
          Defendants.                     )
_____ )

PLAINTIFF'S OMNIBUS OPPOSITION
TO INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS

COMES NOW, the Plaintiff, Carter Page ("Dr. Page"), and presents his
Omnibus Opposition to the Motions to Dismiss filed by the eight named individual
Defendants (the "Individual Defendants") in this matter.

INTRODUCTION

Plaintiff brought this action against the Individual Defendants to seek
accountability and recover damages from them for their extraordinary and
unprecedented actions in illegally spying on him while they were FBI employees.
What makes this case so extraordinary is that these were not mere field agents
bending the rules to pursue criminals, but rather the highest level FBI executives
colluding to subvert the foreign intelligence apparatus to illegally spy on Dr. Page, a
graduate of the U.S. Naval Academy and a loyal American.

The wholly unsupported and preposterous premise for this action was that Dr. Page, a former CIA "operational contact" who had also helped the FBI to *defeat* spying attempts by Russia, was now a foreign agent helping candidate Trump collude with Russia. The Individual Defendants repeatedly sold that false premise to the Foreign Intelligence Surveillance Court ("FISC") and were able to obtain four successive warrants under the Foreign Intelligence Surveillance Act ("FISA") authorizing secret surveillance of Dr. Page, in violation of the process for presenting applications to lawfully obtain a FISA warrant. As a result of the illegal and arguably criminal actions of these individual defendants, Dr. Page was subjected to a full year of unlawful surveillance based upon the knowingly false premise he was a Russian agent. But in addition to being the victim of secretive surveillance, these Defendants then *publicly* branded Dr. Page as a Russian agent and a traitor—thereby intentionally ruining his reputation by leaking the existence of the FISA Warrants and surveillance to the media.

The Individual Defendants do not deny, nor could they, that Dr. Page was illegally spied on and falsely branded as a Russian agent and a traitor to the nation. They do not deny, nor can they, that the FISC was repeatedly deceived about the evidence and by "verifications" of "probable cause" that didn't exist.

Instead, the Individual Defendants seek to avoid responsibility for those outrages with a myriad of technical arguments, many of them totally unfounded and/or wholly inappropriate at this stage of the litigation. And they seek to outdo each other in minimizing their respective roles in the fiasco, each claiming their

culpability in deceiving the FISC, unlawfully disclosing information, and violating Dr. Page's rights, was too minor to impose civil liability on them. If the Individual Defendants are to be believed, these unlawful and false warrants wrote themselves.

Finally, the Individual Defendants try to take advantage of their efforts to conceal their illegal behavior to argue Dr. Page waited too long to sue them. They make no effort to try to reconcile the obvious conflict between their arguments that on the one hand, Dr. Page does not have enough facts to even plausibly allege claims against them, but, on the other hand, he waited too long to bring the allegedly non-existent claims.

In fact, both arguments are wrong. Under well-established law, while Dr. Page knew all along that he was innocent, he could not have brought viable legal claims before he knew the FISC had been misled into approving the warrants and *who* was culpable for preparing, or causing to be prepared, the false FISA applications wrongfully targeting him. Even the public release of the report by the Department of Justice ("DOJ") Inspector General (the "Horowitz Report") on December 19, 2019, did not provide all the necessary information for cognizable legal claims, although it provided some details of the wrongdoing by FBI employees in preparing and submitting the FISA warrant applications.

Dr. Page brought this suit in timely fashion after learning that the FISC had reversed its probable cause determinations and being able to identify the persons who are responsible for violating the FISA in connection with the warrants to surveil him. Finally, Dr. Page's allegations are more than sufficient to establish the liability of

each Defendant for violating his rights under the Fourth Amendment and the FISA statute, as explained in detail below.

The people of the United States have an aversion to government infringement of their liberties without due process of law.  That is why the Fourth Amendment exists:  to protect "the right of the people" from "unreasonable searches and seizures," by requiring a warrant to be issued upon "probable cause."  We have an equally strong aversion to government representatives seeking to secretly spy on Americans without first scrupulously justifying the need to do so to the judicial branch.  That is why FISA requires the government to obtain judicial approval for any surveillance and prohibits unlawful disclosure of any information obtained.  The importance of these safeguards is reflected in FISA's provisions specifically creating criminal penalties and corresponding civil liability allowing an "aggrieved" person to sue (and even to recover punitive damages from) federal employees who abuse the FISA powers.

Contrary to their denials, diversions and distractions, these Defendants unlawfully used the power of the federal government, in the form of secret, anti-terrorism surveillance tools, to violate the rights of an innocent American.  They should be ashamed of that.

They are also legally liable for it.

## STATEMENT OF FACTS

On July 31, 2016, the Federal Bureau of Investigation ("FBI") opened a counterintelligence investigation, "Operation Crossfire Hurricane", putatively concerning the Foreign Agents Registration Act, 22 U.S.C. §§ 611 et seq. (the "FARA"), to determine whether "individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." Soon thereafter, the FBI targeted Dr. Page in that investigation and focused its efforts on obtaining from the FISC a series of four FISA warrants authorizing spying on and electronic surveillance of Dr. Page. The FBI applied for those four FISA warrants on October 21, 2016, January 12, 2017, April 7, 2017, and June 29, 2017. All of the Individual Defendants were FBI employees and all of them played meaningful roles in securing the warrants against Dr. Page.

To surveil an American citizen, the FISA requires that there be probable cause establishing first, that the person is acting on behalf of a foreign power, and second, that he is engaged, in his capacity as a foreign agent, in at least one of five specified activities: current or future criminal conduct, sabotage, terrorism, using a false identity, or abetting someone engaged these activities. (50 USC § 1801(b)(2).) Although the Individual Defendants knew that the FBI lacked probable cause to secure a FISA warrant against Dr. Page, they fashioned and approved warrant applications that were misleading and intentionally omitted relevant facts in order to obtain these warrants.

Early in the investigation, on August 17, 2016, the Central Intelligence Agency ("CIA"), provided information to the FBI's Crossfire Hurricane Team documenting that Dr. Page had been a CIA "operational contact" from 2008 – 2013, assisting the CIA and the FBI in combatting anti-U.S. intelligence activities of Russia and other foreign countries. The CIA also provided the FBI with a positive assessment of Dr. Page's candor. Yet each of the four FISA warrant applications withheld this critical information from the FISC. And Defendant Clinesmith even lied to a colleague to continue the concealment of this fact about Dr. Page when it was about to be exposed in the Fourth Warrant.

The FISA warrant applications relied on documents furnished by Christopher Steele ("Steele") as the sole basis to represent to the FISC there was "probable cause" for the First Warrant to be approved. However, the FBI and its Crossfire Hurricane Team knew that Steele was a paid political opposition researcher hired by the Democratic National Committee and the Clinton presidential campaign, who was determined to stop Trump from being elected. None of the warrant applications disclosed the facts exposing the political funding of Steele's work and the obvious layers of bias that would destroy the reliability of his reports alleging "probable cause" existed to support the first warrant. Of course, Steele provided false, misleading and/or unverified information to the FBI, including allegations of unlawful communications and activities involving Dr. Page and two Russians with close ties to Russian President Vladimir Putin.

On September 23, 2016, an article was published in YAHOO! NEWS, the source of which was also Steele (despite the fact that he was prohibited by the terms of his agreement with the FBI from talking to the media), alleging meetings between Dr. Page and two Russian individuals.  On September 25, 2016, Dr. Page sent a letter to FBI Director Comey in which he categorically denied that he had any such communications with the Russian individuals and documented his previous cooperation with the CIA and the FBI to combat Russian spying (which confirmed the accuracy of the information provided to the Crossfire Hurricane Team on August 17, 2016).  Rather than abandon the illegal effort to spy on Dr. Page, the FBI team treated the YAHOO! article as *corroboration* of Steele's claims inserted in the First Warrant application.  Instead, the Crossfire Hurricane Team failed to investigate Steele's claims in accordance with its own manuals and procedures.  They knew Steele was merely 'corroborating himself' and, even worse, that his information was wholly unverified and unverifiable.

Even after formally severing ties with Steele for cause on November 17, 2016 because of Steele's violations of FBI protocols and lack of credibility, the FBI actively continued to have frequent contract with Steele as a back-channel source of information.  In its second FISA warrant application in January 2017, the FBI misrepresented Steele's status with the FBI, and failed to disclose his lack of credibility and trustworthiness.

 Further, when the FBI ultimately did attempt to confirm the information that Steele had provided about Dr. Page and others—the foundational investigative tasks

that the Crossfire Hurricane Team inexcusably had chosen to not perform prior to seeking the First Warrant, it was unable to do so.  In fact, Steele's "Primary Sub-source" contradicted critical information that Steele attributed to him.  Yet the FBI team never advised the FISC of this contradiction.  Nor did the FBI team advise the FISC that one of Steele's alleged sources of information against Dr. Page had himself been investigated for attempting to recruit Americans to help spy for Russia.

The Individual Defendants fabricated or intentionally disregarded critical evidence, and knowingly misled the FISC, in order to obtain the FISA warrants.  As mentioned, Defendant Kevin Clinesmith, an FBI attorney, altered an email from the CIA in order to indicate falsely that the CIA denied that Dr. Page had been a CIA source serving for many years as an operational contact.  This concealed fact was common knowledge to all members of the Crossfire Hurricane Team, however.

The FBI Team also violated FISC Rule 13 which required them, upon the discovery of a submission to the FISC containing a misstatement or omission of material fact, to inform the FISC immediately, in writing, of the misstatement or omission and any necessary correction; the facts and circumstances relevant to the misstatement or omission; any modifications the government has made or proposes to make in how it will implement any authority or approval granted by the FISC; and how the government proposes to dispose of or treat any information obtained as a result of the misstatement or omission.

In 2018-2019, Michael E. Horowitz, the Inspector General of the Department of Justice (the "DOJ IG"), investigated the circumstances under which the FBI sought

and obtained the four FISA warrants.  His report issued on December 9, 2019, entitled, "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation" (the "Horowitz Report"), established that there is not, and never was, any evidence that Dr. Page acted in concert with Russia or its agents. Although the FBI is required by its own longstanding procedures, established on April 5, 2001 (the "Woods Procedures"), to verify, and certify to the FISC the accuracy of any FISA warrant application, the Horowitz Report concluded that the FBI Team failed in numerous, material ways to comply with the Woods Procedures, and other DOJ and FBI procedures, with respect to the applications for FISA warrants to surveil Dr. Page.  For example, the FBI failed to verify the accuracy of information included in the warrant applications and in many instances, either lacked supporting documentation or misrepresented documentation, some of which showed that the factual assertions made in the FISA warrant applications were incorrect.  In fact, the application for the first FISA warrant contained the affirmative false representation that, "The FBI has reviewed this verified application for accuracy in accordance with its April 5, 2001 procedures [the Woods Procedures], which include sending a copy of the draft to the appropriate field office(s)."  The Horowitz Report found 17 distinct, significant errors and omissions in the FISA warrant applications the FBI submitted to the FISC with respect to Dr. Page. The DOJ has admitted in filings with the FISC that in the third and fourth FISA warrant applications that "there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power" due to many material omissions and misstatements by the

FBI which withheld from the FISC information in its files which did not support, and even contradicted, the applications. The DOJ has accepted and not contested the same express criticisms and legal conclusions by the FISC regarding the first two FISA warrant applications lacking probable cause and admitted there were material omissions and misstatements in those applications. In addition to DOJ not attempting to defend the validity of the FISA Warrants, Deputy Attorney Generals Sally Yates and Rod Rosenstein, who signed and approved the FISA warrant applications, have testified to Congress they would not have signed them had they known at the time of the FBI's misrepresentations and omissions.

The FISC concluded, "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Dr. Page]. … The frequency and seriousness of these errors in a case that, given its sensitive nature, had an unusually high level of review at both DOJ and the Federal Bureau of Investigation have called into question the reliability of the information proffered in other FBI applications." The FISC found violations of the government's duty of candor in all four applications regarding Dr. Page.

These facts are all drawn from the matter alleged with specificity in the 66-page, 311-paragraph, 9-count Second Amended Complaint, dated June 8, 2021. (ECF No. 73.) The essence of what is alleged therein is summarized here for purposes of a concise, summary statement of the facts for this memorandum.

## PROCEDURAL POSTURE OF THE CASE

Dr. Page, initiated this action on November 27, 2020, seeking relief against eight individual defendants and the United States and its agencies for violating his Constitutional and other legal rights. (Dkt. No. 1).

Plaintiff set forth eight causes of action; five against the Individual Defendants under the Foreign Intelligence Surveillance Act (FISA) (Counts I-IV) and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Count VI), and three against the United States and its agencies under the Federal Torts Claims Act (Count V) and the Privacy Act (Count VII and VIII). (Dkt. No. 1). Dr. Page also set forth his intent to amend the Complaint to include a ninth claim against the United States under the Patriot Act depending upon the outcome of his administrative claim under that Act, which was pending. (Dkt. No. 1, p. 49, § X).

While service was being accomplished, a non-substantive amendment was made to the Complaint on April 15, 2021. (Dkt. No. 51). All Defendants thereafter moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. Nos. 60,62-64,66-70).

On April 22, 2021, the federal government provided Dr. Page with his "right to sue" letter on the Patriot Act claim. Accordingly, Dr. Page filed his Second Amended Complaint ("SAC") on June 8, 2021, adding the Patriot Act claim (Count IX) and making other amendments, the filing of which rendered the Defendants' motions to dismiss moot. (Dkt. No. 73).

On September 17, 2021, the Individual Defendants moved to dismiss the SAC and the Government Defendants moved to dismiss the SAC and also for partial summary judgment. (Dkt. Nos. 80-88).

## ARGUMENT

This Opposition is an Omnibus to the Motions to Dismiss filed by each of the eight Individual Defendants. In the aggregate, the Individual Defendants raise approximately ten separate defenses in support of their requested relief. Not all the Individual Defendants raise every defense, and some Individual Defendants raise defenses not raised by any of the others. This Omnibus Opposition addresses all of the defenses collectively. For ease of understanding, a chart identifying the defenses separately, which Individual Defendant has raised them and at what place in his or her Motion to Dismiss, and where within this Omnibus Opposition the corresponding argument(s) are found, is appended as Exhibit A for the Court's benefit.

## I.    Standard of Review

"In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must 'treat the complaint's factual allegations as true and must grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)." *Ladeairous v. Rosen*, No. 15-CV-00954 (ABJ), 2021 WL 722869, at *4 (D.D.C. Feb. 24, 2021).

To survive the Individual Defendants' motions to dismiss under Rule 12(b)(6), the Second Amended Complaint ("SAC") must contain sufficient factual matter that, if accepted as true, states claims to relief that are plausible on their face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A facially plausible claim is one that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Brigida v. Buttigieg*, 538 F.Supp.3d 12, 16 (D.D.C. 2021) (quoting *Iqbal*). "This standard does not amount to a specific probability requirement, but it does require 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).   A plaintiff's burden at the motion to dismiss stage is merely to "nudge [his] claims across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).   Rule 12(b)(6) "test[s] the sufficiency of a complaint" but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

"Well-pleaded factual allegations are 'entitled to [an] assumption of truth,' and the court construes the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Brigida v. Buttigieg*, 538 F.Supp.3d at 17 (citations omitted).   "Ultimately, '[d]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Courts, when deciding a Rule 12(b)(6) motion, "may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). And, a dismissal will only be affirmed "'when "it appears, beyond doubt, that the plaintiff[] can prove no set of facts in support of [its] claim which would entitle it to relief."'" *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C. 1993) (quoting *Klahr v. District of Columbia*, 576 A.2d 718, 721 (D.C. 1990).

In this case, the Court's "context-specific task" of reviewing the FISA and *Bivens* claims against the Individual Defendants is actually quite limited. There is no dispute as to a significant number of the elements of Plaintiff's claims. For example, there is no dispute that Dr. Page is an "aggrieved person" under the FISA - the electronic surveillance against him was <u>not</u> performed pursuant to a warrant supported by probable cause. The Horowitz Report catalogued the many material defects in the FISA Warrant applications submitted to the FISC, and by whom they were committed, *i.e.*, the Individual Defendants in this case. And, as detailed in the SAC (¶¶ 42-51), the FISC has condemned "the frequency and seriousness of these errors" and concluded that none of the four warrants was supported by probable cause.[1]

---

[1] Indeed, the gravity of the false information of the FISA warrant applications and lack of candor involving the Plaintiff caused the FISC to "question the reliability of the information proffered in other FBI applications" submitted to the FISC.

Thus, the narrow question at this preliminary stage of the case is whether the SAC's allegations against the Individual Defendants, if accepted as true, plausibly establish an "offense" in violation of 50 U.S.C., § 1809(a), and under *Bivens*.

## II.    The FISA Claims

### A.    The requisites for a FISA claim

FISA provides a civil action that parallels its criminal provision, 50 U.S.C. § 1809.  The civil remedy provides that "an aggrieved person … who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation." 50 U.S.C. § 1810.  This provision covers two distinct violations:  engaging in unlawful electronic surveillance and disclosing or using information obtained through such surveillance.  *See Al-Haramain Islamic Foundation, Inc. v. Obama*, 705 F.3d 845, 852-53 (9th Cir. 2012).

Surveillance pursuant to an invalid warrant is necessarily unauthorized by FISA and gives rise to civil liability under § 1810.  *See Fagaza v. Federal Bureau of Investigation*, 965 F.3d 1015, 1050 (9th Cir. 2020) ("Plaintiffs allege they were surveilled solely on account of their religion. If true, such surveillance was necessarily unauthorized by FISA, and § 1810 subjects any persons who intentionally engaged in such surveillance to civil liability.").  Where a warrant affidavit contains a knowing or reckless false statement that is necessary to the finding of probable cause, "the

search warrant must be voided … to the same extent as if probable cause was lacking on the face of the affidavit." *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

The legislative history establishes that Congress intended "civil liability of intelligence agents under [§ 1810] [to] coincide with the criminal liability [under § 1809]." H.R. Rep. No. 95-1720, at 34 (1978). Criminal liability under § 1809 extends not only to principals but also to persons who aid or abet the offense. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). The Individual Defendants wholly ignore this provision and the mainsprings of 1809(a)'s reach by wrongfully arguing the SAC does not state FISA claims against them because it does not allege that they each, *personally*, engaged in electronic surveillance of Dr. Page or disclosed or used information obtained from the surveillance. The simple rejoinder to this argument is that there is no need for Plaintiff to do so in order to prove the Individual Defendants are liable, pursuant to 50 U.S.C. 1809 and 18 U.S.C. § 2, for having violated FISA's criminal provisions. [2]

"Aiding and abetting … makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy." *Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949). "The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of the other

---

[2] The Individual Defendants also ignore the sweeping language of both 50 U.S.C. § 1810 (providing a cause of action against "any person" who violates § 1809) and 18 U.S.C. § 2 (reaching "whoever" participates in an offense) in suggesting that they are somehow beyond the ambit of FISA liability.

person which are in furtherance of the common design or plan to commit the felony, or are the natural and probable consequences of acts done in the perpetration of the felony." *United States v. Heinlein*, 490 F.2d 725, 735 (D.C. Cir. 1973); *accord United States v. McGill*, 815 F.3d 846, 936 (D.C. Cir. 2016) (an aider and abettor is responsible for the natural and probable consequences of the execution of a common design shared with the perpetrator).

"Aiding and abetting requires (1) [the defendant's] specific intent to facilitate the commission of the crime; (2) his guilty knowledge (3) that someone else was committing the crime; and (4) his assisting or participating in committing the crime." *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980). "A culpable aider and abetter need not perform the substantive offense, need not know its details, and need not even be present so long as the offense committed by the principal was in furtherance of the common design." *Id.* (citations omitted). "It [is] not essential that the principal in the operation be identified so long as someone had that status." *United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978). All that is required is "guilty knowledge on the part of the defendant that an offense was being committed by someone." *United States v. North*, 716 F.Supp. 644, 647 (D.D.C. 1989).

In the civil context, a defendant may aid and abet an offense even if he is unaware that he is assisting illegal conduct. Extreme recklessness may support aiding and abetting liability. Such recklessness may be found if the alleged aider and abettor encountered "red flags," or "suspicious events creating reasons for doubt" that should have alerted him to the improper conduct of the primary violator, or if there

17

was a danger so obvious that the actor must have been aware of the danger.  *See*
*Howard v. S.E.C.*, 376 F.3d 1136, 1143 (D.C. Cir. 2004).

Here, as alleged in the SAC, all of the Defendants intended, knew of, and
participated in the criminal offense of unlawfully surveilling Dr. Page and/or using
or disclosing his information so obtained, in violation of 50 U.S.C. § 1809.  They are
therefore all liable *qua* principals pursuant to the operation of 18 U.S.C. § 2,
regardless of whether each individually personally conducted any specific portion or
the entirety of the illegal conduct.

A person may be "punishable as a principal" if he "commits an offense against
the United States" because he "**aids, abets, counsels, commands, induces or procures**
its commission" the offense.  (Emphasis added.)  As to causation, whoever "willfully
causes an act to be done which if directly performed by him or another would be an
offense against the United States" is also guilty of committing the offense.  18 U.S.C.
§ 2.  The Defendants in this case are all consequently liable for all the acts
encompassed in the overall course of conduct alleged.

### B.    A FISA claim is alleged against each Individual Defendant

#### 1.  James Comey

Defendant James Comey was Director of the Federal Bureau of Investigation
(FBI) during the period leading up to the application for and issuance of the first
FISA surveillance warrant application targeting Dr. Page, as well as for two of the
subsequent three extensions.  Defendant Comey was fired from his position on May

9, 2017, prior to the fourth FISA warrant (*i.e.*, the third extension) being presented to the FISC. (SAC ¶ 26.)  Defendant Comey is not being sued simply because he held the position of Director, however.  He is being sued because he personally and in concert with his other co-Defendants, engaged in violations of FISA, and thereby harmed Dr. Page.

Among the responsibilities of the FBI Director is the review and certification, consistent with 50 U.S.C.S. § 1804(a)(6), of applications to the FISC seeking to electronically surveil individuals in the pursuit of foreign intelligence information. Defendant Comey attempts in his Motion to Dismiss to minimize the importance of this certification—despite its being critical to the approval of any warrant application made to the FISC—and further argues that the SAC fails to properly plead both his scienter and his level of involvement.  Contrary to Defendant Comey's claims, the facts pled in the SAC more than adequately establish his role in, and responsibility for, the issuance of the warrants which resulted in the unlawful surveillance of Dr. Page.

Specifically, on or about August 17, 2016, Comey received information from the CIA establishing that Dr. Page was an "operational contact" for the CIA during the period of 2008-2013.  (SAC ¶ 144).  On September 7, 2016, the CIA sent an investigation referral to Defendant Comey and Defendant Strzok regarding "U.S. Presidential candidate Hillary Clinton's approval of a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server." (SAC ¶¶

73, 145).   Thus, Defendant Comey was expressly warned and aware of the political agenda driving the claims against Dr. Page at a very early stage.  He was similarly well aware of Dr. Page's status as a CIA contact, yet he chose to move forward with an investigation that he knew was based on a political distraction campaign during a hotly contested election against an innocent American citizen.

Next, on September 25, 2016, Dr. Page sent Defendant Comey a letter denying he had had communications with any sanctioned Russian officials. (SAC ¶ 81).  Dr. Page stated in the letter that he had a decades' long record of interactions with the CIA and FBI. This was consistent with the prior CIA reports provided to the FBI involving Dr. Page, which established that he had such a record. (SAC ¶ 81).  It is clear that Defendant Comey received this letter, as he distributed it to the Crossfire Hurricane team, including its supervisor, Defendant Strzok. (SAC ¶¶ 81, 147).  By the end of September, probably no later than the third week of that month, Defendant Comey learned of the existence of the Steele dossier. Defendant Comey understood at that time that the dossier was funded by political opposition to Presidential candidate Donald Trump and knew that Dr. Page's letter of denial was a response to those unfounded accusations.  This was exactly the political tactic he had been warned about by the CIA about several weeks earlier.  Yet Defendant Comey approved use of the dossier anyway. (SAC ¶¶ 146, 165).

Further, on October 12, 2016, FBI personnel including Defendant Strzok personally briefed Defendant Comey and Defendant McCabe about DOJ attorney Stuart Evans' concerns. (SAC ¶¶ 91, 159, 170).   The FBI—including Defendant

Comey—brushed aside those concerns and gave the "green light", urging the DOJ to proceed with the warrant application despite the lack of probable cause. (SAC ¶¶ 91, 159).   In addition to directing the warrant application process to move forward, Defendant Comey approved the FBI's monitoring and surveillance of Dr. Page by CHS Stefan Halper and, was advised about the results of the conversation in which Dr. Page refuted the allegations that he was an agent of Russia. (SAC ¶ 148).

Despite all of the foregoing, Defendant Comey did not direct agents to interview Dr. Page before applying for the First FISA Warrant. And the application submitted did not advise the FISC that Dr. Page had been a source for the CIA, notwithstanding that Defendant Comey had possessed that information for approximately two months. (SAC ¶ 149).

And, despite knowing that relevant, material information that bore on the question of probable cause was intentionally omitted from the warrant application prepared for the FISC judge to evaluate, Defendant Comey signed the certification for this warrant on October 21, 2016. (SAC ¶ 150). Defendant Comey read this application because of its sensitivity. (SAC ¶ 150).

Further, Defendant Comey remained deeply involved in the operation conducting surveillance of Dr. Page.  Defendant Comey was updated on the status of the Crossfire Hurricane investigation every 2 to 4 weeks. (SAC ¶¶ 151, 161).  These status updates were provided by, among others, Defendants McCabe, Priestap, and Defendant Strzok. (SAC ¶ 151).  Defendant Comey was often briefed on specific investigative actions that the Crossfire Hurricane team had taken or planned to take.

(SAC ¶ 151).  Even as late as May 2017, mere days before his removal as FBI Director, Defendant Comey was briefed on the status of the Crossfire Hurricane investigation by Defendant Auten, who was five levels below him in the FBI hierarchy, which demonstrates the high level of involvement of Defendant Comey in the investigation and its associated surveillance activities. (SAC ¶ 151).

Defendant Comey also signed the Second FISA Warrant, which sought the first extension of the initial warrant despite the lack of any information obtained from that warrant that could have constituted foreign intelligence information (SAC ¶ 150, 152).  On January 12, 2017, Defendant Comey signed and certified the Second FISA Warrant.  (SAC ¶ 152).  In that same month, Defendant Comey described the information from CHS Steele—which was relied on by the FBI for the 'probable cause" required in order to obtain the FISA Warrants, including the Second FISA Warrant that he had just certified—as "unverified" in a conversation with President Trump. (SAC ¶ 152).

Due to his regular and ongoing updates on the "investigation," Defendant Comey knew that Danchenko had been identified as Steele's Primary Sub-source and, on information and belief, knew the results of the FBI's interview of Danchenko in late January 2017. Nonetheless, on or about April 7, 2017, Defendant Comey signed and certified the application for the Third FISA Warrant. (SAC ¶ 150, 153).  Once again, Defendant Comey certified that the ongoing surveillance sought to obtain foreign intelligence information which could not reasonably be obtained by normal investigative techniques (50 U.S.C.S. § 1804[a][6]) despite the total lack of any such

information resulting from the surveillance and despite the multiple indications throughout his regular briefings that the "investigation" was solely an exercise in political maneuvering. Defendant Comey's certifications assisted in falsely assuring the FISC that the Woods Procedures were being followed by the FBI. (SAC ¶ 154).

The allegations set forth in the SAC regarding Defendant Comey are clearly adequate to state claims against Defendant Comey that are plausible. While Defendant Comey attempts, in a bizarre reversal of accountability, to hide behind his position as a supervising member of the team, this case is far removed from the type of case dealt with in *Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017), in which a high-ranking official is sued merely as a figurehead. Rather, the SAC clearly delineates the multiple ways in which Defendant Comey personally either became involved or actively involved himself in the misconduct that produced blatant violations of the FISA and Dr. Page's rights.

### 2. Andrew McCabe

Defendant Andrew McCabe was the Deputy Director of the FBI from February 2016 to January 2018. He was an original and primary participant in the Crossfire Hurricane investigation. Defendant McCabe was the FBI's lead signatory of the final FISA renewal affidavit against Dr. Page in June 2017. (SAC ¶ 27).

The SAC, in ¶¶ 155-163, sets forth the documented actions that plausibly allege the basis for Defendant McCabe's liability for each of the four FISA Warrants: he was the overall leader of the effort, giving direction and approval for all of the

warrant applications, being regularly briefed about the investigation of Dr. Page, and personally signing the fourth application.

Defendant McCabe claimed when interviewed by the OIG not to recall whether he reviewed the entire FISA application package or instead upon his familiarity with the investigation before he made the required certification. (SAC ¶ 163). With that description Plaintiff can agree. Defendant McCabe would not have needed to read the entirety of the defective application(s) as he was involved in every step of the process. None of the 17 material omissions and deficiencies cataloged by the IG report would have been unknown to him. Consequently, because he condoned and approved the submission of the FISA Warrant applications, he is personally responsible (along with the other Defendants) for violating the FISA and Dr. Page's rights.

In addition, the following paragraphs further describe Defendant McCabe's "principal" liability for the FISA violations:

a. Hosting a meeting on August 15, 2016, with Co-defendants Strzok and Page discussing "an insurance policy" to prevent a Trump election (SAC ¶ 71);

b. counseling Co-defendants Strzok and Page to go forward with the defective FISA Warrant applications (SAC ¶ 91); and

c. doing so in spite of the knowledge the information was paid political opposition research and not for use by the U.S. Government (¶ 94).

As a member of the Crossfire Hurricane team, Defendant McCabe aided, abetted and counseled the preparation of the false applications to the FISC—causing

the unlawful FISA Warrants to be approved.  He did so by intentionally approving warrant applications that he knew omitted material facts, such as:

> a. Plaintiff's past assistance to the CIA as an operational contact (SAC ¶¶ 72, 81);

> b. Exculpatory information developed about Plaintiff in monitored conversations (SAC ¶¶ 86, 87); and

> c. the lack of any information developed by the FISA Warrants to support a renewal for another ninety-day period.  (SAC ¶ 71.)

Defendant McCabe's argument that he did not "personally" engage in the actual surveillance is irrelevant, as that is not the test.  His role in submitting the false applications, which misled the FISC, directly caused the illegal electronic surveillance to be performed just as if he had personally planted a listening device or searched Dr. Page's home. This misconduct by Defendant McCabe is a textbook example of precisely how 18 U.S.C. § 2(b) aiding and abetting liability operates. To be clear, Plaintiff has alleged that the personal actions of Defendant McCabe, alone, and pursuant to the heartland operation of 18 U.S.C., § 2, were performed intentionally so as to illegally engage in electronic surveillance of Dr. Page.  (SAC ¶ 257.)

Because a very clear affirmative action by Defendant McCabe is that he signed the Fourth Warrant application as the FBI's certifying official, he attempts to minimize it by arguing that the FBI's "certifying official's role" is limited.  Without conceding the validity of the limitation Defendant McCabe claims, such an argument

is unavailable as a defense when, as here, the certifying official knows the warrant application contains false information, uncorrected misrepresentations, and highly misleading commentary such as that a source used in the application is "truthful and cooperative" when, in reality, the source was truthful and cooperative telling the FBI that he did not make statements attributed to him and relied upon in prior applications.   As with Defendant Comey, it is Defendant McCabe's personal actions in pursuing the FISA warrants - while knowing that the applications were not dealing fairly and accurately with the FISC - that creates legal liability for him, not the mere fact that he held a "certifying official's" position at FBI.

### 3.  Kevin Clinesmith

Defendant Kevin Clinesmith was an Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel, responsible for providing legal support to FBI personnel working on Crossfire Hurricane. (SAC ¶ 28, 185.) He was one of the FBI personnel who communicated with the CIA with respect to the Crossfire Hurricane investigation.   (SAC ¶ 185.) Defendant Clinesmith also provided support to FBI personnel working with the National Security Division of the DOJ to prepare applications for FISA warrants to conduct surveillance on Dr. Page.  (SAC ¶ 186.)

During the period that the FBI was preparing the third warrant application in which it would falsely argue to the FISC that Dr. Page was a Russian agent and fail to advise the FISC judge that, in reality, Dr. Page had a working relationship with

26

the CIA and with FBI, Defendant Clinesmith was in contact with Dr. Page's then-lawyer who was assisting Dr. Page in his on-going effort to try to reach personnel at the FBI to get them to realize they were mistaken about him.  Defendant Clinesmith, in his conversation with the lawyer, intentionally discouraged Dr. Page from publicly asserting his innocence, saying that he, Defendant Clinesmith, would prefer that Dr. Page not do so.  This conversation occurred mere days before the third FISA warrant application was submitted. (SAC ¶ 122.)[3]

Defendant Clinesmith's role in this case also relates to the application for the fourth FISA warrant. Prior to the issuance of that warrant, Dr. Page had publicly stated that he had previously worked with, and favorably assisted, the U.S. intelligence community agencies.  In the face of this assertion by Dr. Page, an FBI Supervisory Special Agent ("FBI SSA") (whose identity is as yet unknown to Dr. Page), who was to be the affiant on the fourth FISA warrant application, asked Defendant Clinesmith to find out from the CIA whether Dr. Page in fact had ever been a source for the CIA.  (SAC ¶¶ 187 and 188.)

Accordingly, on June 15, 2017, Defendant Clinesmith sent an email to a CIA liaison inquiring whether Dr. Page was a CIA source in any capacity, because the FBI

---

[3] It is quite possible that in addition, Defendant Clinesmith was the lawyer providing legal guidance to the FBI agents who ambush interviewed Dr. Page a few weeks earlier. (SAC ¶ 122.) There are many facts relevant to this case and these Defendants that are yet unknown and unknowable to Dr. Page because they are exclusively in the possession of the Individual Defendants and/or the United States in addition to many being also hidden behind the protections for law enforcement and classified information, (which Plaintiff will be seeking proper access to in discovery.)

would need to disclose that on the next FISA application.  (SAC ¶ 189.)  The CIA liaison responded the same day, providing a list of documents that the CIA had previously provided to members of the Crossfire Hurricane team that provided the answer, and also confirmed that Dr. Page "was or is" a source for the CIA. Defendant Clinesmith acknowledged the email, stated he was examining the documents, and thanked the CIA liaison for the information.  (SAC ¶ 190.)

The FBI SSA followed up with Defendant Clinesmith a few days later and asked whether he had confirmed if Dr. Page was a CIA source.  In a series of instant messages, Defendant Clinesmith falsely reported that Dr. Page was a "sub-source" and "was never a source."  Defendant Clinesmith further falsely reported that the CIA had confirmed explicitly that Dr. Page was never a source.

When the FBI SSA then asked if Defendant Clinesmith had that representation in writing, Defendant Clinesmith agreed to forward the email he had received from the CIA liaison.  (SAC ¶ 191.)  Defendant Clinesmith had previously expressed dismay at the prospect of having to write a "terrible footnote" apprising the FISC that such a critical fact - which the FBI had known all along, *i.e.*, that Dr. Page had been a source for the CIA - was only at this late date being brought to the FISC's attention.  He "solved" that personal dilemma by making a False Statement in violation of 18 U.S.C., § 1001.  Defendant Clinesmith protected himself and the Crossfire Hurricane Team by materially altering the original text of the email from the CIA liaison to read that Dr. Page was "not a 'source'" and, on June 19, 2017, forwarded his altered version of the email to the FBI SSA.  (SAC ¶¶ 192 and 193.)

Consequently, information about Dr. Page's history or status as a CIA operational contact was not included in the application for the fourth FISA warrant.  (SAC ¶ 194.)

Defendant Clinesmith was subsequently criminally charged on August 14, 2020, with one count of making false statements in violation of 18 U.S.C. § 1001(a)(3) for his actions in misleading the FBI SSA and altering the email regarding Dr. Page's status as an operational contact of the CIA.  (Id.)  As Defendant Clinesmith himself notes in footnote 5 of his memorandum of law in support of this motion to dismiss, he pleaded guilty to that charge on August 19, 2020.

These facts show clearly that the misconduct of Defendant Clinesmith directly misled a Deputy Attorney General into approving and signing the application for the fourth FISA warrant which otherwise would not have been approved and signed.  His misconduct similarly deceived the FISC into finding probable cause where there was none, and to issuing the fourth FISA warrant, which the FISC subsequently recognized was invalid as lacking probable cause.

### 4.  Peter Strzok

Defendant Strzok was FBI Deputy Assistant Director for Counterintelligence and a Supervisor of the "Crossfire Hurricane" Team until approximately January 2017.  (SAC ¶¶ 12, 29).  Consequently, he was extensively engaged in the production of several of the unlawful FISA warrant applications. (SAC ¶¶ 70, 71, 81, 91, 105, 106, 145-147, 151, 158, 159, and 164-173).

These allegations plainly show Defendant Strzok repeatedly engaged in conduct and exhibited knowledge that forms the basis of his liability for the FISA violations, including that:

a.  He had knowledge of the investigation referral from the CIA notifying the FBI that Hillary Clinton had approved a plan to allege U.S. Presidential candidate Donald J. Trump's collaboration with Russian Hackers to disrupt the election as a way to "distract the public" from her misuse of a private email server (¶¶12,145,167);

b.  He stated an intention to "stop" Trump from ever becoming President (¶¶70, 71);

c.  He hosted a meeting on August 15, 2016, with Co-defendants McCabe and Page discussing "an insurance policy" to prevent a Trump election (¶ 71);

d.   He met with other FBI officials on November 11, 2016, to discuss Steele's source network, background and reliability, during which it was revealed that Steele was passionate about Trump not becoming President (¶106);

e.  He knew of the opinions by certain of Steele's professional contacts that Steele was unreliable (¶105);

f.  He had an ongoing role to supervise the operation Crossfire Hurricane and to report to Defendant Comey about it (¶151);

g.  He was present at an October 12, 2016, meeting wherein he and other FBI officials briefed Comey and McCabe about DOJ Attorney Stuart Evans' concerns about Steele's opposition research, motives and reliability, despite which he pushed for their approval to proceed with the FISA Warrant application without further scrutiny of Steele (¶91, 170).

Moreover, rather than accept Dr. Page truthful explanation in his letter to Defendant Comey that he had no involvement acting on behalf of Russia and confirming his prior CIA "operational contact" status as the affirmative evidence of Page's innocence it represented—or at a minimum providing that information to the FISC as the material information relating to the probable cause determination it represented, Defendant Strzok confided in his close confidant Co-defendant Lisa Page that the letter could be used as a "pretext" to interview Dr. Page.  This bias against Dr. Page, coupled with Defendant Strzok's political animus toward former President Trump metastasized into a scheme with Co-defendant Lisa Page (and others) to disclose information and records to the media regarding the existence a FISA warrant _and a renewal_ that revealed information protected by law under the FISA and Privacy Act. (SAC ¶¶ 147, and 20 to 226).[4]

---

[4] Various Defendants, including Defendant Strzok, complain that FISA obtained information was not improperly used or disclosed as a basis for dismissing the SAC. However, the SAC expressly asserts that the Defendants did unlawfully use FISA obtained information in ways both known and unknown to Dr. Page, including by leaking to the media, and for use in obtaining the warrant renewals, and for other purposes as already admitted by the FBI in filings to the FISC.  (SAC ¶¶ 229, 230, 231.)  At this stage of the case, these allegations must be accepted as true.  Also, given

Defendant Strzok also argues that he did not "personally" engage in the surveillance, meaning he was not the FBI personnel who actually physically executed the warrants obtaining Dr. Page's communications.  This claim is irrelevant. Defendant Strzok's role in supervising the Crossfire Hurricane team, advising Comey, and pushing for the false applications which misled the FISC, directly *caused* the illegal electronic surveillance to be performed just as if he had personally installed the listening device himself.  This misconduct by Defendant Strzok, committed intentionally and with knowledge of its unlawful basis, was undertaken to cause others to physically engage in the unlawful surveillance and is a clear violation of Dr. Page's rights under FISA and otherwise.[5]

---

that the facts further establishing unlawful use of the FISA obtained information are exclusively in the possession of the Defendants in this case because they are protected from the view of the public, including Dr. Page, as "law enforcement" and classified information, it is inappropriate for Defendants to claim that Dr. Page has inadequately set them forth in the SAC prior to the discovery process.  This is particularly so as the Government Defendants in this case also argue that Dr. Page had no legal basis for obtaining information about the unlawful FISA surveillance on him and the investigation of it when he tried to do so through the Privacy Act, the only legal ground on which the public can attempt to do so.

[5] Dr. Page has not named as a defendant any FBI who personally engaged in the physical execution of the unlawful warrants as these persons are as yet unknown and unknowable to him.  Also, while Defendant Strzok and the other co-defendants in this action all had knowledge that the FISA warrant applications were misleading the FISC into issuing warrants that were not based on probably cause, it is probably unlikely that the FBI technicians and some of the agents who executed the warrants would have been in positions to know that information.  Should discovery in this matter prove otherwise, or prove that one of the already named Defendants personally engaged in the physical execution of the warrants, the SAC can be amended to conform to that evidence.

Defendant Strzok is liable in this case because he purposefully and knowingly engaged in conduct that caused the FBI to submit multiple misleading FISA warrant applications to the FISC in 2016 and 2017 to obtain warrants to unlawfully surveil Dr. Page in the absence of probably cause, and also because he unlawfully used and publicly disclosed protected FISA obtained information in the warrant application process and leaks to media outlets.

### 5.  Lisa Page

Defendant Lisa Page was an FBI lawyer and Special Counsel to Deputy Director McCabe and at all times relevant to the SAC was involved in the FBI's preparation of the FISA warrant applications as part of the investigation known as Crossfire Hurricane. (SAC ¶¶ 30, 106, 147, 158.)   She was well aware of the details of the investigation and also its importance.  On September 2, 2016, Defendant Lisa Page advised Defendant Strzok that the President (Barack Obama) "wants to know everything we are doing." (SAC ¶ 7.)

As early as August 2016, correspondence between Defendant Lisa Page and Defendant Strzok shows they shared a strong common interest in preventing Donald Trump from being elected President.  On August 8, 2016, in text messages exchanged between them, she asked: "[Trump's] not ever going to become president, right? Right?!" and Defendant Strzok replied "No. No he won't. We'll stop it." (SAC ¶ 70.) On August 15, 2016, Defendant Strzok sent her a text message stating, "I want to believe the path you threw out for consideration in Andy's [McCabe's] office - that

there's no way he gets elected - but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40." (SAC ¶ 71.) Thereafter, the two of them engaged in a series of acts with the other Defendants intended to carry out these objectives, including but not limited to, engaging in conduct that violated FISA and Dr. Page's rights. Indeed, the OIG determined that the various text messages exchanged between Defendants Lisa Page and Strzok, during the Crossfire Hurricane investigation and preparation of the multiple FISA warrants in which they both participated, "were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties." (SAC ¶ 197.)

Specifically, in her role of providing legal guidance to Defendants McCabe and Strzok, Defendant Lisa Page facilitated the issuance of the First FISA warrant for electronic surveillance of Dr. Page despite knowing there were serious issues with the application. In response to a letter from Dr. Page to Defendant Comey on September 25, 2016, in which he declared his innocence and disclosed his relationship with U.S. intelligence, Defendant Strzok wrote her on September 26, 2016, stating, "At a minimum, the letter provides us a pretext to interview." (SAC ¶ 147.)

Further, on October 18, 2016, then-Associate Attorney General Bruce Ohr, whose wife worked for political opposition research firm Fusion GPS, briefed McCabe and Lisa Page on CHS Christopher Steele's accusations against Dr. Page. Bruce Ohr advised them that Steele's work product was not for the U.S. Government but, rather, was political opposition research for a private political party. (SAC ¶ 94.)  Defendant

34

Lisa Page was at the crossroads of the information stream learning of the problems with the first warrant application.

In October 2016, as the FBI Crossfire Hurricane team was attempting to complete the first warrant application, DOJ attorney Stuart Evans expressed reluctance to proceed with it. He wanted more scrutiny of Steele's motives and believed that before pursuing a surveillance warrant against someone associated with a presidential campaign, leadership of both the FBI and DOJ should sign off on the request. In messages to Defendant Lisa Page, Strzok said, "Currently fighting with Stu for this fisa" and "Hey-The FISA will probably not go forward without a call from [McCabe]." (SAC ¶ 168.)  This is exactly the kind of conduct contemplated by 18 U.S.C., § 2, for supporting "principal" liability in the commission of an offense.

On October 11, 2016, Defendant Strzok messaged Defendant Lisa Page that the FISA application to surveil Dr. Page could not gain approval at DOJ without a call from Defendant McCabe. (SAC ¶ 158.) The next day, she emailed Defendant McCabe, informing him that she had communicated to Mr. Evans that both Defendant McCabe and Defendant Comey had given a "green light" to apply for the First FISA warrant. She asked Mr. Evans where things stood and added that "This might take a high-level push. Will keep you posted." (SAC ¶ 91.)

On November 21, 2016, after the FISC had issued the first warrant, Defendant Lisa Page again met with Bruce Ohr, along with Defendants Strzok and Pientka, and other FBI officials, to discuss Steele's "background and reliability as a source" and to "identify his source network." During this meeting, Bruch Ohr advised that Steele

"was desperate that Donald Trump not get elected and was passionate about him not becoming the U.S. president." He also advised that Steele had been hired by "a lawyer who does opposition research" and that the information purportedly linking Donald Trump to Russia was being relayed to Hillary Clinton's presidential campaign. (SAC ¶ 106.) This information from Bruce Ohr plainly advised Defendant Lisa Page and the others that Steele was not a reliable source for truthful, unbiased information to use in the FISA Warrants.

The legal requirement in the Rules of the FISC to correct the First Warrant and bring that information to the attention of the FISC was ignored, however, and the information was also omitted from the renewal applications as well. (SAC ¶¶ 55-58.) Notwithstanding her knowledge of these problems, Defendant Lisa Page proceeded to facilitate the issuance of the FISA warrant renewals against Dr. Page. Whether or not Defendant Lisa Page was the individual who officially requested the First FISA warrant, she clearly participated, facilitated, and "pushed" for it. In numerous instances, she operated as an intermediary, coordinating efforts of various parties united in the common goal of obtaining the First FISA warrant to spy on Dr. Page. And she did so not as a low-level functionary, but rather as an attorney for the FBI, giving guidance to the overall effort, participating in decision level meetings, and making arguments about the strength of the effort. This is not someone passively sitting on the sidelines, taking notes. This is an active participant, personally motivated to fully engage in the unlawful effort, possessing the training to

understand the FISA requirements, and having the position from which to object, yet permitting the misleading information to be presented to the FISC anyway.

Defendant Lisa Page also disclosed or used information obtained through the unlawful electronic surveillance. On Monday, April 10, 2017, Defendant Strzok sent her another text message stating, "I had literally just gone to find this phone to tell you I want to talk to you about media leak strategy with DOJ before you go." (SAC ¶ 220.) Two days later, he sent Defendant Lisa Page a text message to alert her that two media articles were coming out about her "namesake" [Dr. Page] and that one was worse than the other. (SAC ¶ 222.)

Later that week the Washington Post and the New York Times published articles about Dr. Page and the government's investigation of him, including that FISA warrants were used. (SAC ¶¶ 221, 224.) Also that weekend, Defendant Strzok also sent Defendant Lisa Page another text message stating, the "article is out!" and "Well done, Page," (SAC ¶ 223), clearly congratulating her, not for being an innocent bystander in the media leak "strategy," but for her active participation in it. Her role in unlawfully aiding and abetting the unlawful warrants is compounded by her role in leaking the existence of the FISA warrants and renewals.

Plaintiff has alleged that certain Defendants in this case, to include Defendant Lisa Page, were in possession of FISA obtained (and also Privacy Act protected) information about him, and among other things, leaked it to the media. The foregoing facts demonstrate that Defendant Lisa Page had already engaged in a media leak

strategy to disclose information about Dr. Page that she obtained because of her participation in the Crossfire Hurricane investigation. (SAC 225, 226).

There is simply no doubt this happened.  There is also the circumstance that after the FISC began issuing the warrants, a stream of information about Dr. Page, the FISA warrant, the warrant renewals, and his supposed status as a Russian agent working to undermine the nation, began to flood the airwaves and the newsstands. The source of that information can only have been the Crossfire Hurricane team.  It is beyond plausible that it was the established leaker on that team, among others, who provided the information to the press.

The SAC alleges sufficient facts to state a FISA claim against Defendant Lisa Page. She is liable because she personally participated in conduct that caused the unlawful electronic surveillance of Dr. Page and she unlawfully disclosed or used information obtained through the unlawful surveillance.

### 6. Joe Pientka III

Defendant Joe Pientka, III served as a Supervisory Agent on Crossfire Hurricane. (SAC ¶¶ 31, 198).  He was responsible for making sure the warrant applications complied with the FBI's "Woods Procedures," (SAC ¶ 198), which are intended to ensure the accuracy of facts proffered in applications submitted to the FISC. (SAC ¶¶ 60, 198).  Accordingly, this responsibility required Defendant Pientka to verify the accuracy of the facts and confirm that the "Woods File" contained all documents to support each factual assertion in a FISA application. (SAC ¶ 198).

Defendant Pientka, however, falsely certified that the information in the First FISA Warrant application was verified for accuracy. (SAC ¶¶ 97,198). Contrary to the verification, the information contained in the application was grossly incorrect and incomplete. (SAC ¶¶ 95-96). Indeed, the application and the renewal applications, which substantially reflected it (and contained even more inaccurate information), were so flawed as to be completely misleading. Little wonder then that the FISC later characterized the FISA Warrants as lacking candor and containing serious and frequent errors.

Defendant Pientka had first-hand knowledge of the inaccurate and misleading information in the applications prepared for submission to the FISC. For example, he was present for the November 2016, meeting in which Bruce Ohr advised several of these Defendants that Steel was not a reliable source, was politically motivated, and was being paid to do political opposition research (SAC ¶ 106). Pientka was also in possession of information obtained in November 2016, from an FBI liaison, that Kathleen Kavalec, a State Department official, had met with Steele, who was also attempting to peddle his political narrative to the State Department. Ms. Kavalec, with no law enforcement or investigative background, had promptly determined that some of Steele's information was inaccurate. However, Defendant Pientka took no steps to follow up with Ms. Kavalec. (SAC ¶ 109.) It takes little imagination to conclude that perhaps that was because he was engaged in conduct, along with others, to obtain the FISA Warrants regardless of the fact that probable cause was lacking.

Defendant Pientka also personally knew that Dr. Page had worked with the FBI in a prior matter that had resulted in the incarceration and deportation of a ring of Russian agents, which were facts that undermined the warrant application's central claim that Dr. Page was a Russian agent. These facts and circumstances were critical to the FISC properly adjudicating the FISA Warrants but they were intentionally omitted from each application presented to the FISC seeking to spy on Dr. Page. (SAC ¶ 200.)

As the SAC plausibly alleges, Defendant Pientka simply disregarded the "Woods Procedures," and his responsibilities under it, other FBI policies, and his basic obligation to tell the truth to a court. Instead, he intentionally set forth misleading statements to the FISC to falsely establish probable cause for the First FISA Warrant when the facts know to him fell far below that standard. He also failed to advise the FISC of information received after the fact which contradicted the information provided to the FISC, he did not provide the new information in any draft for a subsequent renewal application either, and he did not annotate the casefile so that any FBI personnel working on the matter after his departure from the case would be alerted to the need to provide corrective information to the FISC. (SAC ¶¶ 70-100 and 198-199).

Defendant Pientka's failure to actually verify the information included in the First FISA Warrant application and to provide corrective action after learning of contradictory or undermining facts indicating that the first application was, at a minimum, incomplete, thus also directly led to continued unlawful surveillance of Dr.

40

Page via the subsequent warrant renewals.  The application for the Second FISA Warrant contained the same inaccurate and incomplete information as the first because Defendant Pientka had included it and "verified" that it was accurate. (SAC ¶¶ 111-114).   And those same, false, inaccurate, misleading facts were carried forward into the third and fourth warrants as well.  (See, e.g., SAC ¶ 128.)[6]

Defendant Pientka's argument that he cannot be liable to Dr. Page for any injury sustained as a result of the subsequent Warrants because his temporary assignment with Crossfire Hurricane terminated before they were issued is incorrect for two reasons.  First, as noted, Defendant Pientka was included in conversations and privy to information that contradicted the veracity of the information in the application for the Second FISA Warrant *prior* to leaving the Crossfire Hurricane team. (SAC ¶¶ 106 and 109).  Defendant Pientka's Crossfire Hurricane assignment terminated the same month that the application for the Second Warrant was submitted to FISC.   Thus, he was involved in the preparation of the first renewal application leading up to the second warrant. His conduct resulted in that application misleading the FISC in order to persuade it to issue the Second FISA Warrant.

Second, the subsequent warrant renewal applications incorporated, relied upon, and built upon the false and incomplete information that Defendant Pientka "verified" to obtain the First Warrant and did not correct in the Second Warrant application.  Defendant Pientka personally participated in the conduct that resulted in the first two unlawful FISA Warrants, and that same conduct set in motion the

---

[6] These facts also reflect a classic form of principal liability under 18 U.S.C. § 2(b).

circumstances that created the final two unlawful warrants.  It is not a defense to liability that other people did not cut off the pernicious effects of his unlawful conduct. It was his obligation to do so, or better yet, not to have set them in motion in the first place.

The SAC therefore contains more than sufficient facts stating FISA violations against Defendant Pientka for engaging in unlawful surveillance of Dr. Page.

### 7.  Stephen Somma

Stephen Somma, *a.k.a.* "Steve Holt," as he presented himself to Dr. Page during a series of meetings in 2017, is an FBI agent who worked on the Crossfire Hurricane team responsible for the unlawful FISA Warrants targeting Dr. Page. (SAC ¶ 32).

Defendant Somma is at the very center of this unlawful acts to obtain the FISA warrants in this case. To begin, he is the FBI employee who first proposed surveillance of Dr. Page. (SAC ¶ 202).

In mid-August 2016, the FBI's Office of the General Counsel had already advised Defendant Somma there was not probable cause for a FISA against Dr. Page. (SAC ¶ 203).  That he was on notice of this deficiency explains several of Defendant Somma's actions that illustrate why he intentionally participated in misleading the FISC in order to unlawfully obtain FISA Warrants.

First, on or about September 29, 2016, Defendant Somma *personally* provided incomplete, inaccurate, and conflicting information to the DOJ Office of Intelligence

attorney who asked whether Dr. Page had been a source for the CIA. (SAC ¶ 84). In fact, Defendant Somma had actual knowledge Dr. Page had been an "operational contact" for the CIA from 2008-2013. (SAC ¶ 204). But when directly asked just a month later, in September 2016, about Dr. Page's prior relationship with the CIA, Mr. Somma failed to accurately describe the nature and extent of the information the FBI had received on Dr. Page from the CIA. (SAC ¶ 205). Omitting this key information reveals Defendant Somma's knowledge that if that exculpatory information was included in the FISA warrant application, it would never pass internal review at DOJ, much less at the FISC. (SAC ¶ 205).

To facially overcome the FBI OGC's view that the warrant application lacked probably cause, Defendant Somma seized upon the untrustworthy and unverified allegations about Dr. Page in Christopher Steele's opposition research. Defendant Somma provided only partially responsive answers to a DOJ lawyer when pressed on the question of whether Steele was affiliated with a political campaign. (SAC ¶ 89.) Further, Defendant Somma provided misleading information in the warrant application about the extent to which the FBI had previously relied on Steele. (SAC ¶ 206). Defendant Somma also intentionally did not seek the approval or review of the application by Steele's handling agent - as required by FBI procedures. (SAC ¶ 206). According to his own handwritten notes from a December 2016 Crossfire Hurricane team meeting, Defendant Somma also learned of Steele's "judgment problems," but that material was omitted from subsequent FISA Warrants. (SAC ¶ 208).

Finally, Defendant Somma was advised in November 2016 by an FBI liaison, that Kathleen Kavalec, a State Department official, had met with Steele, who was also attempting to peddle his political narrative to the State Department. Ms. Kavalec, with no law enforcement or investigative background, had promptly determined that some of Steele's information was inaccurate. However, Defendant Somma took no steps to follow up with Ms. Kavalec about Steele. (SAC ¶ 109.)

Defendant Somma was also the personal handler for Stefan Halper, an established confidential human source tasked with meeting Dr. Page and other associates of the Trump campaign. In his role as Mr. Halper's handler, Defendant Somma received, yet intentionally or recklessly failed to disclose, exculpatory statements made by Dr. Page and others in recorded conversations leading up to the 2016 Presidential election. (SAC ¶ 203). Specifically, in the calls Dr. Page categorically denied any communication with Paul Manafort and further denied ever meeting with two sanctioned Russians with close ties to Russian President, Vladimir Putin. These unambiguous, exculpatory statements directly contradicted Steele's reporting and should have raised questions about Steele's reliability and credibility, as well as the reports Defendants Somma used to support a finding there was probable cause.

And, Defendant Somma, with knowledge that Mr. Steele's political bias likely rendered his reports on Dr. Page suspect, shielded that information from the DOJ attorneys who had legal responsibilities to approve the FISA applications. (SAC ¶ 207). Evidencing the intentionality of the malfeasance, Defendant Somma evaded

responding to at least three (3) requests from DOJ attorneys and the Unit Chief seeking direct and specific information as to Mr. Steele's political bias in his reporting. *Id.* He ultimately responded and prevaricated. He said that the FBI assumed Mr. Steele had been paid to develop political opposition research damaging to Mr. Page and others. *Id.*[7]

Additionally, in early 2017, Mr. Somma personally participated in a series of interviews with Igor Danchenko, the Primary Sub-source used in Steele's reports with the allegations against Dr. Page. The information provided in these interviews flatly contradicted the information from Steele used to establish probable cause and obtain the First Warrant. However, this information was withheld from the FISC in the subsequent FISA Warrants and, in direct violation of the FISC Rules, was never brought to the Court's attention, by Defendant Somma or anyone else, to correct the original FISA Warrant. (SAC ¶ 209).

Finally, in March 2017, Defendant Somma and another FBI agent personally interviewed Dr. Page at least four times. (SAC ¶ 210). Dr Page_spoke freely and openly without the benefit of counsel in each interview and provided information that

---

[7] Defendant Somma alleges in his Motion to Dismiss that all four of Dr. Page's FISA claims against him are inadequately pleaded because the SAC supposedly does not plausibly allege that Defendant Somma undertook any actions proscribed by FISA with improper intent. Just how specific allegations of repeated outright lying by a law enforcement officer to DOJ attorneys responsible for approving a secret warrant application that was to be presented to a secret surveillance court, coupled with specific explanations of why he did so, do not constitute a description of his improper intent is mystifying. In reality, Defendant Somma's contentions are patently frivolous, merely a further attempt to brazen his way out of responsibility for his extremely serious misconduct.

undermined any reasonable contention that he was acting as a foreign agent. This information was also never disclosed in the subsequent FISA warrant applications—much less used to correct the false information contained in the first two FISA warrant applications.

The culmination of this course of conduct resulted in the FISA warrant applications containing multiple knowing material omissions and misleading statement that achieved the desired purpose - the FISC made findings of probable cause even though in reality there was none. In short, the SAC more than adequately alleges facts illustrating that Defendant Somma's own conduct supports a claim that he engaged in violations of the FISA and Dr. Page's rights.

### 8. Brian Auten

Defendant Brian J. Auten, an FBI Supervisory Intelligence Analyst (SAC ¶¶ 33, 174.) and author of an article on spying ethics, was assigned to the Crossfire Hurricane investigation from its inception (July 2016). He supervised its analytical efforts throughout 2017, with between five and six other intelligence analysts directly reporting to him throughout the Crossfire Hurricane investigation. (SAC ¶175). As such, he played an instrumental role along with the agents preparing the FISA applications—including reviewing the probable cause section of the applications. He also provided other FBI agents with information about Steele's sub-sources that were noted within the applications. Defendant Auten was also instrumental in preparing and reviewing the drafts of the renewal FISA applications. (SAC ¶176).

Furthermore, Defendant Auten assisted the specific case agents by providing information on the reliability of Steele and his sources and he reviewed all information cited in the body of the FISA applications, for accuracy, even going so far as filing in "gaps" within the FISA applications in order to bolster weaker areas. (SAC ¶176). He was further responsible for reviewing the footnotes within the FISA applications. Defendant Auten, through his work with Operation Crossfire Hurricane, falsely enhanced the credibility of information obtained from Steele. In fact, he specifically wrote that information from Steele had been "corroborated and used in criminal proceedings," although none of Steele's past reporting as an informant had been corroborated and had never been used in any criminal proceedings. (SAC ¶179). To further bolster the information Steele had provided, in the application that Defendant Auten knew would be submitted to the FISC, he intentionally failed to disclose the negative feedback that he had received from British Intelligence Service colleagues regarding Steele. Indeed, Defendant Auten was specifically cautioned by Steele's former colleagues that Steele exercised "poor judgment" and pursued as sources "people with political risk but no intel value." (SAC ¶180). This intentional material omission was particularly harmful because Steele was the *sole* source of the information allegedly supporting a "probable cause" determination.

Defendant Auten was also directly aware of material, inaccurate allegations within the Steele reports. For example, he knew Steele's claim that Paul Manafort had used Dr. Page as an intermediary was false, as were Steele's reports mentioning

a non-existent Russian consulate in Miami. Neither of these falsehoods from Steele—
which adversely impacted his credibility in material ways—were disclosed in the
FISA Warrant applications. (SAC ¶¶ 181,182).

Defendant Auten was also directly aware of the concern expressed by the CIA
over the lack of vetting of the Steele "dossier" and that the CIA believed it should not
be used in any intelligence community assessment on the basis that its information
was nothing more than "internet rumor," but was being relied on by the FBI to
establish probable cause. (SAC ¶183).

Finally, Defendant Auten raised specific issues with Steele's sources and in
fact met with Steele's primary sub-source, Danchenko. In this meeting Defendant
Auten learned that Danchenko was based in the United States, *i.e.*, that he was *not*
a Russian based source, a fact that was pointed out in the FISA warrants and never
corrected, as was required by FISC Rule 13(a). (SAC ¶184).

As specifically alleged in the Second Amended Complaint, "Surveillance is not
authorized when the authorization for it has been obtained by false and misleading
statements. As the Supreme Court stated in *Franks v. Delaware*, '[W]hen the Fourth
Amendment demands a factual showing sufficient to comprise "probable cause," the
obvious assumption is that there will be a truthful showing.' 438 U.S. 154, 164-165
(1978) (internal quotation omitted, alteration and emphasis in original)." (SAC ¶258).

Here, Plaintiff has amply alleged numerous instances when Defendant Auten
either misled or made material omissions that withheld important facts and
circumstances necessary for the FISC to properly adjudicate the validity of the FISA

Warrant applications.  Because Defendant Auten both failed to disclose, or withheld information pertinent to the FISA warrants, Dr. Page has a valid cause of action against Defendant Auten based on his own personal actions. And the allegations that Defendant Auten was silent regarding specific facts that he personally knew called into question the veracity of information alleged in the FISA applications, plausibly alleges a violation of the Foreign Intelligence Surveillance Act by him.

Furthermore, Defendant Auten's claim that he, himself, was not personally "engaged in electronic surveillance" is irrelevant.  His role in submitting the false FISA Warrant applications, as well as his involvement in the overall conduct to conceal facts and circumstances that would have severely diminished the credibility of Steele to the FISC, directly caused the illegal surveillance.  It makes no difference that Defendant Auten didn't conduct the actual surveillance himself.  Nor can he successfully claim that he was not involved in the "acquisition of intelligence."  Under the statutory requirements of FISA, the "acquisition of intelligence" must be done (and may only be done) through the authority of a warrant presented by FBI and DOJ personnel to a FISC judge and duly authorized by that judge.  That is step one in the acquisition.  As the SAC clearly alleges, Defendant Auten was personally responsible for specific falsehoods being contained in the FISA warrants that sought authorization from the FISC for the surveillance.  He was definitely involved in the acquisition of intelligence.

Defendant Auten complains that he should not be liable in this case because first he must have acted intentionally with respect to the elements § 1809(a) and

intended the consequences of his acts.  As outlined above, the SAC alleges that he, an FBI analyst tasked with drafting FISA warrant applications in this case, intentionally withheld material information and knowingly boosted misleading and inaccurate information ‑ that he knew was being used by a court to rule on a request for a surveillance warrant.  Any argument that he didn't act intentionally or didn't intend the consequences of his actions, is ludicrous.  It is also an argument for the jury, not for a motion to dismiss.

It is Defendant Auten's own conduct that makes him liable to the Plaintiff. Throughout the SAC, as noted herein, the allegations against Defendant Auten paint the troubling picture of an FBI employee whose actions and willingness to be deceitful intentionally violated the FISA and Dr. Page's Constitutional rights.

### 9.  As to all Defendants[8]

The Individual Defendants seek to limit the evaluation of the sufficiency of the SAC's allegations against them by focusing on their own actions, without reference to the bigger picture or the actions of their co-defendants.  A significant

---

[8] In addition to the facts set forth in section II.B of this memorandum, the SAC describes misconduct that clearly took place in the preparation of the FISA warrant applications, but for which the currently publicly available information does not identify the perpetrator.  SAC paragraph 80 is one example.  These facts should also be taken into account in evaluating the sufficiency of the SAC's allegations, but they also illustrate that Plaintiff should be entitled to discovery in this matter before any serious contemplation is undertaken of dismissing the case as additional salient, material facts supporting his claims do exist against these and possibly other defendants, but at present those facts are in the exclusive purview of the Defendants.

reason for this "silo" approach is that the Individual Defendants cannot otherwise contest much of Plantiff's case. They implicitly concede, as any rational person will conclude, that Dr. Page was "aggrieved" as a result of the four FISA warrants targeting him—none of which had probable cause.  They also do not contest the existence of manifold, material omissions and deficiencies in each of the FISA warrant applications identified by the FISC decisions and the Horowitz Report.  Nor do they seriously contest that these omissions and deficiencies form the basis for a violation of FISA section 1809.

Instead, each Individual Defendant argues that his or her own actions, viewed in isolation, are insufficient to plausibly allege a violation of section 1809 as to him or her separately.  Their arguments are unpersuasive.

Again, the FISA warrant applications did not write themselves.   The Individual Defendants were the key players on the only team responsible for preparing and approving the unlawful applications for submission to the FISC.  They were not novices at their jobs.   And the investigation here was an especially important, sensitive one because it touched on an ongoing Presidential campaign, and then on the elected President.

It is not coincidence that each of the four successive warrant applications painted a misleading picture to the FISC about whether there was reason to believe that Dr. Page was a Russian agent, which was the key to being able to spy on him. Nor is it coincidence that the FBI's internal controls (the Woods Procedure) were not

followed in Dr. Page's case.  As Ian Fleming once memorably put it in "Goldfinger": "Once is happenstance. Twice is coincidence. The third time it's enemy action."

As noted above, the Individual Defendants assiduously ignore the theory of aiding and abetting in their motions to dismiss.[9]  However, the law on this point is clear: a defendant is liable under this theory if he is "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" and "knowingly and substantially assist[s] the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  As with a civil conspiracy, the defendant's state of mind must be inferred from the surrounding circumstances. "[T]he relationships between the actors and between the actions (*e.g.,* the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action."  *Id.* at 481.  And, again like civil conspiracy, "a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it."  *Id.* at 484.

The Individual Defendants are not entitled to any presumption of good faith when the allegations of the Second Amended Complaint are assessed.  Rather, the allegations must be assessed in the light most favorable to Dr. Page.  It is also abundantly clear that there is a trove of currently non-public documents and facts that relate to Dr. Page's claims, which are presently in the exclusive possession of the

---

[9] In hundreds of pages of briefing, Defendants cite no authority for the proposition that the aiding and abetting provision in 18 U.S.C. § 2 is inapplicable to violations of 18 U.S.C. § 1809(a).

Individual Defendants and the United States and its agencies, but which will undoubtedly further support and vindicate Dr. Page's claims.[10] Even so, the SAC alleges facts that plausibly support the conclusion that all of the Individual Defendants engaged, in concert, in violations of FISA.  Indeed, this inference is far more plausible than any alternative theory in explaining how all of the misconduct associated with the FISA warrants occurred.

### C.    The FISA claims are not barred by the statutory affirmative defense

A number of the Individual Defendants contend that the FISA claims are barred by the affirmative defense established by 50 U.S.C. § 1809(b).  This provision "creates a defense … for any 'law enforcement or investigative officer engaged in the course of his official duties [when] the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction.'"  *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 204 n.3 (4th Cir. 2010) (Traxler, C.J., concurring & dissenting in part) (quoting statute).

FISA's legislative history makes clear that this is a "statutory good faith defense" which applies to both the criminal provision and the civil cause of action. *See* H.R. Rep. No. 95-1283, at 98 (1978).  Congress explained that § 1809(b) was

_____

[10] For example, after the initial filing of the Complaint in November 2020, additional facts concerning Defendant Clinesmith's role with respect to the alteration of the email were disclosed when the Department of Justice filed its sentencing memorandum in Defendant Clinesmith's criminal prosecution, including internal FBI emails not referenced in the Horowitz Report.

included "to further insure that intelligence personnel are protected in the proper performance of legitimate duties" by explicitly providing a good faith defense to liability. *Id.* at 97.

Lawful authorization is an affirmative defense for the defendants, not plaintiff, to plead and prove pursuant to the canon of statutory construction that the party seeking the benefit of an exception to a statutory prohibition bears the burden of proof. *See U.S. v. First City Nat'l. Bank of Houston*, 386 U.S. 361, 366 (1967). An affirmative defense may be raised in a motion to dismiss only "when the facts that give rise to the defense are clear from the face of the complaint." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

It is audacious indeed for the Individual Defendants to argue *that the SAC* establishes that the alleged FISA violations were based on their good faith reliance on the FISA warrants. To the contrary, the entire tenor of the SAC is that none of the Individual Defendants acted in good faith. Patently, "the good-faith exception would not apply if the material presented to the magistrate or judge is false or misleading." *Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring). For example, section IV of the Second Amended Complaint (see ¶¶'s 40-69) as a matter of law precludes the availability of the FISA's § 1809(b) 'statutory good faith defense' from having any application to excuse the Individual's conduct.

III.    The *Bivens* Claim

    A.    A *Bivens* claim is alleged against each Individual Defendant

    To state a *prima facie Bivens* claim, the plaintiff must establish that: (1) the defendant violated a federal constitutional right of the plaintiff; (2) the right was clearly established; (3) the defendant was a federal actor by virtue of acting under color of federal law; and (4) the defendant was personally involved in the alleged violation. *See Berman v. Crook*, 293 F.Supp.3d 48, 54-55 (D.D.C. 2018).

    "[T]he Constitution d[oes] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." *Miller v. Prince George's County, MD*, 475 F.3d 621, 632 (4th Cir. 2007) (collecting cases).  To assert a *Bivens* claim based on misrepresentations or omissions in a warrant application, the plaintiff must allege that the misrepresentations or omissions were made knowingly and intentionally, or with reckless disregard for the truth, and that they were necessary to the finding of probable cause. *See Berman v. Crook*, 293 F.Supp.3d at 55.

    "Because vicarious liability is inapplicable to *Bivens* ... suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). But this does not preclude a defendant from being liable for actions that he or she helped to orchestrate.  "[S]upervisory liability exists under *Bivens* ... where there is an 'affirmative link between the occurrence of ... various incidents of ... misconduct

55

and the adoption of any plan or policy by [officials]—express or otherwise—showing their authorization or approval of such misconduct.'" *Fletcher v. U.S. Parole Com'n*, 550 F.Supp.2d 30, 39 (D.D.C. 2008) (citation omitted).  "[A] supervisor is … liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them". *Id.* (quoting *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir.1997)).  "[A]n earlier link in the causal chain of events (that is, authorization or approval of an unconstitutional act) may provide the basis for liability under *Bivens*." *Id.*

"Tort defendants, including those sued in *Bivens* actions, are responsible for the 'natural consequences' of their actions." *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007).  For example, in *United States v. Calisto*, 838 F.2d 711 (3d Cir. 1988), information was passed through a chain of three police officers to a fourth officer who eventually incorporated the information into a warrant application.  In assessing a *Franks* challenge to the warrant, the Third Circuit analyzed the conduct of each officer in the chain as a potential source of *Franks* liability. *Id.* at 714–16.[11]  Likewise, a defendant "cannot falsely obtain a warrant without probable cause and then shield himself from liability by relying on the fact that [the officer], who executed the warrant, was ignorant 'of the circumstances under which the warrant was obtained.'" *Miller v. Prince George's County, MD*, 475 F.3d at 630.

---

[11] This undermines Defendant Auten's claim that *Bivens* is inapplicable to him as an "analyst" who is not directly involved in applying for a warrant.  To the contrary, it is well established that *Bivens* applies to everyone in the chain of transmitting "facts" to a court in support of an application for a warrant.

Similarly, the D.C. Circuit has rejected the contention that officers cannot be held liable for their involvement in arrests without probable cause because they did not personally arrest each of the plaintiffs.   It found sufficient evidence that defendants, through their own individual actions, had violated the constitutional rights of the plaintiffs where they "were the hub of th[e] investigation: they gathered evidence, including photographs of the people in the house, and actively participated in questioning the Plaintiffs and other key witnesses … In this context, that is sufficient to establish causation."   *Wesby v. District of Columbia*, 765 F.3d 13, 29 (D.C. Cir. 2014), *rev'd on other grnds*, 138 S.Ct. 577 (2018).

"Multiple tortfeasors who concurrently cause an indivisible injury are jointly and severally liable; each can be held liable for the entire injury. It is not essential that all persons who concurrently caused the harm be joined as defendants." *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996).  Thus, "[p]ersons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned." *Id.*

Under the foregoing legal principles, the allegations against each Individual Defendant in the SAC, as set forth with respect to each Individual Defendant in sections II.B.1-8 *above*, fully suffice to state a claim under *Bivens*.   Each of them participated in or directed the violations of Dr. Page's Fourth Amendment rights, or knew of the violations and failed to act to prevent them when they had an obligation to do so.   They are responsible for the natural consequences of their actions and are

jointly and severally responsible for Dr. Page's injuries that flow from their unlawful actions.

### B.     The *Bivens* claim here does not involve a new context

The Individual Defendants argue that the *Bivens* claim should be dismissed because it seeks to imply a damages remedy for a constitutional violation in a "new context" and that special factors preclude such a remedy.  *See Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017).  This argument fails because its premise is wrong.  This case does not involve a new context for the application of a *Bivens* remedy.

*Bivens* held that a federal agent who commits an unconstitutional search and seizure can be held liable in damages through a right of action implied under the Fourth Amendment.  The Supreme Court has reaffirmed the continued vitality of this type of claim.  In *Ziglar*, the Court emphasized that its opinion "is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." 137 S.Ct., at 1856.  "The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Id.* at 1857.  This Court recently noted that "*Bivens* remains settled 'in the search-and-seizure context in which it arose.'"  *LKQ Corp. v. United States*, 2019 WL 3304708, at *10 (D.D.C. 2019).

Federal courts have repeatedly recognized the validity of *Bivens* claims based on an allegation that defendants falsely obtained a warrant without probable cause,

even as they have rejected companion *Bivens* claims that did involve a new context. For example, the Sixth Circuit opined that, "[i]n the *Bivens* context, '[i]t is well-established that a government investigator is liable for violating the Fourth Amendment when he deliberately or recklessly submits false and material information in a warrant affidavit.'" *Meeks v. Larsen*, 611 F. App'x 277, 283 (6th Cir. 2015) (citation omitted).  Yet the court declined to extend *Bivens* to other claims by plaintiff that did involve a new context.  Similarly, Judge Lamberth examined a *Franks v. Delaware* claim on its merits while refusing to consider other *Bivens* claims that involved a new context.  *See Berman v. Crook*, 293 F.Supp.3d at 54-57.

Nor can this conclusion be avoided by invoking the talisman of "national security" as some of the Individual Defendants (*e.g.*, Defendant Strzok) seek to do. The Supreme Court has cautioned against such a result, warning that:  "[N]ational-security concerns must not become a talisman used to ward off inconvenient claims— a "label" used to "cover a multitude of sins." *Mitchell v. Forsyth*, 472 U. S. 511, 523, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). This "'danger of abuse'" is even more heightened given "'the difficulty of defining'" the "'security interest'" in domestic cases. Ibid. (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U. S. 297, 313-314, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972))." *Ziglar,* 137 S. Ct., at 1862.

Try as they may, the Individual Defendants simply cannot demonstrate that this case involves the application of *Bivens* to a <u>new</u> context.  Rather, it involves the

application of *Bivens* in the search-and-seizure context, which is precisely the

context in which *Bivens* arose.

### C.  Election of remedies and damages proofs are not issues properly raised at this stage of the case

With respect to the *Bivens* claims, the Individual Defendants contend that the

existence of a comprehensive statutory framework, such as FISA, prevents imposition

of *Bivens*' liability for the same misconduct.  As just discussed, however, this case

does not involve the extension of *Bivens* to a new context.  And, even if the *Bivens*

and FISA claims overlap to some extent, that is not a basis for dismissing either of

them.

"The purpose of the doctrine of election of remedies is not to prevent recourse

to any remedy, or to alternative remedies, but to prevent double recoveries or redress

for a single wrong."  *Eco Tour Adventures, Inc. v. Jewell*, 174 F.Supp.3d 319, 333

(D.D.C. 2016) (quoting 25 Am. Jur. 2d Election of Remedies § 3).  "Generally, a party

must make an election of remedies after the verdict is entered and prior to the entry

of judgment."  25 Am. Jur. 2d Election of Remedies § 13.  In the event that Dr. Page

ultimately receives an award on both his FISA and his *Bivens* claims, the Court may

require him to make an election.  But, at this stage of the proceedings, the potential

overlap between these claims (or any other claims in the SAC) is irrelevant.

Similarly, how exactly Dr. Page's specific damages relate to which of his claims

and the detailed delineation of damage amounts and kinds are issues to be explored

in discovery, not resolved on motions to dismiss.  The SAC specifically alleges under

the heading of each Count that Dr. Page suffered damages as a result of that legal claim and specifies the type of damages is seeking for that specific cause of action, as permitted by the applicable statutory and case law.

Neither of these arguments provides a basis for dismissing the SAC.

## IV. The Individual Defendants Are Not Entitled To Qualified Immunity

Finally, the Individual Defendants argue that they are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011).

The Individual Defendants are not entitled to qualified immunity on the *Bivens* claim. It has been clearly established since the Supreme Court's 1978 decision in *Franks v. Delaware* that "the Constitution d[oes] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." *Miller v. Prince George's County, MD*, 475 F.3d at 632 (collecting cases).

Likewise, qualified immunity does not protect an officer who seeks a warrant on the basis of an affidavit that a reasonably well-trained officer would have known failed to demonstrate probable cause—even if the magistrate erroneously issues the warrant. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Nor are the Individual Defendants entitled to qualified immunity on the FISA claims. The qualified immunity doctrine has no application to these statutory claims because FISA itself contains a statutory affirmative defense that exempts law enforcement or investigative officers engaged in official duties when the electronic surveillance was authorized by and conducted pursuant to a search warrant. *See* 50 U.S.C. § 1809(b). "When Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates." *Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998). Thus, the common law defense of qualified immunity does not apply to FISA claims.

Defendant Clinesmith asserts that he nonetheless is entitled to common law qualified immunity because he is not a "law enforcement or investigative officer" who can assert the statutory affirmative defense. But he provides no authority for his premise that he does not qualify as a "law enforcement or investigative officer" within the meaning of the statute, and it makes little sense that he, unlike other personnel involved in securing FISA warrants, could not invoke the affirmative defense (had they not misled the FISC as they did in this case). The facts surrounding his felony violation show the extent to which he was central to the overall effort to mislead the FISC about the existence of probable cause to permit spying on Dr. Page.

The purpose of FISA is to gather foreign intelligence, not evidence for law enforcement, and Congress recognized that the individuals involved in the FISA warrant process would include "intelligence agents" not merely law enforcement officers. *See* H.R. Rep. No. 95-1720, at 34 (1978) ("The conferees agree that the civil

liability of intelligence agents under this act should coincide with the criminal liability."). The statutory defense therefore presumptively includes all persons, whether they are law enforcement or "intelligence agents," who are involved in the pursuit and execution of a FISA warrant. Clinesmith's argument is too clever by half. He was a lawyer *for the FBI*—the nation's top "law enforcement" agency— and he was assigned to the National Security and Cyber Law Branch of the General Counsel's office of that law enforcement agency. His official position was to directly support the FBI's efforts to investigate national security issues. Had he been charged criminally under 50 U.S.C. 1809(a) by the Department of Justice, there is little doubt that he would have argued that he was entitled to invoke the statutory defense as a "law enforcement or investigative officer" within the meaning of 1809(b) *if* the FISA Warrants had been lawfully obtained. His self-serving arguments to the contrary in this case should be rejected. In any event, neither Defendant Clinesmith nor any of his co-Defendants may properly invoke the defense of qualified immunity in this case because they obtained the FISA Warrants at issue by deceit.

Finally, as with the statutory defense under 1809(b), any issue of qualified immunity fails as an argument for dismissal of the SAC. These issues are affirmative defenses and as such the Defendants bear the burden of proving them and also disproving that they acted with deceit which, as discussed above, eliminates a qualified immunity defenses. Moreover, at this stage of the case such arguments must be made from the allegations in the SAC. While affirmative defenses may be

raised on motion to dismiss, they can only succeed if the allegations in the complaint itself conclusively demonstrate that the affirmative defense is unassailable.

In other words, 'dismissal at the Rule 12(b)(6) stage is improper 'if' a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint.'" *Arthur v. D.C. Housing Authority*, 2020 WL 7059552 at *3 (D.D.C. 2020). That is certainly the situation here. The entire thrust of the SAC is that these Defendants intentionally deceived the FISC to unlawfully obtain the FISA warrants. The Defendants may protest otherwise, but that is what the SAC alleges, and those allegations refute the defense of qualified immunity. This affirmative defense will need to be plead in Answers and proved - over Dr. Page's evidence to the contrary - at trial.

## V.     The Claims Are Not Time-Barred

The Individual Defendants contend that all of Dr. Page's claims are time-barred. This is an affirmative defense that may be asserted in a motion to dismiss only "when the facts that give rise to the defense are clear from the face of the complaint." *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). "'[S]tatute of limitations issues often depend on contested questions of fact,' and as a result, 'dismissal is appropriate only if the complaint on its face is conclusively time-barred.' In other words, 'dismissal at the Rule 12(b)(6) stage is improper' if 'a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint."' *Arthur v. D.C. Housing Authority*, 2020 WL 7059552,

at *3 (D.D.C. 2020).  The SAC does not conclusively establish that the claims in this case are time-barred.  To the contrary, they plainly are timely.

There is no statute of limitations for FISA claims or *Bivens* claims.  "When a federal action contains no statute of limitations, courts will ordinarily look to analogous provisions in state law as a source of a federal limitations period."  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985).  In this case, D.C. Code § 12-301 provides the relevant limitations periods.   It establishes a three-year limitations period for actions "for which a limitation is not otherwise specially prescribed."  *Id.* § 12-301(8).

While state law provides the applicable statute of limitations, federal law controls when the claim accrues.  *See Loumiet v. United States*, 828 F.3d 935, 947 (D.C. Cir. 2016).  Accrual occurs "when the plaintiff has a complete and present cause of action."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S 192, 201 (1997)).  "Under federal law, the statute of limitations on a *Bivens* claim begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."  *Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28, 38-39 (1st Cir. 2006) (quoting *Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir. 2004)).

The D.C. Circuit ruled long ago that secrecy surrounding a wiretap program tolls the running of the statute of limitations where it prevents a plaintiff from learning of the existence of his cause of action.  *See Smith v.* Nixon, 606 F.2d 1183,

1190-91 (D.C. Cir. 1979). The court noted that, "[r]ead into every federal statute of limitations … is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Id.* at 1190 (quoting *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C. Cir. 1977)). The court concluded that, "[a]t this stage of the litigation we cannot say that there is no genuine issue of material fact as to whether Government secrecy foreclosed the [plaintiffs] from learning of the wiretap before it became public knowledge." *Id.* at 1191.

Here, likewise, Government secrecy foreclosed Dr. Page from learning the information that would give rise to a cause of action against any of the Individual Defendants. The FISA warrant process is "highly classified, and fundamentally secret." *In re Motion for Release of Court Records*, 526 F.Supp.2d 484, 490 (F.I.S.C. 2007).

Dr. Page's claims arise from the facts underlying the FISA warrants, *i.e.,* that they were obtained *without* probable cause by the inclusion of numerous, material misrepresentations and omissions, which rendered the disclosure or use of information obtained through those warrants unlawful. But Dr. Page had no knowledge of these key facts, and no reasonable opportunity to discover them, and indeed was affirmatively prevented by the Government Defendants from discovering them despite his efforts to do so, until they were first made public by the release of the Horowitz Report in December 2019.

Thus, Dr. Page's claims against the Individual Defendants did not accrue until December 2019, at the earliest when he obtained information that revealed both the material misrepresentations or omissions in the FISA warrant applications and which individuals made them or caused them to be made.  *See Annappareddy v. Lating*, 2019 WL 12094026, at *18 (D. Md. 2019), *rev'd on other grnds*, 996 F.3d 120 (4th Cir. 2021); *Berman v. Crook*, 293 F.Supp.3d at 56 (claim accrued when plaintiff received a copy of the warrant affidavit, including the portions with the alleged false statements).  Dr. Page filed this suit in November 2020, less than one year after the earliest accrual of his causes of action.  This suit is plainly timely.

## CONCLUSION

Simply put, the central question raised by the Individual Defendants in their Motions to Dismiss is whether they are, as individuals, responsible for the illegal and unconstitutional spying on Dr. Page.  That central question was effectively answered by Defendant McCabe when he testified before the United States Senate in November 2020 about the FISA warrant applications.

Senator Graham asked him: Okay. The question is who's responsible?

And Defendant McCabe correctly answered: "[W]e are all responsible for the work that went into that FISA."  (SAC ¶¶ 1 and 215.)

Although Defendant McCabe may have been speaking of accountability to the public at that time, his answer is also correct under the law.  All of these Defendants are legally responsible for the violations of Dr. Page's rights under FISA and the

Fourth Amendment to the Constitution caused by the four flawed warrant applications and the misuse of the FISA obtained information. The Second Amended Complaint more than adequately alleges those claims.

WHEREFORE, Dr. Page, respectfully requests that the motions to dismiss be denied, or that in the alternative he be given leave to amend.

<u>REQUEST FOR HEARING</u>

Plaintiff respectfully requests a hearing for oral argument.

Dated: January 21, 2022                    Respectfully Submitted,


_____/s/_____
MCADOO GORDON & ASSOCIATES, P.C.
By:   /s/ Leslie McAdoo Gordon
Bar# 456781
1140 19th Street, N.W.
Suite 602
Washington, DC  20036
(202) 704-7388
leslie.mcadoo@mcadoolaw.com

MILLER KEFFER & PEDIGO PLLC
By:   /s/ K. Lawson Pedigo
Bar ID: TX0186
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone: (214) 696-2050
klpedigo@mkp-law.net

PARLATORE LAW GROUP, LLP
By:   /s/ Timothy C. Parlatore
Bar ID: NY0332
One World Trade Center, Suite 8500
New York, NY 10007
(212) 679-6312
timothy.parlatore@parlatorelawgroup.com

*Attorneys for Plaintiff Dr. Carter Page*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 21, 2022, a copy of the foregoing Plaintiff's Omnibus Opposition to Individual Defendants' Motions to Dismiss was served electronically on:

Amisha R. Patel
David N. Kelley
Dechert, LLP
1900 K Street, NW
Washington, DC 20006

Brigida Benitez
Lisa M. Southerland
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

William Bullock Pittard, IV
Christopher Muha
Sarah Renee Fink
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005

Aitan Dror Goelman
Ivano Michael Ventresca
Zuckerman Spaeder, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036

Dorothy Ames Jeffress
Kaitlin Brooke Konkel
Robert J. Katerberg
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001

James Koukios
Vanshika Vij
Robin A. Smith
Morrison & Foerster LLP
2100 L Street NW
Suite 900
Washington, DC 20037

Meaghan McLaine VerGow
Andrew Hellman
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Brian Matthew Heberlig
Patrick Francis Linehan, III
James Martin Hobbs
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036

Amy E. Powell
U.S. Department of Justice
150 Fayetteville St.
Ste 2100
Raleigh, NC 27601

Daniel Paul Chung
Cate Cardinale
U.S. Department of Justice
Civil Division Torts Branch-FTCA Section
P.O. Box 888
Washington, DC 20044

_____/s/_____
Leslie McAdoo Gordon