# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
CARTER W. PAGE,                          )
                                         )
          Plaintiff,                     )
                                         )         CIVIL NO.: 20-cv-3460-DLF
v.                                       )
                                         )
JAMES COMEY, ET AL,                      )
                                         )
          Defendants.                    )
———————————————————— )

## PLAINTIFF'S OPPOSITION TO GOVERNMENT DEFENDANTS' MOTION TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT

COMES NOW, the Plaintiff, Carter Page ("Dr. Page"), and presents his Opposition to the Motions to Dismiss and for Partial Summary Judgment filed by the United States, the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") (collectively, the "Government") in this matter.

## INTRODUCTION

Plaintiff brought this action against the United States to seek accountability and recover damages for the extraordinary and unprecedented actions of its employees in illegally spying on him, and for injunctive relief for DOJ's denial of his rights under the Privacy Act.  What makes this case so extraordinary is that the employees were not mere field agents bending the rules to pursue criminals, but rather the highest-level FBI executives colluding to subvert the foreign intelligence apparatus to illegally spy on Dr. Page, a graduate of the U.S. Naval Academy and a

loyal American.  The wholly unsupported and preposterous premise for this action was that Dr. Page a former CIA "operational contact" who had also helped the FBI to *defeat* spying attempts by Russia was now a foreign agent helping candidate Trump collude with Russia.

The FBI repeatedly presented that false premise to the Foreign Intelligence Surveillance Court ("FISC") and were able to obtain four successive warrants under the Foreign Intelligence Surveillance Act ("FISA") authorizing secret surveillance of Dr. Page, in violation of the process for presenting applications to lawfully obtain a FISA warrant.  As a result of the illegal and arguably criminal actions of these employees, Dr. Page was subjected to a full year of unlawful surveillance based upon the known lie that he was a Russian agent.  But in addition to being the victim of secretive surveillance, the Government's employees then *publicly* branded Dr. Page as a Russian agent and a traitor—thereby intentionally ruining his reputation by leaking the existence of the FISA Warrants and surveillance to the media.  These were gross violations of Dr. Page's rights, for which he is entitled to compensation and redress through this lawsuit.

Further, when the DOJ Inspector General prepared a report (the "Horowitz Report") detailing the many abuses of the FISA warrant process in Dr. Page's case, the agency denied Dr. Page his right under the Privacy Act to review and correct the references to him before that report was released to the public.  Dr. Page seeks injunctive relief to remedy this wrong.

The Government does not deny, nor could it, that Dr. Page was illegally spied on and falsely branded as a Russian agent and a traitor to the nation.  Indeed, the Government has been forced to correct and retract various statements that it made to the FISC and either agreed with—or declined to contest and defend against—the FISC's findings that the FISA Warrants against Dr. Page were unlawfully authorized and lacked probable cause.  But, rather than step up and rectify the outrages perpetrated on Dr. Page, the Government makes hyper-technical arguments about why it is not liable for its employees' actions and why, even if it is liable, Dr. Page waited too long to sue, all the while also arguing that Dr. Page doesn't have a legal right to pursue access to the report that would provide him the first inklings as to how the historic FBI misconduct could occur and all the FISA protections ostensibly in place could be manipulated and circumvented.

Even now, the Government mounts a rearguard defense of some of its agents' actions, for example, unreasonably disputing the blatant scheme whereby Defendants Lisa Page and Peter Strzok were responsible for leaking information about the surveillance of Dr. Page to the Washington Post and New York Times in April 2017.  Further, the Government denies Dr. Page had any right to review the Horowitz Report under the Privacy Act even though it put out a press release identifying him as the subject of that report and providing an internet link so that the public could access it at or near his first opportunity to do so.

The Government's various arguments all fail, as explained in detail below. The Government cannot escape liability for the wrongs its employees did to

Dr. Page.  Nor can it demonstrate that Dr. Page waited too long to bring this suit. While Dr. Page knew all along that he was innocent and should not have been spied on, he could not bring viable legal claims before he knew that the FISC had been misled into approving the warrants without probable cause, who was responsible for preparing the false FISA applications, and what disclosures have been made of the information obtained through the warrants.   This information remained secret until—*at the earliest*—the release of the "Horowitz Report" on December 19, 2019, and additional information by the FISC in January 2020, officially declaring there was no probable cause for the FISA Warrants.

In sum, the FBI unlawfully used the power of the federal government, in the form of secret, anti-terrorism surveillance tools, to violate the rights of an innocent American.  The Government is liable for the illegal actions of its employees.  The Government also must rectify its wrong-headed refusal to afford Dr. Page his rights under the Privacy Act with respect to the Horowitz Report.

It is long past time for the United States to step up to the plate and do right by Dr. Page.

## STATEMENT OF FACTS

The Second Amended Complaint ("SAC") alleges in detail how the individual defendants in this case ("Individual Defendants") obtained four successive FISA warrants against Dr. Page, without probable cause, by intentionally submitting misleading applications to the FISC that omitted material information.  Further, Plaintiff's Omnibus Opposition the Motions to Dismiss, filed by date even with this

Opposition and hereby incorporated by cross reference fully discuss the overall facts of this case at this stage.  The specific details of those allegations are not relevant to the issues presented by the Government in its motion, and thus this statement of facts focuses on the facts that are relevant to the Government's Motion.

## I.      Unlawful Disclosure And Use Of Information

The SAC also discusses the unlawful disclosure and use of information obtained from, and relating to, the illegal FISA surveillance of Dr. Page.  (SAC ¶¶ 218-232).  It first outlines a "media leak strategy" that involved defendants Strzok and Lisa Page, and then discusses other disclosures and uses.  Unauthorized disclosure of the FISA Warrants for political motives was known and foreseeable from the beginning.  Dr. Page on his own was just an unknown volunteer on a foreign policy advisory committee to candidate Trump.  He served a purpose merely as a vehicle to unlawfully pursue the FISA Warrants and then illegally disclose the FISA investigation and the fact of renewals for political purposes.  That the leak strategy was implemented just *after* there were renewals, rather than after the First Warrant was authorized, is also consistent with a plan to maximize the political damage.

On April 10, 2017, Strzok texted Ms. Page to discuss a "media leak strategy." The next day, the Washington Post broke the story about the FISA warrants targeting Dr. Page, including that a FISA warrant had been issued in 2016 and had been renewed at least once.  On April 12, 2017, Strzok texted Ms. Page to warn her

that two media articles were coming out about her "namesake" Carter Page and one was worse than the other.  On April 22, 2017, Strzok sent another text to Ms. Page stating that the "article is out!"  congratulating her on a job well done.  That same day the New York Times published an article that discussed the FISA warrants against Dr. Page.  (SAC ¶¶ 220-224).

The SAC alleges, on information and belief, that Defendants Comey, McCabe, Strzok, and Page leaked information and records concerning Dr. Page to media outlets, including but not limited to the existence of the FISA warrants, the contents of the warrant applications, and the results of the warrants, that were protected from disclosure under FISA and the Privacy Act.  (SAC ¶ 226).

It further alleges that "[t]he Defendants unlawfully obtained, disclosed, and used information and records regarding Dr. Page, including, but not limited to, the information contained in the warrant applications, the applications themselves and the results of the surveillance on him in ways known and unknown to him due to the secrecy of the FISA and investigative processes. These ways included, but are not limited to:  leaks to the media, obtaining each subsequent renewal warrant, obtaining additional surveillance and investigative information without probable cause." (SAC ¶ 229).

Finally, the SAC alleges that "[t]he United States has conceded in several filings with the FISC that it has used and disclosed the information obtained from the unlawful FISA warrants on Dr. Page in numerous ways, some of which were

then specifically prohibited by the FISC.  *See* filings in FISC Docket Nos.: 16-1182, 17-52, 17-375, and 17-679."  (SAC ¶ 231).

## II.   Privacy Act Review Issue

The SAC also sets forth the predicate for the Privacy Act review claim.  In the Fall of 2019, in advance of its release, the Horowitz Report was provided by the DOJ Office of Inspector General ("OIG") to various of the Individual Defendants and others for review and comment.  However, Dr. Page was not contacted and offered an opportunity for review and comment.  (SAC ¶¶234-235).

On September 13, 2019, IG Horowitz wrote to members of Congress to advise them that his office had nearly concluded its work and would be entering the review and comment phase of its investigation.  Dr. Page sent emails to DOJ and DOJ OIG seeking his right to review and amend the forthcoming report pursuant to the Privacy Act, but he received no reply to them.  (SAC ¶¶ 237-238).

On October 10, 2019, Dr. Page sent an email to the DOJ Office of Privacy and Civil Liberties (with a copy to IG Horowitz) requesting the right to view and amend the Horowitz Report pertaining to the FISA warrants to surveil him, citing his rights under the Privacy Act.   On October 16, 2019, Dr. Page inquired into the status of his request by email to the DOJ Office of Privacy and Civil Liberties, with copies to IG Horowitz and Peter A. Winn, the Acting Chief Privacy and Civil Liberties Officer of the DOJ.  Mr. Winn replied that they were reviewing Dr. Page's email request.  (SAC ¶¶ 240-243).

On October 21, 2019, Dr. Page wrote a third time to DOJ OIG demanding his right to review and amend the Horowitz Report.  (SAC ¶ 244).

On November 12, 2019, Dr. Page received a letter from Jonathan Malis, General Counsel for DOJ OIG, in response to his request to view and amend the Horowitz Report.  This letter did not address his requests under the Privacy Act, but instead informed Dr. Page that he would not be contacted for an OIG interview. Dr. Page received no further communication from DOJ regarding his request to view and amend the Horowitz Report.  (SAC ¶ 249).

The Horowitz Report contains numerous errors that Dr. Page has a right to have amended to reflect accurate information.  (SAC ¶ 250).


## PROCEDURAL POSTURE OF THE CASE

Dr. Page, initiated this action on November 27, 2020, seeking relief against eight individual defendants and the United States and its agencies for violating his Constitutional and other legal rights. (Dkt. No. 1).

Plaintiff set forth eight causes of action; five against the Individual Defendants under the Foreign Intelligence Surveillance Act (FISA) (Counts I-IV) and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Count VI), and three against the United States and its agencies under the Federal Torts Claims Act (Count V) and the Privacy Act (Count VII and VIII). (Dkt. No. 1).  Dr. Page also set forth his intent to amend the Complaint to include a ninth claim against

the United States under the Patriot Act depending upon the outcome of his administrative claim under that Act, which was pending. (Dkt. No. 1, p. 49, § X).

While service was being accomplished, a non-substantive amendment was made to the Complaint on April 15, 2021. (Dkt. No. 51). All Defendants thereafter moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. Nos. 60,62-64,66-70).

On April 22, 2021, the federal government provided Dr. Page with his "right to sue" letter on the Patriot Act claim.  Accordingly, Dr. Page filed his Second Amended Complaint ("SAC") on June 8, 2021, adding the Patriot Act claim (Count IX) and making other amendments, the filing of which rendered the Defendants' motions to dismiss moot. (Dkt. No. 73).

On September 17, 2021, the Individual Defendants moved to dismiss the SAC and the Government Defendants moved to dismiss the SAC and also for partial summary judgment.  (Dkt. Nos. 80-88).

## ARGUMENT

The Government raises issues in its Motion as to Count V (the Federal Torts Claims Act), Counts VII and VIII (the Privacy Act), and Count IX (the Patriot Act).

## I.    The Patriot Act Claim Is Not Subject To Dismissal

### A.    The PATRIOT ACT claim is properly alleged

Dr. Page asserts a claim against the United States under the Patriot Act, 18 U.S.C. § 2712, based on unlawful disclosure or use of surveillance information

obtained pursuant to FISA.  When FISA was originally enacted, it did not impose any liability upon the Government for violations of the Act.  Instead, it imposes criminal and civil liability on individuals who violate the Act.  *See* 50 U.S.C. §§ 1809, 1810.  In 2001 Congress made the Government liable for certain FISA violations when it enacted the Patriot Act.  Section 223 of the Patriot Act imposes "Civil Liability for Certain Unauthorized Disclosures."  P.L. 107-56, 115 Stat. 293-95.  One of its provisions, 18 U.S.C. § 2712, provides for a civil action against the United States by any person who is aggrieved by a willful violation of section 106(a) of FISA (50 U.S.C. § 1806(a)), which governs use of information acquired by surveillance pursuant to FISA.

The civil liability of the Government under the Patriot Act is narrower than the civil liability of individuals under FISA, 50 U.S.C. § 1810.  An individual is liable for (1) engaging in unlawful electronic surveillance, and (2) unlawfully disclosing or using information obtained through electronic surveillance.  *See Al-Haramain Islamic Foundation, Inc. v. Obama*, 705 F.3d 845, 852 (9th Cir. 2012).  In contrast, a plaintiff "can bring a suit for damages against the United States for *use* of the collected information, but cannot bring suit against the government for collection of the information itself."  *Id.* at 853 (emphasis in the original).

The liability of the Government and individuals for unlawful disclosure or use of surveillance information enforces 50 U.S.C. § 1806(a), which provides that "[n]o information acquired from an electronic surveillance pursuant to [FISA] may be used or disclosed by Federal officers or employees except for lawful purposes."

When Congress enacted FISA, it enforced this prohibition by imposing liability on "any person who discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute."  H.R. Rep. No. 95-1720, at 33 (1978) (emphasis added).

Congress expanded this liability to the United States when it later enacted the Patriot Act.  Under 18 U.S.C. § 2712, the United States is liable if one of its agents discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by FISA.  Further, section 2712 permits "lawsuits for damages as to both knowing and reckless violations of [the FISA disclosure prohibition]."  *Fikre v. FBI*, 142 F. Supp. 3d 1152, 1169 (D. Or. 2015).

Here, the SAC plausibly alleges several different ways in which the Individual Defendants disclosed or used information obtained through the warrants against Dr. Page, knowing or having reason to know that the surveillance was not lawfully authorized by FISA.  First, the SAC specifically alleges the existence of a "media leak strategy" with respect to Dr. Page that resulted in articles about the FISA warrants targeting Dr. Page being published in the Washington Post and New York Times.

Second, the SAC alleges, on information and belief, that some of the Individual Defendants information and records concerning Dr. Page to media

outlets, including but not limited to the existence of the FISA warrants, the contents of the warrant applications, and the results of the warrants.  It alleges that "[t]he Defendants unlawfully obtained, disclosed, and used information and records regarding Dr. Page … in ways known and unknown to him due to the secrecy of the FISA and investigative processes … [which] included … leaks to the media, obtaining each subsequent renewal warrant, obtaining additional surveillance and investigative information without probable cause."  (SAC ¶ 229).

Third, the SAC alleges that "[t]he United States has conceded in several filings with the FISC that it has used and disclosed the information obtained from the unlawful FISA warrants on Dr. Page in numerous ways, some of which were then specifically prohibited by the FISC.  *See* filings in FISC Docket Nos.: 16-1182, 17-52, 17-375, and 17-679."  (SAC ¶ 231).

The Government argues unpersuasively that these allegations are insufficient to state a plausible claim of unlawful disclosure or use.  With respect to the specific leaks to the Washington Post and New York Times, the Government argues that, although these articles discuss the FISA warrants, neither of them contains information obtained from FISA warrants.  But it is far from clear that this is correct.  And it is not clear what unlawful disclosures of FISA-related information were made to the reporters who wrote these articles.  All that Dr. Page need do at this juncture is to plausibly allege that there were unlawful disclosures of information obtained from the FISA warrants.  The SAC does so.

Similarly, the Government argues the SAC contains no factual support for its allegation that the renewal applications contained FISA-obtained information.  But exactly what the renewal applications contained in this regard has not yet been publicly disclosed.  It is both logical and plausible to conclude that, because there were four successive warrants issued by the FISC, the applications for the three follow-on warrants included information obtained unlawfully through the preceding warrants.  This would be an unlawful use.

The Government contends that seeking authorization from the FISC for electronic surveillance is not an unlawful purpose, but the legislative history of the FISA demonstrates that its prohibition on unlawful disclosure or use covers "information obtained under color of law by electronic surveillance [by persons] knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute."  H.R. Rep. No. 95-1720, at 33 (1978).  FISA warrants that are obtained without probable cause by deceiving the FISC are not authorized by the statute.

Finally, the Government complains that the SAC does not identify the specific filings with the FISC in which the Government allegedly has conceded that it has used and disclosed the information obtained from the FISA warrants on Dr. Page in various ways.  The Government contends that the SAC does not plausibly plead that any uses or disclosures were in violation of minimization procedures or without lawful purpose, or that any such violations were willful.  But again the Government attempts to treat this as a motion for summary judgment rather than a

motion to dismiss the complaint.  The SAC provides ample notice of the FISC proceedings in which the Government, itself, has discussed the various uses it has made of information obtained from the warrants targeting Dr. Page.  The Government asserts that any such uses were lawful while ignoring that the FBI personnel knew or should have known that the surveillance, itself, was unlawful and precluded any use of the information.

The allegations in the SAC are to be construed in favor of Dr. Page, not the Government.  The SAC amply alleges the unlawful disclosure or use of information obtained from the FISA warrants targeting Dr. Page, which gives rise to a claim against the Government under the Patriot Act.

### B.    The claim is not time-barred

The Government contends that the statute of limitations bars the Patriot Act claim.  A written claim must be filed with the appropriate federal agency within two years after a claim accrues, and suit must be brought within six months after the claim is denied.  Further, the claim accrues on the date upon which the claimant first has a reasonable opportunity to discover the violation.  *See* 18 U.S.C. § 2712(b)(2).  Here, Dr. Page filed his administrative claim with respect to the Patriot Act Violation on September 30, 2020.  The issue is whether Dr. Page had a reasonable opportunity to discover his claim prior to September 30, 2018.

The statute of limitations is an affirmative defense that may be asserted in a motion to dismiss only "when the facts that give rise to the defense are clear from the face of the complaint."  *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578

(D.C. Cir. 1998). "'[S]tatute of limitations issues often depend on contested questions of fact,' and as a result, 'dismissal is appropriate only if the complaint on its face is conclusively time-barred.'  In other words, 'dismissal at the Rule 12(b)(6) stage is improper' if 'a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint."'  *Arthur v. D.C. Housing Authority*, 2020 WL 7059552, at *3 (D.D.C. 2020).  The SAC does not conclusively establish that the Patriot Act claim in this case is time-barred.  To the contrary, the claim plainly is timely.

The D.C. Circuit ruled long ago that secrecy surrounding a wiretap program tolls the running of the statute of limitations where it prevents a plaintiff from learning of the existence of his cause of action.  *See Smith v.* Nixon, 606 F.2d 1183, 1190-91 (D.C. Cir. 1979).  The court noted that, "[r]ead into every federal statute of limitations … is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit."  *Id.* at 1190 (quoting *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C. Cir. 1977)).  The court concluded that, "[a]t this stage of the litigation we cannot say that there is no genuine issue of material fact as to whether Government secrecy foreclosed the [plaintiffs] from learning of the wiretap before it became public knowledge."  *Id.* at 1191.

Here, likewise, Government secrecy foreclosed Dr. Page from learning the information that would give rise to a cause of action under the Patriot Act.  The

FISA warrant process is "highly classified, and fundamentally secret." *In re Motion for Release of Court Records*, 526 F.Supp.2d 484, 490 (F.I.S.C. 2007). Dr. Page's claim under 18 U.S.C. § 2712 does not arise from the mere fact of the FISA surveillance. Rather, it arises from the facts underlying the FISA warrants, *i.e.*, that they were obtained without probable cause by making material misrepresentations and omissions, which rendered the disclosure or use of information obtained through those warrants unlawful. But Dr. Page had no knowledge of these key facts, and no reasonable opportunity to discover them, until they were made public by the release of the Horowitz Report in December 2019. Indeed, as alleged in the SAC, Dr. Page repeatedly sought access to the Horowitz Report before its public release, but DOJ ignored his requests.

A claim based on a false and misleading warrant application does not accrue until the plaintiff obtains information that reveals the material misrepresentations or omissions and who made them or caused them to be made. *See Annappareddy v. Lating*, 2019 WL 12094026, at *18 (D. Md. 2019), *rev'd on other grnds*, 996 F.3d 120 (4th Cir. 2021); *Berman v. Crook*, 293 F.Supp.3d at 56 (claim accrued when plaintiff received a copy of the warrant affidavit, including the portions with the alleged false statements). That did not happen until the Horowitz Report was released. Accordingly, Dr. Page's claim accrued in December 2019.

Dr. Page acted in timely fashion once he gained access to the Horowitz Report. He filed his administrative claim with respect to the Patriot Act violation

on September 30, 2020, and, after that claim was denied on April 22, 2021, he amended his complaint to add the Patriot Act claim to this action on June 8, 2021.

The Government makes three factual arguments about why Dr. Page's Patriot Act claim accrued earlier than the release of the Horowitz Report. None survives scrutiny. First, it argues that the claim is based, in part, on leaks to the media about the FISA surveillance, and that Dr. Page has been aware of, and complained about, those leaks since mid-2017. But Dr. Page had no real ability to investigate or confirm the source of these leaks at that time. All he could have done was to file an action based solely on the media articles. The Government doubtless would have moved to dismiss any such complaint as inadequate. *See Teixeria v. St. Jude Medical S.C., Inc.*, 193 F.Supp.3d 218, 233-34 (N.D.N.Y. 2016) ("At most, these articles intimate 'a sheer possibility that [defendant] has acted unlawfully' … [and] a suspicion [of] a legally cognizable right of action.'") (citations omitted). And no court would have given Dr. Page leave to conduct free-ranging discovery into the FBI's conduct of Operation Crossfire Hurricane in order to corroborate his claim. In sum, Dr. Page lacked a reasonable opportunity to discover the Patriot Act violation behind the media leaks until the Horowitz Report was released.

Second, the Government argues that Dr. Page was aware of the FISA warrants at least since those orders were officially confirmed in February 2018 and released in July 2018, and that he has contended that FISA surveillance of him was unlawful since at least 2017. However, "[a] person's suspicion that he is a target of lawful law enforcement activity, such as surveillance, … cannot conceivably

constitute notice of possible constitutional violations, without creating the anomalous situation of requiring persons to file suit on a hunch, only to be dismissed for failure to state a claim." *Hobson v. Wilson*, 737 F.2d 1, 38-39 (D.C. Cir. 1984). As the D.C. Circuit explained in another case, it is not enough that a plaintiff "knew the falseness of the charges against him" because he could rightfully assume that "he had been the victim only of a false informant against whom no redress was possible" rather than a conspiracy "to ruin the career of an innocent man." *Richards v. Mileski*, 662 F.2d 65, 72 (D.C. Cir. 1981).

Here, Dr. Page knew that he was not a Russian agent and that any FISA warrants secured against him on that basis were profoundly mistaken. But, while he could suspect that some sort of official misconduct was involved, until the Horowitz Report was released, he could not identify an actual cause of action under the Patriot Act.[1]

Third, the Government contends that any allegation that FISA information was wrongfully disclosed or used in order to obtain the subsequent warrants is time-barred since Dr. Page has had notice of the existence of the subsequent warrants since at least February 2018. (The Government concedes, however, that it still has not publicly confirmed or denied whether information obtained via FISA appears in the renewal applications). Again, however, knowledge of the existence of

---

[1] The FISA warrant applications which were publicly released on July 21, 2018, were heavily redacted. They did not disclose the defects that were identified in the Horowitz Report.

the FISA warrants did not provide notice to Dr. Page that they lacked probable

cause due to material misrepresentations and omissions in the applications.

Dr. Page did not gain this knowledge until the release of the Horowitz Report.

Until then, he had no reason to infer that the subsequent warrants involved the

improper disclosure or use of information unlawfully obtained through the previous

warrants.  To this day he has had no ability to confirm the existence of this violation

because the Government continues to withhold the relevant information.

     Dr. Page's claim under the Patriot Act did not accrue until he knew that the

FISA warrants covering him had been obtained without probable cause by making

material misrepresentations and omissions, which rendered the disclosure or use of

information obtained through those warrants unlawful.  He did not, and could not,

obtain this information until the release of the Horowitz Report, in December 2019,

and the FISC's subsequent disclosure, in January 2020, of the Government's

concession that at least two of the warrants lacked probable cause.  Thus, this claim

is timely.  The Government cannot concoct a statute of limitations defense from the

allegations of the SAC.


## II.     The FTCA Claim Is Not Subject To Dismissal

### A.     The FTCA claim is properly alleged

     Dr. Page asserts a claim under the Federal Torts Claim Act ("FTCA").  The

SAC alleges that individual Defendants, who are law enforcement officers, committed

an abuse of process against him because they acted with an ulterior motive to use the

FISA warrant process to accomplish an end not permitted by law: to obtain the surveillance of Dr. Page and the Trump presidential campaign *without probable cause*. (SAC ¶¶ 279, 280). The Government challenges the sufficiency of this claim but its argument is wide of the mark.

An "'[a]buse of process' is the misuse of the power of the court. It is an act done in the name of the court and under its authority by means of use of a legal process not proper in the conduct of a proceeding for the purpose of perpetrating an injustice." 3 *Fed. Jury Prac. & Instr.* § 121:51 (6th ed.). "The essence of the tort is the use of legal process for improper purposes …." *Whelan v. Abell*, 953 F.2d 663, 670 (D.C. Cir. 1992). Accordingly, "an abuse of process claim may be maintained 'even where the earlier suit was ostensibly legitimate, so long as the reasons for the suit are found illegitimate.'" *Eastern Savings Bank, FSB v. Papageorge*, 31 F.Supp.3d 1, 19 (D.D.C. 2014) (quoting *Neumann v. Vidal*, 710 F.2d 856, 860 (D.C. Cir. 1983)).

Abuse of process covers "'a variety of dissimilar situations which have in common only the fact that actionable injury was inflicted in connection with the use of judicial process and under circumstances such that the narrowly circumscribed action of malicious prosecution was inapplicable.'" *Hall v. Field Enterprises, Inc.*, 94 A.2d 479, 481 (D.C. 1953) (quoting *Italian Star Line v. U.S. Ship. Bd. Emerg. Fleet Corp.*, 53 F.2d 359, 361 (2d Cir. 1931)). "[T]he right to charge an abuse of process arises when there has been a perversion of court processes to accomplish some end which the process was not intended by law to accomplish, or which compels the party against whom it has been used to do some collateral thing which he could not legally

and regularly be compelled to do." *Id.* To state an abuse of process claim, a plaintiff must allege the "existence of an ulterior motive" and "the perversion of the court process to accomplish an end which the process was not intended to bring about." *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959).

The SAC satisfies these requirements. It alleges that the Government's agents perverted the FISA warrant process by making material misstatements and omissions to obtain four successive warrants without probable cause for the ulterior motive of surveilling Dr. Page and the Trump presidential campaign.

This is a well-established theory of abuse of process. "[O]btaining search and arrest warrants by means of false testimony is a proper basis for a claim of abuse of process (at least for pleading purposes)." *Gonzalez Rucci v. U.S. I.N.S.*, 405 F.3d 45, 50 (1st Cir. 2005); *see also Morin v. Caire*, 77 F.3d 116, 122-23 (5th Cir. 1996) (allegations that arresting officer omitted material statements and included false and misleading statements in affidavit underlying detainees' arrest warrant were sufficient to state claim for abuse of process). "The ulterior motive element can be inferred from proof of a willful improper act …." *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 750 (E.D. Cal. 2008); *see also Gonzalez Rucci, supra* ("a wrongful motive in an abuse of process claim can be inferred from a wrongful act"). And the second element is satisfied because "[k]nowingly including false statements in a probable cause affidavit submitted to a magistrate constitutes the willful commission of an act 'not proper in the regular conduct of the proceedings' of issuing warrants based on probable cause." *Martinez v. City of West Sacramento*, 2019 WL 448282, at * 23 (E.D.

Cal. 2019).

Dr. Page's abuse of process claim is analogous to the claim upheld in *Watson v. City of Kansas City*, 185 F.Supp.2d 1191 (D.Kan, 2001). There, the court upheld a claim of abuse of process against officials who allegedly obtained a search warrant for plaintiffs' residential buildings based on false and misleading testimony and then searched the properties for the improper purpose of finding a way to shut them down, rather than for tenant protection. *See id.* at 1208.

The Government argues that "[t]he initiation of the process is irrelevant to an abuse-of-process claim because it is the improper use *after* the process is issued that creates a claim for abuse of process." (Gov. Br. at 20) (emphasis in the original). This is simply wrong. None of the cases cited by the Government support this proposition. To the contrary, as shown above, the requisite perversion of the judicial process may center on the fraudulent initiation of that process.

The Government further contends that the legal process here was not used for an unintended purpose since FISA contemplates that search warrants will issue and surveillance will be conducted pursuant to those warrants. This glib argument does not withstand scrutiny. It is true that the judicial processes for issuance of search warrants and arrest warrants are designed to yield warrants that authorize law enforcement officers to conduct searches and make arrests. But -- as the cases cited above demonstrate -- an abuse of process action arises when officers pervert these judicial processes by submitting false or materially misleading affidavits to obtain warrants without probable cause. The intended purpose of these judicial

processes is to issue warrants only where the judicial officer finds probable cause based on a truthful, good faith warrant application.

Likewise, the D.C. appellate court upheld an abuse of process claim based on a comparable perversion of the civil litigation process, i.e., the plaintiff alleged that the defendants fraudulently filed suit against him for a contractual obligation of his wife, obtained a fraudulent judgment, and then wrongfully caused to be issued a writ of attachment against him and seized his wages.  *Hall v. Field Enterprises, Inc.*, 94 A.2d at 480-81.  Although the judicial process contemplates the issuance of writs of attachment based on finding of liability, an abuse of process claim arises when a person fraudulently misuses that judicial process to obtain a writ of attachment.

In sum, the SAC states a viable claim for abuse of process and so the FTCA claim is not subject to dismissal.

### B.    The claim is not time-barred

The Government also contends that the FTCA claim is barred by the two-year limitations period in 28 U.S.C. § 2401(b), which requires a tort claim against the United States to be presented in writing to the appropriate federal agency within two years after the claim accrues.  Dr. Page presented his FTCA claim to the DOJ on April 29, 2020, and the Government contends that the claim accrued more than two years earlier.

As discussed above, the statute of limitations is an affirmative defense that may be asserted in a motion to dismiss only "when the facts that give rise to the

23

defense are clear from the face of the complaint." *Smith–Haynie v. District of Columbia*, 155 F.3d at 578.  Here the allegations of the SAC do not make it clear that Dr. Page knew of the existence of his abuse of process claim prior to April 29, 2018.  Neither do the variety of other materials cited by the Government that are extraneous to the SAC.

"[I]n cases such as this one, where the government conceals the acts giving rise to plaintiff's [FTCA] claim, or where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." *Kronisch v. U.S.*, 150 F.3d 112, 121 (2d Cir. 1998).  "Under this rule, 'accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause.'"  *Id.* (citation omitted).  In addition, the time limits in the FTCA can be tolled on equitable grounds.  *See United States v. Wong*, 575 U.S. 402, 412 (2015).  Equitable tolling is permitted where "'despite all due diligence [a plaintiff] is unable to obtain vital information bearing on the existence of her claim.'"  *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (quoting *Smith–Haynie v. District of Columbia*, 155 F.3d at 579) (alteration in original).

Here, the secrecy surrounding the FISA wiretap program tolled the running of the statute of limitations because it foreclosed Dr. Page from learning of the existence of his cause of action.  *See Smith v.* Nixon, 606 F.2d at 1190-91.  His abuse of process claim (like his claim under the Patriot Act) does not arise from the mere fact of the FISA surveillance.  Rather, it arises from the facts underlying the FISA

warrants, i.e., that they were obtained without probable cause by making material misrepresentations and omissions, which constituted an abuse of the FISA process. But Dr. Page lacked knowledge of these key facts, and had no ability to discover them, until -- at the earliest -- they were made public by the release of the Horowitz Report in December 2019. *See Adrian v. Selbe*, 2007 WL 164642, at *4 (W.D. La. 2007) (An FTCA claim based on a false warrant affidavit does not accrue until the plaintiff has knowledge of the falsity in the affidavit).

The Government argues that the issue of probable cause is immaterial to the accrual of Dr. Page's claim because "probable cause is not an element of abuse of process under District of Columbia law." (Gov. Br. at 24). But, while abuse of process can occur with or without probable cause, Dr. Page's claim depends on the absence of probable cause. The judicial process that was abused here was the FISA process of "issuing warrants based on probable cause." *Martinez v. City of West Sacramento*, 2019 WL 448282, at * 23. The abuse consisted of deliberately procuring the FISA warrants through material misstatements and omissions. Thus, the abuse of process claim requires both the absence of probable cause and the use of material misstatements or omissions to secure a warrant. *See Sforza v. City of New York*, 2009 WL 857496, at *17 (S.D.N.Y. 2009) (the presence of probable cause can negate a claim for abuse of process). The Government did not concede that any of the warrants for Dr. Page lacked probable cause until December 9, 2019 (the day the Horowitz Report was publicly released), when it filed a non-public letter with the FISC acknowledging that two of the warrants were deficient. This

concession was not made public until January 7, 2020, when the FISC filed an unclassified order discussing it. *See In re Carter W. Page, a U.S. Person*, FISC Docket Nos. 16-1182, 17-52, 17-375, 17-679, Order of Jan. 7, 2020.

The Government contends that Dr. Page cannot invoke the concealment doctrine because he knew he had been the target of a series of FISA warrants and he had access to public reporting about the warrants, as well as the public disclosures made in the so-called Nunes Memo and the Redacted Grassley-Graham Referral, which were publicly disclosed in February 2018. But the latter document simply refers Christopher Steele to DOJ for investigation of a potential false statement violation; it does not challenge the validity of the FISA warrants for Dr. Page. *See* Doc. 88-14.

The Nunes Memo did criticize the FISA warrant applications and asserted that certain "material and relevant" information had been omitted from them: (1) that Christopher Steele, who compiled the "dossier," was ultimately working on behalf of, and paid by, the DNC and Clinton campaign; (2) that the September 23, 2016 article by Michael Isikoff in *Yahoo News* did not corroborate the Steele dossier because the source for the article was Steele; (3) that Steele was "desperate that Donald Trump not get elected and was passionate about him not being president;" (4) the application ignored or concealed Steele's anti-Trump financial and ideological motivations; and (5) that texts between defendants Strzok and Lisa Page discuss orchestrating leaks to the media and a meeting with defendant McCabe to

discuss an "insurance policy" against President Trump's election. (Doc. 88-12).[2]

However, by no stretch of the imagination did the Nunes Memo disclose that Dr. Page had a viable claim for abuse of process. While it criticized certain omissions from the warrant applications, it did not contend that these omissions undermined the existence of probable cause. Further, it did not reveal, or even suggest, many of the defects that the Horowitz Report later found.

Moreover, although the Nunes Memo alerted Dr. Page to some concrete problems with the warrant applications, the continuing veil of official secrecy shrouding those applications made it impossible for him to investigate and discover the additional facts necessary to establish his abuse of process claim. For example, it was impossible to examine the applications, themselves, until July 21, 2018, when they were publicly released (in heavily redacted form).[3] Even then, examination of the applications did not disclose the underlying facts about the preparation of those applications that was revealed in the Horowitz Report.

Thus, this case is readily distinguishable from *Callahan v. United States*, 426 F.3d 444 (1st Cir. 2004), which is cited by the Government. In *Callahan*, the court

---

[2] The Nunes Memo was countered by the so-called Schiff Memo, released at the same time, which vociferously denied that DOJ or FBI officials had abused the FISA process, omitted material information, or used the warrants for Dr. Page to spy on the Trump campaign. It set forth a lengthy analysis of the evidence supposedly possessed by those officials and asserted that the evidence met FISA's probable cause requirement regardless of any questions about the reliability of Christopher Steele. (Doc. 88-16).

[3] Dr. Page's administrative claim under the FTCA is timely as measured from this date.

held that news reports "should have prompted Plaintiff to obtain certain <u>publicly</u> available documents" which would have disclosed her cause of action.  *Id.* at 453 (emphasis added).  Here, there was no publicly available information which Dr. Page could investigate to discover his cause of action until the Horowitz Report was released in December 2019.  Once the Report became available, he moved expeditiously and filed his FTCA administrative claim five months later. Accordingly, his abuse of process claim is not time-barred.

## III.   The Privacy Act Claim (Count 7) Is Not Subject To Dismissal

Dr. Page alleges a Privacy Act claim, under 5 U.S.C. §§ 552a(g)(1)(A), (g)(2), seeking injunctive relief compelling DOJ to amend inaccuracies in the Horowitz Report concerning him.  The SAC alleges that, before the public release of the Horowitz Report, Dr. Page repeatedly requested the right to review it and to have any errors about him corrected, but the DOJ ignored his requests.  It further alleges that The Horowitz Report contains errors that Dr. Page has a right to have amended to reflect accurate information.  And it alleges, on information and belief, that the Horowitz Report is retrievable by Dr. Page's name or personal identifier in a DOJ OIG records system.  The Government makes a series of challenges to this claim, none of which is meritorious.

### A.    No further exhaustion of administrative remedies is required

First, the Government contends that this count should be dismissed because Dr. Page failed to exhaust his administrative remedies.  It argues that he did not pursue an administrative appeal of the OIG's denial of access.  It further argues that the OIG denied Dr. Page access to the "draft" Report prior to its finalization and publication, but that he now has received the "final" Report (along with the rest of the public) and has not made a request to OIG to amend the "final" Report.

The short answer to both of these arguments is that "[b]ecause the failure to exhaust administrative remedies is considered an affirmative defense, 'the defendant[s] bear[ ] the burden of pleading and proving it.'"  *Ramstack v. Department of Army*, 607 F.Supp.2d 94, 104 (D.D.C. 2009) (quoting *Bowden v. United States,* 106 F.3d 433, 437 (D.C. Cir. 1997)).  This defense cannot be "invoked in a Rule 12(b)(6) motion [unless] the complaint somehow reveals the exhaustion defense on its face." *Thompson v. Drug Enforcement Admin.*, 492 F.3d 428, 438 (D.C. Cir. 2007).  Here, the SAC does not reveal an exhaustion defense on its face.

Indeed, the SAC alleges that the only response Dr. Page received from DOJ regarding his requests to view and amend the Horowitz Report was a letter which did not address his requests under the Privacy Act, but instead informed him that he would not be contacted for an OIG interview.  (SAC ¶ 249).  Individuals who are not informed of their right to administratively appeal a Privacy Act decision are treated as having "exhausted" administrative remedies.   *Harper v. Kobelinski*, 589

F.2d 721, 723 (D.C. Cir. 1978) (per curiam).  Thus, on the facts alleged in the SAC, exhaustion cannot be an issue.

**B.    The complaint need not identify the particular errors it seeks to correct**

The Government next contends that the SAC does not sufficiently state a claim under the Privacy Act because, although it alleges that the Horowitz Report "contains numerous errors that Dr. Page has a right to have amended" (SAC ¶ 250), it does not spell out those errors.  The Government cites no authority for this argument because there is none.

All that a complaint must contain is "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  The SAC provides this statement by alleging that Dr. Page sought and was denied an opportunity to review the Horowitz Report before it was released and that the Report contains errors that he has a right to have amended.  There is no need to detail the alleged errors in order to provide the Government with the requisite notice of Dr. Page's claim.  Identifying each of the putative errors in the Horowitz Report would enable the Government to dispute whether they are actual errors that require correction, but any such dispute would go to the merits of Dr. Page's claim and would not affect the sufficiency of the complaint.

**C.    The Horowitz Report is not exempt from the Privacy Act**

The Government argues that the Horowitz Report is exempt from the access and amendment requirements of the Privacy Act.  This argument is unpersuasive.  First, "[a]n 'exemption claim is an affirmative defense,' which should typically 'be

raised in a responsive pleading, not in a motion to dismiss.'" *Fleck v. Dep't of Vets.*

*Affairs, Ofc. of Inspector General*, 2020 WL 42842, at *6 (D.D.C. 2020) (citation

omitted).  Recognizing this problem, the Government also moves for immediate

summary judgment on this issue and submits the declaration of Jonathan Malis

(Doc. 88-32) in support of its motion.  However, the Malis declaration does not

establish undisputed facts that entitle the Government to judgment in its favor.  To

the contrary, it is evident that the Horowitz Report is not exempt.

The Government and Mr. Maris rely on a DOJ regulation, 28 C.F.R. §

16.75(a), which exempts OIG investigative records from the Privacy Act pursuant to

three statutory exemptions:

> (1) 5 U.S.C.. § 552a(j)(2), which permits an agency or component that
> "performs as its principal function any activity pertaining to the
> enforcement of criminal laws" to exempt records which contain
> information compiled for the purpose of a criminal investigation;
>
> (2) § 552a(k)(1), which permits an agency to exempt matters that are
> classified; and
>
> (3) § 552a(k)(2), which permits a non-law-enforcement agency to exempt
> records containing "investigatory material compiled for law enforcement
> purposes.

Mr. Maris invokes only the latter two exemptions in his declaration, implicitly

conceding that the OIG is not an agency component whose principal function is the

enforcement of criminal laws.

The DOJ regulation further provides that OIG records are exempt only to the

extent that information in the OIG's system of records is subject to one of these

exemptions.  This language "mean[s] that, in order to be exempted, a particular

record must fulfill the statutory criteria in whichever subsection of the [Privacy] Act on which the agency relies." *Lugo v. U.S. Dep't of Justice*, 214 F.Supp.3d 32, 38 (D.D.C. 2016) (citing *Vymetalik v. FBI*, 785 F.2d 1090, 1094–96 (D.C. Cir. 1986); *Doe v. FBI*, 936 F.2d 1346, 1353 & n.8 (D.C. Cir. 1991)).  In other words, the Horowitz Report, itself, must satisfy the exemption criteria.  The Horowitz Report does not do so.

The Maris declaration suggests that the Report is covered by the exemption for classified information.  It states that, "At the time of Mr. Page's access request, the draft Report was still classified. It only underwent final classification review just prior to its issuance and public release." (Maris Decl. ¶ 12).  This avoids the issue.  As alleged in the SAC, Dr. Page asked to review the Report because it was going to be publicly released.  *See* SAC ¶¶ 239-40.  The public Report, which would not be classified, is what Dr. Page sought to review.

The Maris declaration also asserts in conclusory fashion that the "[R]eport would be 'investigatory material compiled for law enforcement purposes' under Section 552a(k)(2)." (Maris Decl. ¶ 12).   But it cites no facts that support this conclusion.  Whether OIG records qualify for this exemption depends on the type of investigation involved.  *See Vymetalik v. FBI*, 785 F.2d at 1095.  Records may be considered law enforcement records only where the investigation "was 'realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached.'"  *Id.* at 1098 (citation omitted).

32

The investigation here was not based on either of these concerns.  It was not a law enforcement exercise but, rather, a compliance exercise.  When the OIG announced the investigation on March 28, 2018, it stated that it was being conducted "in response to requests from the Attorney General and Members of Congress … [to] examine the [DOJ's] and the [FBI's] compliance with legal requirements, and with applicable DOJ and FBI policies and procedures, in applications filed with the U.S. Foreign Intelligence Surveillance Court (FISC) relating to a certain U.S. person [Dr. Page]."  https://oig.justice.gov/press/2018/2018-03-28b.pdf.  The investigation was not conducted by the Investigations Division of the OIG, which investigates alleged violations of fraud, abuse and integrity laws and develop cases for criminal prosecution, civil, or administrative action.  Instead, it was conducted by the Oversight and Review Division, which conducts special reviews and investigations of sensitive allegations involving DOJ employees and operations.  ((Maris Decl. ¶ 9).

The D.C. Circuit long ago distinguished between two types of investigatory files that government agencies compile: (1) files in connection with government oversight of the performance of duties by its employees, which are not compiled for law enforcement purposes, and (2) files in connection with investigations that focus directly on specific alleged illegal acts which could result in civil or criminal sanctions, which are compiled for law enforcement purposes.  *See Rural Housing Alliance v. Dep't of Agriculture*, 498 F.2d 73, 81-82 (D.C. Cir. 1974); *accord Jefferson v. Dep't of Justice, Ofc. of Prof. Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002).

The Horowitz report is in the former category -- it is an oversight exercise. Moreover, it also became a transparency exercise when the OIG announced its intent to publicly disclose the Report.  Records compiled for law enforcement purposes are not publicly disclosed and accompanied by press releases, as the Horowitz Report was.

Thus, the Malis declaration fails to establish that the Horowitz Report is exempt from the access and amendment requirements of the Privacy Act.

### D.    The Horowitz Report is in a system of records

Finally, the Government contends that the Horowitz Report is not covered by the access and amendment provisions of the Privacy Act, because it is not in a system of records from which it is retrievable by Dr. Page's name.  This argument elevates form over substance in an effort to evade the requirements of the Privacy Act.

A system of records is "a group of any records ... from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  5 U.S.C. § 552a(a)(5). "The key limitation in the Act's definition of 'system of records' is its use of 'retrieved.' ... '[t]his qualifying language in the statute reflects a statutory compromise between affording individuals access to those records relating directly to them and protecting federal agencies from the burdensome task of searching through agency records for mere mention of an individual's name.'"  *McCready v. Nicholson*, 465 F.3d 1, 9 (D.C. Cir. 2006) (citation omitted).  "An agency can only be held accountable under Privacy

Act provisions tied to a system of records requirement for records it can easily retrieve consistent with its day-to-day practice of information management—records found within a 'system of records.'" *Id.* at 11.

Thus, "the agency must in practice retrieve information by personal identifier." *Maydak v. U.S.*, 363 F.3d 512, 520 (D.C. Cir. 2004).  "Although incidental or ad hoc retrieval by personal identifier does not convert a group of records into a system of records, where an agency compiles information about individuals for investigatory purposes, 'Privacy Act concerns are at their zenith, and if there is evidence of even a few retrievals of information keyed to [personal identifiers], it may well be the case that the agency is maintaining a system of records.'" *Id.* (citations omitted).

In this case, the OIG put out a press release on the day it publicly released the Horowitz Report.  This press release identified Dr. Page by name as one of the subjects of the "Crossfire Hurricane" investigation and the Report.  Exhibit __.  It went on to advise the public that the Report "is available on the DOJ OIG website," and to provide the link to the report on the OIG website: https://oig.justice.gov/reports/2019/o20012.pdf.  *Id.*  Inspector General Horowitz subsequently testified publicly about the Report before Congress on two occasions and tied it to Dr. Page:  on December 11, 2019, to the U.S. Senate Committee on the Judiciary, *see* https://oig.justice.gov/node/1100, and on December 18, 2019, to the U.S. Senate Committee on Homeland Security and Governmental Affairs, *see* https://oig.justice.gov/node/16547.

The Government again relies on the Malis declaration in support of its argument that the Horowitz Report is not part of a system of records, and attempts to draw a distinction between the "draft" Report and the "final" Report.  With respect to the "draft" version, Malis asserts that "[t]he OIG's Oversight and Review Division … generally does not index its investigative records relating to reviews or retrieve them by use of a personal identifier. Rather, O&R would access such records by reference to the title of the report or OIG investigation file number." (Malis Decl. ¶ 9) (emphasis added).  Malis acknowledges that the "final" version of the Report "is accessible on the public OIG website and filed in O&R's electronic files." (*Id.* ¶ 10). But he caveats that the Report "is indexed by the title and number of the Report, not Mr. Page's personal identifier [and that,] [w]hile one could conceivably run a text search for Mr. Page's name, that is not how the agency accesses or retrieves the Report." (*Id.*).  He omits to mention that the OIG has publicly linked the Report to Dr. Page and advised the public exactly how to access the Report.

The Government cites the decision in *McCready v. Nicholson*, which held that an Inspector General ("IG") report at the Department of Veterans Affairs was not part of a Privacy Act system of records simply because it could be accessed via plaintiff's name through the IG's website.  The court reasoned that the website was not used in that manner by the agency and the "practice of retrieval by name or other personal identifier must be an *agency* practice to create a system of records and not a 'practice' by those outside the agency." 465 F.3d at 13 (emphasis in the original).

However, the decision in *McCready v. Nicholson* was not intended to be a roadmap for an agency to circumvent Privacy Act requirements.  As the court noted in that case, the purpose of the "retrieved" limitation is to "protect[] federal agencies from the burdensome task of searching through agency records for mere mention of an individual's name," *id.* at 9, and to hold "[a]n agency … accountable under Privacy Act … for records it can easily retrieve consistent with its day-to-day practice of information management—records found within a 'system of records.'" *Id.* at 11. Here, the OIG's day-to-day practice of information management is to maintain the Horowitz Report on the OIG website, to publicly tie it to Dr. Page, and to advise the public exactly how to access it.  This circuit's Privacy Act jurisprudence "ha[s] consistently turned back 'neat legal maneuver[s]' … attempted by the government that, while literally consistent with the Act's terms, were not in keeping with the privacy-protection responsibilities that Congress intended to assign to agencies under the Act." *Gerlich v. U.S. Dept. of Justice*, 711 F.3d 161, 168 (2013) (quoting *Pilon v. U.S. Dep't of Justice,* 73 F.3d 1111, 1118 (D.C. Cir. 1996)).

Moreover, the Government seeks summary judgment on this issue before Dr. Page has had any opportunity to engage in discovery, *see* Fed.R.Civ.P. 56(d), and to ascertain whether "there is evidence of even a few retrievals of information keyed to [personal identifiers]" which would also establish "that the agency is maintaining a system of records." *Maydak v. U.S.*, 363 F.3d at 520.

Accordingly, the Government's argument that the Horowitz Report is not covered by the access and amendment provisions of the Privacy Act should be

rejected.

## IV.   The Privacy Act Claim (Count 8) Is Not Subject To Dismissal

Dr. Page also asserts a damages claim under the Privacy Act.  The SAC alleges that the FBI and DOJ intentionally and willfully disclosed information pertaining to Dr. Page in violation of the Privacy Act.  *See* 5 U.S.C. § 552a(g)(1)(D). It alleges that, "[o]n information and belief, Defendants, known and unknown to Dr. Page, but including but not limited to, Comey, McCabe, Strzok, and [Lisa] Page, leaked information and records concerning Dr. Page, including but not limited to the existence of the FISA Warrants, the contents of the warrant applications, and the results of the Warrants, that were protected from disclosure under the FISA and the Privacy Act to media outlets, including the New York Times, the Washington Post, and possibly others."  (SAC ¶ 226).  As an example, the SAC alleges that, in April 2017, defendants Strzok and Lisa Page texted each other about a "media leak strategy" and that, later that month, articles about the FISA surveillance of Dr. Page appeared in the Washington Post and New York Times. (SAC ¶¶ 220-224).

### A.   The claim is not time-barred

The Government contends that this claim is barred by the two-year statute of limitations in the Privacy Act.  See 5 U.S.C. § 552a(g)(5).  But this is an affirmative defense that may be asserted in a motion to dismiss only "when the facts that give rise to the defense are clear from the face of the complaint."  *Smith–Haynie v.*

*District of Columbia*, 155 F.3d at 578. "'[S]tatute of limitations issues often depend on contested questions of fact,' and as a result, 'dismissal is appropriate only if the complaint on its face is conclusively time-barred.' In other words, 'dismissal at the Rule 12(b)(6) stage is improper' if 'a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint.'" *Arthur v. D.C. Housing Authority*, 2020 WL 7059552, at *3. Dismissal is certainly improper here.

The Privacy Act "cause of action does not arise and the statute of limitation does not begin to run until the plaintiff knows or should know of the alleged violation." *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir. 1987). This is because "[t]he [Privacy] Act seeks to provide a remedy for governmental conduct that by its very nature is frequently difficult to discover." *Id.* at 797. Until the plaintiff knows the identity of the individual(s) who disclosed the information at issue, he cannot show that the disclosure was intentional or willful, as required by the statute. *See Convertino v. U.S. Dept. of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). Thus, the cause of action does not accrue until that point.

The Government argues that Dr. Page's claim is time-barred because he must have been aware of the April 2017 Post and Times articles when they came out and he did not file this suit until more than two years later. This argument ignores that the identity of the leakers was not disclosed in these articles, and so their publication did not trigger the running of the statute of limitations.

Next the Government resorts to citing evidence extraneous to the SAC in an effort to demonstrate that Dr. Page knew that defendants Strzok and Lisa Page

were behind these articles more than two years before he filed suit.  But the
Government has not moved for summary judgment based on the statute of
limitations, nor could it credibly do so at this juncture given that Dr. Page has had
no opportunity to engage in discovery about the full extent of the media leak
strategy and all of the improper disclosures of Privacy Act information that were
made by the defendants.  Accordingly, this argument should be ignored.

In sum, there is no basis for moving to dismiss the Privacy Act claim based on
the statute of limitations because the SAC reveals no such defect in Dr. Page's
claim.

### B.    Damages are sufficiently pled

Finally, the Government contends that the Privacy Act claim should be
dismissed because Dr. Page has not plausibly pled actual damages.  It argues that
the damages allegations in the SAC are insufficiently specific and that they do not
plausibly allege that these damages were caused by the specific disclosures alleged
in the SAC.  Neither of these arguments survives scrutiny.

The SAC alleges that, "[a]s a direct and proximate result of Defendants'
actions, Dr. Page … was falsely portrayed as a traitor to his country … resulting in
the loss [of] at least tens of millions of dollars of business opportunities and future
lifetime earning potential, in addition to other pecuniary harms such as costs, fees,
attorneys' fees and other losses caused by the violation of his Privacy Act rights."
(SAC ¶ 301).  The SAC further alleges four different types of economic losses that
Dr. Page suffered:  (1) losses from the destruction of his ability to continue

conducting business through his own companies because others would not contract with him, including banks and other business entities with whom he had previously worked; (2) losses from being rendered effectively unemployable; (3) expenses caused by having to relocate and travel and take other security measures in response to death and kidnapping threats; and (4) the costs of responding to government investigations and being involved in litigation.  (SAC ¶ 254).

These allegations are directly comparable to damages allegations that Judge Friedman upheld in *Hill v. U.S. Department of Defense*, 70 F.Supp.3d 17 (D.D.C. 2014).  He ruled that a proposed amended complaint sufficiently alleged damages under the Privacy Act where it stated that plaintiff "paid for medical services to address the trauma caused to her by the disclosures," "paid for transportation to and from [said] medical services," and was "denied employment opportunities because ... [the] disclosures disqualified the [plaintiff] for employment because she could not obtain sufficient references."  *See id.* at 21.

Judge Friedman also rejected an argument that Ms. Hill's allegations did not show a causal relationship between the alleged disclosure and her alleged damages. He ruled that it was plausible that (1) "a disclosure of Hill's medical records and eventual termination could cause mental distress and trauma, causing her to seek psychological help, for which she had to pay," and (2) "specific employment opportunities required references of a supervisor, which Hill would have been able to obtain but for the alleged disclosures, resulting in her being disqualified from the position or positions."  *Id.* at 22.  Here, likewise, it is plausible that Dr. Page was

falsely branded as a traitor because of the disclosure that FISA warrants had been obtained against him on the grounds he was a Russian agent.  It is entirely plausible that this notoriety caused him (1) to incur various expenses to protect himself and (2) to lose income, by ruining his business and rendering him unemployable.  Thus, the SAC sufficiently alleges damages.

## CONCLUSION

The central question raised by the Government in its Motion is whether it can be held liable for the illegal and unconstitutional spying on Dr. Page under the Patriot Act and the FTCA.  The answer is yes - it is liable under both statutes.  It is liable under the FTCA for abuse of process in obtaining the FISA warrants.  And it is liable under the Patriot Act for unlawful disclosure or use of information obtained through those warrants.

Further, under the Privacy Act, the Government is liable for the unlawful disclosure of any private information about Dr. Page, which includes leaks relating to the FISA warrants in any way whatsoever.

Finally, Dr. Page has rights under the Privacy Act with respect to the Horowitz Report and the Government must afford those rights to him.

The Second Amended Complaint more than adequately alleges all of these claims.

WHEREFORE, Dr. Page, respectfully requests that the Government's motion to dismiss and for partial summary judgment be denied or, in the alternative, that he be given leave to amend.

## REQUEST FOR HEARING

Plaintiff respectfully requests a hearing for oral argument on the Motion.

Dated: January 21, 2022                    Respectfully Submitted,


_____/s/_____

**MCADOO GORDON & ASSOCIATES, P.C.**

By: ___/s/ Leslie McAdoo Gordon
Bar# 456781
1140 19th Street, N.W.
Suite 602
Washington, DC  20036
(202) 293-0534
leslie.mcadoo@mcadoolaw.com


**MILLER KEFFER & PEDIGO PLLC**

By: ___/s/ K. Lawson Pedigo
Bar ID: TX0186
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone: (214) 696-2050
klpedigo@mkp-law.net

**PARLATORE LAW GROUP, LLP**

By: ___/s/ Timothy C. Parlatore
Bar ID: NY0332
One World Trade Center, Suite 8500
New York, NY 10007
(212) 679-6312
timothy.parlatore@parlatorelawgroup.com


*Attorneys for Plaintiff Dr. Carter Page*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 21, 2022, a copy of the foregoing Plaintiff's Opposition to Government Defendants' Motion to Dismiss and For Partial Summary Judgment was served electronically on:

Amisha R. Patel
David N. Kelley
Dechert, LLP
1900 K Street, NW
Washington, DC 20006

Brigida Benitez
Lisa M. Southerland
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

William Bullock Pittard, IV
Christopher Muha
Sarah Renee Fink
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005

Aitan Dror Goelman
Ivano Michael Ventresca
Zuckerman Spaeder, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036

Dorothy Ames Jeffress
Kaitlin Brooke Konkel
Robert J. Katerberg
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001

James Koukios
Vanshika Vij
Robin A. Smith
Morrison & Foerster LLP
2100 L Street NW
Suite 900
Washington, DC 20037

Meaghan McLaine VerGow
Andrew Hellman
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Brian Matthew Heberlig
Patrick Francis Linehan, III
James Martin Hobbs
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036

Amy E. Powell
U.S. Department of Justice
150 Fayetteville St.
Ste 2100
Raleigh, NC 27601

Daniel Paul Chung
Cate Cardinale
U.S. Department of Justice
Civil Division Torts Branch-FTCA Section
P.O. Box 888
Washington, DC 20044

_____/s/_____
Leslie McAdoo Gordon