## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARTER PAGE,<br><br>     Plaintiff,<br><br>  v.<br><br>JAMES COMEY, ANDREW MCCABE, KEVIN CLINESMITH, PETER STRZOK, LISA PAGE, JOE PIENTKA III, STEPHEN SOMMA, BRIAN J. AUTEN, DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, UNITED STATES OF AMERICA, JOHN DOES 1-10, JANE DOES 1-10,<br><br>     Defendants. | No. 20-cv-3460-DLF<br><br><u>Oral Argument Requested</u> |

### KEVIN E. CLINESMITH'S REPLY IN SUPPORT OF HIS
### MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

William Pittard (#482949)
Christopher C. Muha (#987116)
Sarah Fink (#166663)
KAISERDILLON PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
wpittard@kaiserdillon.com
cmuha@kaiserdillon.com
sfink@kaiserdillon.com

*Attorneys for Kevin E. Clinesmith*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...............................................................................................................1

ARGUMENT.....................................................................................................................3

I.    Page's Claims Are Untimely. ..............................................................................3

II.   The FISA Claims Fail on Their Merits.................................................................7

      A.    The Text of FISA Leaves No Room for Secondary Civil Liability.. ......................8

      B.    The Legislative History Shows Secondary Civil Liability Was
            Affirmatively Rejected by Congress When It Enacted FISA................................13

      C.    The SAC Fails to Plead Any Facts Supporting a Plausible Inference of
            Secondary Civil Liability as to Clinesmith...........................................................18

III.  The *Bivens* Claim Must Be Dismissed on Its Merits as Well...........................20

IV.   Clinesmith is Entitled to Qualified Immunity. ..................................................22

CONCLUSION ................................................................................................................24

## INTRODUCTION

Page's Opposition ("Opp.") all but rewrites his Second Amended Complaint ("SAC"), then advances a number of basic errors in an effort to avoid dismissal. The entire Opposition is premised on the notion that what the SAC really advances is a theory of *secondary* liability, whereby the individual Defendants aided and abetted each other in violating FISA and the Fourth Amendment (as opposed to engaging in those violations individually). *See* Opp. at 16-18 (laying out theory of secondary liability); *id.* at 18-50 (regurgitating SAC's allegations); *id.* at 50-53 (again discussing theory of secondary liability). That idea barely exists in the SAC—it appears almost exclusively as boilerplate at the end of a long paragraph under each FISA cause of action, *see* SAC ¶¶260, 264, 268, 272, and the SAC nowhere identifies a "principal" whom the others were supposedly aiding and abetting. Nor, as to Clinesmith, does it allege *any* facts suggesting he knew of, let alone supported, some improper purpose of an unnamed principal.[1] On that, the SAC—via the IG Report it incorporates—says only the opposite: that there was *no* evidence "that political bias or improper motivation influenced the decision" "to seek FISA authority on Carter Page" (or on anything else for that matter). IG Report at iv, vi. Perhaps recognizing all of that, Page insists that the SAC may be dismissed only if he "'can prove no set of facts in support of [his] claim which would entitle him to relief,'" Opp. at 14 (quoting *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C. 1993)). But as this Court itself has recognized, "that standard was premised, at least in part, on the now-abrogated standard from *Conley v. Gibson*" that did not survive *Bell Atl. Corp. v. Twombly*, 550 U.S. 540 (2007). *Thomas v. Washington Metro. Area*

---

[1] The Opposition doesn't either, haphazardly suggesting in various places that the principal was one or the other of the individual Defendants. *See, e.g.*, Opp. at 24 (seeming to suggest McCabe was the principal); *id.* at 35 (appearing to imply that Lisa Page, and perhaps Strzok, were the principals).

*Transit Auth.*, 305 F. Supp. 3d 77, 85 (D.D.C. 2018) (Friedrich, J.).  It does not save Page's failure

to have plausibly pled secondary liability in the SAC.

    Even if Page had adequately pled secondary liability, his claims still would fail for a host

of well-established reasons:

- Page's only real argument as to why his claims are timely is that the statute of limitations should be tolled until the time he learned all of the facts required to establish his claims. Opp. at 66.  But it's black letter law that "[a]ccrual does not wait until the injured party has access to or constructive knowledge of all the facts required to support its claim," *Sprint Commc'ns Co., L.P. v. F.C.C.*, 76 F.3d 1221, 1228 (D.C. Cir. 1996), and that even where a discovery rule applies, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). Page knew he was being surveilled, and believed it to be wrongful, more than three years before he sued, so his claims are untimely.

- As to his FISA claims, Page's only response to Clinesmith's Motion is his general pivot to a theory of secondary liability.  Opp. at 50-53.  But it's again black letter law that secondary civil liability for statutory violations does not exist "unless Congress speaks to it *explicitly*," *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277 (D.C. Cir. 2018) (emphasis added), and FISA nowhere does that—despite expressly including aiding and abetting theories elsewhere in the statute.  *See, e.g.*, 50 U.S.C. § 1801(b)(1)(E).  Its legislative history further shows that Congress rejected secondary civil liability from the very start of the legislative process.

- As to his *Bivens* claim, Page asserts that it survives because it arises in the well-established "search and seizure context."  Opp. at 58-60 (relying on *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)).  But *Abbasi* couldn't be clearer that granular differences like "the rank of the officers involved" and the "legal mandate under which the officer was operating" suffice to make a context new, and Page doesn't deny—because he can't—that both of those differences (and several more) exist here.  *See* ECF No. 81-1 (Clinesmith Mem. in Support of Mot. to Dismiss (hereafter "Mem.")) at 31-33.

- Finally, Page fails to show why, if none of the above were true, Clinesmith isn't nevertheless entitled to qualified immunity.  What the SAC, the IG Report, and judicially noticeable facts all show is that Clinesmith genuinely believed (as Judge Boasberg credited) that his altered email reflected the truth of Page's status; that he passed on the underlying documents that would confirm or deny the truth of Page's status rather than hide them; and that he expressly acknowledged that Page had a relationship with the relevant government agency.

    That is the actual truth of what happened as it relates to Clinesmith, and it is confirmed by

the very facts Page has put before this Court and those which he does not dispute are judicially

noticeable.  Clinesmith has suffered greatly, and will continue to suffer, for his serious error in judgment in altering that email.  Page's recourse, if he has any, is not against Clinesmith.  The claims against him are factually unfounded and legally unsupported at every turn.  They must respectfully be dismissed with prejudice in their entirety.[2]

## ARGUMENT

### I.  Page's Claims Are Untimely.

Page does little to refute that his FISA and *Bivens* claims as to Clinesmith are untimely.  As Clinesmith's Motion explained, causes of action accrue under federal law "when the plaintiff has a complete and present cause of action," *Hampton v. Comey*, No. 1:14-cv-1607-ABJ, 2016 WL 471277, at *13 (D.D.C. Feb. 8, 2016) (quotation marks omitted), which occurs "when the factual and legal prerequisites for filing suit are in place," *Loumiet*, 828 F.3d 935, 947 (D.C. Cir. 2016).  Here that occurred—and in fact was *known* to Page—before the earliest date on which those claims could accrue to be timely.  Mem. at 16-18.  Page offers just two things in response, both of which are legally unfounded and contradicted by the facts he alleges.

*First*, as to both his FISA and *Bivens* claims, Page asserts that they're timely because the statute was tolled until he "learn[ed] of the existence of his cause of action," which he equates with knowing "the facts underlying the FISA warrants, *i.e.*, that they were obtained without probable cause by the inclusion of numerous, material misrepresentations and omissions, which rendered the disclosure or use of information obtained through those warrants unlawful."  Opp. at 65, 66.[3]

_____

[2] Clinesmith adopts by reference those arguments of the other individual Defendants that apply to him.

[3] Page claims, in further support of this point, that "additional facts concerning" Clinesmith's conduct "were disclosed when the Department of Justice filed its sentencing memorandum" in his criminal case, "including internal FBI emails not referenced in the Horowitz Report."  Opp. at 53 n. 10.  In addition to be being legally irrelevant for the reasons discussed above in the text, this

But that simply isn't the law:  It's well-settled that claims accrue even when a party is missing facts that are *required* for it to be able to prove a claim.  *See, e.g.*, *Sprint Commc'ns Co., L.P.*, 76 F.3d at 1228 ("Accrual does not wait until the injured party has access to or constructive knowledge of all the facts required to support its claim.").  Even where a discovery rule applies, the Supreme Court "has been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555.  Indeed, even "[i]n the circumstance of medical malpractice, where the cry for a discovery rule is loudest, we have been emphatic that the justification for a discovery rule does not extend beyond the injury." *Id.* That is true even for claims that require a "pattern" of wrongful conduct among defendants and where that "pattern of predicate acts may well be complex, concealed, or fraudulent," as Page (without foundation) alleges here. *Id.* It is of no moment to the limitations analysis that such fraudulent patterns of activity might require "considerable enquiry and investigation . . . before [one] can make a responsible judgment about the actionability of the" conduct. *Id.* Once the need for such enquiry is known, the statute begins to run. *See, e.g.*, *Sexton v. United States*, 832 F.2d 629, 633-34 (D.C. Cir. 1987) (statute on survivors' claims began to run when individual died because survivors' level of knowledge at time of death should have prompted reasonably inquiry that would have eventually led to discovery of cause of death).

Given that standard, Page's claims are clearly untimely.  As to both his FISA and *Bivens* claims, he himself pleads that he knew he was being surveilled, knew it was the FBI that was conducting that surveillance, and believed the surveillance to be unfounded much more than two years before he filed suit. *See* Mem. at 16-17; SAC ¶221.  That is more than enough for the statute

---

assertion is also factually untrue—and in a manner subject to judicial notice.  Every email from the government's sentencing memorandum was disclosed in the Horowitz Report and/or referenced by news articles prior to that report's publication.

to run.  *See, e.g.*, *Berman v. Crook*, 293 F. Supp. 3d 48, 56 (D.D.C. 2018) (plaintiff's *Bivens* claim

"accrued in 2000 when he learned of the search of his office" and believed it to be unfounded);

*Hill v. Dep't of Def.*, 981 F. Supp. 2d 1, 7-8 (D.D.C. 2013) (statute began to run on Privacy Act

claim when plaintiff learned "that the defendant kept records on him that he believed to be

erroneous," even though he didn't know "with specificity the documents referred to" or "what

specific errors those documents may have contained"); *Francis v. Miligan*, 530 F. App'x 138, 139

(3d Cir. 2013) (plaintiff on notice when he learned his car had been searched without consent, even

if he didn't know "that the search and seizure were allegedly illegal" at the time).  *Smith v. Nixon*—

one of the cases on which Page chiefly relies, *see* Opp. at 65-66—itself held that fraudulent

concealment tolled the statute only until the *existence* of the surveillance becomes known.  606

F.2d 1183, 1190-91 (D.C. Cir. 1979).  Because Page knew of that more than three years before he

sued, all of his claims are untimely.

Even if more were required, Page had both actual and constructive knowledge of

Clinesmith's specific conduct more than a year before he filed suit, supplying a further reason why

Page's *Bivens* claim is untimely.  As to his actual knowledge, Clinesmith's Motion explained how

the SAC (1) shows Page was attuned to national media coverage of his surveillance, yet (2) fails

to deny that Page was aware of the national news stories that circulated in late November 2019

detailing Clinesmith's conduct—even after Clinesmith argued in his motion to dismiss the First

Amended Complaint that those articles showed Page's actual knowledge of his conduct.  Mem. at

28-30.[4]  That silence is deafening, and by now conspicuous, given the Opposition's inability to say

anything in response.  Those articles detailed that Clinesmith had altered an email; that the email

---

[4] The Opposition nowhere disputes that the Court may properly take judicial notice of the national
news stories identified in Clinesmith's Motion.

had come from another government agency; that Clinesmith had done so by inserting text to make it look like his understanding had been expressly stated by that agency; and that he had passed the altered email on to the affiant for the fourth warrant.  Those aren't just *some* of the facts Page would go on to allege against Clinesmith in the SAC; it's nearly all of them.  Given the history behind Page's refusal to deny it in his SAC, it is not plausible to infer that he was unaware of those articles in late November 2019.

Finally, even if Page were not on actual notice of his claim against Clinesmith when those stories came out, he at least was on *constructive* notice by that time.  *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994) (to toll limitations period by fraudulent concealment, plaintiff must plead with particularity that he was "not on actual or constructive notice of the evidence, despite [the] exercise of diligence"); *Bibeault v. Advanced Health Corp.*, 1999 WL 301691 at *5 (S.D.N.Y. May 12, 1999) ("when the facts giving rise to a fraud action are in the public domain, courts regularly impute constructive knowledge to the plaintiffs for the purpose of triggering the statute of limitations").  Those articles more than sufficed to place Page on constructive notice of Clinesmith's actions.  *See, e.g.*, *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) (press conference that "led to the publication of articles in at least two newspapers circulated within the federal district in which the suit was eventually filed" put Klan on constructive notice of claims); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) ("press release" that "led to the publication of front-page stories in Nashville's two leading newspapers," followed by separate lawsuit year later, put plaintiff on constructive notice of claims); *County of Hudson v. Janiszewski*, 520 F. Supp. 2d 631, 643 (D.N.J. 2007) (plaintiff on inquiry notice of fraudulent scheme no later than day it was reported in three media outlets); *Zola v. Gordon*, 701 F. Supp. 66, 70 (S.D.N.Y. 1988) (finding constructive notice when individual's wrongdoing was published in

"six area newspapers, two of which are national newspapers" and noting that "[p]ublicity on a less significant scale than this" would suffice).  At a minimum those articles put Page on constructive notice of the need to read the impending IG Report; the limitations period therefore began to run no later than the time he was on constructive notice of the need for that inquiry.  *Sexton*, 832 F.2d at 633-34.

That leads to Page's second assertion as to why his claims are timely: his statement that his *Bivens* claim is governed by a three-year limitations period.  Opp. at 65.  Page offers no argument at all in support of that bald assertion.  He cites to D.C. Code § 12-301, D.C.'s residual three-year limitations period, Opp. at 65, but never argues why it should apply.  Nor does he deny that the "gist" of his *Bivens* claim sounds in defamation or address the wealth of authority holding that *Bivens* claims based on false statements of this nature sound in defamation and are governed by a one-year statute of limitations.  *See* Mem. at 15-16.  There is no basis for applying a three-year limitations period, which means even if Page's *Bivens* claim as to Clinesmith did not run until he learned of Clinesmith's conduct, it would still be untimely.

## II.     The FISA Claims Fail on Their Merits.

Even if they were timely, Page's FISA claims would still fail.  Despite the SAC's almost non-existent focus on secondary liability, the Opposition feigns shock that, "[i]n hundreds of pages of briefing, Defendants" purportedly ignore the theory and "cite no authority for the proposition that the aiding and abetting provision in 18 U.S.C. 2 is inapplicable to violations of 18 U.S.C. 1809(a)."  Opp. at 52 n. 9.  But that just isn't so: Clinesmith did explain why secondary civil liability would be unavailable under FISA, in space appropriate to its prominence in the SAC.  Mem. at 21.  Now that Page has made it his primary theory, it bears a deeper look.

The truth is that overwhelming authority establishes that secondary civil liability is not available under FISA, just as it is not available under the Stored Communications Act, *see Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020) (Friedrich, J.); the Wiretap Act, *see Kirch v. Embarq Management Co.*, 702 F.3d 1245, 1246-47 (10th Cir. 2012), and a host of other statutes.  Secondary civil liability does not exist "unless Congress speaks to it *explicitly*," *Owens*, 897 F.3d at 277 (emphasis added), and nothing like that appears in the civil liability provision of FISA—even though FISA expressly uses the concepts of aiding and abetting elsewhere in the statute.  50 U.S.C. § 1801(b)(1)(E).  Even if it were appropriate to consult FISA's legislative history (it is not), that history in fact shows that Congress specifically rejected secondary civil liability under FISA, from the very start of the legislative process.

## A.      The Text of FISA Leaves No Room for Secondary Civil Liability.

Interpretation of statutory text begins with its plain meaning, and it ends there as well unless the plain language compels an odd result.  *Engine Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075, 1088 (D.C. Cir. 1996) ("Thus, if apparently plain language compels an 'odd result,' the court may refer to evidence of legislative intent other than the text itself, such as the legislative history.") (quoting *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 454 (1989)); *Consumers Union of U.S., Inc. v. F.T.C.*, 801 F.2d 417, 421 (D.C. Cir. 1986) ("we decline to limit the plain meaning of the text by resort to bits of legislative history that describe some, but not necessarily all, of the purposes that the provision serves").  The plain meaning of FISA's text limits liability to one who "intentionally" (i) "engages in" electronic surveillance, or (ii) "discloses or uses" its fruits.  50 U.S.C. § 1809(a)(1)-(2); Mem. at 19-20.  The text of the statute does not subject to liability those who aid, abet, or otherwise assist someone who "engages in" surveillance or uses its fruits; it

concerns only those who have themselves "committed such violation[s]." *Id.* § 1810.  That is the language of primary, not secondary, liability.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) ("Aiding and abetting is 'a method by which courts create secondary liability' in persons *other than the violator* of the statute.") (emphasis added, quoting *Pinter v. Dahl*, 486 U.S. 622, 648 n. 24 (1988)).  And because there is a presumption against reading secondary civil liability into statutes, *id.* at 182, "aiding and abetting liability is not included in [a statutory] cause of action unless Congress speaks to it explicitly." *Owens*, 897 F.3d at 277.  Congress has not done so in FISA.[5]

Courts interpreting related statutes have reached that same conclusion based on similar statutory text.  In *Broidy Capital Management LLC v. Muzin*, this Court held that the plain language of the Stored Communications Act (SCA) did not encompass secondary civil liability. Similar to FISA, the SCA makes it a crime to "'intentionally access[] without authorization'" facilities that provide electronic communications services, and gives any "aggrieved" person a civil cause of action against one who "engaged in that violation."  *Broidy Cap. Mgmt. LLC*, 2020 WL 1536350, at *11 (quoting 18 U.S.C. §§ 2701(a)(1), 2707(a)), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021).  As this Court held, that "'plain language shows that Congress had one category of offenders in mind—*i.e.*, those who directly access, or exceed their authority to access, a facility through which an electronic communication service is provided.'"  *Id.* (quoting *Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 26 (D.D.C. 2012)).  "In drawing the boundaries of civil liability under the Stored Communications Act," the Court continued, "'Congress made no mention of conspiracy, aiding and abetting, or any other form of secondary liability.'"  *Id.* (quoting *Gaubtz*,

---

[5] *See also F.B.I. v. Fazaga*, 142 S. Ct. 1051, 1057 (2022) (similarly concluding that FISA's text "weighs heavily against" idea that it displaces state secrets privilege because it "makes no reference to the state secrets privilege" either "by name" or "identifiable synonym").

891 F. Supp. 2d at 27).  The Court then noted the principle that when Congress creates civil causes of action for violations of statutory norms, "'there is no general presumption that the plaintiff may also sue aiders and abettors,'" because Congress "knows how to provide private plaintiffs with an action for secondary liability when it sees fit."  *Id.* (quoting *Cent. Bank, N.A.*, 511 U.S. at 182).

That reasoning is on all fours with FISA's civil liability provision.  In fact it applies with extra force here, because *FISA itself* shows that when its drafters wanted to include the concept of aiding and abetting in the statute, they expressly did so.  The statute defines "agent of a foreign power" to include, among others, one who "knowingly aids or abets any person" or "knowingly conspires with any person" to engage in certain activities.  50 U.S.C. § 1801(b)(1)(E).  The absence of similar language in the civil liability provision is further evidence that secondary civil liability is not available there.  *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("absence of" *mens rea* requirement in statutory provision, when such requirement existed elsewhere in statute, was "all the more telling" of congressional intent to exclude it from specified provision); *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 93 (D.D.C. 2017) ("We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence.") (quotation marks omitted).[6]  The fact that FISA claims inevitably involve sensitive issues of national security is still more reason not to read a secondary civil damages remedy into the statute when the statute is silent on it.  *Fazaga*, 142 S. Ct. at 1057 ("foreign intelligence surveillance presents special national-security concerns, and

---

[6] As explained below, the Senate Permanent Select Committee on Intelligence gave extensive consideration to the question whether those "aiding and abetting" foreign powers should be allowed to be surveilled, further showing that Congress had such concepts in mind as its members drafted FISA—and included those concepts in its text when it wanted to.

Congress therefore enacted FISA"); *cf. Abbasi*, 137 S. Ct. at 1857, 1861 (judicial inquiry into "sensitive issues of national security" counsels against finding implied *Bivens* remedy, especially "in the context of a claim seeking money damages").

Courts interpreting the Wiretap Act have reached the same conclusion—even though that act's criminal provision *does* allow for aiding and abetting liability. The Wiretap Act, as amended by the Electronic Privacy Communication Act of 1986, makes it a crime to "intentionally intercept" or "intentionally use[]" an electronic communication, or to "procure[] any other person to" do so. 18 U.S.C. § 2511(1)(a)-(b). Its civil liability provision creates a cause of action for anyone whose communications are intercepted or used "in violation of this chapter" against anyone who "engaged in that violation." 18 U.S.C. § 2520(a). In analyzing that statute's plain language, the Tenth Circuit held that the phrase "that violation" referred only to primary civil liability, noting that the provision "includes no aiding-and-abetting language" and that such liability is not to be presumed to have been created by Congress. *Kirch*, 702 F.3d at 1246-47.[7] So too here, where civil liability is limited to those who "committed such violation," 50 U.S.C. § 1810, where there is no aiding-and-abetting language, and where the companion criminal provision itself has no aiding-and-abetting language. It would be an extremely odd result for secondary civil liability to be unavailable under the SCA and the Wiretap Act, yet available in FISA's more sensitive national security context. *Fazaga*, 142 S. Ct. at 1057.

Courts interpreting still other statutes have reached the same conclusion based on the text of those statutes. *See, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 98 (2d Cir. 2013) (Alien Tort Claims Act); *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 840 (3d Cir. 2000)

---

[7] As explained further below, the *Kirch* Court went on to examine the legislative history of the Wiretap Act to further support its holding, in an analysis that sheds considerable light on the legislative history of FISA as it relates to Page's claim here.

(RICO); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 525 (S.D.N.Y. 2018) (Trafficking Victims Protection Act).   And Congress has shown itself to be active in creating—and removing— secondary civil liability when it sees fit.   For example, and as discussed further below, it removed such liability from the Wiretap Act in 1986.   *Kirch*, 702 F.3d at 1247.   And in response to decisions affirming that there was no secondary civil liability under the Alien Tort Claims Act, *see, e.g.*, *Owens*, 897 F.3d at 278, Congress passed the Justice Against Sponsors of Terrorism Act, which "provides for secondary liability against 'any person who aids and abets'" one particular kind of tort: "'an act of international terrorism.'"   *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 215-16 (D.C. Cir. 2022) (quoting 18 U.S.C. § 2333(d)(2)).   Congress's activity in this sphere confirms that when it has not "explicitly" provided for aiding-and-abetting liability in a statute, *Owens*, 897 F.3d at 277, that's because such liability was not intended.

Page's only argument for secondary civil liability based on the *text* of FISA is his statement, in a footnote, that the "sweeping language" of section 1810 establishes a cause of action against "any person who committed such violation" of section 1809.   Opp. at 16 n. 2.   The defendants in *Broidy Capital Management* made that same argument with respect to the SCA, and this Court rightly rejected it.   *See* No. 1:19-cv-150-DLF, ECF No. 43 (June 4, 2019) at 93 (arguing for secondary liability because liability attaches to "'**_any_** violation of this chapter'" (emphasis in brief); *id.* (supplying emphasis to Senate Report stating that recovery may be obtained from "'**_any_** person or entity'" who "'violated this chapter'").   That language is nowhere close to an "explicit[]" reference to aiding and abetting liability.   *Owens*, 897 F.3d at 277.   And it appears in a statute that *does* explicitly refer to aiding and abetting concepts when it wants to.   50 U.S.C. § 1801(b)(2)). Generic references back to a companion criminal liability provision do not smuggle aiding-and-

abetting liability into a civil liability provision, even when that criminal provision itself allows for secondary liability. *Kirch*, 702 F.3d at 1246-47. Still less does it do so here.

### B.   The Legislative History Shows Secondary Civil Liability Was Affirmatively Rejected by Congress When It Enacted FISA.

Because it's not an "odd result" for there to be no secondary civil liability under FISA (indeed, it's quite common for statutes to lack it, as shown above), the analysis should begin and end there. *Engine Mfrs. Ass'n*, 88 F.3d at 1088. But even if it were appropriate to consult legislative history on the question, the result would be no different, because that history shows that Congress expressly rejected secondary civil liability in drafting FISA. It also shows that the lone piece of that history that Page relies on—the statement in the conference report that "Congress intended 'civil liability of intelligence agents under [§ 1810] [to] coincide with the criminal liability [under § 1809],'" Opp. at 16 (quoting H.R. Rep. No. 95-1720, at 34 (1978))—refers not to the kinds of *acts* that can give rise to civil liability (whether primary, aiding and abetting, or conspiracy), but to the *mens rea* required for civil liability. It affirms that civil liability may lie only for *intentional* violations of the statute, a far stricter standard than normally required for civil claims. Like the rejection of secondary civil liability, it is a *limiting* of civil liability in this sensitive national security context.

From its very start, FISA's legislative history makes clear that Congress meant to reject secondary civil liability. The initial bills out of both Houses of Congress planned to codify much of FISA, including its civil liability provision, by making changes to the Wiretap Act (the statute providing for domestic surveillance) and cross-referencing those amended provisions in FISA. *See, e.g.*, S. Rep. 95-701 (1978) at 73 (civil damages liability). At the time, the Wiretap Act *did* expressly allow for secondary civil liability, stating that an aggrieved person could recover against one who engaged in unlawful surveillance *or* who "procure[d] any other person to" do so:

> Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, **or procures any other person** to intercept, disclose, or use such communications[.]

18 U.S.C. § 2520 (1968) (emphasis added).  In the face of that provision, both Houses proposed, in their initial bills, *to delete that provision and replace it with one that contained **no** "procure" language*, but instead limited civil liability only to primary violators:

> Any person . . . who has been subject to electronic surveillance, as defined in chapter 120, or whose wire or oral communication has been intercepted, or about whom information has been disclosed or used, in violation of this chapter, shall (1) have a civil cause of action against any person **who so acted in violation of this chapter**[.]

H.R. 7308 (May 18, 1977), at 29-30 (emphasis added); S. 1566 (May 18, 1977) at 39 (emphasis added).[8]  That proposed change remained constant as both bills passed through their respective Houses and were marked up by various committees.  The Senate, for example, referred its bill to two committees: the Committee on the Judiciary, and the Select Committee on Intelligence.  S. 1566 at 1.  Both committees left the provisions regarding civil liability untouched, keeping the removal of the "procure" language and its replacement with primary liability language, even as they proposed amendments to other parts of the bill.  *See* S. Rep. 95-604 (Judiciary Comm., Nov. 15, 1977) at 71-72; S. Rep. 95-701 (Intelligence Comm., Mar. 14, 1978) at 79.  Near the end of the process, the House's Permanent Select Committee on Intelligence ("HPSCI") recommended that FISA be codified in its own title rather than by conforming amendment to the Wiretap Act,

---

[8] The House bill proposed to amend section 2520 by deleting everything "before" subsection 2 (i.e., by deleting subsection 1).  H.R. 7308 at 29.  The Senate bill proposed to do so by deleting everything "below" subsection 2.  S. 1566 at 39.  "Below" is an error that should read "before." There were only two subsection in section 2520, and the Senate bill proposed replacing the deleted subsection with the same new language proposed in the House bill.  Both bills, in other words, proposed amending section 2520 in the same way.

and thus rearranged many of its provisions, including the civil liability provision.  *See* H. Rep. 95-1283 (June 8, 1978) at 12.[9]  In doing so, HPSCI expressly stated that the relocation of the civil liability provision was made "to minimize the multiplicity of cross references to chapter 119" (the home of section 2520), ***not*** to change its meaning.  *Id.* at 97.  The language of its new recommended provision was nearly identical to the language that the original bills had used to replace the "procure" language:

> An aggrieved person . . . who has been subjected to an electronic surveillance or whose communication has been disseminated or used in violation of section 109 shall have a cause of action against any person ***who committed such violation***.

*Id.* at 12 (emphasis added).

The committee of conference that gathered to reconcile the House and Senate versions opted for the House's styling, Conf. Rep. 95-1720 (Oct. 5, 1978) at 34, and Congress thus created FISA's civil liability provision in Title 50.  And the final language was nearly identical to HPSCI's, differing only in its "use and disclosure" wording:

> An aggrieved person . . . who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person ***who committed such violation***.

50 U.S.C. § 1810.  The language of the civil liability provision, in short, originated in Congress's express *rejection* of secondary civil liability.

Subsequent developments would confirm the obvious—that rejecting the Wiretap Act's "procure" language was an express rejection of secondary civil liability.  Because the Wiretap Act was no longer being amended as part of FISA, the "procure" language initially remained in 18

---

[9] The House also referred the bill to the House Judiciary Committee, *see* H.R. 7308 at 1, but that committee appears not to have issued a report on the bill.

U.S.C. § 2520.  But only for another eight years:  In 1986, Congress finished the job and separately removed secondary civil liability from the Wiretap Act as well, as part of the Electronic Communications Privacy Act of 1986 ("ECPA").  *See Kirch*, 702 F.3d at 1247.  It did so by deleting the "procure" language, just as the FISA Congress initially had considered, and replacing it with language that mimicked the final language of FISA, making it a crime to "intentionally intercept" or "intentionally use[]" an electronic communication and creating a civil cause of action only against anyone who "engaged in that violation."  18 U.S.C. §§ 2511(1)(a)-(b), 2520.[10]  And those actions, the Tenth Circuit held in *Kirch*, were an obvious indication from the legislative history that Congress had rejected secondary civil liability in amending the Wiretap Act.  *Kirch*, 702 F.3d at 1247 ("deletion of the 'procures' clause" was presumably "to change the statute's meaning").  So too the identical actions Congress took, ultimately through a different route, in enacting FISA.

The legislative history shows in other ways, too, that FISA allows only for primary civil liability.  In describing the Senate bill (which the House bill had imitated until its rearranging for logistical reasons), the conference report stated that the civil liability provision gave a cause of action to those unlawfully "subject[ed] to electronic surveillance" against "any person *who so acted*."  Conf. Rep. 95-1720 (Oct. 5, 1978) at 33-34 (emphasis added).  Those who "so act," and thus are liable under the statute, are those who unlawfully "subject [another] to electronic surveillance"—*i.e.*, primary actors, not those aiding or abetting them.  That is why the conference report, in the very line Page cites, goes on to identify "intelligence agents,"—i.e., the individuals

---

[10] It also mimicked FISA by requiring that violations be "intentional" (as in FISA) and not merely "knowing" (as they had been under the Wiretap Act prior to the ECPA).  *See Kirch*, 702 F.3d at 1247; H.R. Rep. 95-1283 at 97 (explaining importance of limiting FISA liability to "intentional" rather than "willful" violations).

actually *doing* the surveilling—as the ones subject to "civil liability" under FISA.  *Id.* at 34.  As Clinesmith explained in his Motion, and as Page now effectively concedes, Clinesmith did not do (and is not alleged to have done) any surveilling, or to have used or disclosed the fruits of any such surveilling.

The legislative history also shows that Congress had in mind the concepts of aiding and abetting and conspiracy as it drafted the statute and included those concepts in the text when it wanted to.  *See, e.g.*, S. Rep. 95-701 at 44 (advocating for provisions allowing for surveillance of anyone "who knowingly aids or abets" or "conspires with" those engaged in the primary activities that allow for electronic surveillance).  It further confirms what FISA's text shows—that its drafters consciously applied aiding and abetting concepts when they wanted to do so.

The legislative history further shows that the single line on which Page relies has nothing to do with the *actus rei* that qualify for civil liability under FISA, but rather its *mens rea*.  There's no debate in the legislative history, as far as Clinesmith's counsel is aware, about the kinds of actions that could give rise to civil liability—agreement on that was widespread and consistent from the start, as explained above.  There was, however, sustained focus by HPSCI, right at the end of the process, on the *mens rea* that should be required for criminal liability under FISA.  The Senate version of the bill had allowed for criminal liability so long as an intelligence agent "willfully" violated the statute.  S. Rep. at 95-701 at 75.  In proposing changes to that bill, HPSCI raised the bar and requested that criminal liability lie only where an intelligence agent "intentionally" did so.  The Committee explained:

> The word "intentionally" was carefully chosen.  It is intended to reflect the most strict [sic] standard for criminal culpability.  What is proscribed is an intentional violation of an order or one of the specified provisions, not just intentional conduct.  The Government would have to provide [sic] beyond a reasonable doubt both that the

> conduct engaged in was in fact a violation, and that it was engaged
> in with "a conscious objective or desire" to commit a violation.

H.R. Rep. 95-1283 at 97.  HPSCI, in short, proposed codifying a narrower version of criminal

liability under FISA than normally exists in the criminal law.  And the Conference Committee, in

adopting that recommendation, then stated in its report that criminal and civil liability should

"coincide."  H.R. Rep. No. 95-1720, at 34 (1978).  It had *mens rea* in mind, about which the most

recent mark-up of the bills had suggested an important change; not the *actus rei*, a topic on which

neither House had expressed any disagreement since their initial bills were proposed.  Treating the

Conference Committee's statement as one about the kinds of acts that give rise to liability, rather

than the mental state required, makes it an answer to a question that nobody had asked.  Like so

much else, this line in the Conference Report—which by its terms limits liability to "intelligence

agents" (i.e., primary violators)—was meant to be a narrowing of civil liability under FISA, not

the opposite.

   **C.    The SAC Fails to Plead Any Facts Supporting a Plausible Inference of
          Secondary Civil Liability as to Clinesmith.**

   Even if secondary civil liability were available under FISA (and it is not, for all the reasons

discussed above), the SAC fails to allege *any* facts making it plausible to infer that Clinesmith

acted in concert with anyone in committing the acts identified in the SAC.  It alleges no

involvement by him at all with the first two warrants.  As to the third warrant, it alleges just a

single thing: that he told Page's attorney he "would prefer" if Page didn't speak with the media

about someone named Evgeny Buryakov.  SAC ¶122.  It says nothing about Clinesmith having

done so at anyone's request or even having communicated with anyone about it at all.  Nor are

there any allegations supporting the idea that Clinesmith knew of—let alone supported—the

supposed illegal purpose of those who *had* been involved in the two preceding warrant applications.

So too with the fourth warrant.  The SAC describes the application for that warrant in two places, and both times it identifies just *two* people Clinesmith communicated with about that application:  his contact at the other government agency, and the SSA who asked whether Page was a source.  SAC ¶¶129-32, 188-93.  Neither, of course, are alleged to be wrongdoers here.

Nor does the SAC supply any facts between the third and fourth warrants suggesting that Clinesmith had learned of, and decided to support, some illegal purpose shared by one or more of the other individual defendants here.  It alleges nothing suggesting that Clinesmith himself acted out of political bias (he didn't), that he knew or suspected that political bias motivated the work of *any* other individual Defendant (he didn't), or—most importantly—that he engaged in wrongdoing *to support* that purpose (again, he didn't).  On that, the SAC in fact shows the opposite, because the IG Report that it incorporates, and which Page relies on when it's convenient, *expressly* found no evidence "that political bias or improper motivation influenced the decision" to investigate Page or "to seek FISA authority on Carter Page."  IG Report at iv, vi.  (Indeed, the IG Report found no evidence that political bias or improper motivation influenced any of the actions investigated, full stop.  *See id.*)  And Judge Boasberg mitigated Clinesmith's sentence in part because he (correctly) concluded that Clinesmith genuinely believed that his alteration to the relevant email reflected the *truth* of Page's relationship status with the government.  The SAC, especially in light of judicially noticeable documents, offers no basis from which to infer that Clinesmith's wrongdoing was an attempt to aid and abet anyone; it absolutely was not.

**III.    The *Bivens* Claim Must Be Dismissed on Its Merits as Well.**

Page offers little serious argument in support of his *Bivens* claim.  The truth is that it fails

for multiple reasons.  As Clinesmith explained in his Motion, the claim arises in a new context in

several ways, and therefore fails.  Mem. at 31-33.  Alternative remedies to *Bivens* also exist for

those unlawfully subjected to electronic surveillance, and so the claim fails for that independent

reason.  *Id.* at 33-36, 38-39.  And Page does not plead that Clinesmith *himself* committed a Fourth

Amendment violation, so the claim again fails.  *Id.* at 39-43.  Page offers a smattering of responses

to those points, *all* of which must succeed for his *Bivens* claim to survive.  None of them do.

*First*, Page argues that his *Bivens* claim does not involve a new context because it arises in

"the search and seizure context, which is precisely the context in which *Bivens* arose."  Opp. at 60.

But the Supreme Court, in *Ziglar v. Abbasi*—the very case on which Page chiefly relies here, *see*

*id.* at 58—couldn't have been clearer that whether a context is "new" isn't analyzed at that level

of generality.   *Abbasi* itself identified a non-exhaustive list of seven "differences that are

meaningful enough to make a given context a new one," and which include such granular things

as "the rank of the officers involved" and "the statutory or other legal mandate under which the

officer was operating," 137 S. Ct. at 1859-60—*both* of which make Page's *Bivens* claim different

than the claim in *Bivens.*  See Mem. at 31-33 (identifying those and other factors making this a

new context).  Page offers no argument at all why those granular factors do not make this context

a new one—because there simply is no disputing it in light of *Abbasi*.

*Second*, Page strangely argues that the existence of a comprehensive statutory framework

providing alternative remedies in the electronic surveillance space does not preclude his *Bivens*

claim because he has the right to elect the remedy on which to recover (under FISA or *Bivens*)

should he succeed in establishing liability on both.  Opp. at 60-61.  But a successful plaintiff's

right to elect her remedy at the end of a case has nothing to do with whether a *Bivens* claim *gets off the ground at all* because it arises in a highly regulated sphere.  Yet that is precisely what comprehensive statutory frameworks do—preclude *Bivens* claims from ever getting off the ground.  *See* Mem. at 33-36, 38-39 (discussing cases).  They do so even when alternative recovery *is not possible* in a particular case and thus where there would be nothing to elect between at the end of the case.  *See, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 706-08 (D.C. Cir. 2008).  None of those holdings would make sense if the rule were instead that *Bivens* claims may proceed in the face of alternate potential remedies and simply be subject to election after trial.  Page tellingly cites no case where a plaintiff was in a position to elect between a *Bivens* remedy and some other overlapping remedy.  Nor does he offer *any* argument why FISA (under which he sues), the Patriot Act (under which he sues), the Privacy Act (under which he sues), the Wiretap Act, and the Stored Communications Act do not comprise the kind of highly regulated space that precludes *Bivens* claims.  *See generally* Mem. at 33-36.

*Third*, and consistent with his pivot to amorphous group liability, Page says he need not show that each defendant committed a constitutional violation because *Bivens* allows for supervisory liability (Opp. at 55-57) and joint and several liability (*id.* at 57-58).  But even if supervisory liability under *Bivens* survives *Iqbal*, *see* 556 U.S. at 676, it has no application to Clinesmith, who is not alleged to have supervised anyone.  And, as for joint and several liability, that is a theory for apportioning *damages*, not for establishing a defendant's *liability*, as courts (including the one Page cites) repeatedly have explained in the related context of section 1983 claims.  *See, e.g.*, *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996); Opp. at 57 (quoting *Marin*).  It merely allows, for example, any of several joint tortfeasors to be liable to pay the entirety of a judgment for a harm if one or more of the others are judgment proof.  It is not an

alternative way for a plaintiff to establish liability in the first instance. It therefore does not excuse Page from showing that Clinesmith, "through [his] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. And *that* demonstration is something Page does not even *attempt* to do in his Opposition. He does not, for example, actually argue along the lines required by *Franks v. Delaware* and explain why there would not have been probable cause to issue the third and fourth warrants absent Clinesmith's alleged actions. And he does not dispute the judicially-noticeable evidence showing the opposite—the conclusion of Judge Boasberg, the erstwhile chief judge of the very Court Clinesmith allegedly deceived, that the fourth warrant "may well have been signed and the surveillance authorized" even without the altered email. Mem. at 42, n. 30. Page's only response to *all* of Clinesmith's arguments as to why the SAC fails to plead that he personally violated the Constitution is to improperly pivot to group liability, rather than showing how Clinesmith's "own individual actions [] violated the Constitution." *Iqbal*, 556 U.S. at 676.

## IV. Clinesmith Is Entitled to Qualified Immunity.

Finally, Page cannot meet the "demanding standard" required to carry his burden of demonstrating that Clinesmith violated a clearly-established right under either the Fourth Amendment or FISA. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Clinesmith is entitled to qualified immunity on Page's *Bivens* claim because it's not clearly established that providing an altered document to an officer tasked with certifying facts as part of *yet another* officer's probable cause determination, while *simultaneously* giving him the underlying documents showing whether the alteration was accurate, violates the Fourth Amendment. Mem. at 42 n. 28 (citing IG Report at 250-52). And he is entitled to qualified immunity on Page's FISA claims because even if providing support to those who engage in surveillance were the same as

"engaging in" surveillance (it's not), no court has ever said so, and thus it was not clearly established.  Mem. at 45.  Page responds with two legal errors that fail to defeat immunity.

*First*, as to the *Bivens* claim, Page insists that it's clearly established that "'a police officer'" may not "'make material misrepresentation or omissions to seek a warrant.'"  Opp. at 61 (quoting *Miller v. Prince George's County, MD*, 475 F.3d 621, 632 (4th Cir. 2007)).  But that flouts the rule that "clearly established" "must be defined with specificity."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  Clinesmith's alleged misrepresentation was not made to the official making the probable cause determination.  Moreover—and perhaps more importantly—there is no allegation, nor could there be, of any unadorned material misrepresentation.  Clinesmith altered an email to reflect his genuine understanding of the nature of the relationship between Page and the other government agency.  No more; no less.  In doing so, Clinesmith did not hide the existence of Page's relationship with the other government agency.  Rather, he provided the SSA the underlying documents that would reveal whether his email alteration was correct or not, and he even labeled Page a "subsource" to that same SSA around that same time, thereby acknowledging that Page had had some relationship with the other government agency.  Further, he forwarded the *un*altered email to various other officials, including the actual DOJ attorney tasked with drafting the relevant warrant application and submitting it to the FISC.  Mem. at 42 n. 28 (citing IG Report at 250-52)  In short, while certain unambiguous material omissions may be clearly established as violating the Fourth Amendment, lesser kinds of omissions and misrepresentations are not so established.  *See, e.g.*, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 909-12 (10th Cir. 2020).[11]

---

[11] Nor does an omission that fails to change the probable cause determination violate the Fourth Amendment, and, as Page does not contest, judicially-noticeable documents show that Judge Boasberg, after exhaustive consideration of the evidence, concluded that the fourth warrant may well have issued anyways.  Mem. at 42, n. 30.

*Second*, as to the FISA claims, Page's argument is that Clinesmith is not eligible for qualified immunity because he qualifies for FISA's safe harbor provision.  Opp. at 62-64 (citing *Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998)).  But the plain terms of that provision cover only "law enforcement or investigative officer[s]," 18 U.S.C. § 1809(b), and Clinesmith was neither—he was an attorney tasked with helping those officers in a "support" role.  SAC ¶122.  Attorneys doing attorney things are not law enforcement or investigative officers; if Page wants to establish the counter-intuitive proposition that they are, it is his burden to come up with authority for that.  But the only authority he points to—the conference report's reference to "intelligence agents," Opp. at 62-63—squarely cuts against him, and for the same reason:  No one thinks of attorneys doing attorney things as intelligence agents.  It is simply wrong, and nowhere close to clearly established, that Clinesmith qualifies for the safe harbor provision.

No case suggests that a lawyer in a support role who altered an email that was *not* used in a warrant affidavit (or otherwise presented to the court) somehow "engages in electronic surveillance."  And the evidence incorporated in the complaint, and judicially noticeable by this Court, further shows that Clinesmith did not act out of political bias and indeed believed he was altering the email with a truthful statement.  He intentionally altered the email, but he did not intentionally violate FISA, as required for liability to attach there.  He is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, all claims against Clinesmith should be dismissed with prejudice.

Dated:    April 1, 2022                            Respectfully submitted,

                                                   /s/ Christopher C. Muha
                                                   William Pittard (#482949)
                                                   Christopher C. Muha (#987116)
                                                   Sarah Fink (#166663)
                                                   KAISERDILLON PLLC
                                                   1099 14th St. N.W.
                                                   8th Floor West
                                                   Washington, D.C. 20005
                                                   Phone:  (202) 640-2850
                                                   Fax:  (202) 280-1034
                                                   wpittard@kaiserdillon.com
                                                   cmuha@kaiserdillon.com
                                                   sfink@kaiserdillon.com

                                                   *Attorneys for Kevin E. Clinesmith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2022, a copy of the foregoing was served upon counsel of record through the Court's electronic filing system.

/s/ Christopher C. Muha
Christopher C. Muha
