**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARTER W. PAGE, | |
| Plaintiff, | Civil No.:  20-cv-3460-DLF |
| -v- | |
| JAMES COMEY, ET AL, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF CARTER W.**
**PAGE TO ALTER OR AMEND JUDGMENT PURSUANT TO CIV. R. 59(E) AND FOR**
**RELIEF FROM JUDGMENT UNDER CIV. R. 60(B)**

Plaintiff Carter W. Page ("Dr. Page") by counsel, submits this Memorandum of Law in

support of his "**Motion Of Plaintiff Carter W.  Page To Alter And Amend Final Order Pursuant**

**To Rule 59(e) and for Relief from Judgment Pursuant to Rule 60(B),**" pursuant to Federal Rules

of Civil Procedure 59(e) and 60(b), his constitutional, statutory and other rights at law.

I.      **INTRODUCTION**

A.  **DEFENDANT DOJ'S COVER-UP POSTURE PROVED TO BE**
    **TRANSFORMATIONAL IN MISLEADING THIS COURT: NEW**
    **EVIDENCE OF SEPT. 1 TO SEPT. 13, 2022 IN** *U.S. V. DANCHENKO*  **(E.D.**
    **VA.)**

A primary 1976 U.S. Senate study which led to Congress's original demands for the FISA

statute concluded that, "Covert action programs have been used to disrupt the lawful political

activities of individual Americans and groups and to discredit them, using dangerous and degrading

tactics which are abhorrent in a free and decent society." U.S. Senate, *Intelligence Activities and the*

*Rights of Americans* (Church Comm. Rpt.), Apr. 14, 1976, at 211,

https://www.intelligence.senate.gov/sites/default/files/94755_II.pdf. In light of newly revealed dangerous

and humiliating tactics by the Defendants, the Court should reconsider its order most especially where

material, new information has now been uncovered that the plaintiff could not have previously obtained, particularly from once top secret sources.  Precisely the same circumstance served as a central foundation of the original causal impetus behind Congress' eventual enactment of the FISA statute from this legislation's genesis: "Intelligence officers frequently concealed or misrepresented illegal activities to their own General Counsel and superiors within and outside the agencies in order to protect these activities from exposure." *Id.* at 149.

When Special Counsel John Durham initiated prosecution of Igor Y. Danchenko, the Defendants used this accomplice to illegally apply for surveillance warrants against Dr. Page. Yet, the full extent of the Defendants' related wrongdoing remained largely unknown. *See U.S. v. Danchenko*, Dkt. 1, Nov. 3, 2021 (1:21-cr-00245, E.D. Va.). Defendant DOJ eventually revealed a far greater degree of wrongdoing than that previously known or imagined regarding the Defendants' recruitment schemes behind its severely unlawful conduct. *Id.* at Dkt. 78, Sept. 13, 2022. Available at Exhibit A.

Prior to Sept. 13, 2022, Defendants' misconduct was not known to this Court, to the Plaintiff, or the public. Of course, the Defendants themselves knew these details of Danchenko's full role in Christopher Steele's and the Defendants' fraudulently and unlawfully surveilling Dr. Page. Defendants conducted this litigation before this Court from November 2020 until September 2022 secretly knowing that the Plaintiff's claims were not only true but the real scenario was far worse than ever suspected or pled by the Plaintiff. Only the Court and the Plaintiff remained in the dark.

Danchenko appears in this Court's preceding analysis, but it turns out that Danchenko was actually on the Defendant Federal Bureau of Investigation's ("FBI's") payroll as a confidential human source ("CHS") from March 2017 through October 2020.  Perfectly concurrent with and over the weeks immediately following this court's decision [Dkt. 115, Memorandum Opinion ("Mem. Op."),

Sept. 1, 2022], Defendant U.S. Department of Justice ("DOJ") eventually shocked the nation[1] with this astonishing admission. One of the central heretofore non-parties in the instant case, Igor Danchenko, had in fact been paid to assist each of the Defendants' perpetration of their illegal activities that have remained in controversy in this case. As explained in the filing available at Exhibit A, these belated revelations significantly undercut many of the numerous specific legal findings throughout the Mem. Op. Once purporting to have some remaining level of credibility in their representation of the government, past and present, this unfortunate situation directly stems from the newly revealed reality that the Defendants instead falsely took critical positions throughout the course of this litigation upon which the Court was left to base its decision as further summarized below.

As a starting point, the Mem. Op. does illustrate the prior false information consistently distributed by the Defendants which had successfully hitherto misled this court and all Americans. The citizens adversely impacted included Dr. Page, who personally bore the primary brunt of their astonishing levels of deceit. But the Defendants collectively misrepresented Danchenko's role as a minor actor in these offenses until two weeks ago, in ways memorialized by this court in the Mem. Op.:

> In late January 2017, the FBI, including **Auten and Somma, interviewed Igor Danchenko, one of Steele's sources, for information about Page.** *Id.* ¶¶ 120, 184, 209. The complaint alleges that Danchenko's statements "contradicted or undermined" the allegations that Steele had attributed to him. *Id.* And in March, two FBI agents, including Somma, conducted an "ambush interview" of Page. *Id.* ¶¶ 122, 210. They interviewed him four more times that month, and the information he provided did not support the contention that he was a Russian agent. *Id.* ¶ 121.
>
> The third warrant application was submitted to the FISC on April 7, 2017, again signed by **Comey, who was aware of the results of the Danchenko interview.** *Id.*

---

[1]   *See* Emily Crane, *Main Steele dossier source Igor Danchenko was FBI operative*, N.Y. POST (Sept. 14, 2022), https://nypost.com/2022/09/14/main-steele-dossier-source-igor-danchenko-was-fbi-operative/; Ben Weingarten, *The FBI Paid for Russian Disinformation While Punishing a Patriot*, NEWSWEEK (Sept. 23, 2022), https://www.newsweek.com/fbi-paid-russian-disinformation-while-punishing-patriot-opinion-1745574.

¶¶ 122, 153. The application stated that Danchenko was "truthful and cooperative," but allegedly did not disclose that his answers contradicted Steele's allegations. *Id.* ¶ 121. And it claimed that the requested warrant would "continue to produce foreign intelligence information," even though no such evidence had been revealed in the past six months of surveillance. *Id.* ¶ 123. DOJ has since conceded to the FISC that it lacked probable cause when it sought the third warrant. *Id.* ¶ 119….

The fourth warrant application was submitted to the FISC on June 29, 2017 and signed by McCabe. *Id.* ¶¶ 133, 163. Again, it did not disclose Page's status as a CIA operational contact or the results of the Danchenko interviews. *Id.* ¶¶ 134-135. It also asserted that the warrant would "continue to produce foreign intelligence information," despite, as Page alleges, the lack of any such information produced during the previous nine months of surveillance. *Id.* ¶ 136. DOJ has since conceded to the FISC that it lacked probable cause when it sought the fourth warrant. *Id.* ¶ 127.

Page claims that the defendants, in seeking these four warrants, failed to comply with the FISA statute, FISC rules, and FBI policies. *Id.* ¶¶ 52-62….

Mem. Op. 6-7 (emphasis added).

But instead, and after more than five years of fraudulent concealment, Defendant DOJ began taking steps to belatedly correct the false record which this party and their Co-Defendants created once this Court's Mem. Op. had already been filed. The Mem. Op. filing on Sept. 1, 2002, would suggest to them that their litigation risk had been safely dodged.

This Court further memorialized a few other original false assumptions with which the Defendants had efficaciously misled both this Court and the neighboring FISC forum throughout these past five years:

Auten and Somma were allegedly responsible for that false statement, along with numerous other material omissions. *Id.* ¶¶ 179, 206. Brian Auten was an FBI Supervisory Intelligence Analyst who worked on the Crossfire Hurricane investigation from its start in July 2016 through 2017. *Id.* ¶¶ 33, 175. He helped the agents prepare the applications by reviewing the probable cause sections for accuracy, filling in gaps, and providing information about Steele and his sub-sources. *Id.* ¶¶ 175-176. He "falsely enhanced [Steele's] credibility" by writing the misstatement discussed above and failing to disclose that Steele's colleagues gave negative feedback about his judgment and that some of his reporting was inaccurate. *Id.* ¶¶ 179-181. **In January 2017, he interviewed Danchenko, one of Steele's key**

**sub-sources, and found that he "contradicted key claims in Steele's reports"**; this was not reported to the FISC. *Id.* ¶¶ 184, 209.

Stephen Somma was an FBI counterintelligence investigator and "Case Agent 1" on the Page investigation. *Id.* ¶ 201. He allegedly failed to disclose exculpatory statements from Page and other witnesses that he did not, contrary to Steele's reports, meet with sanctioned Russians. *Id.* ¶ 203. And he misled and withheld information from DOJ attorneys regarding Page's status as a CIA operational contact and Steele's political bias and funding source. *Id.* ¶¶ 205, 207. Like Auten, he "mischaracterized the extent to which the FBI had previously relied on . . . **Steele's prior reporting" and did not disclose that Danchenko contradicted assertions made in the initial FISA application.** *Id.* ¶¶ 206, 209. According to the OIG, Somma was "primarily responsible for some of the most significant errors and omissions in the FISA applications." *Id.* ¶ 32. "Finally, Kevin Clinesmith was an FBI Assistant General Counsel during the Page investigation who provided support to the Crossfire Hurricane team. SAC ¶¶ 28, 122, 185…"

Mem. Op. 3 (emphasis added).

But instead, and as a matter of law, Defendant DOJ has now raised the *ante* by paying for such misrepresentations and unprecedented damage to the Article III judiciary through its failure to disclose. While the nation remained entirely unaware of the incriminatory full truth about Danchenko's actual role, the Defendants knew, even while concealing these essential facts from this Court throughout the course of the current litigation. Yet almost none of the specific individual defendants who led this scheme directly responded to the specific allegations from the Mem. Op.'s otherwise correctly cited sections of the Second Am. Compl. ("SAC"), Dkt. 73 at all, *supra*. For example, *see* Dkts. 85-1, 86-1. For now-understandable reasons following this month's disclosures by Defendant DOJ, neither went so far as to even respond to the allegations in the necessarily limited SAC that suffered from the Defendants' years of stubborn non-disclosure. *See*, as a more recent example, SAC 232-253.  Defendant Comey led the FBI at the time in question and signed off on the false warrant affidavit during precisely this same period, well-protected by his institutional co-defendants. Yet he instead self-assuredly went so far as to mock the lack of information that had so

damaged Dr. Page both in this more recent limitation as well as throughout the years since the former

FBI Director's original offenses while in office. *See, e.g.*, Dkt. 67-3, ¶ 94. Thus, in his Dkt. 87-1 reply

to the SAC, Comey's footnote 9 briefly mentioned: "[n]otably, the Second Amended Complaint does

not explain how the warrant application would have been fatally weakened by indications that a key

source about Russian intelligence activity had a close connection to Russian intelligence." *Id.* at 15.

But during early 2017, he himself led the institutional defendant agency that then paid for this fatal

lack of disclosure which led to such weakening of the Plaintiff's claims on many levels.

In the vast majority of conceivable FISA actions, this court's interpretation is correct that,

"[t]he statute's criminal and civil liability provisions cover those who participate in the acquisition, by

a particular device, of the contents of certain communications sent or received by a targeted person."

Mem. Op. 22. But in the final months preceding enactment of the FISA statute, the other core

legislative intent of this then-new authority also points to an additional directly relevant objective in

parallel. More specifically, the final report of the responsible U.S. House Committee directly warned

against bad actors ***in a supervisory position*** within the intelligence agencies. Just as Defendant FBI

has now been exposed with this month's belated disclosures, one of the main Congressional reports

leading to the enactment of FISA warned of acts that would enable ***supervisory personnel*** – here,

each of the individual defendants – to establish plausible deniability, as has now simarly been seen

throughout recent weeks of this current litigation:

> In reviewing the abuses of the past, it can be seen that **the method used by senior executive branch officials to try to escape responsibility was by establishing "plausible deniability."** As noted by Philip Lacovara, the former Counsel to Watergate Special Prosecutors Archibald Cox and Leon Jaworski, the most effective way to prevent these abuses would be to fix record responsibility on those who authorize foreign intelligence electronic surveillance.
>
> **It appears doubtful that anyone would abuse this authority if a statute provided that:**

(1) all authorizations of surveillance be made in writing.
(2) all written records be maintained and be subject to later inspection by the duly
constituted House and Senate intelligence committees.
(3) **any abuse would subject the guilty party to civil** and criminal **liability**.

*Report: Foreign Intelligence Surveillance Act of 1978*, H. Perm. Sel. Comm. on Intel., June 8, 1978

("HPSCI FISA Rep.") at 119. (emphasis added).

The specific abuses which were disclosed within the past 28 days has now clearly established

precisely what the drafters of this statute had feared. Namely, the Defendants' illicit payments of

Danchenko to keep quiet while granting him extraordinary accommodations which established

"plausible deniability." Until Sept. 13, 2022, they maintained that deniability throughout most of this

civil litigation.

"In 1970, the heads of both agencies signed a document for President Nixon, which correctly

stated that mail opening was illegal, falsely stated that it had been discontinued, and proposed that the

illegal opening of mail should be resumed because it would provide useful results." Church Comm.

Rep. 12.

Accordingly, the pre-enactment Congressional record seen during the first half of 1978

explicitly sought to ensure that senior executive branch officials who tried to escape responsibility as

demonstrated through this month's revelations surrounding the Danchenko case would indeed be held

to account:

> Absent this criminal provision, intelligence agency personnel – **agents and
> supervisors alike** – could intentionally and totally ignore the minimization
> procedures and be **immune from criminal or civil liability.** Moreover, they could
> intentionally destroy records required by the bill to be retained for oversight
> purposes without fear of liability.

HPSCI FISA Rep. at 97 (emphasis added).

Here, the years of payoffs to Danchenko and the misrepresentations to the courts which led to

the efficient cover-up of the true extent of the Defendants' wrongdoing had precisely the same

practical impact as any *de facto* intentional destruction of records would as well. As noted in

*Grunewald v. United States*, 353 U.S. 391, 423-424 (1957): "[w]e are not unmindful that the question

whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of

credibility is usually within the discretion of the trial judge. But where such evidentiary matter has

grave constitutional overtones, as it does here, we feel justified in exercising this Court's supervisory

control to pass on such a question. This is particularly so because in this case the dangers of

impermissible use of this evidence far outweighed whatever advantage the Government might have

derived from it if properly used." These same principles directly apply to the government's illicit

payoff of Danchenko. It had not only grave Constitutional overtones, but also a life-shattering impact

on the safety, security and life of Dr. Page.

Also, speaking to the statutue of limitations claimed by the Institutional Defendants:

Equitable tolling generally has two elements, (successful) concealment by defendant
and diligence by plaintiff, and second, that a defendant who contrives to commit a
wrong in such a manner as to conceal the very existence of a cause of action, and
who misleads plaintiff in the course of committing the wrong, may be found to have
concealed the wrong. This second principle distinguishes between acts that are self-
concealing (such as frauds) and acts where, absent a subsequent act of concealment,
only the perpetrator, but not the fact that a cause of action might exist, would be
unknown (such as a burglary). In the former case, concealment is established by the
nature of the act; in the latter case, additional acts of concealment are required to
trigger the tolling doctrine.

*Hobson v. Wilson*, 737 F.2d 1, 33 (D.C. Cir. 1984).

These additional acts of concealment surrounding the extraordinary payoff involved in the

Danchenko coverup scheme persisted throughout the years of the current litigation until after the

dismissal, throughout which Defendants wrongfully succeeded in misleading the Court. Their most

recent written pleadings of Apr. 1, 2022 (Dkt. 101-11, *et al.*), accepted as true at the time by the

Court, have succeeded in their perennial manner of fundamentally concealing the very existence of any cause of action. The Danchenko revelations following Mem. Op. represent deficient initial steps to correct the record earlier this month.

Yet, the belated disclosure tactics here were by no means immediate. On the very day of this Court's Mem. Op., Defendant DOJ at first filed a "Motion to Seal" much of this information that further exposes the non-disclosure and disinformation tactics which have successfully misled the Court throughout the instant case. *See United States v. Danchenko*, Dkt. 75, Sept. 1, 2022 (1:21-cr-00245, E.D.Va.). *See* Exhibit B. The following day after this Court filed its decision, the District Court for the Eastern District of Virginia granted the motion to seal these inflammatory revelations. *Id.* at Dkt. 76, Sept. 2, 2022.

With the instant case then recently dismissed and the government's civil liability for the Defendants' ostensibly relieved, Defendant DOJ belatedly filed a motion to unseal on Sept. 13, 2022. This document regarding Igor Y. Danchenko whom this institutional Defendant and its agents once again supported – albeit in a substantive rather than a financial capacity in this instance. *Id.* at Dkt. 80.

These tactics do more than just reveal the government's scheme to defraud the FISA Court – a scheme once thought to be more limited than the world now sees. Rather, this court's Mem. Op. decision offers a clear case study of how the Defendants' *continue* to do so. "A person's state of mind is rarely susceptible of proof by direct evidence, so specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence. Courts refer to this inference when, in the common law fraud context, they say that the factfinder is permitted to impute knowledge of the falsity of the statements to the accused, not as a matter of law but as a consequence of inferences reasonably drawn from the facts shown." *United States v. Philip*

*Morris USA, Inc.*, 566 F.3d 1095, 1105 (D.C. Cir. 2009).

While further details remain subject to the discovery requested in this current motion before the court, the Defendants had instead initiated the illicit establishment of this payoff scheme in March 2017. It came just weeks before the April 2017 warrant where the specific objective included this month's newly revealed payoff of money. For example, *see*:

> The federal wire fraud statute makes it a crime to effect (with the use of the wires) "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Similarly, the federal-program fraud statute bars "obtain[ing] by fraud" the "property" (including money) of a federally funded program or entity. §666(a)(1)(A). These statutes are "limited in scope to the protection of property rights," and do not authorize federal prosecutors to "set[ ] standards of disclosure and good government for local and state officials." So under either provision, the Government had to show not only that Baroni and Kelly engaged in deception, but that an object of their fraud was money or property.

*Kelly v. United States*, 140 S. Ct. 1565, 1567 (2020) (citation omitted).

This latest *prima facie* showing of fraudulent statements and conduct regarding the money underhandedly funneled to Danchenko for years by certifying officers as well as other institutitonal associates of the Defendants fits squarely into the specific criteria that Congress once considered in the early development of the government's then-nascent FISA scheme:

> The power of the district court judge to determine the legality of a FISA surveillance is limited in that he is not to make determinations which the issuing judge is not authorized to make. Where the [Act] specifies the scope or nature of judicial review in the consideration of an application, any review . . . is similarly constrained. For example, when reviewing the certifications required by [§ 1804(a)(7)], **unless there is a prima facie showing of a fraudulent statement by a certifying officer, procedural regularity is the only determination to be made if a non-U.S. person is the target, and the "clearly erroneous" standard is to be used where a U.S. person is targeted. <u>Of course, the judge is also free to review the constitutionality of the law itself</u>.**

*FISA: Oversight hearings, Courts, Civil Liberties, and Admin. of Justice Subcomm*., House

Jud. Comm., 98th Cong., first sess., on FISA, June 8-9, 1983 ("FISA Oversight Hearings

Rep.") at 136 (emphasis added).

Accordingly and in the wake of this daring coverup, Dr. Page only had the ability to briefly

speculate in his SAC ¶ 4, that: "[t]he Defendants' conduct, which began not later than August 2016,

and continued through at least Sept. 2017, constituted a fraud on the FISC and violated the

Constitutional and other rights of Dr. Page." By DOJ's own admission, the evidence which this

institutional defendant and their co-defendants covered-up for years through at least Sept. 1, 2022,

and eventually revealed over the weeks since have now established facts that proved even worse than

those originally alleged. Namely, the Defendants' fraudulent conduct in fact continued through at

least October 2020 and indeed by all preliminary indications constituted a fraud on the FISC. In doing

so, they clearly violated the Constitutional and other rights of Dr. Page.

In the FISA statute's early legislative history, Congress had remained apprehensive of some

provisions of 50 U.S.C. § 1810:

> Although FISA does authorize civil suits for damages resulting from a violation of
> its terms, few suits will result if the aggrieved persons do not receive notice of the
> surveillances. In short, what FISA gives us is a court order issued after an *ex parte*,
> in camera hearing that, in almost all cases, will never be tested by adversary
> challenge.

FISA Oversight Hearings Rep. at 129.

Here, and in light of the recent Danchenko revelations, this first ever substantive test of the

civil remedies explicitly mandated by Congress in the FISA statute warrants a more complete

consideration of the actual wrongdoing which in fact occurred.

This Court suggests that: "[i]t is unclear from the complaint what investigative steps, if any,

Dr. Page took or could have taken after April 2017." *See* Mem. Op. at 18. But the new evidence now

subsequently admitted by DOJ displays why all such efforts as briefly summarized in SAC ¶¶ 238-250, led to a factual vacuum that prevented a more detailed pleading earlier. No such shocking reality could have been raised prior to the court's Mem. Op. decision on Sept. 1, 2022.

In an analogous federal statutory context and relevant to the now revealed federal contractor Danchenko, the government's cover-up carries substantial implications. The Supreme Court has stated: "[o]ur textual analysis of §1514A fits the provision's purpose. It is common ground that Congress installed whistleblower protection… as one means to ward off another Enron debacle. S. Rep., at 2-11. And, as the ARB observed in Spinner, '**Congress plainly recognized that outside professionals—accountants, law firms, contractors, agents, and the like—were complicit in, if not integral to, the shareholder fraud and subsequent cover-up** [Enron] officers . . . **perpetrated**.'" *Lawson v. FMR LLC*, 571 U.S. 429, 447 (2014) (internal citations omitted).

On April 1, 2022, the government suggested in their falsely pled original Motion to Dismiss: "[i]n short, not only has Plaintiff failed to allege that any specific disclosure caused any specific injury, he likely cannot do so in light of other public information available both before and after the allegedly unlawful acts." ECF No. 67-1, at 43. This month's shocking revelations finally disclosed by the DOJ displays in stark relief why the "public information" that the government has thus far successfully encouraged the Court to rely upon was in fact Russian disinformation *itself*. Any such disclosures "before and after" were disclosures by the same Defendants themselves, and their agents, and thus part of the same on-going scheme.

The investigation that led to the FISA statute acknowledged the longstanding Article III tendency, which has this month been experienced in this civil action as well: "[m]ost domestic intelligence issues have not reached the courts, and in those cases when they have reached the courts, the judiciary has been reluctant to grapple with them." Church Comm. Rpt. 6.  DOJ's shocking new

admissions and procedural tactics in the 28 days since Mem. Op., including the disclosure of previously unimaginable increased levels of criminal activities by the Defendants and their accomplices, requires the court to fully grapple with the unsettled areas of law now first considered for the first time in a FISA statute context.

## B. SUMMARY OF RELIEF REQUESTED

Plaintiff moves the Court to alter and/or amend the final order, including:

A.  Suspending the finality of the Sept. 1, 2022, order.  Although this should be an automatic consequence of filing a Rule 59(e) Motion, the certainty and confidence of memorializing it in writing would be appreciated.

B.  Reinstate this civil action as an active, open case, to allow the Court to correct mistakes of fact and law governing the Plaintiff's Causes of Action stemming in significant part from the Defendants' newly admitted and disclosed "lies [that] were highly relevant and material to the FBI", [Exhibit A, at 5].

C.  Consistent with the Court's several discussions within the Mem. Op. of the problem of any plaintiff being able to learn sufficient details to plead the relevant causes of action, Plaintiff moves the Court to authorize the Plaintiff's targeted, discovery limited on the questions necessary to decide the Motions to Dismiss. The Plaintiff now formally moves the Court to do so. The Plaintiff therefore asks the Court to reverse its Mem. Op. for Plaintiff to have the opportunity for such targeted discovery. As the Court commented and as is discussed below, this sort of circumstance is unique in that nearly all of the facts are held privately by the Defendants, not only as a government agency but in circumstances of exceeding secrecy.

D.  Alter and/or amend Mem. Op. to grant for Plaintiff leave to amend his SAC. Particularly, where the Court acknowledges in expansive terms the seriousness of the Defendants'

misconduct, largely admitted, and the unusual nature of the asserted reasons for dismissing the lawsuit, the Court should allow amendment. The Court dismissed claims without prejudice against re-filing but then directed the case to be closed.  To the extent that the Court depends upon the Plaintiff to explicitly request leave to refile, the Plaintiff does make that request now.

## C.      BACKGROUND

Since the establishment of the secret Foreign Intelligence Surveillance Court ("FISC") in 1978, legal scholars of varying backgrounds have criticized the concept as a plain violation of Article III of the United States Constitution that functions as a one-sided "Star Chamber"-esque platform for government abuse.[2]  But the FISC's secret proceedings, motions, and rulings were always sealed, and there was never any way for the public to know whether these concerns and predictions were valid.

Now, however, in the only case in which FISC warrant affidavits, related proceedings, motions, and rulings have been made public, it is clearly apparent that the aforementioned criticisms sorely underestimated the severity of FISC's Constitutional violations.

This case involves an FBI lawyer who made a false statement in seeking a secret Foreign Intelligence Surveillance Act of 1978 ("FISA") search warrant. Furthermore, Defendant Clinesmith (and perhaps other individuals) intentionally altered Central Intelligence Agency ("CIA") emails, which originally identified Dr. Page as a CIA source, to instead state that Dr. Page was not a CIA source. Through these efforts, the individual FBI Defendants contrived a fairytale to justify illegal surveillance of Dr. Page. Extensive proof shows that FBI leadership, including Defendant Comey and other individual Defendants, knowingly presented a false narrative of Trump-Russia collusion for a

---

[2]  "This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *ACLU v. Nat'l Sec. Agency / Central Sec. Serv*., 438 F. Supp. 2d 754, 775-776. (E.D.Mich. 2006) (citations omited).

period of years to the public and within congressional hearings in which numerous agents testified to the narrative under oath. Further proof demonstrates that political operatives in Washington, effectively laundered thousands of dollars under the guise of "legal services" to create a fabricated dossier. *See, e.g.*, SAC ¶¶ 91-100. But with this month's Danchenko payoff admissions by Defendant DOJ and with these new *prima facie* realities exposed, the vastly underestimated deception and potential strata of fraudulent acts inherent in that extensively pled original guise has now grown infinitely worse.

## II.     LEGAL STANDARD

A Rule 59(e) motion may be granted if the moving party demonstrates any of the following: (1) the judgment was based upon a manifest error of law or fact; (2) there is newly discovered or previously unavailable evidence; (3) to prevent manifest injustice; and (4) there is an intervening change in controlling law. *See* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed. 1995).

As the U.S. Supreme Court explained as a component part of *Banister v. Davis,* 590 U. S. ____ (June 1, 2020), Record No. 18–6943:

> Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing so is short—28 days from entry of the judgment, with no possibility of an extension. See Fed. Rule Civ. Proc. 6(b)(2) (prohibiting extensions to Rule 59(e)'s deadline). The Rule gives a district court the chance "to rectify its own mistakes in the period immediately following" its decision. *White v. New Hampshire Dept. of Employment Security*, 455 U. S. 445, 450 (1982). In keeping with that corrective function, "federal courts generally have [used] Rule 59(e) only" to "reconsider[] matters properly encompassed in a decision on the merits." *Id.*, at 451. In particular, courts will not address new arguments or evidence that the moving party could have raised before the decision issued. *See* 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2810.1, pp. 163–164 (3d ed. 2012) (Wright & Miller); accord, *Exxon Shipping Co. v. Baker*, 554 U. S. 471, 485–486, n. 5 (2008) (quoting prior edition). The motion is therefore tightly tied to the underlying judgment. The filing of a Rule 59(e) motion within the 28-day period "suspends the finality of the

original judgment" for purposes of an appeal. *FCC v. League of Women Voters of Cal.*, 468 U. S. 364, 373, n. 10 (1984) (internal quotation marks and alterations omitted).

The Mem. Op.'s wording leaves some doubt about its finality in that most of the Causes of Action were dismissed without prejudice yet without customary language that a party may amend. The Order directs the Clerk to close the file. Therefore, the Plaintiff treats the September 1, 2022, Order as a final order of dismissal as a matter of caution.

Further, relief is warranted under Fed. R. Civ. P. 60(b). Specifically, the extraordinary lengths to which these Defendants have traveled to perpetrate this fraud clearly warrant such relief under the Plaintiff's newly discovered evidence pursuant to Rules 60(b)(1) regarding the mistakes described herein, Rule 60(b)(2) as it relates overall to the newly discovered Danchenko evidence, Rule 60(b)(3) with respect to the Defedants' fraud pursuant to *Kelly v. United States*, 140 S. Ct. 1565, 1567 (2020), and Rule 60(b)(6) given Dr. Page's clear showing of severe inequity and hardship in light of these new Danchenko revelations.

## III.    ARGUMENT

### A.    THE DEFENDANTS' FALSE STATEMENTS AND COVER-UP PLAYED A CENTRAL ROLE IN THE COURT'S DECISION, ALTHOUGH THIS MAY BE REMEDIED BY AMENDMENT

Here, the deceit from the Defendants in the form of their false and misleading pleadings (and associated cover-up) led the Court to construe allegations in the light most favorable to the government. For example, the significant lack of information on the full scope of the Defendants' fraudulent activities and political kickback schemes as filed throughout this action led the Court to determine that Dr. Page had not alleged that any of the individual Defendants "personally conducted the surveillance or acquired or collected his communications." Mem. Op at 29. Yet, this is simply not

known by Plaintiff, and in fact is knowable only by the Defendants. Perhaps James Comey actually *did* personally connect wires and pushed the buttons. We do know he ordered that it be done.

Furthermore, and as this court has noted in *Jacksonville Urban League, Inc. v. Azar*, the Plaintiff has a due process right to cure imperfections in his complaint and file an amended complaint. Fed. R. Civ. P. 15(a)(2). Here, it is entirely possible that Defendant Comey and other individual Defendants did listen to Dr. Page's communications via electronic surveillance. However, Dr. Page would have no way to know who electronically surveilled him without conducting discovery. Dr. Page is entitled to limited, targeted discovery to uncover this information.

Especially in light of the new levels of deceit that has been exposed this month, the Court should permit the Plaintiff the opportunity to take targeted discovery and to amend.

## B.  NEWLY DISCOVERED INFORMATION, REVEALED AFTER THE ISSUANCE OF THE COURT'S ORDER, JUSTIFY RELIEF UNDER RULES 59 AND 60

Mere days after the Court issued its order dismissing Dr. Page's lawsuit, a revelation arose that Igor Danchenko became a paid FBI informant in March 2017 – months after the federal government began questioning him regarding his involvement in the Steele Dossier.[3]

Before this revelation, Dr. Page knew that the individual FBI Defendants concocted and fabricated a scheme with which to violate his rights and to spin a false narrative that former-President Trump "colluded" with the Russian government to, somehow, win the 2016 presidential election. Now, Dr. Page also understands that the individual FBI Defendants deliberately put one of the fabricators of the Steele Dossier on FBI payroll in order to keep him quiet and further cover up the individual FBI Defendants' misdeeds.

---

[3] *See* Emily Crane, *Main Steele dossier source Igor Danchenko was FBI operative*, N.Y. POST (Sept. 14, 2022), https://nypost.com/2022/09/14/main-steele-dossier-source-igor-danchenko-was-fbi-operative/.

Special Prosecutor John Durham's ongoing prosecution of Danchenko includes evidence that Danchenko alerted and informed the individual FBI Defendants of the falsity of the Steele Dossier. However, instead of dropping and relinquishing the FBI's false claims and correcting the public messaging due to these developments, the FBI continued the coverup and made it much worse.

As was partially documented in December 2019 with the Defendant DOJ's FISA Abuse report, the newly revealed payoff scheme to defraud was quickly followed by the Third FISA Warrant of April 7, 2017. SAC ¶ 268. This future-contemplated action continued the Defendants' scheme to defraud with the Fourth FISA Warrant that they convinced the FISC to issue on June 29th, 2017. *Id.* at 272.[4]

In a letter sent to Defendant FBI not long before the filing of Plaintiff's complaint, the Chairman of the U.S. Senate Committee made yet another attempt to expose the cover-up related to the crimes committed against Dr. Page:

> On August 6, 2020, the Senate Homeland Security and Governmental Affairs Committee (HSGAC) subpoenaed the FBI for all records related to the Crossfire Hurricane investigation, which requires that records actually be produced to the Committee, not merely made available for review in a reading room. We have waited nearly 70 days to receive these text messages, and when records were actually produced, we received only eight percent of what we know exists. Moreover, on September 24, 2020, we requested the production of text and Lync messages for several other individuals involved in the Crossfire Hurricane investigation but, to date, we have not received a single message. It is simply unacceptable that we have waited so long to receive so little.[5]

Yet the Constitutional and statutorily mandated rights of Dr. Page through the use of the

---

[4] The individual characteristics of the Danchenko payoff scheme runs parallel to several key elements of the mail fraud statute: "(T)he mail fraud statute is violated when some or all of the following factors are present: **a duty to disclose an interest with a concomitant failure to do so; An attempt to cover-up through false pretenses; a taking of money or property or rights of another through the use of kickbacks, extortion, bribery, tax evasion, perjury, or violation of some state or federal statute**; a use of the United States mails." *United States v. Diggs*, 613 F.2d 988, 998 (D.C. Cir. 1979) (emphasis added).

[5] **https://www.hsgac.senate.gov/imo/media/doc/2020-10-12%20CEG%20RHJ%20to%20FBI%20(McCabe%20Texts%20Failure%20to%20Produce).pdf**.

Defendants' kickback scheme to Danchenko remained covered up until weeks ago.

Among the individual Defendants, the month after the end of Defendant FBI and their co-defendants successful cover-up through false pretenses ended, Defendant McCabe who had long taken extraordinary measures to avoid his duty to disclose testified:

*Senator Kennedy:* Do you know who Igor Danchenko is?

*Andrew McCabe:* I do not.

*Senator Kennedy:* You have no idea who that is, even today?

*Andrew McCabe:* I am not going to speculate as to who he is.

*Senator Kennedy:* Well, he was the sub source that the Steele dossier was based on… So you're telling me, I'm want to be sure I understand. You're the assistant director of the FBI. You've decided to investigate the Trump campaign. You get this dossier, which whether you admit it or not was the basis for all the FISA warrants. You never sat down and so I want to talk to Chris Steele. If you had talked to Chris Steele, you would have found out that his sub source was Igor Danchenko. That was his primary sub source. Danchenko wasn't from Russia. He was some guy in Washington, DC working for Brookings. He went to University of Louisville. He went to Georgetown. He was buddies with Dr. Fiona Hill. He was relying on his drinking buddies. Why didn't all of you folks who are running the show say, wait a minute, this is all centered around Chris Steele, we better talk to Steele and we better talk to this guy, Danchenko?

*Andrew McCabe:* Senator, it's important that I get this out. So if you could give me just a second.

*Senator Kennedy:* Sure.

*Andrew McCabe:* I am not sure that the … I have now read the report of the sub source interview and the interviewee's name is still redacted in that report. So I do not feel comfortable acknowledging or confirming or denying any identity that might be associated with that person.

These shocking revelations since the Mem. Op. constitute newly discovered information and evidence justifying a stay and an order vacating and setting aside the Court's Order under Rules 59 and 60.  These new revelations further support the appropriateness and necessity of leave to amend

the Plaintiff's Complaint and for limited, targeted discovery. Leave to amend a complaint under Rule 15(a) "shall be freely given when justice so requires." FED. R. CIV. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962). Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as "undue delay, bad faith or dilatory motive … repeated failure to cure deficiencies by [previous] amendments … [or] futility of amendment." *Foman*, 371 U.S. at 182; *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

## C.     DISMISSAL OF FISA CAUSES OF ACTION 1, 2, 3, 4

The Mem. Op. carefully considers the statute of limitations objections of the Defendants to Page's FISA claims, but did not adopt those objections.  The Opinion carefully discusses many aspects of Page's Causes of Action 1, 2, 3, and 4 concerning violations of FISA.

However, the Court's dismissal of these four Causes of Action turns on the question of whether the Defendants who set in motion the unlawful surveillance of Page did not "engage in" unlawful electronic surveillance by orchestrating, planning, insisting upon, and ordering it to be done.

The intent of Congress, however, as shown in legislative history demonstrates the Defendants should be liable. The core legislative intent of the FISA statute also points to a more directly relevant objective in parallel, as highlighted in the final report of the responsible U.S. House Committee which directly warned against bad actors in a supervisory position within the intelligence agencies such as Defendant FBI as has been exposed with this month's belated disclosures which enable each of the Defendants to establish plausible deniability throughout the early years of this litigation:

> **the method used by senior executive branch officials to try to escape responsibility was by establishing "plausible deniability."**

> (3) **any** **abuse would subject the guilty party to civil** and criminal **liability**.

HPSCI FISA Rep. at 119 (emphasis added).

The pre-enactment Congressional record seen during the first half of 1978 explicitly sought to ensure that senior executive branch officials who tried to escape responsibility as demonstrated through this month's revelations surrounding the Danchenko case would indeed be held to account:

> "Absent this criminal provision, intelligence agency personnel – **agents and <u>supervisors</u> alike** – could intentionally and totally ignore the minimization procedures and be **immune from criminal or civil liability.**

*Id.* at 97.

Dr. Page respectfully disagrees that the phrase "engage[] in electronic surveillance" can be so narrowly limited to only those who physically activate the machinery. Dr. Page suggests that this narrow reading is in conflict with the meaning of the statute as a whole. It also runs afoul of the interpretive rule that it leads to an unreasonable result – that those most culpable escape liability while those lowest on the food chain who are following their orders are the only ones answerable. This cannot be what Congress intended as being in conflict with the purpose of the statute. *United States v. Providence Journal Co.*, 485 U.S. 693, 708, 710 (1988) (Stevens, J., dissenting).

Statutory interpretation requires reading the entire statute as a whole and harmonizing individual provisions with the intent of the statute as a whole.

> Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme— because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Savings Ass'n v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 371 (1988) (citations omitted).

FISA is not about operators of surveillance machinery. It is about the overall invasive search and seizure of a target's confidences. It cannot be that Congress intended to expose only the low-level

underlings who push buttons and connect wires while letting those who order them to do so and set the unlawful surveillance in motion escape responsibility. The Mem. Op. finds it persuasive that:

> If it were understood expansively to encompass the entire FISA surveillance process, the statute could presumably provide liability for many different actors: those who took part in the decision to surveil (with or without a warrant), the preparation and submission of the warrant application (if any), and the collection of the communications, among other things. But text, structure, and context point toward a much narrower reading.

Mem. Op at 22.

Dr. Page respectfully submits that this is not what Congress intended. First, of course, the statement is over-expansive. What is at stake is clearly not "to encompass the entire FISA surveillance process" – only those actually responsible. The question at hand is not about the entire personnel of every agency related to FISA. The question at bar is for those who actually ordered or participated in these specific acts of unlawful surveillance, knowing or having reason to know that their actions were a violation of the laws. The Government and the Court have conceded that most or all of the Defendants actually did, in fact, break governing law.

So the interpretive question before us is whether those who actually broke the law and/or gave the orders in this specific case are liable. It is not aimed "to encompass the entire FISA surveillance process." The operative characteristic is not someone related to the FISA process, bur rather those who actually caused or ordered the unlawful surveillance against Page in particular. Holding those specific people liable is neither a result to be avoided nor in conflict with Congress' intent.

Meanwhile, it is well-established that a peson who is a "substantial factor in bringing about the harm" is treated legally as a participant:

> The dispatchers' conduct counts as a cause-in-fact of Goolsby's injuries if it was a "**substantial factor** in bringing about the harm." *District of Columbia v. Carlson, 793 A.2d 1285, 1288 (D.C. 2002)* (quotation omitted). Taking Goolsby's factual allegations as true, it would be strange to say that the inaccurate information relayed

by the dispatchers was not a substantial factor in his ultimate injuries. Had the dispatchers not reported an attempted robbery, it is unlikely that the officers would have approached Goolsby in the first place. Moreover, even assuming that the officers would have approached Goolsby regardless of the dispatchers' mistake, the officers may have responded in a less aggressive and frightening manner—and Goolsby would not have fled nor been arrested in the rough manner he alleges. <u>See</u> Pl's Opp. at 15-16. Therefore, the Court cannot say that the facts pled by Goolsby fail to establish cause-in-fact.

*Goolsby v. District of Columbia*, Civil Action No. 2016-2029 at 6 (D.D.C. 2019).


### D.   THE COURT FOUND THAT THE JOHN DOES 1-10 COMMITTED ILLEGALITIES, AND THEN DID NOT PERMIT PLAINTIFF TO FIND OUT WHO THE DOE DEFENDANTS ARE

The Court interpreted the Plaintiff's Complaint as lacking specifics which the Court also commented would be difficult or impossible for any plaintiff to know about activities from within a government agency or agencies, especially secret ones.

The extraordinary circumstances here and associated payoffs revealed by Defendant DOJ this month mandate application of the "good cause" standard for allowing discovery prior to a Rule 26(f) conference. as this jurisdiction has consistently applied in precedent such as and its progeny:

> A plaintiff who seeks to conduct expedited discovery prior to the Rule 26(f) Conference in order to learn the identity of putative defendants is in essence seeking jurisdictional discovery . . . Federal Rule of Civil Procedure 26(d) explains that parties may generally seek discovery only after a Rule 26(f) conference, "except . . . when authorized by . . . court order." . . . . To determine whether to authorize discovery prior to a Rule 26(f) conference in a particular case, this district has applied a "good cause" standard.

*Malibu Media, LLC v. Doe*, 64 F. Supp. 3d 47, 48-49 (D.D.C. 2014). The subsequent related decision in *Malibu Media, LLC v. Doe*, 2019 U.S. Dist. LEXIS 154469, *2 (D.D.C. 2014) held that: "[g]ood cause to take discovery prior to the Rule 26(f) conference exists where the discovery is necessary 'before th[e] suit can progress further.'"

Here, under the Court's reasoning, further discovery is crucial to identifying the individuals who "engaged in" the mechanics of the FISA surveillance of Dr. Page before the case can progress further.

As now-revealed this month, the disinformation tactics in which Defendant FBI and its leadership engaged closely parallel many of the same disinformation tactics that led Congress to create the FISA statute:

> A distressing number of the programs and techniques developed by the intelligence community involved transgressions against human decency that were no less serious than any technical violations of law. Some of the most fundamental values of this society were threatened by activities such as the smear campaign against Dr. Martin Luther King, Jr., the testing of dangerous drugs on unsuspecting American citizens, the dissemination of information about the sex lives, drinking habits, and marital problems of electronic surveillance targets, and the COINTELPRO attempts to turn dissident organizations against one another...

Church Comm. Rep. at 140.

More directly applicable to the current case, this also cuts straight to the explicit expectations of Congress in their response to Watergate, which directly led to the FISA statute:

> We believe that the courts will be able to fashion discovery procedures, including inspection of material in chambers, and to issue orders as the interests of justice require, to allow plaintiffs with substantial claims to uncover enough factual material to argue their case, while protecting the secrecy of governmental information in which there is a legitimate security interest.

*Id.* at 337. *See also* Brooke Singman, Jake Gibson, and David Spunt, *Durham moves to admit evidence in Danchenko trial that may discredit Trump Ritz-Carlton Moscow allegations*, FOX NEWS, Sept. 13, 2022, https://www.foxnews.com/politics/durham-moves-admit-evidence-danchenko-trial-may-discredit-trump-ritz-carlton-moscow-allegations.

Thus, Congess unambiguously decided and expected that the Article III courts would serve as the branch responsible for fashioning discovery procedures that would allow plaintiffs such as Dr. King

and Dr. Page with substantial claims to uncover enough factual material to argue their case. Church

Comm. Rep. at 140. Instead, and as Defendant DOJ finally admitted 12 days after the Mem. Op., the

reason for the illicit payoff and coverup was to disguise their high profile nationwide political smear

campaign.

Particularly where the FISC and this Court have acknowledged the "deeply troubling" nature

of the Government's conduct and made determinations explicitly based on a perceived lack of detail

in the Complaint (Mem. Op. 52), where no Plaintiff could know the internal details within the

Government claimed to be lacking, the Court should reinstate the case and allow for limited, targeted

discovery prior to making a final decision on whether to dismiss Dr. Page's claims.

Specifically, the list of requested discovery items should include without limitation:

1)  The identities of all "John Does" or "Jane Does" whose personal conduct the Plaintiff identified

    as fulfilling the roles of the unlawful collection of surveillance.

2)  What exactly the Defendants and their remunerated political consultants including Danchenko

    disclosed to journalists or others from the information unlawfully collected from surveillance of

    Carter Page, not merely what appeared in news articles.

3)  Who participated in the unlawful surveillance of Page, including government officials and outside

    political consultants such as Danchenko.

4)  What did the Defendants know about the partisan, political motivations of the surveillance of

    Page for the purpose of promoting an election campaign victory for their preferred candidate,

    amongst other illicit objectives.

### E.      PRIVACY ACT: DISCLOSURE VIOLATIONS

With regard to the FBI, DOJ, and United States ("Institutional Defendants"), the Court

dismissed Cause of Action Eight with respect to disclosure violations on statute of limitations

grounds: "[i]n sum, Page's complaint shows that he knew of the alleged disclosure violations in April 2017, yet he did not file suit until November 2020." Mem. Op. 52. The Court suggested that:

> Accordingly, by April 11, 2017, Page knew that he was subject to surveillance by the FBI and DOJ, and he suspected that the allegations, and the ensuing warrants, were baseless.

Mem. Op. at 16.

Again, nearly transpiring in perfectly concurrent timing with the Defendants' illicit hiring of the political consultant Danchenko, the original facts alleged in this action pale by comparison to the full wrongdoing that Defendant DOJ has now made apparent. A person can be aware that they are being investigated, and yet have no knowledge that the investigation is fraudulent and transcending nearly every corner of one's life. The fact that Dr. Page may have "suspected" that "the allegations, and the ensuring warrants, were baseless" seems the same as a "hunch" that the D.C. Circuit and this Court view as insufficient to start the clock. *Id.* at 16-17.

This month's Danchenko debacle is reflective of the nearly complete lack of credible and reliable information over the course of the past six years relating to the surveillance of Dr. Page. Defendant DOJ has now presented a new story this month in the form of their belated admissions regarding the government's payoff of Danchenko, as found in Exhibits A & B. But the *Washington Post's* publication of their April 2017 FISA cover story offered no basis standing alone to make Dr. Page aware he had a viable Privacy Act claim. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

Similar to Defendant DOJ just changing their fundamental Danchenko story this month, their pleadings of last year in Dkt. 67 and associated Exhibits further demonstrate how their FISA-related

disinformation tactics have long remained in place without remedy.  During the Congressional investigations following the *Washington Post's* April 2017 FISA cover story, the two competing interpretations of the members of the respective Congressional Intelligence Committees demonstrate the success of the government's deceitful yet successful pattern of half-truths regarding this subject matter. On the one hand, Dkt. 67-9 presents one interpretation from then-House Intelligence Committee Chairman Devin Nunes. It offered Dr. Page some shred of hope that a viable claim might eventually accrue.

On the other hand, and released soon thereafter in February 2018, Dkt. 67-11 from then-House Intelligence Committee Ranking Member Adam Schiff painted an entirely different picture: "FBI and DOJ did <u>not</u> 'abuse' the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign. In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page…" *Id.* at 2. (emphasis in the original). Congressman Adam Schiff had access to Top Secret information which Dr. Page did not (although he once had such clearance levels during his service as a U.S. Naval officer).

In conclusion and once their extensive illegitimate damage to this landmark civil litigation had been successfully achieved, it would take Defendant DOJ more than *four years* to eventually admit that the FBI had in fact "omit[ted] material information" after all.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff respectfully requests the Court grant Plaintiff's motions, including by permitting limited discovery as set forth herein and granting leave to amend.


Date: September 29, 2022                    Respectfully Submitted,


                                            /s/ John M. Pierce

                                            John M. Pierce
                                            Bar ID: CA00096
                                            21550 Oxnard Street
                                            3rd Floor, PMB #172
                                            Woodland Hills, CA 91367
                                            Tel: (213) 400-0725
                                            Email: jpierce@johnpiercelaw.com
                                            Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed on this September 30, 2022, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

Amisha R. Patel, Esq.
Email:  amisha.patel@dechert.com
Dechert, LLP
1900 K Street, NW
Washington, DC 20006
*Counsel for James B. Comey*

David N. Kelley, Esq.
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone:  212-698-3500
Email:  david.kelley@dechert.com
*Counsel for James B. Comey*

Stormie Mauck, Esq.
DECHERT, LLP
2929 Arch Street
Cira Center
Philadelphia, PA 19104
Telephone:  215-994-2516
Email:  stormie.mauck@dechert.com
*Counsel for James B. Comey*

Brigida Benitez, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202) 429-6261
Email:  bbenitez@steptoe.com
*Counsel for Andrew McCabe*

William Bullock Pittard, IV, Esq.
Telephone:  (202) 640-2850
Email:   wpittard@kaiserdillon.com
Christopher Muha, Esq.

Telephone:  (202) 640-2850
(202) 280-1034 (fax)
Email:  cmuha@kaiserdillon.com
Sarah Renee Fink, Esq.
Telephone:  (202) 640-2850
Email:  SFink@kaiserdillon.com
KaiserDillon PLLC
1099 14th Street NW
8th Floor West Suite 800
Washington, DC 20005
*Counsel for Kevin Clinesmith*

Aitan Dror Goelman, Esq.
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone:  (202) 778-1996
(202) 822-8106 (fax)
Email:  agoelman@zuckerman.com
*Counsel for Peter Strzok*

Dorothy Ames Jeffress, Esq.
Telephone:  (202) 942-5968
(202) 942-5999 (fax)
Email:  amy.jeffress@aporter.com
Kaitlin Brooke Konkel, Esq.
Telephone:  (202) 942-5757
(202) 942-5999 (fax)
Email:  kaitlin.konkel@arnoldporter.com
Robert J. Katerberg, Esq.
Telephone:  (202) 942-5000
(202) 942-5999 (fax)
Email:  robert.katerberg@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001
*Counsel for Lisa Page*

James Koukios, Esq.
Telephone:  202-887-1590
202-887-0763 (fax)
Email:  JKoukios@mofo.com
Vanshika Vij, Esq.

Telephone:  202-887-1558
202-887-0763 (fax)
Email:  vvij@mofo.com
Robin A. Smith, Esq.
Telephone 202-247-1481
Email:  rsmith@mofo.com
Morrison & Foerster LLP
2100 L Street NW, Suite 900
Washington, DC 20037
*Counsel for Joe Pientka III*

Andrew Robert Hellman, Esq.
Telephone:  202-383-5300
Email:  andrewhellman@omm.com
Meaghan VerGow, Esq.
Telephone:  (202) 383-5300
(202) 383-5414 (fax)
Email:  mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
*Counsel for Stephen Somma*

Brian Matthew Heberlig, Esq.
Telephone:  (202) 429-3000
(202) 429-3902 (fax)
Email:  bheberlig@steptoe.com
Patrick Francis Linehan, III, Esq.
Telephone:  (202) 429-8154
(202) 429-3902 (fax)
Email:  plinehan@steptoe.com
James Martin Hobbs
Telephone:  202-429-8179
Email:  jhobbs@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036
*Counsel for Brian J. Auten*

Brigada Benitez, Esq.
Email:  bbenitez@steptoe.com
Lisa M. Southerland
Email:  lsoutherland@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Ave., NW

Washington, DC 20036
Telephone:  (202) 429-6261
*Counsel for Andrew McCabe*


Elizabeth Murray Tulis, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone:  (202) 514-9237
(202) 616-8470 (fax)
Email:  elizabeth.tulis@usDOJ.gov
*Counsel for U.S. Department of Justice*
*and the Federal Bureau of Investigation*

Amy E. Powell, Esq.
U.S. Department of Justice
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:  (919) 856-4013
Email:  amy.powell@usDOJ.gov
*Counsel for U.S. Department of Justice*
*and the Federal Bureau of Investigation*
*and the United States of America*

**Kristin McGrory**
DOJ-CIV
Torts Branch - FTCA
PO Box 880, Ben Franklin Station
Washington DC, DC 20044
Telephone:  202-616-4206
E-mail:   kristin.b.mcgrory@usDOJ.gov
*Counsel for the United States of America*

_____
                    John M. Pierce