# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARTER W. PAGE,

        Plaintiff,

-v-

JAMES COMEY, ANDREW MCCABE,
KEVIN CLINESMITH, PETER STRZOK,
LISA PAGE, JOE PIENTKA III,
STEPHEN SOMMA, BRIAN J. AUTEN,
DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION,
UNITED STATES OF AMERICA, JOHN
DOES 1-10, JANE DOES 1-10,

        Defendants.

Civil No.:   20-cv-3460 (DLF)

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITIONS TO
<u>MOTION TO ALTER OR AMEND JUDGMENT</u>**

## **TABLE OF CONTENTS**

I.   **INTRODUCTION** .................................................................................................... 1

     A.   Watergate precedent, the Danchenko revelations and civil conspiracy liability ................................. 2

II.   **LEGAL STANDARDS** ........................................................................................... 11

     A.   Amending Complaint ............................................................................................ 11

     B.   FTCA Claim ...................................................................................................... 12

     C.   FISA Statute and FBI's "Adjustable" Definition of Collection: Major Questions Doctrine
         Prohibits the Defendants' Deployment of Danchenko as an "Other Surveillance Device" ................. 15

     D.   PATRIOT Act Claim ........................................................................................... 18

          1.   Recent Disclosures Regarding Illicit Hushmoney Payoffs in Support of the
               Defendants' Abuse of Process Have Now Established Jurisdiction .................................. 18

          2.   Exposing Danchenko as an Agent of the Defendants Has Now Created a Clear
               Nexus to their Illicit Media Leak Operation .............................................................. 19

          3.   Danchenko Disclosures Regarding Defendants' Abuse of Process Has
               Demonstrated Violations of FISA Minimization and Other Unlawful Purposes ................. 19

          4.   The Defendants Payoff Scheme with Danchenko Has Made Dr. Page's Claims
               Factually Robust while Clarifying the Prior Misunderstandings that their
               Conspiracy had Created ....................................................................................... 20

          5.   Recent Disclosures Surrounding the Defendants' Abuse of Process Has Helped
               to Establish Jurisdiction ....................................................................................... 20

          6.   The Government and its Sanctionable Agents Now Admit to Using or
               Disclosing FISA Information in Violation of the Minimization Procedures and
               for Unlawful Purposes ........................................................................................ 20

     E.   Privacy Act ...................................................................................................... 22

     F.   Service of Process on Does 1-10 ............................................................................. 24

III.   **CONCLUSION** ................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acosta Orellana v. CropLife Int'l*,
   711 F. Supp. 2d 81 (D.D.C. 2010) ..........................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................5, 8

*Broidy Capital Mgmt. LLC v. Muzin*,
   No. 19-cv-0150 (DLF), 2020 WL 1536350 (D.D.C. Mar. 31, 2020) ..................5, 18

*C&E Servs. v. Ashland, Inc.*,
   601 F. Supp. 2d 262 (D.D.C. 2009) ......................................................................10

*Chagnon v. Bell*,
   642 F.2d 1248 (D.C. Cir. 1980) ...........................................................................19

*Cinciarelli v. Reagan*,
   729 F.2d 801 (D.C. Cir. 1984) .............................................................................18

*Ciralsky v. CIA*,
   355 F.3d 661 (D.C. Cir. 2004) .............................................................................11

*United States ex rel. Citynet, LLC v. Gianato*,
   962 F.3d 154 (4th Cir. 2020) ...............................................................................21

*Curran v. Holder*,
   626 F. Supp. 2d 30 (D.D.C. 2009) ........................................................................15

*Flynn v. R.C. Tile*,
   353 F.3d 953 (D.C. Cir. 2004) .............................................................................15

*Foman v. Davis*,
   *371 U.S. 178 (1962) (internal citations omitted)* ................................................11

*Ground Saucer Watch, Inc. v. CIA*,
   692 F.2d 770 (D.C. Cir. 1981) .............................................................................10

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982).............................................................................................14

*Hinton v. Combined Sys.*,
   105 F. Supp. 3d 16 (D.D.C. 2015) ........................................................................12

*Hobson v. Wilson*,
    737 F.2d 1 (D.C. Cir. 1984) ..................................................................................................14

*Kattan by Thomas v. District of Columbia*,
    995 F.2d 274 (D.C. Cir. 1993) ...............................................................................................9

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ..............................................................................................................22

*Kleiman v. Dep't of Energy*,
    956 F.2d 335 (D.C. Cir. 1992) .............................................................................................23

*Moore v. United States*,
    213 F.3d 705 (D.C. Cir. 2000) .............................................................................................13

*Scott v. Conley*,
    937 F. Supp. 2d 60 (D.D.C. 2013) ........................................................................................25

*Sekhar v. United States*,
    570 U.S. 729 (2013) ..............................................................................................................10

*Skilling v. United States*,
    561 U.S. 358 (2010) ..........................................................................................................6, 10

*State v. Singh*,
    245 N.J. 1, 243 A.3d 662 (2021) ..........................................................................................14

*United States v. Bridgeman*,
    523 F.2d 1099 (D.C. Cir. 1975) .............................................................................................6

*United States v. Danchenko*
    (E.D. Va.) ...........................................................................................................................4, 21

*United States v. Danchenko*,
    No. 1:21-cr-00245-AJT (E.D. Va.) .......................................................................1, 3, 19, 22

*United States v. Haldeman*,
    559 F.2d 31 (D.C. Cir. 1976) ........................................................................................3, 4, 7

*United States v. Kubrick*,
    444 U.S. 111, 100 S. Ct. 352 (1979) .....................................................................................20

*W. Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ....................................................................................................15, 17

*Woodham v. American Cystoscope Co.*,
    335 F.2d 551 (5th Cir. 1964) ...............................................................................................12

**Statutes**

5 U.S.C. § 552a ..................................................................................................22

17 U.S.C. § 101 ..................................................................................................17

18 U.S.C. § 1001 ..................................................................................................4

18 U.S.C. § 1951 ..................................................................................................9

28 U.S.C. § 1346 ................................................................................................10

28 U.S.C. § 2674 ................................................................................................12

42 U.S.C. § 1985 ................................................................................................14

50 U.S.C. § 1801 ..........................................................................................16, 17

50 U.S.C. § 1803 ................................................................................................16

50 U.S.C. § 1806 ................................................................................................20

50 U.S.C. § 1809 ..........................................................................................17, 19

50 U.S.C. § 1810 ................................................................................................19

**Federal Rules**

Fed. R. Civ. P. 1 ................................................................................................12

Fed. R. Civ. P. 4 ................................................................................................24

Fed. R. Civ. P. 8 ..................................................................................................8

Fed. R. Civ. P. 9 ..................................................................................................8

Fed. R. Civ. P. 15 ..............................................................................................24

Fed. R. Civ. P. 59 ..............................................................................1, 9, 11, 12

Fed. R. Civ. P. 60 ................................................................................................1

Fed. R. Civ. P. 83 ..............................................................................................11

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ....................................................14, 17

David S. Kris & J. Douglas Wilson, *National Security Investigations & Prosecutions* § 7:9 ............................................................................................................16

Edward C. Liu*, Cong. Rsch. Serv.*, IF11451, *Foreign Intelligence Surveillance Act (FISA): An Overview* (Apr. 6, 2021)..........................................................................2

*Interview with James Baker, Frontline: Spying on the Home Front* (last viewed March 2018) ..........................................................................................................16

Kris Treatise.....................................................................................................................16

Marshall Cohen, *Durham rebukes his own witness and slams FBI's Russia probe after trial setbacks*, CNN (Oct. 14, 2022) ......................................................................10

Marshall Cohen, *FBI offered Christopher Steele $1 million to prove dossier claims, senior FBI analyst testifies*, CNN, (Oct. 14, 2022)....................................................4

News Release, *Sen. Chuck Grassley, Debunked Anti-Trump Dossier Sub-Source Who Sought To Traffic Classified Information Remained On FBI Payroll Until Late 2020: Grassley, Johnson demand explanation for the FBI's continued reliance on sketchy source at taxpayer expense* (Sept. 26, 2022).......................................12, 23

Press Release*, FBI, FBI Director Christopher Wray's Response to Inspector General Report* (Dec. 9, 2019)...............................................................................................25

Report: Foreign *Intelligence Surveillance Act of 1978, H. Perm.* Sel. Comm. on Intel. (June 8, 1978).........................................................................................................19

Ted Cruz, *Justice Corrupted: How The Left Weaponized Our Legal System* (2022)...................13

U.S. Senate, *Intelligence Activities and the Rights of Americans* (Church Comm. Rpt.) (Apr. 14, 1976).........................................................................................................9

Plaintiff Carter W. Page, Ph.D. ("Dr. Page") submits this Memorandum in reply to the Defendants' Opposition to Plaintiff's Motion to Alter or Amend Judgment (Dkt. 121, "Gov. Oppo.") and (Dkt. 122, "Indiv. Oppo.") (together, the "Def. Oppos."). The Defendants' filings were offered in response to the Plaintiff's motion to Alter and Amend Judgment Pursuant to Civ. R. 59(e) and for Relief from Judgment Under Civ. R. 60(b), (Dkt. 119-1, "Pl.'s Mot.").

## I.      INTRODUCTION

The Pl.'s Mot. of Sept. 29, 2022, has largely undermined any possible remaining basis for most of the Defendants' prior misrepresentations which sufficiently misled the court to the preliminary conclusions in the Memorandum Opinion [*See* Dkt. 115, "Mem. Op."]. The weeks immediately following the court's initial order of Sept. 1, 2022, the proceedings in *United States v. Danchenko*, No. 1:21-cr-00245-AJT (E.D. Va.) marked an entirely new reality. Albeit again wildly misinterpreted by the Defendants in their latest pleadings, a closer examination of the specific legal arguments collectively offered in their Def. Oppos. leave little doubt of the need to alter or amend the Mem. Op. Specifically, the newly discovered evidence from the Danchenko case has instead clearly established an unmistakable basis for reconsideration of and relief from the Court's initial decision. Yet now once again this month, the Defendants refuse to acknowledge those prior misrepresentations which another office of DOJ already revealed with these FISA abuse-related criminal proceedings.

The revelations about Danchenko that bear on and distorted this civil case obviously were and remain unrelated to the outcome of that criminal trial. Danchencko was found not guilty of lying to the FBI. But the instant case relates to the government and individual Defendants' lies to the Foreign Intelligence Surveillance Court ("FISC"). The jury of Danchenko's found that he did not lie to the FBI, because the FBI already knew that its positions and statements were false. Thus, that criminal prosecution's verdict has little bearing on the issues here. But the acquittal of Danchenko increases the

fault and liability of the Defendants for making false statements to the FISC, because they were not the victims of being misled.  Instead, the abuse of process stemmed from their own misconduct.

Furthermore, the revelations about Danchenko concern issues as already briefed in Pls. Mot. are unrelated to Danchenko's guilt but do greatly affect the analysis and factual decisions of this Court. Despite the offenses of its sister agency the FBI against Dr. Page, these Defendants instead collectively attempt to maintain a fleeting grip on nearly all prior pleadings which had previously convinced this court to reach conclusions now widely divergent from the actual facts in this historic scandal.

A.   **Watergate precedent, the Danchenko revelations and civil conspiracy liability**

Although each Defendant has once again cited another vast array of largely irrelevant case law, the most applicable legal authorities instead now stand as the closest historic equivalent. Namely, the Watergate domestic political intelligence scandal. Coincidentally, this specific precedent marks the nearest factual analog which in turn led to the U.S. Congress's enactment of the 1978 Foreign Intelligence Surveillance Act ("FISA") statute in the first place. *See* Dkt. 119-1 at 6-7, 24-25.

Just as the Defendants' pleadings prior to the Court's Mem. Op. almost entirely avoid any mention of Danchenko (*Id.* at 3-5), their most recent briefs similarly do not in any way address this highly analogous precedent and its serious implications as Dr. Page has correctly highlighted throughout Pl.'s Mot. Both past and present, this historical nexus between high level political dirty tricks, illegal surveillance, as well as the primary initial justification for the FISA statute upon which Dr. Page has founded several of his preliminary claims two years ago could not be more clear:

> "Following revelations regarding widespread privacy violations by the federal government **during the Watergate era**, Congress enacted FISA to establish guidelines for government collection of foreign intelligence."

*See* Edward C. Liu, Cong. Rsch. Serv., IF11451, Foreign Intelligence Surveillance Act (FISA): An Overview, 1 (Apr. 6, 2021) (emphasis added)*.*

Yet even more precisely aligned with this applicable historic precedent and now based on the

closely parallel facts which the U.S. Department of Justice (DOJ) has recently revealed, the newly discovered scenario now reflected in the instant case has also uncovered highly analogous facts and associated claims in each of these respective scandals. Namely, the secret hush money payments, associated theories of liability and subsequent belated disclosures which eventually unravelled the Watergate scandal too. In each instance, it followed several years of stubborn coverups, illegal political spying, corrupt financial motives and years of illicit payoffs at high levels of the U.S. Government:

> On March 21, 1973, [White House Counsel John] Dean thus told Nixon that there was a "cancer" growing on the presidency in the form of the endless hush money demands. He recounted all that he knew about the origin of the break-in and the subsequent payment of hush money. He guessed that future demands would come to another million dollars. **Nixon replied that "you could get a million dollars.** And you could get it in cash. I, **I know where it could be gotten.**"

*See United States v. Haldeman,* 559 F.2d 31, 57 (D.C. Cir. 1976) (emphasis added).

Similarly and as recently revealed in the Danchenko case, we have now learned where such corrupt payoffs to the foreign political consultant Christopher Steele and his associates "could be gotten." It could be gotten from Defendant FBI, upon the orders, arrangements and directions of the individual Defendants in this case as they sought to advance their illegal domestic political intelligence operation. Subsequent to the Plaintiff's motion on Sept. 29, 2022, such a "you could get a million dollars" device was belatedly revealed by Defendant Auten at the *Danchenko* trial. Auten has testified under oath that Defendant FBI and their co-conspirators offered precisely that same sum, "up to a million dollars", to their foreign agent and political consultant Christopher Steele to further advance their sponsored conspiracy. Danchenko's prosecutor and Auten had the following exchange at trial:

> Q. And what was it -- tell the ladies and gentlemen of the jury what it is that the FBI offered Mr. Steele for any corroborative information.
>
> A. Mr. Steele was offered anywhere up to a million dollars for any information, documentary, physical evidence, anything of that sort which could help to prove the allegations.
>
> Q. At any time when you were overseas meeting with Steele in early October, did he provide anything?

A. He did not.

*United States v. Danchenko* (E.D. Va.), Oct. 12, 2022, Tr. at 166:7-15.[1]

The aforementioned early October 2016 meetings overseas with and their million dollar payoff offer to the political consultant Steele came prior to Judge Rosemary M. Collyer's signature of Defendants' first abusive FISA warrant on Friday, Oct. 21, 2016. In turn, the FBI's first associated political operative to face charges in the FISA abuse scandal was Igor Yurievich Danchenko.

The Defendants are correct that Danchenko was acquitted of the single, exceptionally narrow 18 U.S.C. § 1001(a)(2) charge he faced. But that criminal case nevertheless led to revelations which fundamentally clarified the true foundation of the instant civil case against the other named Defendants involved in their conspiracy which is now before this court. Based on the applicable Watergate precedent, directly contrary to many assertions included in the latest round of misleading statements by these Defendants and instead as a question of legitimate law, the D.C. Circuit has correctly noted that: "The specific intent required for the crime of conspiracy is in fact the intent to advance or further the unlawful object of the conspiracy." *Haldeman*, 559 F.2d at 112.

Although previously not even a hunch nor a potential theory prior to this Court's Mem. Op. that the Plaintiff has hoped to further assess in the course of future discovery, the recent revelations from the Danchenko case have now radically redefined these Defendants' apparent intent. Namely and in support of the co-conspirators' shared political objectives, their secret payoff schemes and their directly related efforts to further the unlawful object of their abuse of process against Dr. Page in the FISC. As referenced throughout this brief, the parties' exhibit list from the Danchenko trial, available at Exhibit A, Doc. No 130-2 & 130-3, Oct. 18, 2022 (Ex. A), demonstrates not only specific illegal activities by

---

[1]   *See also* Marshall Cohen, *FBI offered Christopher Steele $1 million to prove dossier claims, senior FBI analyst testifies*, CNN, Oct. 14, 2022, https://www.cnn.com/2022/10/11/politics/steele-dossier-fbi-durham-danchenko.

their conspiracy accordingly but also the other relevant documents which the Defendants always had readily available. This now allows the Court to, "draw the reasonable inference that [any of] the defendant[s] [are] liable for the misconduct alleged." Mem. Op. at 34, citing *Iqbal*, 556 U.S. at 678.

The Individual Defendants suggest that, "First, the Court concluded that the FISA provisions in question do not provide for aiding and abetting liability. See Mem. Op. at 20-21." Dkt. 122 at 10. But diverging significantly from Defendants' other assorted array of baseless assertions and associated legal arguments, this Court has previously explained the now applicable modern context of civil conspiracy which thus instead applies in the instant case based on the once unimaginable Danchenko revelations:

> Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy,... a coconspirator incurs tort liability co-equal with the immediate tortfeasors.
>
> To plead a civil conspiracy, a plaintiff must allege: (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design. The sufficiency of the pleadings often turns upon the existence of an agreement, which is the essential element of a conspiracy claim. Direct evidence of such an agreement is rare in civil conspiracy cases. Hence, one may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.

*See Broidy Capital Mgmt. LLC v. Muzin,* No. 19-cv-0150 (DLF), 2020 WL 1536350, 59-60 (D.D.C. Mar. 31, 2020) (citations and internal quotation marks omitted).

Thus and as this court has previously noted, direct evidence of such an agreement is indeed rare in civil conspiracy cases. It has proven even rarer still when government intelligence agents, their managers and these respective bureaucracies have previously engaged in landmark civil rights abuses which they then attempt to desparately coverup.  Nevertheless and after many years of successful distortions, the recent revelations in the Danchenko case have now clearly crossed this dark threshold.

In March 2017, Dr. Page begged Defendants Somma and the FBI for protection from the death threats he had frequently faced nationwide based on the falsehoods now known to have been concocted

by the FBI political consultant Danchenko. See the sample slide deck as presented by the Plaintiff from one of their many meetings, at Exhibit B (Ex. B). Instead and that very same month, the Defendants began their illicit payoffs of Danchenko who had helped foreign political agent Steele with the deadly political dossier. "An individual who joins an already formed conspiracy knowing of its unlawful purpose may be held responsible for acts done in furtherance of the conspiracy both prior to and subsequent to his joinder." *United States v. Bridgeman*, 523 F.2d 1099, 1108 (D.C. Cir. 1975) (citations omitted). In stark contrast, the initial theories previously suggested by the Plaintiff, based on the inaccurate public record from the Horowitz OIG Report and as accepted by this court had incorrectly reflected the Defendants' false story from their long cover-up era. For example:

> "*4. Third FISA Warrant.* In late January 2017, the FBI, including Auten and Somma, interviewed Igor Danchenko, one of Steele's sources, for information about Page. [SAC] ¶¶ 120, 184, 209. The application stated that Danchenko was 'truthful and cooperative,' but allegedly did not disclose that his answers contradicted Steele's allegations. *Id*. ¶ 121 . . . . The third warrant application was submitted to the FISC on April 7, 2017, again signed by Comey, who was aware of the results of the Danchenko interview. *Id.* ¶¶ 122, 153." Mem. Op. at 6-7.

In refining the interpretation of honest services fraud, the Supreme Court has similarly confirmed that, "The vast majority of cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling v. United States*, 561 U.S. 358, 407 (2010).

It has long been widely acknowledged that information from the false political Russian dossier operation played an essential role in convincing the FISC to approve the Defendants' illegal surveillance of Dr. Page. But based on the highly incomplete, damaging and inaccurate FISA abuse OIG Report, the personal liability for the dossier had remained misunderstood until the Danchenko trial revealed the Defendants' conspiracy. See for example from early Sept. 2022, Mem. Op. at 49:

> "Moreover, not only—as the OIG Report concluded—was Comey not involved in the compilation of any evidence used to support the probable cause determination in the application, but the Inspector General found no evidence that Comey actually knew, at the time of his certifications, that the factual information submitted in

support of the applications was false or misleading."

But to the contrary and as Defendant Auten has recently admitted in the Danchenko case, we have now learned a completely different reality. Seeking to shore up these loose ends, the Defendants' direct funding operation through their illicit payoff scheme which began in Mar. 2017 established a crafty design to ensure that the false story they had filed in the FISC in Oct. 2016 would not ring false. Through secrecy and myriad violations of the Privacy Act over the years since, their conspiracy's actions did not backfire until Sept. 13, 2022. These bold alternative cover-up strategies with their top secret political consultant Danchenko had played an essential role in avoiding liability for the time being, as they sought to clean up their false narrative and unlawful pleadings to the FISC with the Defendants' first warrant against Dr. Page. Accordingly, in line with the Watergate precedent and as the Plaintiff will more fully explain in the forthcoming amended complaint, the revelations have now clearly established conspiratorial liability for these Defendants:

> As the threads of the cover-up began to unravel, it became increasingly important to review what had taken place in order to identify and shore up the loose ends. It became critical for the conspirators to try to ensure that any story they wished to present would not ring false and that any action they were considering would not backfire, a strategy whose success required total familiarity with the facts.  In a conspiracy in which consideration of alternative strategies played so central a role, statements which narrate past events are not necessarily mere narratives in the usual sense of that phrase. Rather, they can constitute activity that is plainly and importantly in furtherance of a conspiracy, and thereby be admissible…"

*United States v. Haldeman,* 559 F.2d 31, 110-111 (D.C. Cir. 1976) (citations and internal quotation marks omitted).

The Individual Defendants now inexplicably claim that these Danchenko revelations are irrelevant and argue that the Pl.'s Mot. represents "another bite at the apple" (Indiv. Oppo. at 1). But after years of these Defendants consistently feeding poisonous fruit to this D.D.C. court as well as the neighboring FISC (together the "Prettyman Courts") using such daring disguises of the illegitimate origins or basis for their pleadings, the standards of this court have previously explained why this

instead actually represents the very first true bite at the apple:

> "Fraudulent concealment is an equitable doctrine employed to toll the running of an applicable statute of limitations where a defendant is alleged to have improperly concealed the existence of a cause of action (noting that to invoke the doctrine of fraudulent concealment the defendant must have done something of an affirmative nature designed to prevent discovery of the cause of action)… under the law of the District of Columbia, fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff… Parties pleading fraudulent concealment must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts."

*Acosta Orellana v. CropLife Int'l,* 711 F. Supp. 2d 81, 95 (D.D.C. 2010) (internal quotations and citations omitted).

Despite years of diligent efforts by Dr. Page and the U.S. Congress alike, the Defendants' devious misconduct in this scheme had effectively prevented the Plaintiff from pleading with any particularity such requisite facts, thus now giving rise to such fraudulent concealment doctrines and the requisite procedural steps which they allow.

Indeed, the Defendants' often-cited landmark case of *Ashcroft v. Iqbal* has instead made clear that: 'Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of Rule 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 686-687 (2009) (internal citations omitted). Continuing after this court's preliminary Mem. Op. on Sep. 1, 2022 and not until DOJ's subsequent admissions regarding their longstanding fraudulent Top Secret coverup scheme, there remained no plausible way for Dr. Page to overcome the particularity requirement applicable to the Defendants' fraud. More recently, and perhaps understandably given the Defendants' clear culpability, not one of

their Def. Oppos. addressed the fraud claims outlined in the Pl.'s Mot. at 9-18.

While carefully avoiding the core claims, DOJ instead somehow falsely suggests that: "In arguing for reconsideration, he addresses only the Privacy Act disclosure claim (Count 8)." Dkt. 121 at 6. But the only reason these issues could not have been raised previously is due to the cover-up, payoffs and complete falsehoods relied upon by the Defendants until this day. "A losing party may not use a Rule 59 motion to raise new issues that could have been raised previously." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993) (citations omitted).

In Congress's preceding elucidation of a secondary part of its original legislative intent in 1976 which subsequently led to the enactment of the FISA statute just two years later, the legislators explicitly highlighted: **"The abusive techniques used by the FBI in COINTELPRO from 1956 to 1971 included violations of both federal and state statutes prohibiting mail fraud, wire fraud, incitement to violence**, sending obscene material through the mail, **and extortion."**  U.S. Senate, Intelligence Activities and the Rights of Americans (Church Comm. Rpt.), Apr. 14, 1976, at 139, https://www.intelligence.senate.gov/sites/default/files/94755_II.pdf  (Emphasis added).  With the exception of "sending obscene material through the mail", the Defendant jointly and severally now find themselves at the epicenter of each of these same other abuses in the wake of the Danchenko revelations.  Dr. Page presented the slides at Ex. B to Defendant Somma and the FBI on Mar. 30, 2017, in the wake of frequent and continued death threats that Dr. Page was experiencing during the same month that the Defendants began paying Danchenko. These meetings which did not stop the violence threatened against Dr. Page had been "induced by wrongful use of… threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). With his life at risk from these threats based on the falsehoods in the national headlines as advanced by their conspiracy, the Defendants succeeded with their obtaining of items of value from Dr. Page with the information provided in these

unremunerated slides. *Sekhar v. United States*, 570 U.S. 729 (2013).

Recently, and similar to the Defendants' secret arrangement with Danchenko, the Supreme Court has clarified that the essence of the honest service fraud statute has focused on the type of kickback schemes which the FBI established to perpetrate their civil rights violations against Dr. Page. 'In proscribing fraudulent deprivations of "the intangible right of honest services," § 1346, Congress sought to bar schemes to defraud involving kickbacks. Construing the honest-services statute to extend beyond that core meaning, we conclude, would encounter a vagueness shoal. We therefore hold that § 1346 covers only bribery and kickback schemes.' *Skilling*, 561 U.S. at 368.

"Although the failure to produce identified documents might sometimes raise a substantial and material question of good faith, the reasonableness of an inference necessarily depends on its factual context." *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 772 (D.C. Cir. 1981) (citations and internal quotation marks omitted). It is hard to imagine a worse "factual context" than the associated coverup and payoff which was recently admitted by Defendant DOJ. It extends far beyond Defendant Auten merely getting "recommended for suspension" by his employer, Defendant FBI.[2]

In sum, these damning revelations have clarified a new pathway forward:

'Rule 15 (a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave

---

[2]  "Whether the parties were acting within the scope of the fiduciary relationship is a question of fact for the jury to decide, not a question of law for the court." *C&E Servs. v. Ashland, Inc.*, 601 F. Supp. 2d 262, 271 (D.D.C. 2009) (citations and internal quotation marks omitted). *See also* Marshall Cohen, *Durham rebukes his own witness and slams FBI's Russia probe after trial setbacks*, CNN, Oct. 14, 2022, https://www.cnn.com/2022/10/12/politics/durham-fbi-russia-probe-witness.

without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.'

*Foman v. Davis, 371 U.S. 178, 182 (1962) (internal citations omitted).*

## II.    LEGAL STANDARDS

### A.    <u>Amending Complaint</u>

"Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Iqbal*, 556 U.S. at 671. In light of the government's explosive new revelations during the Danchenko case, highly unfair misconduct and the earlier associated uncertainties whereby they had effectively created confusion for this Court as well as most Americans, the Defendants' scheme to defraud with their secret payoffs of these political operatives have opened severe doubts regarding the government's original falsehoods upon which most of these proceedings prior to the preliminary Mem. Op. of September 1, 2022, had once been based.

As explained in *Ciralsky v. CIA*, 355 F.3d 661, 666 (D.C. Cir. 2004):

The dismissal with prejudice of either a complaint or an action is final and appealable. However, courts often regard the dismissal without prejudice of a complaint as not final, and thus not appealable under 28 U.S.C. § 1291, because the plaintiff is free to amend his pleading and continue the litigation. (citations and internal quotation marks omitted).

"Unfortunately, it is not always clear whether a district court intended its order to dismiss the action or merely the complaint. This case presents some difficulties in that regard . . . ." *Id.* at 667 (footnote omitted). Similarly, the Plaintiff expressed such uncertainties in his Rule 59(e)/60(b) motion. *See* Dkt. 119-1 at 16. For example, Mem. Op. at 44: "**To survive a motion to dismiss, he must allege facts in his complaint** that allow the Court to plausibly infer that the defendants disclosed FISA-acquired information. He has not." As the Danchenko case revelations indeed fundamentally established the essence of FISA-related claims, an amended complaint may reflect these new realities.

As noted in Fed. R. Civ. P. 83(a)(2): "A local rule imposing a requirement of form must not be

enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." In the two weeks following the transformational news of the illicit Danchenko payoff scheme on Sept. 13, 2022, which the Government, DOJ and their Co-Defendants had aggressively covered up for more than five years despite countless demands by the U.S. Congress as well as this Plaintiff[3], Dr. Page's legal team worked diligently to hurriedly prepare its Rule 59(e)/60(b) motion.  As has been similarly observed by at least one court: "Rule 1 of the Federal Rules of Civil Procedure is designed to temper the discretionary power of the district court: the rules 'shall be construed to secure the just, speedy, and inexpensive determination of every action'. The force of this first and greatest of the Rules should not be blunted by district courts' exaggerating the importance of local rules and enforcing such rules through inappropriate, over-rigorous sanctions." *Woodham v. Am. Cystoscope Co.*, 335 F.2d 551, 557 (5th Cir. 1964). In contrast and at every turn since September 25, 2016, when Dr. Page sent his letter to then-Director Comey, the Defendants have consistently endeavored to ensure that their FISA abuse was as extraordinarily unjust, slow and costly as possible. Both in this Court and in the neighboring FISC.

### B. FTCA Claim

"The FTCA operates as a limited waiver of sovereign immunity, providing that the United States shall be liable 'in the same manner and to the same extent as a private individual under like circumstances.' (quoting 28 U.S.C. § 2674). Tort liability under the FTCA is determined according to the law of the place where the alleged acts or omissions occurred." *Hinton v. Combined Sys.*, 105 F. Supp. 3d 16, 22 (D.D.C. 2015) (citation omitted).

---

[3]   *See*, for example, News Release, Sen. Chuck Grassley, Debunked Anti-Trump Dossier Sub-Source Who Sought To Traffic Classified Information Remained On FBI Payroll Until Late 2020: Grassley, Johnson demand explanation for the FBI's continued reliance on sketchy source at taxpayer expense (Sept. 26, 2022), https://www.grassley.senate.gov/news/news-releases/debunked-anti-trump-dossier-sub-source-who-sought-to-traffic-classified-information-remained-on-fbi-payroll-until-late-2020 ("U.S. Senate Danchenko Letter").

With regards to Dr. Page's FTCA claim, the government somehow suggests that, "neither the purported newly discovered evidence related to Danchenko's status as a paid confidential human source nor any of the other arguments raised in the Motion have any bearing on the Court's well-reasoned finding that Plaintiff failed to state a claim for abuse of process under District of Columbia law." *See* Dkt. 121 at 12. In contrast, the D.C. Circuit's explanation of abuse of process leads to an entirely contrary conclusion:

> Local courts have emphasized that the critical concern in abuse of process cases is whether process was used to accomplish an end unintended by law…. The essence of the tort of abuse of process is the use of the legal system to accomplish some end which is without the regular purview of the process. . . . For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended.

*Moore v. United States*, 213 F.3d 705, 712 (D.C. Cir. 2000) (citations and internal quotation marks omitted).

With the latest revelations in the Danchenko case, the FISA abuse against Dr. Page has now extended far beyond merely accomplishing an end unintended by law as the Court acknowledged, in noting that, "There is little question that many individual defendants, as well as the agency as a whole, engaged in wrongdoing." Dkt. 115 at 53.

This month's new book by a member of the U.S. Senate Judiciary Committee has explained in detail how these Defendants used the secret FISC process against Dr. Page for an immediate political purpose, rather than the purpose for which this Article III court was created, designed and intended. *See* Ted Cruz, *Justice Corrupted: How The Left Weaponized Our Legal System*, 70-73 (2022). However, the magnitude and corruption now associated with these tactics remained largely unknown to almost all Americans until the specific revelations of this month.

Similarly and closely analogous to the instant case, courts in this jurisdiction have taken a negative view of other FBI defendants who have previously argued, "that compliance with an agency's approved policy should be deemed one of the 'extraordinary circumstances' (as yet undefined) giving

rise to immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). In its most extreme form, this argument amounts to the contention that obedience to higher authority should excuse disobedience to law, no matter how central the law is to the preservation of citizens' rights. We have no hesitation in rejecting this . . . argument." *Hobson v. Wilson*, 737 F.2d 1, 67 (D.C. Cir. 1984).  Within this framework, the extraordinary new level of wrongdoing exposed with the illicit Danchenko payoff scheme represents an extreme disobedience to the law inherent in the FISA statute.

While the text of some federal statutes might be open to interpretation, 42 U.S.C. § 1985(3) is crystal clear with regards to conspiracy to interfere with civil rights:

> "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws,… or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President,… of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

While one of Black's Law Dictionary (11th ed. 2019) definitions for "disguise" may relate to apparel[4], the majority of definitions of this statutory term instead cut to the core of the Defendants' tactics as they have attempted to apply it throughout their exection of this scandal: "2. The application of a façade to misrepresent the true nature of a thing. 3. The act of concealment or misrepresentation." The Danchenko trial eventually ripped off the mask and finally revealed the Defendants' complete façade, a firm foundation for fully pled and new causes of action which the Plaintiff intends to file in

---

[4]   For example, *see State v. Singh*, 245 N.J. 1, 9-16, 243 A.3d 662, 667-671 (2021).

the forthcoming amended complaint.

The Defendants' purpose of depriving Dr. Page of the equal protection of the laws in the FISA Court remained highly effective for many years, through such indirect secretive tactics with a magnitude and audacity not seen in America since the otherwise equivalent but less damaging Watergate scandal. Although only disclosed by the government after this court's initial order, this has now uncovered their disguise.  Federal courts "are without power to entertain claims otherwise within their jurisdiction if they are so attenuated and unsubstantial as to be absolutely devoid of merit." *Curran v. Holder*, 626 F. Supp. 2d 30, 33 (D.D.C. 2009) (citations and internal quotation marks omitted). Having already staked their pleadings and reputations on a purported arms-length detachment from these foreign political consultants with their false pleadings to the FISC, their corrupt payoffs have now established a clear basis for liability. "Differences as may arise over time following a non-arms length transfer are not sufficient for a finder of fact to conclude that the businesses are not alter egos." *Flynn v. R.C. Tile*, 353 F.3d 953, 959 (D.C. Cir. 2004).

### C.   FISA Statute and FBI's "Adjustable" Definition of Collection: Major Questions Doctrine Prohibits the Defendants' Deployment of Danchenko as an "Other Surveillance Device"

The major questions doctrine precludes agencies from:

"[Claiming] to discover an unheralded power representing a transformative expansion of its regulatory authority in the vague language of a long-extant, but rarely used, statute designed as a gap filler. That discovery allowed it to adopt a regulatory program that Congress had conspicuously declined to enact itself. Given these circumstances, there is every reason to hesitate before concluding that Congress meant to confer on [agency] the authority it claims…"

*W. Virginia v. EPA,* 142 S. Ct. 2587, 2595 (2022) (citations and internal quotation marks omitted).

Yet by all indications, this is exactly the transformative expansion that the Defendants have tried to adopt for their "use of an **other surveillance device**" term included with the 50 U.S.C. § 1801(f)(4) "Electronic surveillance" definition. A prominent treatise on the FISA statute co-authored

by FISC amicus curiae[5] David S. Kris includes the explanation of this agency's transformative expansion of surveillance power from James Baker, who then served as General Counsel of Defendant FBI and a superior to Defendant Clinesmith[6] during the time of the FISA abuse against Dr. Page. As an ominous prelude to the crimes recklessly commited against Dr. Page via the FISC several years later and rather than strictly following the law as mandated by Congress, Baker's 2007 interview has provided a perverse explanation of how the FISC may simply just, "adjust over time to different types of collection" at the whims of his federal agency. In the context of this "other surveillance device" term from the 50 U.S.C. § 1801(f)(4) "Electronic surveillance" definition:

> "In an interview . . . James Baker, then the Counsel for Intelligence Policy, was asked, 'what constitutes collection. There are disputes, and indeed in doing our reporting, we've had people say collection occurs at the moment that a wiretap is placed on, and other people say no, it's not until some human being listens to, reads, tries to analyze the communication. What does the FISA law say?' Baker gave the following answer: 'The FISA law talks in terms of acquisition of communications, and it differs. When you acquire something differs depending upon what it is that you're acquiring. So if you're acquiring something off of a telephone wire, a normal telephone call, acquisition occurs at one point in time. If you're acquiring something from a microphone in a room, that's slightly different. And **so the law in the FISA world and the rulings of the FISA court and the filings of the government have had to adjust over time to different types of collection that we're doing, different types of acquisition. So we have, within the FISA law, developed a variety of methods to address the changes in modern communications and dealing with this exact question of when something is acquired.**'
>
> Interview with James Baker, Frontline: Spying on the Home Front, http://www.pbs.org/wgbh/pages/frontline/homefront/interviews/baker.html (last viewed March 2018)." *See* David S. Kris & J. Douglas Wilson, National Security Investigations and Prosecutions at § 7:9, n.10.[7]

Nevertheless and as it relates to the illicit Danchenko device, Baker's explanation misapplies the FISA statute's textual definition of electronic surveillance which leaves some flexibility as well:

---

[5]   Pursuant to 50 U.S.C. § 1803(i)(1).
[6]   Per his then disguised title of "OGC Attorney" in the OIG Report, at 81-83.
[7]   Link provided in Kris treatise is no longer active. Full text available at:
https://www.pbs.org/wgbh/pages/frontline/homefront/interviews/baker.html (last viewed Nov. 12, 2022).

"the installation or use of an electronic, mechanical, or **other surveillance device**." 50 U.S.C. § 1801(f)(4) (emphasis added). In another definitional "device" statute, Congress expressly authorizes such an evolutionary interpretation, 17 U.S.C. § 101: '**A "device"**, "machine", or "process" **is one** now known or **later developed**.' (emphasis added). Congress included no such "later developed" provision in FISA, most especially regarding Danchenko's Watergate-style political consultant payoff schemes and associated illegal leak media tactics as an "other surveillance device". 50 U.S.C. § 1809(a)(2). Contrary to the Gov. Oppo., there is no conceivable way that the government can, "point to clear congressional authorization for the authority it claims." *W. Virginia*, 142 S. Ct. at 2595 (citation and internal quotation marks omitted). Yet in the instant, "extraordinary case[], both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *Id.* at 2609 (citation and internal quotation marks omitted). Especially given a close parallel between the crimes committed against Dr. Page and the original post-Watergate legislative intent which led to the FISA statute, Congress undoubtedly would have conspicuously declined authorization of such a historic repeat in this Russian citizen's epic political consultant payoff scheme and their conspiracy's now-conspicuous coverup.

In parallel to what the Defendants originally intended to achieve and successfully managed to execute with their unconscionable scheme to defraud the FISA Court, Black's Law Dictionary (11th ed. 2019) offers an exceptionally applicable interpretation of "device." This textual authority's primary definition of the term echoes the Defendants' specific acts against both Dr. Page as well as the Prettyman Courts: "1. A scheme to trick or deceive; a stratagem or artifice, as in the law relating to fraud." Through their daring series of coverups and lies, the Defendants' corrupt stratagem has effectively succeeded until the recent Danchenko revelations. Here and now, the scheme to trick or deceive with the Defendants' other surveillance device named Igor Y. Danchenko and associated

members of their conspiracy has thus far been allowed to proceed. Nevertheless and in light of the abuse of process offenses described in the FTCA section above, the recent disclosures surrounding the Defendants' abuse of process has now clearly established jurisdiction in this court accordingly. As "statutory interpretation issue turned ultimately on subtle and competing policy judgments", courts, "will not hold the government to a standard of prescience as to which way we would resolve competing policies . . . ." *Cinciarelli v. Reagan*, 729 F.2d 801, 806-807 (D.C. Cir. 1984) (citation and internal quotation marks omitted). But in the wake of the Danchenko debacle, no such lack of clarity exists here. Although the new fact pattern recently exposed in this criminal dossier case has entirely changed all prior false assumptions regarding the Defendants' liability, it has created a new clarity and opened up a range of additional claims. And as this court has explained in *Broidy Capital Mgmt.*, an essential new legal liability doctrine that had once remained largely unimaginable prior to the Mem. Op.

### D.   PATRIOT Act Claim

Albeit otherwise characteristically devoid of any truthful representation vis-à-vis the critical disclosure which their agency has only recently revealed regarding these same six consitituent elements, DOJ nevertheless provides a handy summary of the Court's initial judgment on the PATRIOT Act claims. Dkt. 121 at 2-3. But accordingly, as explained below and especially in the weeks following the Plaintiff's filing of his Dkt. 119-1 motion, the recent revelations during the Danchenko trial have exposed each of these respective elements of Dr. Page's PATRIOT Act claim.

#### 1.   Recent Disclosures Regarding Illicit Hushmoney Payoffs in Support of the Defendants' Abuse of Process Have Now Established Jurisdiction

Consistent with the principles of the major questions doctrine and the text of the FISA statute, the legislative history explains the clear sovereign immunity dividing line: "One of the important purposes of the bill is to afford security to intelligence personnel so that if they act in accordance with the statute and the court order, they will be insulated from liability; **it is not to afford them immunity**

**when they intentionally violate the law.**" Report: Foreign Intelligence Surveillance Act of 1978, H. Perm. Sel. Comm. on Intel., June 8, 1978 ("HPSCI FISA Rep.") at 96 (emphasis added). The Danchenko case made apparent intentional violations of the law, as now enabled by the clear civil conspiracy between the named defendants and their newly revealed political consulting arm.

The 9th Cir. has instead suggested that the text of 50 U.S.C. § 1810 on "civil liability" which explicitly states that, "An aggrieved person, shall have a cause of action against any person who committed such violation and shall be entitled to recover…" might somehow not intend a sovereign immunity waiver. Mem. Op. at 42   (citation omitted). But other essential principles from this jurisdiction instead echo Congress's explicit intent, consistent with the legislative history above: "It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Chagnon v. Bell*, 642 F.2d 1248, 1252 (D.C. Cir. 1980). Defendants' entirely unreasonable payoffs of their co-conspirator foreign political consultant has now egregiously breached the bounds of bad-faith and illegality.

      2.      **Exposing Danchenko as an Agent of the Defendants Has Now Created a Clear Nexus to their Illicit Media Leak Operation**

The evidence summarized in Ex. A and the transcript of the Danchenko trial where several of the Co-Defendants discussed it now provide a wide array of damning new evidence that their hired co-conspirator served as the device for advancing their "media leak strategy". 50 U.S.C. § 1809(a)(2). For example, *see* the LinkedIn messages at Government Exhibits (GX) 1500, 1502 and 1800. Ex. A *Danchenko*, as explained with Oct. 12, 2022, Tr. at 226:3-233:21.

      3.      **Danchenko Disclosures Regarding Defendants' Abuse of Process Has Demonstrated Violations of FISA Minimization and Other Unlawful Purposes**

Per the examples summarized with the preceding element as well as the FTCA analysis, *supra*,

the Defendants' unlawful purposes and methods have now been vividly exposed with the recent

Danchenko trial. 50 U.S.C. § 1806(a).

> **4.     The Defendants Payoff Scheme with Danchenko Has Made Dr. Page's Claims Factually Robust while Clarifying the Prior Misunderstandings that their Conspiracy had Created.**

By forging the financial agreement between these Defendants and Danchenko, they established

a direct sponsorship relationship with the illegal pleadings in the FISC. The Defendants unquestionably

did so in furtherance of their shared scheme and associated political objectives.

> **5.     Recent Disclosures Surrounding the Defendants' Abuse of Process Has Helped to Establish Jurisdiction**

Also consistent with the preceding FTCA statute analysis, courts have consistently found that,

"The 2-year period did not begin to run until the plaintiff has discovered both his injury and **its cause**."

*United States v. Kubrick*, 444 U.S. 111, 120, 100 S. Ct. 352, 358 (1979) (emphasis added). With the

Defendants' new direct sponsorship link to root cause of these illegal leak activities now disclosed

during the Danchenko trial following their longstanding illicit coverup and lies, Dr. Page's

administrative claims will imminently be updated accordingly.

> **6.     The Government and its Sanctionable Agents Now Admit to Using or Disclosing FISA Information in Violation of the Minimization Procedures and for Unlawful Purposes**

Earlier this month, the Danchenko trial's DOJ prosecutor and the instant case's Defendant

Auten provided clarity regarding their conspiracy's illegal FISA activities whereby even their co-

Defendant FBI has deemed it necessary to warrant his suspension:

BY MR. DURHAM:

Q. Do you recall that there was a reporter that the OIG had written concerning the Carter Page FISAs?

A. Yes.

Q. And how would you characterize that report?

A. The report was quite extensive and it discussed characterizing a number of errors and omissions.

Q. And with respect to the errors and omissions, were they tick-tacky kinds of omissions or were they significant omissions and errors that had been committed?

A. I believe the OIG described them as significant.

Q. And then with respect to the investigation done by the OIG, separate and apart from that, would it be a fair statement that you and your colleagues were under investigation by the inspection division by the FBI?

A. Yes.

Q. And would it be a fair statement that your conduct in connection with that is, you, yourself, based on the investigation done by the inspection division of the FBI, have some issues, correct?

A. I -- be a little bit more specific. I'm sorry. I don't -- I have issues?

Q. Isn't it, in fact, true that you've been recommended for suspension as the result of the conduct?

A. It is currently under appeal…

*United States v. Danchenko* (E.D. Va.), Oct. 12, 2022, Tr. at 530:10-531:9.

> "While courts have recognized the public interest in affording public officers immunity from suit to protect their ability to exercise independent discretion in carrying out their official duties, it surely does not serve the public interest to extend immunity protection to public officials who defraud the government. Thus, while immunity should protect discretion, it must not shield fraud."

*United States ex rel. Citynet, LLC v. Gianato,* 962 F.3d 154, 160 (4th Cir. 2020) (citation omitted).

In light of the recent Danchenko revelations, again construing the facts in accordance with the latest pleadings by the Defendants would represent an unfortunate continuation of the Article III Courts' shield for fraud which the perpetrators have succeeded in steadfastly maintaining throughout this unprecedented FISA abuse scandal thus far.

The Supreme Court has also held that the fraudulent concealment doctrine allows a plaintiff to preclude defendants' assertion of statute of limitations defenses only if the plaintiff shows that he lack knowledge or had insufficiently pursued due diligence of the offense.[8] It is difficult to imagine how Dr. Page or Congress could have done more than they have already done in their attempts to uncover the

---

[8] "The [fraudulent] concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense. We have found many antitrust cases that say the same, and none that says the contrary . . . ." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 195 (1997) (citations and internal quotation marks omitted).

corrupt scheme surrounding the dossier. Yet despite it all, the Danchenko revelations surrounding the Defendants' direct sponsorship have only just been learned in these recent months. Nevertheless, the violations of the FISA minimization procedures and unlawful purposes have now become readily apparent. Once lost in a blizzard of the Defendants' lies, the *Danchenko* case Exhibit Lists at Ex. A provide a clear summary road map to extensive evidence that has recently become available in support of Dr. Page's now readily apparent claims.

### E.    Privacy Act

The government claims: "Plaintiff's allegations about Danchenko's status as a paid informant have no bearing whatsoever on the Privacy Act disclosures claim or the Court's reasoning with respect to the statute of limitations." Gov. Oppo. at 11. But the text of the Privacy Act explicitly states that:

> "**An action to enforce any liability created under this section may be brought** . . . within two years from the date on which the cause of action arises, **except that where an agency has materially and willfully** misrepresented **any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.**"

5 U.S.C. § 552a(g)(5) (emphasis added).

The shocking revelations from the Danchenko case run contrary to the prior false information which led the court, the U.S. Congress and indeed the Plaintiff to once surmise that some of the individual Defendants might not have been, "involved in the compilation of any evidence used to support the probable cause determination." Mem. Op. at 49. But now that a different reality has been revealed with their deviously disguised Danchenko device, the essential nature of the illegal activities committed by the Defendants and advanced by their government funded disinformation co-conspirators shed essential new light. It illustrates their direct responsibility for compilation of the false evidence on the erroneous FISC docket as well as the historic record, which their conspiracy jointly pumped into the national headlines for years. In turn and as similarly found in the false court records now on the

docket in the instant case as well, the individual Defendants' actual underlying misrepresentations and

their own bad judgment which led to the FISA abuses against Dr. Page must now be remedied.[9]

Especially in light of the material and willfull misrepresentations regarding the hired Russian

political operative, and what this Court had similarly been misled to include in its initial Mem. Op.:

> "Because, as appellees concede, there is no record that [plaintiff-appellant] was advised of the administrative review procedure, he should not be penalized for bypassing it. His lack of knowledge of the appropriate channels of administrative review could have led him to forego that review which might have afforded him relief and that in turn deterred the District Court from reaching the merits of his claim." *Harper v. Kobelinski*, 589 F.2d 721, 723 (D.C. Cir. 1978) (per curiam)

In any case, the D.C. Circuit has long held that:

> "An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit… Summary judgment is warranted on the basis of agency affidavits when the **affidavits describe the justifications for nondisclosure with reasonably specific detail**, demonstrate that the information withheld logically falls within the claimed exemption, and **are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.**" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citations and internal quotation marks omitted, emphasis added).

As we have now learned through the Danchenko case, the specific detail previously proferred

regarding their essential dossier scheme were largely false and entirely unreasonable. The evidence of

the Defendants' bad faith cover-up payoffs of their hired political operatives have now come to light.

Particularly given the material and willfull misrepresentations which were recently revealed in the

Danchenko case, the forthcoming revisions to be filed in the amended complaint will be well within

---

[9]  "The Privacy Act allows for amendment of factual or historical errors. It is not, however, a vehicle for amending the judgments of federal officials or . . . others . . . as those *judgments* are reflected in records maintained by federal agencies." *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337-338 (D.C. Cir. 1992) (emphasis in the original and citation omitted). Accordingly, their core bad judgment and associated payoffs of political operatives represent the causal root of the problem, which should be more accurately reflected in the FISA abuse record against Dr. Page including the highly inadequate OIG Report by Michael Horowitz. Or as senior members of the U.S. Congress recently wrote to Defendants DOJ and the FBI: "This extraordinary fact pattern requires additional information from the Justice Department and FBI relating to why Danchenko was placed on the payroll and paid by the taxpayer to assist in the federal government's flawed investigation…" *See* U.S. Senate Danchenko Letter.

the statute of limitations which now has been extended by the Defendants' misconduct.

   **F.**      <u>**Service of Process on Does 1-10**</u>

   The Gov. Oppo. claims that: "Nor is Plaintiff entitled to take discovery to identify John Does

1-10. First, as with any other defendants, for the case to proceed against the John Does, Plaintiff was

required to complete service on the Doe defendants within 90 days of the filing of his complaint." ECF

121 at 14 (citations omitted).

   To the contrary, Fed. R. Civ. P. 15(c)(1) provides that:

   "*When an Amendment Relates Back*. An amendment to a pleading relates back to the date of the
   original pleading when: . . .
   (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or
   occurrence set out—or attempted to be set out—in the original pleading; or
   (C) the amendment changes the party or the naming of the party against whom a claim is
   asserted, if Rule 15(c)(1)(B) is satisfied and if, **within the period provided by Rule 4(m) for
   serving the summons and complaint, the party to be brought in by amendment:**
         **(i) received such notice of the action that it will not be prejudiced in defending on
         the merits; and**
         **(ii) knew or should have known that the action would have been brought against
         it, but for a mistake concerning the proper party's identity.** (emphasis added).

   Whereas Dr. Page, and indeed the U.S. Congress, have contacted the Defendants countless times

over the past five years for essential requisite information related to the FISA abuse offenses of those

respective employees, there is no question that they were on notice. For just a few of these examples,

*see* Dkt. 67-23 at 6-25. In addition, consistent with the major questions doctrine, concurrent with the

Danchenko payoffs and despite the countless corresponding errors in the OIG FISA abuse report about

the crimes against Dr. Page, the FBI Director ordered a new: "training requirement for FBI personnel

at all levels who handle FISA and CHS matters. This training will be experience-based, and it will

cover specific lessons learned from this Report…" *See* Press Release, FBI, FBI Director Christopher

Wray's Response to Inspector General Report (Dec. 9, 2019), <u>https://www.fbi.gov/news/press-</u>

<u>releases/press-releases/fbi-director-christopher-wray-response-to-inspector-general-report</u>.

Accordingly, each of those involved in the FISA abuse knew or should have known that an action would have been brought against them, but for and relieved only by their Co-Defendant FBI's coverup and continued secret payoffs of their hired political consultants such as Danchenko.

In addition and as correctly explained in *Scott v. Conley*, 937 F. Supp. 2d 60, 69 (D.D.C. 2013): "A court will not entertain a suit unless the defendant has been made a party by service of process. Courts do grant an exception . . . for 'John Doe' defendants, but only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." (citation and internal quotation marks omitted).  To this day, pending the Plaintiff's discovery motion in ECF 119-1 at 13-17, and besides for certain limited exceptions with the damning revelations from the recent Danchenko case, Dr. Page has never been had any opportunity to identify these unknown defendants.

## III.   CONCLUSION

For the reasons stated above, Plaintiff respectfully requests the Court grant Plaintiff's motions, including by permitting limited discovery as set forth herein and granting leave to amend.

Date: November 17, 2022                         Respectfully Submitted,


/s/ John M. Pierce
John M. Pierce
Bar ID: CA00096
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: jpierce@johnpiercelaw.com

*Attorney for Plaintiff*

25

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on this November 17, 2022, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

Amisha R. Patel, Esq.
Email:  amisha.patel@dechert.com
Dechert, LLP
1900 K Street, NW
Washington, DC 20006
*Counsel for James B. Comey*

David N. Kelley, Esq.
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone:  212-698-3500
Email:  david.kelley@dechert.com
*Counsel for James B. Comey*

Stormie Mauck, Esq.
DECHERT, LLP
2929 Arch Street
Cira Center
Philadelphia, PA 19104
Telephone:  215-994-2516
Email:  stormie.mauck@dechert.com
*Counsel for James B. Comey*

Brigida Benitez, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202) 429-6261
Email:  bbenitez@steptoe.com
*Counsel for Andrew McCabe*

William Bullock Pittard, IV, Esq.
Telephone:  (202) 640-2850
Email:   wpittard@kaiserdillon.com
Christopher Muha, Esq.

26

Telephone:  (202) 640-2850
(202) 280-1034 (fax)
Email:  cmuha@kaiserdillon.com
Sarah Renee Fink, Esq.
Telephone:  (202) 640-2850
Email:  SFink@kaiserdillon.com
KaiserDillon PLLC
1099 14th Street NW
8th Floor West Suite 800
Washington, DC 20005
*Counsel for Kevin Clinesmith*

Aitan Dror Goelman, Esq.
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone:  (202) 778-1996
(202) 822-8106 (fax)
Email:  agoelman@zuckerman.com
*Counsel for Peter Strzok*

Dorothy Ames Jeffress, Esq.
Telephone:  (202) 942-5968
(202) 942-5999 (fax)
Email:  amy.jeffress@aporter.com
Kaitlin Brooke Konkel, Esq.
Telephone:  (202) 942-5757
(202) 942-5999 (fax)
Email:  kaitlin.konkel@arnoldporter.com
Robert J. Katerberg, Esq.
Telephone:  (202) 942-5000
(202) 942-5999 (fax)
Email:  robert.katerberg@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001
*Counsel for Lisa Page*

James Koukios, Esq.
Telephone:  202-887-1590
202-887-0763 (fax)
Email:  JKoukios@mofo.com
Vanshika Vij, Esq.

Telephone:  202-887-1558
202-887-0763 (fax)
Email:  vvij@mofo.com
Robin A. Smith, Esq.
Telephone 202-247-1481
Email:  rsmith@mofo.com
Morrison & Foerster LLP
2100 L Street NW, Suite 900
Washington, DC 20037
*Counsel for Joe Pientka III*

Andrew Robert Hellman, Esq.
Telephone:  202-383-5300
Email:  andrewhellman@omm.com
Meaghan VerGow, Esq.
Telephone:  (202) 383-5300
(202) 383-5414 (fax)
Email:  mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
*Counsel for Stephen Somma*

Brian Matthew Heberlig, Esq.
Telephone:  (202) 429-3000
(202) 429-3902 (fax)
Email:  bheberlig@steptoe.com
Patrick Francis Linehan, III, Esq.
Telephone:  (202) 429-8154
(202) 429-3902 (fax)
Email:  plinehan@steptoe.com
James Martin Hobbs
Telephone:  202-429-8179
Email:  jhobbs@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036
*Counsel for Brian J. Auten*

Brigada Benitez, Esq.
Email:  bbenitez@steptoe.com
Lisa M. Southerland
Email:  lsoutherland@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Ave., NW

Washington, DC 20036
Telephone:  (202) 429-6261
*Counsel for Andrew McCabe*


Elizabeth Murray Tulis, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone:  (202) 514-9237
(202) 616-8470 (fax)
Email:  elizabeth.tulis@usDOJ.gov
*Counsel for U.S. Department of Justice*
*and the Federal Bureau of Investigation*

Amy E. Powell, Esq.
U.S. Department of Justice
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:  (919) 856-4013
Email:  amy.powell@usDOJ.gov
*Counsel for U.S. Department of Justice*
*and the Federal Bureau of Investigation*
*and the United States of America*

**Kristin McGrory**
DOJ-CIV
Torts Branch - FTCA
PO Box 880, Ben Franklin Station
Washington DC, DC 20044
Telephone:  202-616-4206
E-mail:   kristin.b.mcgrory@usDOJ.gov
*Counsel for the United States of America*

John M. Pierce

29