## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARTER PAGE,

*Plaintiff,*

v.

No. 20-cv-3460 (DLF)

JAMES B. COMEY, *et al.*,

*Defendants.*

## NOTICE OF APPEAL

Plaintiff hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from this Court's September 1, 2022 Order granting Defendants' motions to dismiss, *see* Order and Memorandum Opinion (Doc. Nos. 114 & 115) (collectively attached as Ex. 1), January 18, 2023 Order denying Plaintiff's Motion to Alter Judgment and for Relief from Judgment, *see* Order and Memorandum Opinion (Doc. Nos. 126 & 127) (collectively attached as Ex. 2), and all other orders and decisions comprised therein.

Respectfully submitted this day February 17, 2023.

*/s/ Gene C. Schaerr*
Gene C. Schaerr (D.C. Bar No. 416638)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel.: 202.787.1060
E-mail: gschaerr@schaerr-jaffe.com

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARTER PAGE, | |
| *Plaintiff*, | |
| v. | No. 20-cv-3460 (DLF) |
| JAMES B. COMEY *et al.*, | |
| *Defendants*. | |

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that the individual defendants' Motions to Dismiss, Dkts. 80–87, are

**GRANTED**.  It is further

**ORDERED** that the government defendants' Motion to Dismiss, Dkt. 88, is

**GRANTED**.  It is further

**ORDERED** that the plaintiff's Second Amended Complaint, Dkt. 73, is **DISMISSED**.  It

is further

**ORDERED** that Count Six (*Bivens*) is **DISMISSED WITH PREJUDICE**.  The

remaining counts are **DISMISSED WITHOUT PREJUDICE**.

The Clerk of Court is directed to close this case.

DABNEY L. FRIEDRICH
United States District Judge

September 1, 2022

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARTER PAGE, | |
| *Plaintiff*, | |
| v. | No. 20-cv-3460 (DLF) |
| JAMES B. COMEY *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

As part of its investigation into the alleged connection between the Trump 2016 presidential campaign and the Russian government, the Federal Bureau of Investigation obtained warrants under the Foreign Intelligence Surveillance Act (FISA) to electronically surveil Carter Page, an informal advisor to the campaign. Page alleges that the surveillance was unlawful because the warrant applications were false and misleading. He brings statutory and constitutional claims against the United States, the Department of Justice, the FBI, and individuals who worked at the FBI. Before the Court are the individual defendants' Motions to Dismiss, Dkts. 80–87, and the government defendants' Motion to Dismiss, Dkt. 88. For the reasons that follow, the Court will grant each motion.

## I.      BACKGROUND

### A.      Facts

#### 1.      *Operation Crossfire Hurricane*

On July 31, 2016, the FBI opened a counterintelligence investigation named "Operation Crossfire Hurricane" to determine whether individuals associated with the Trump presidential campaign were involved in coordinated activities with the Russian government. Second Am.

Compl. (SAC) ¶ 5, Dkt. 73.[1]  Plaintiff Carter Page, a "volunteer member of an informal foreign policy advisory committee" to the Trump campaign, alleges that he was targeted in this investigation.  *Id.* ¶¶ 5, 21.  According to Page, the FBI obtained four successive FISA warrants to electronically surveil him, despite there being no probable cause to suspect that he was a Russian agent.  *Id.* ¶ 3; 50 U.S.C. §§ 1804(a)(3)(A), 1805(a)(2)(A).

Allegedly, defendant Stephen Somma, then an FBI counterintelligence investigator, was the first to propose the surveillance of Page.  SAC ¶ 202.  After asking about the possibility of seeking FISA warrants, the FBI Office of General Counsel told Somma on August 15, 2016, that he needed more evidence to establish probable cause.  *Id.* ¶ 203.  Meanwhile, on August 17, the CIA told the Crossfire Hurricane team that Page had been a CIA "operational contact" from 2008 to 2013 and had helped the agency combat Russian and other foreign countries' intelligence-related activities.  *Id.* ¶ 11.  And on September 7, the CIA allegedly told defendants James Comey, then-director of the FBI, and Peter Strzok, then-Deputy Assistant Director of Counterintelligence, that 2016 presidential candidate Hillary Clinton had approved a plan to connect Trump and Russian hackers in order to distract the public from her use of a private email server.  *Id.* ¶ 12.

Page further alleges that soon after, on September 19, the FBI received information about a connection between the Trump campaign and Russia.  *Id.* ¶ 14.  Christopher Steele, a confidential source for the FBI, provided two reports alleging that Page engaged in "improper or unlawful communications or activities" with "two sanctioned Russians with close ties to Russian President Vladimir Putin."  *Id.* ¶¶ 14, 74.  Steele was paid by the Democratic National Committee and/or the

---

[1] In deciding these motions to dismiss, the Court accepts as true all material factual allegations in the complaint.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

Clinton campaign to perform political opposition research.  *Id.* ¶ 9.  The FBI used his reports as a basis to obtain a FISA warrant to surveil Page.  *Id.* ¶ 14.

According to Page, Steele's reports were "essentially the exclusive source of information supporting probable cause for the FISA warrant applications."  *Id.* ¶ 15.  FBI officials allegedly chose to proceed with and rely on Steele's information without adequately investigating his reliability and motives.  *See, e.g., id.* ¶¶ 15, 91, 157, 170.  And they falsely elevated Steele's credibility in the warrant applications and omitted facts that cast doubt on his claims.  *See, e.g.*, *id.* ¶¶ 17, 111.  At the same time, they never disclosed Page's previous work as an operational contact for the CIA in any of the four warrant applications.  *Id.* ¶¶ 17–18.

The DOJ Office of Inspector General (OIG) later investigated and revealed the FBI's "material failures" during this process.  *Id.* ¶ 42.  The Foreign Intelligence Surveillance Court (FISC) has indicated that Page's surveillance was "unlawful."  *Id.* ¶ 50.  Indeed, the government has conceded that it lacked probable cause to surveil Page under the last two warrants and also agreed to sequester information obtained from all four of the warrants.  *Id.* ¶ 48.  Below, the Court will describe Page's allegations about each warrant application, *see infra* Part I.A.2–5, and about each individual defendant's actions, *see infra* Part III.A.1.ii.c.

2.    *First FISA Warrant*

On September 23, 2016, soon after the FBI received Steele's reports, a Yahoo! News article repeated the allegations that Page met with two sanctioned Russians, according to a "well-placed Western Intelligence source."  SAC ¶ 76.  Although Steele's confidential source agreement with the FBI prohibited him from talking to the media about the information he provided to the FBI, allegedly he was the source for the article.  *Id.*  A draft application for the first FISA warrant acknowledged that he was the source for the article, though the draft was later changed to say that

Steele's business associate or client gave the information. *Id.* ¶ 80. The final version of the warrant application cited the Yahoo article as corroboration for Steele's allegations, even though he was the source for both. *Id.* ¶¶ 78, 80.

Two days after publication of the Yahoo article, Page sent a letter to Comey denying that he had contact with the sanctioned Russians and explaining his long history of interactions with the CIA and the FBI. *Id.* ¶ 81. Comey gave the letter to the Crossfire Hurricane team and its supervisor, Strzok. *Id.* Around the same time, Page told Stefan Halper, another FBI confidential source, that he was never involved with Russia on behalf of the Trump campaign. *Id.* ¶ 86. This was consistent with statements that other witnesses made during FBI interviews. *Id.* ¶¶ 85, 87. Allegedly, Page's denials were never disclosed by the FBI to DOJ attorneys. *Id.* ¶ 86. Meanwhile, even though a DOJ attorney asked Somma whether Page was ever a source for the CIA, Somma did not mention Page's years as a CIA operational contact. *Id.* ¶¶ 11, 72, 84, 205.

Page alleges that in early October, a DOJ attorney learned that Steele was performing political opposition research and thus grew concerned about his credibility. *Id.* ¶ 89. Strzok briefed Comey and defendant Andrew McCabe, then-Deputy Director of the FBI, about these concerns, but they "brushed [them] aside" and urged DOJ to move forward with the warrant application. *Id.* ¶ 91. Defendant Lisa Page, an FBI lawyer, told the DOJ attorney that Comey and McCabe had approved the decision to apply for the warrant; she also told McCabe that a "high-level push" might be necessary to get it approved. *Id.* After the DOJ attorney asked the FBI whether Steele had ties to any political campaign, a footnote was added to the application that indicated that Steele was hired to perform political opposition research. *Id.* ¶¶ 89–92. The footnote did not, however, reveal that Steele was paid with Democratic National Committee funds, a fact allegedly known to senior DOJ and FBI officials. *Id.* ¶¶ 93, 96.

The warrant application was submitted to the FISC on October 21, 2016. *Id.* ¶ 95. Defendant Joe Pientka III, an FBI supervisory special agent on the Crossfire Hurricane team, signed the authorization for its submission. *Id.* ¶ 198. Comey signed the warrant application. *Id.* ¶ 150. Based on Steele's reports, the application claimed that Page met with at least two Russian officials during a July 2016 trip to Russia. *Id.* ¶ 95. Allegedly, Pientka did not verify or correct the application's false statement that "Steele's reporting had been corroborated and used in criminal proceedings." *Id.* ¶ 199. Nor did he confirm, as FBI policy required, that Steele's FBI handling agent had reviewed and approved the application's content. *Id.* In fact, Page alleges that the handling agent had not done so because Somma failed to seek his review. *Id.* ¶ 206. According to the complaint, the application failed to disclose (1) Steele's funding source, (2) Page's work as a CIA operational contact, or (3) a witness's exculpatory statement that no one in the Trump campaign coordinated with Russia. *Id.* ¶¶ 87, 95–96. Further, it did not contain a "cautionary warning to be vigilant against politically motivated false reports" regarding Russia. *Id.* ¶ 95.

   3. *Second FISA Warrant*

  On October 31, 2016, Mother Jones published a story about Steele's reports to the FBI. *Id.* ¶ 101. After Steele admitted that he was the source for the story, his FBI handling agent told him to stop collecting information for the FBI and that it was unlikely that the agency would continue to work with him. *Id.* ¶¶ 101–103. On November 17, the FBI closed Steele as a source "for cause." *Id.* ¶ 104. FBI officials including Strzok and defendant Brian Auten, an FBI supervisory intelligence analyst on the Crossfire Hurricane team, investigated Steele's credibility during trips to London in November and December; several former colleagues reported on Steele's poor judgment and habit of pursuing politically risky people. *Id.* ¶¶ 105, 174–175, 180. Allegedly, Lisa Page, Strzok, Pientka, and other FBI personnel then learned more about Steele's anti-Trump bias

from DOJ official Bruce Ohr, who told them that Steele's reports were being relayed to the Clinton campaign. *Id.* ¶ 106.

Yet the FBI continued to receive information from Steele through various intermediaries. *Id.* ¶¶ 107–108. And his reliability continued to be called into question. Page further alleges that after Pientka and Somma received information from the Deputy Assistant Secretary of State that cast doubt on some of Steele's claims, no one from the Crossfire Hurricane team followed up with her to learn more. *Id.* ¶ 109. The FBI also learned in December that one of Steele's sources was possibly a Russian spy and intelligence officer. *Id.* ¶ 110.

The second warrant application to surveil Page was submitted to the FISC on January 12, 2017, also signed by Comey. *Id.* ¶¶ 111, 152. It acknowledged that the FBI's relationship with Steele was "suspended." *Id.* ¶ 111. But according to Page, it asserted, falsely, that Steele's information was reliable because earlier reporting had been verified and used in criminal proceedings. *Id.* The application did not mention Steele's questionable credibility due to his political motivations and the fact that one of his sources was a possible Russian intelligence officer. *Id.* ¶¶ 112–113. Nor did it include "any foreign intelligence information that had been gathered during the first three months" of Page's surveillance, as none had been produced. *Id.* ¶¶ 114–115.

> 4.   *Third FISA Warrant*

In late January 2017, the FBI, including Auten and Somma, interviewed Igor Danchenko, one of Steele's sources, for information about Page. *Id.* ¶¶ 120, 184, 209. The complaint alleges that Danchenko's statements "contradicted or undermined" the allegations that Steele had attributed to him. *Id.* And in March, two FBI agents, including Somma, conducted an "ambush interview" of Page. *Id.* ¶¶ 122, 210. They interviewed him four more times that month, and the information he provided did not support the contention that he was a Russian agent. *Id.* ¶ 121.

The third warrant application was submitted to the FISC on April 7, 2017, again signed by Comey, who was aware of the results of the Danchenko interview. *Id.* ¶¶ 122, 153. The application stated that Danchenko was "truthful and cooperative," but allegedly did not disclose that his answers contradicted Steele's allegations. *Id.* ¶ 121. And it claimed that the requested warrant would "continue to produce foreign intelligence information," even though no such evidence had been revealed in the past six months of surveillance. *Id.* ¶ 123. DOJ has since conceded to the FISC that it lacked probable cause when it sought the third warrant. *Id.* ¶ 119.

### 5.    *Fourth FISA Warrant*

Before the submission of the fourth warrant application, Page publicly stated that he had previously assisted the U.S. government. *Id.* ¶ 129. Accordingly, the affiant for the fourth application asked defendant Kevin Clinesmith, then-FBI assistant general counsel, whether Page had ever been a source for the CIA. *Id.* On June 15, a CIA liaison told Clinesmith in an email that Page had been a CIA source. *Id.* ¶ 130. Thereafter, Clinesmith falsely told the affiant that Page had been a "sub source" but "never a source." *Id.* ¶ 131. When the affiant asked for proof in writing, Clinesmith altered the email from the CIA liaison to state that Page was "not a [CIA] source." *Id.*[2] Relying on this email, the affiant signed the application. *Id.* ¶ 132.

The fourth warrant application was submitted to the FISC on June 29, 2017 and signed by McCabe. *Id.* ¶¶ 133, 163. Again, it did not disclose Page's status as a CIA operational contact or the results of the Danchenko interviews. *Id.* ¶¶ 134–135. It also asserted that the warrant would "continue to produce foreign intelligence information," despite, as Page alleges, the lack of any such information produced during the previous nine months of surveillance. *Id.* ¶ 136. DOJ has

---

[2] On August 19, 2020, Clinesmith pled guilty to making a false statement under 18 U.S.C. § 1001(a)(3). SAC ¶ 131; *see United States v. Clinesmith*, Minute Entry, No. 20-cr-165 (D.D.C. Aug. 19, 2020).

since conceded to the FISC that it lacked probable cause when it sought the fourth warrant.  *Id.* ¶ 127.

Page claims that the defendants, in seeking these four warrants, failed to comply with the FISA statute, FISC rules, and FBI policies.  *Id.* ¶¶ 52–62.  He also alleges that the defendants, after unlawfully obtaining the four warrants and thus his electronic communications, "used and disclosed" them to obtain the subsequent warrants, to "unlawfully pursue investigative ends," and to leak information to the media.  *Id.* ¶¶ 140–142.  According to Page, the United States has conceded in filings with the FISC that it has used and disclosed information obtained from the warrants in ways prohibited by that court.  *Id.* ¶ 231.

### 6.  *Media coverage and investigation*

On April 11, 2017, the Washington Post first reported about the FISA warrants obtained to surveil Page.  *Id.* ¶ 221.  The investigation of Page, it explained, was part of the FBI's Russia probe that had begun in July 2016.  *Id.*  The article revealed that a FISA warrant had been issued in 2016 and renewed at least once, based on a "lengthy declaration" with evidence that Page was a Russian agent.  *Id.*  It also mentioned Page's alleged meeting with one of the two sanctioned Russians, as disclosed by the Steele report.  *Id.*  Soon after, a New York Times article reported about the Russia probe and the Steele dossier, briefly discussing Page's alleged Russia ties.  *Id.* ¶ 224.  Lisa Page and Strzok exchanged texts about these articles.  *Id.* ¶¶ 220, 222–223, 225.  The complaint further alleges that they collaborated to leak protected information about Carter Page to the media, *see id.*, and that McCabe approved this plan, *id.* ¶ 225.

The DOJ OIG began investigating the Page warrants in March 2018.  *Id.* ¶ 232.  On December 9, 2019, the OIG released the Horowitz Report, which revealed that the FISA warrants lacked probable cause and were "unlawfully obtained."  *Id.* ¶ 233.  In the months before the report's

release, the OIG provided it to some of the defendants in this case for review and comment.  *Id.*

¶ 234.  During this time, Page sent numerous emails to DOJ and the OIG, asserting his right under

the Privacy Act to review and amend the forthcoming report.  *Id.* ¶¶ 238, 240, 242, 244.  But his

requests went largely unanswered; the OIG general counsel told him only that the OIG would not

contact him for an interview.  *Id.* ¶ 249.  Page alleges that the Horowitz Report contains numerous

errors that he has "a right to have amended."  *Id.* ¶ 250.

### B.   Procedural History

On November 27, 2020, Page filed suit, bringing claims against individual, institutional,

and unknown defendants.  *See* Compl., Dkt. 1.  He brought claims under FISA, 50 U.S.C. § 1810,

and *Bivens* against defendants Comey, McCabe, Clinesmith, Strzok, Lisa Page, Pientka, Somma,

and Auten.  *Id.* ¶¶ 216–234, 243–250; *see also* SAC ¶¶ 256–274, 283–289.  He sued the United

States under the Federal Tort Claims Act (FTCA), Compl. ¶¶ 235–242; *see also* SAC ¶¶ 275–282,

and DOJ and the FBI under the Privacy Act, Compl. ¶¶ 251–263; *see also* SAC ¶¶ 290–302.  He

filed an Amended Complaint on April 15, 2021.  Am. Compl., Dkt. 51.

Meanwhile, Page was in the process of exhausting his administrative remedies under the

PATRIOT Act.  SAC ¶ 306; 18 U.S.C. § 2712(b)(1).  He presented an administrative claim to DOJ

on September 30, 2020, which was denied on April 22, 2021.  SAC ¶ 306.  Accordingly, Page

filed his Second Amended Complaint on June 8, 2021, adding a claim against the United States

for a violation of the PATRIOT Act, 18 U.S.C. § 2712.  *Id.* ¶¶ 303–311.

Each individual defendant separately moves to dismiss the FISA and *Bivens* claims.  *See*

Mots. to Dismiss, Dkts. 80–87.  The United States, the FBI, and DOJ move to dismiss the FTCA,

Privacy Act, and PATRIOT Act claims.  *See* Gov't Mot. to Dismiss, Dkt 88.

## II.   LEGAL STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).  When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citations and internal quotation marks omitted).  But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted).  A court that lacks jurisdiction must dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative

level.").  A complaint need not contain "detailed factual allegations," *Iqbal*, 556 U.S. at 678, but

alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line

between possibility and plausibility," *id.* (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and

the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all

inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471,

476 (D.C. Cir. 2012) (internal quotation marks omitted).  The assumption of truth does not apply,

however, to a "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (internal

quotation marks omitted).  An "unadorned, the defendant-unlawfully-harmed-me accusation" is

not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."  *Id.*  Ultimately, "[d]etermining whether a complaint

states a plausible claim for relief [is] a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense."  *Id.* at 679.

## III.    ANALYSIS

The defendants seek to dismiss the complaint on statute of limitations grounds and for

failure to state a claim.  The United States also moves to dismiss the FTCA claim and one of the

Privacy Act claims on the basis that the Court lacks jurisdiction over them.  The Court will first

address the claims against the individual defendants, followed by the claims against the

institutional defendants.

### A.    Individual Defendants

Page brings four counts against the individual defendants for FISA violations, one for each

warrant, under 50 U.S.C. § 1810.  SAC ¶¶ 256–274.  He also brings a claim under *Bivens v. Six

Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), seeking damages for

11

alleged violations of his Fourth Amendment rights.  SAC ¶¶ 283–289.  The Court will address each claim in turn.

1.   *FISA Claims*

FISA governs the procedures for "governmental electronic surveillance of communications for foreign intelligence purposes."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); 50 U.S.C. § 1801 *et seq.* (1978).  To obtain a surveillance order, a federal officer must submit an application to a FISC judge that satisfies various statutory criteria.  50 U.S.C. § 1804(a)(1)–(9).  For instance, the applicant must include, upon oath or affirmation, "a statement of the facts and circumstances relied upon by the applicant to justify his belief that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power."  *Id.* § 1804(a)(3), (a)(3)(A).  The judge shall approve the application if, among other requirements, "there is probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power."  *Id.* § 1805(a)(2), (a)(2)(A).  The judge makes this determination "on the basis of the facts submitted by the applicant."  *Id.* § 1805(a)(2).

A person may be criminally liable "if he intentionally . . . (1) engages in electronic surveillance under color of law except as authorized" by FISA, the Wiretap Act, and certain other federal statutes, or "(2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by the same statutes.  *Id.* § 1809(a).  An "aggrieved person" has a civil cause of action against those who violated § 1809(a).[3]  *Id.* § 1810.  Page alleges that the individual defendants violated §§ 1809(a) and 1810 both by unlawfully engaging in electronic

---

[3] An "aggrieved person" is a "person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance."  50 U.S.C. § 1801(k).

surveillance and using or disclosing the fruits of that surveillance.  SAC ¶¶ 260, 264, 268, 272.

The defendants argue that these claims are time-barred.  Alternatively, each defendant claims that

Page fails to sufficiently allege that he or she violated the statute.  The Court finds that the claims

are not time-barred but that Page does not state a claim against any of the individual defendants.

i.   Statute of Limitations

A statute of limitations defense may be raised in a pre-answer Rule 12(b)(6) motion only

"when the facts that give rise to the defense are clear from the face of the complaint."  *Smith-*

*Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).  When a "cause of action

created by a federal statute" has no express limitations period, courts "generally borrow the most

closely analogous state limitations period."  *Graham Cnty. Soil & Water Conservation Dist. v.*

*United States ex rel. Wilson*, 545 U.S. 409, 414 (2005) (internal quotation marks omitted).  In rare

cases, courts borrow analogous federal limitations periods but only where applying the state

limitations period would frustrate federal policy.  *Id.* at 415; *N. Star Steel Co. v. Thomas*, 515 U.S.

29, 34–35 (1995).

FISA's civil cause of action does not contain a statute of limitations.  *See* 50 U.S.C. § 1810.

The Court cannot locate, and the parties do not provide, any case that has decided the appropriate

statute of limitations for a FISA claim.  The parties disagree over the proper statute of limitations

period.  The defendants argue that Page's FISA claim is most analogous to libel, slander, or

invasion of privacy, so D.C.'s one-year limitations period should apply.[4]  *See* D.C. Code § 12-

301(4) (libel or slander); *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1061–62 (D.C. 2014)

---

[4] *See* McCabe Mot. to Dismiss at 24–25 & n.9, Dkt. 80; Clinesmith Mot. to Dismiss at 15, Dkt.
81; Strzok Mot. to Dismiss at 9, Dkt. 82; Lisa Page Mot. to Dismiss at 15, Dkt. 83; Pientka Mot.
to Dismiss at 7, Dkt. 84; Somma Mot. to Dismiss at 10–11, Dkt. 85; Auten Mot. to Dismiss at 11,
Dkt. 86; Comey Mot. to Dismiss at 18, Dkt. 87.

(invasion of privacy).  Alternatively, they point to the two-year limitation for violations of the federal Wiretap Act, *see* 18 U.S.C. § 2520(e) (running from "the date upon which the claimant first has a reasonable opportunity to discover the violation"), and the federal Stored Communications Act, *see id.* § 2707(f) (running from "the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation").[5]  Page rejects these and instead relies on the three-year limitations period that D.C. law prescribes for actions "for which a limitation is not otherwise specifically prescribed."  Pl.'s Omnibus Opp'n at 65, Dkt. 98 (citing D.C. Code § 12-301(8)).[6]

The Court agrees with Page.  As a starting point, applying an analogous federal limitations period is the "exception," and the defendants provide nothing to overcome "[t]he presumption that state law will be the source of a missing federal limitations period."  *N. Star Steel Co.*, 515 U.S. at 35; *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 157–70 (1987) (Scalia, J., concurring) (questioning the legitimacy of borrowing analogous federal limitations periods).  Looking to D.C. law, the residual three-year limitations period, *see* D.C. Code § 12-301(8), fits best.  Page's claim is for an unlawful search, which is not akin to the intentional torts listed in D.C. Code § 12-301(4).  Courts in this district, when borrowing analogous state limitations periods, have applied the residual three-year period when the claim at issue does not resemble those enumerated intentional torts.  *See Bame v. Clark*, 466 F. Supp. 2d 105, 109 (D.D.C. 2006) (applying the three-year limit to an unlawful search claim); *Berman v. Crook*, 293 F. Supp. 3d 48,

---

[5] *See* McCabe Mot. to Dismiss at 24 n.10; Clinesmith Mot. to Dismiss at 18; Strzok Mot. to Dismiss at 9; Pientka Mot. to Dismiss at 7; Somma Mot. to Dismiss at 13; Auten Mot. to Dismiss at 11; Comey Mot. to Dismiss at 18.

[6] McCabe and Pientka recognize that the three-year limitations period could apply.  *See* McCabe Mot. to Dismiss at 24–25; Pientka Mot. to Dismiss at 7.

56 (D.D.C. 2018) (applying the three-year limit to an unlawful search claim based on alleged falsity in the warrant application); *Lederman v. United States*, 131 F. Supp. 2d 46, 61–62 (D.D.C. 2001) (applying the three-year limit to First and Fourth Amendment claims). Page's FISA claim more closely resembles these constitutional claims, as he alleges "unwarranted government intrusion," *Bame*, 466 F. Supp. 2d at 109, as opposed to a common-law intentional tort committed by "private persons," *see Lederman*, 131 F. Supp. 2d at 61 (quoting *Payne v. Gov't of Dist. of Columbia*, 559 F.2d 809, 817 n.32 (D.C. Cir. 1977)). Accordingly, the Court will apply the three-year time bar, meaning Page's claim must have accrued on or after November 27, 2017 to be timely.

Federal law governs the accrual of federal claims, and it specifies that the statute of limitations begins to run when the plaintiff has a "complete and present cause of action." *Loumiet v. United States*, 828 F.3d 935, 947 (D.C. Cir. 2016) (citation omitted). Federal courts "generally apply a discovery accrual rule when a statute is silent on the issue, as [FISA] is here." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). And "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Id.*; *see also Sprint Commc'ns Co. v. FCC*, 76 F.3d 1221, 1228 (D.C. Cir. 1996) ("Accrual does not wait until the injured party has access to or constructive knowledge of all the facts required to support its claim.").

The complaint reveals that, at the latest, Page learned about the FISA warrants when the Washington Post broke the story on April 11, 2017. SAC ¶ 221. The article disclosed quite a bit of information about Page's claim: (1) the FBI and DOJ were involved; (2) the agencies convinced a FISC judge that there was probable cause to believe that Page was an agent of Russia; (3) a partially unverified "dossier compiled by a former British intelligence officer" alleged that Page met with a Putin confidant in Russia; and (4) a warrant issued in 2016 and was renewed at least

once. *Id.*; *see also* Comey Mot. to Dismiss Ex. 5 (Wash. Post Article) at 2, Dkt. 87-7. Plus, Page is quoted in the article, saying, "This confirms all of my suspicions about unjustified, politically motivated government surveillance." Wash. Post Article at 3.[7] He "dismissed what he called 'the dodgy dossier' of false allegations" and denied that he met with the Russian. *Id.* at 4. Accordingly, by April 11, 2017, Page knew that he was subject to surveillance by the FBI and DOJ, and he suspected that the allegations, and the ensuing warrants, were baseless.

In a typical case, that might be enough for a claim to accrue. For example, in a medical malpractice case, the claim accrues when the plaintiff knows that "he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979). Accrual does not wait until he knows that "his injury was negligently inflicted," because a "reasonably diligent" plaintiff can "seek[] advice in the medical and legal community" and can thus learn "if he has been wronged." *Id.* at 122–23. This holds true even where "a considerable effort may be required" to determine whether a claim is actionable. *Rotella*, 528 U.S. at 556.

But in some contexts, more is required before a plaintiff is deemed to be on notice of his claim. In *Klein v. City of Beverly Hills*, for instance, the plaintiff brought a § 1983 suit alleging that police detectives obtained search warrants based on false statements and omissions. 865 F.3d 1276, 1278 (9th Cir. 2017). The court held that this judicial deception claim began accruing not when the unlawful search occurred, but rather when the underlying affidavit was "reasonably available." *Id.* at 1278–79. Without the affidavit, which revealed that the officers misled the judge, the plaintiff could not "discover the underlying illegality." *Id.* at 1279. In order to ensure

---

[7] Page did not include this portion of the article in his complaint. But because the complaint "specifically references" and relies on the article, the Court may consider it in its entirety without converting the motion into one for summary judgment. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). Page does not object to the defendants' reliance on the article. *See* Pl.'s Omnibus Opp'n at 64–67.

that plaintiffs not file "unripe and factually unsupported" suits to "preserve their claims," the court ruled that "accrual need not begin at the time of the search" as long as "a diligent plaintiff has pursued the underlying affidavit without success." *Id.*; *see also Berman*, 293 F. Supp. 3d at 56 (plaintiff's claim for unlawful search based on a faulty warrant accrued the year that he learned of the search and received a redacted affidavit, "including the portions with the statements that he now alleges were false").

Similarly, the plaintiffs in *Hobson v. Wilson* alleged that they were victims of an unlawful FBI program that infringed their First Amendment rights. 737 F.2d 1, 38–39 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993). Because the defendants "offered no evidence of what plaintiffs could have done to find out more about their claims, short of filing suit," the D.C. Circuit found that their claims accrued only when they knew both that they were targets of FBI investigation and surveillance *and* that the program was unconstitutional. *Id.* at 35 n.107, 38–41. As the Circuit explained, a plaintiff's suspicion or awareness of government surveillance or investigation, standing alone, "cannot conceivably constitute [actual] notice of possible" illegality, "without creating the anomalous situation of requiring persons to file suit on a hunch, only to be dismissed for failure to state a claim." *Id.* at 38–39.

Thus, in the context of government searches and surveillance, the rationale for the typical application of the discovery rule—that a diligent plaintiff, after discovering his injury, can gather enough information to state a claim within the limitations period—does not necessarily apply. This is especially true for FISA claims given the "secrecy shrouding the FISA process." *United States v. Daoud*, 755 F.3d 479, 486 (7th Cir. 2014) (Rovner, J., concurring). Indeed, when the government notifies a criminal defendant that it plans to introduce evidence obtained from FISA

surveillance of him, even then he is rarely given access to the underlying FISA application.  *Id.* at

484 (majority opinion); *id.* at 490 (Rovner, J., concurring).

Here, the face of the complaint does not reveal when Page's claim accrued.  Even though

Page knew in April 2017 that he was under FISA surveillance and suspected that it was unjustified,

it is far from clear that a diligent investigation would have revealed enough evidence of illegality

to avoid "fil[ing] suit on a hunch."  *Hobson*, 737 F.2d at 39.  The complaint does not allege that

Page had access to the underlying affidavits.  *See generally* SAC.  Nor did the April 2017

Washington Post article describe the contents of the affidavits, and it is unlikely that Page would

have been granted full access to them.  *See Daoud*, 755 F.3d at 486 (Rovner, J., concurring).

Though his suspicions of unlawful surveillance did not trigger the need to sue, it did "require[]

him to make inquiries in the exercise of due diligence."  *Hobson*, 737 F.2d at 35; *see also Klein*,

865 F.3d at 1279 (the accrual date is delayed to a point after notice of the search as long as the

plaintiff has diligently "pursued the . . . affidavit without success").  It is unclear from the

complaint what investigative steps, if any, Page took or could have taken after April 2017.  It is

possible that he failed to search for the facts needed for his claim, or that he was adequately on

notice of his claim well before the release of the Horowitz Report on December 9, 2019, which

Page contends is the proper accrual date.  *See* Pl.'s Omnibus Opp'n at 9, 67.  But at this juncture,

the complaint does not conclusively show that Page was sufficiently on notice of his claims before

November 27, 2017.  Accordingly, the Court will not dismiss his FISA claims as time-barred and

will instead proceed to the merits.[8]

---

[8] The defendants refer to materials outside the complaint to demonstrate Page's knowledge of his
claims.  *See, e.g.*, Clinesmith Mot. to Dismiss at 17.  Even if the Court were inclined to take judicial
notice, none of these documents shows that, before November 27, 2017, Page was on sufficient
notice of his claims so as to trigger accrual.

ii.      Engaging in Electronic Surveillance

Page alleges that "the individual Defendants and others, known and unknown to [him], engaged in electronic surveillance against [him] that was not lawfully authorized by FISA" and "aided and abetted one another in doing so."  SAC ¶ 260; *see also id.* ¶¶ 264, 268, 272.  As an initial matter, the Court finds, and the defendants do not contest, that Page's surveillance, at least as alleged, was unlawful.  Surveillance pursuant to a warrant obtained without probable cause is not "authorized" by FISA.  50 U.S.C. § 1809; *see also id.* §§ 1804(a), 1805(a).  The complaint alleges material errors and omissions in each application that plausibly misled the FISC into an erroneous finding of probable cause.  *See, e.g.*, SAC ¶¶ 16–19, 42–46.  Indeed, the government has already conceded as much for the last two warrants.  *Id.* ¶¶ 50–51.

Because Page's claims are rooted in FISA §§ 1809(a) and 1810, the Court must look there to determine if he has a cause of action against these defendants for the concededly unlawful searches.  Section 1810 provides "a cause of action against any person who committed [a] violation [of § 1809]," which in turn prohibits "intentionally . . . engag[ing] in [unauthorized] electronic surveillance," § 1809(a).[9]  Therefore, the relevant question is whether the complaint adequately alleges that these defendants "intentionally engage[d] in electronic surveillance" within the meaning of the statute.  *Id.*  Page argues that the defendants are liable as both aiders and abettors as well as principals, because they "supervis[ed]," "facilitat[ed]," "prepar[ed]," "approv[ed]," and "submit[ted]" the "false" applications, which  "cause[d] others to physically engage in the unlawful surveillance."  *See* Pl.'s Omnibus Opp'n at 32, 34, 49, 51.  But his FISA claim fails for

---

[9] The Court addresses Page's "use or disclosure" claims under §§ 1809(a) and 1810 below in Part III.A.1.iii.

two reasons: § 1810 does not allow for aiding and abetting liability, and the phrase "engage in electronic surveillance" does not cover any of the defendants' alleged actions.

### a.  Aiding and Abetting Liability

"[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 182 (1994).  Instead, courts presume that "statutory silence on the subject of secondary liability means there is none." *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 93 (D.D.C. 2017) (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008)).  Neither FISA § 1809(a) nor § 1810 reference any form of secondary liability.  Thus, the statute's "plain language shows that Congress had one category of offenders in mind—i.e., those who directly" engage in unauthorized surveillance.  *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 27 (D.D.C. 2012).  Congress's express inclusion of an aiding and abetting provision in another section of FISA, *see* 50 U.S.C. § 1801(b)(1)(B), (E) (defining "[a]gent of a foreign power"), further indicates that it did not "intend[] § [1810] to authorize civil liability for aiding and abetting through its silence," *Owens*, 235 F. Supp. 3d at 93 (citation omitted).

Page offers little in response.  Because the criminal aiding and abetting statute, 18 U.S.C. § 2, applies to criminal violations of 50 U.S.C. § 1809(a), he assumes that aiding-and-abetting liability also applies to the civil cause of action in § 1810.  Pl.'s Omnibus Opp'n at 16.  But Congress has not enacted an analogous *civil* aiding and abetting provision and instead takes a "statute-by-statute approach." *Cent. Bank of Denver*, 511 U.S. at 182–83.  And § 1810 makes no mention of aiding and abetting liability.  Moreover, courts, including this one, have held that

plaintiffs cannot bring a civil action using a secondary liability theory under the Stored Communications Act, which similarly incorporates that Act's criminal provision. *See Gaubatz*, 891 F. Supp. 2d at 27; *Broidy Cap. Mgmt. v. Muzin*, No. 19-cv-150, 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020) (collecting cases). Thus, to state a claim under § 1810, Page must allege that the individual defendants *personally* engaged in unauthorized surveillance, not simply that they *aided* those who did. *See Cent. Bank of Denver*, 511 U.S. at 177–78.

> b. "Engaging in Electronic Surveillance" Defined

To determine the meaning of the phrase "engage[] in electronic surveillance," the Court starts, as it must, with the text. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). To "engage" means "to take part" or "participate." *Engage*, Merriam-Webster's New Collegiate Dictionary 378 (1977). And the common meaning of "electronic surveillance" is akin to "[e]avesdropping," *Electronic Surveillance*, Black's Law Dictionary (5th ed. 1979), which in turn is defined as "listen[ing] surreptitiously to" or "observ[ing]" an individual in "a private place," or "[i]nstalling or using . . . any device" to do so," *Eavesdropping*, Black's Law Dictionary (5th ed. 1979). *See also Wiretapping*, Black's Law Dictionary (5th ed. 1979) ("A form of electronic eavesdropping where, upon court order, enforcement officials surreptitiously listen to phone calls"); *Surveillance*, Oxford English Dictionary (2d ed. 1989) ("Watch or guard kept over a person[.]"). More importantly, FISA itself defines "electronic surveillance." That definition includes, as relevant here:

> [T]he acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f)(1).[10]

The statute's criminal and civil liability provisions cover those who participate in the acquisition, by a particular device, of the contents of certain communications sent or received by a targeted person. The breadth of the phrase "engage in electronic surveillance" depends on the term "acquisition." If it were understood expansively to encompass the entire FISA surveillance process, the statute could presumably provide liability for many different actors: those who took part in the decision to surveil (with or without a warrant), the preparation and submission of the warrant application (if any), and the collection of the communications, among other things. But text, structure, and context point toward a much narrower reading. *See Robinson*, 519 U.S. at 341.

Turning first to the text, the ordinary meaning of "acquisition" is "the *act* of acquiring," *Acquisition*, Merriam-Webster's New Collegiate Dictionary 11 (1977) (emphasis added), not the process behind it. That "acquisition" is followed in the statute by the term "by an electronic, mechanical, or other surveillance device" further indicates that its statutory meaning is tethered to the actual collection of the communications by specified means, as opposed to the pre-collection investigation or authorization stage. One who engages in acquisition is one who takes part in the act of obtaining communications by using a device. *See also* 50 U.S.C. § 1810(f)(4) ("[E]lectronic surveillance" also means "the *installation* or *use* of an electronic, mechanical, or other surveillance *device* in the United States for monitoring *to acquire information*." (emphasis added)).

This narrower reading of FISA's definition of "electronic surveillance" comports with common usage of that term. "Surveillance" has long been understood to refer to the specific act

---

[10] While this first definition is relevant to Page as a "target[ed]" and "known United States person who is in the United States," *id.*, FISA also includes three other definitions for "electronic surveillance," *see id.* § 1801(f). Each of the other three definitions is similarly limited to the "acquisition by an electronic, mechanical, or other surveillance device," *id.* §§ 1801(f)(2), (3), or "installation or use of an electronic, mechanical, or other surveillance device," *id.* § 1801(f)(4).

of collecting information by listening to or watching someone.  *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 354 (1967) ("The agents confined their surveillance to the brief periods during which [the petitioner] used the telephone booth, and they took great care to overhear only the conversations of the petitioner himself." (footnote omitted)); *Lopez v. United States*, 373 U.S. 427, 465 (1963) (Brennan, J., dissenting) (comparing "electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and disguise").  That activity is distinct from the process of getting a warrant.  *See, e.g.*, *United States v. U.S. Dist. Court* (*Keith*), 407 U.S. 297, 315 (1972) (addressing whether the Fourth Amendment "requir[es] a warrant before [electronic] surveillance is undertaken"); *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 179 (1977) (Stevens, J., dissenting) (referring to "the Government's application for permission to engage in surveillance by means of a pen register").  To interpret the phrase "engage in electronic surveillance" to include the process of getting the warrant would trample on this common understanding.  The application for an order approving electronic surveillance and the actual surveillance are not one and the same.

Other provisions of FISA confirm this interpretation.  FISA defines "[a]gent of a foreign power" to include, among others, "any person other than a United States person who . . . *engages in* the international proliferation of weapons of mass destruction, or *activities in preparation* therefor . . . or knowingly *aids or abets* [or *conspires* with] any person in the conduct of such proliferation or activities in preparation therefor[.]"  50 U.S.C. § 1801(b), (b)(1)(E) (emphasis added).  This language implies that "engaging in" an activity does not include preparing for it or aiding the primary actors.[11]  And unlike that section, FISA's liability provisions omit any reference

---

[11] The defendants point to the Supreme Court's decisions in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), and *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), to support their

to preparation, aiding, abetting, or conspiring. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)).

Further, the FISA application must state "the period of time for which the electronic surveillance is required to be maintained," 50 U.S.C. § 1804(a)(9), implying that the surveillance has not yet begun. In fact, Page's complaint recognizes this distinction: it alleges that the defendants "unlawfully obtained the four warrants" and then "used the warrants to engage in surveillance of him." SAC ¶ 140. And § 1809(b), the statutory defense for a § 1809(a) violation, refers to "electronic surveillance [that] was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction." If engaging in electronic surveillance included the process of getting the court order, this sentence would make very little sense.

FISA's provisions detailing "minimization procedures," 50 U.S.C. §§ 1801(h), 1804(a)(4), 1805(c)(2)(A), likewise confirm that "acquisition" is a specific, narrow stage in the FISA process. Minimization procedures, which balance privacy concerns with "the need of the United States to obtain, produce, and disseminate foreign intelligence information," specifically differentiate between the "acquisition," "retention," and "dissemination" of information. *See id.* § 1801(h)(1). In the minimization context, "acquisition" refers to the actual gathering of information, for instance, by "tapp[ing]" a switchboard line. *In re Sealed Case*, 310 F.3d 717, 731 (FISA Ct. Rev.

---

argument that the phrase "engage in" means "to do." *See* Rough Hr'g Tr. at 5–6, 10–12. In both cases, the Court indicated that "engaged in" has a narrower meaning than other formulations, such as "affecting" or "involving." *Saxon*, 142 S. Ct. at 1789 (citing *Circuit City*, 532 U.S. at 118). These decisions offer limited support, however, because both addressed the meaning of "engaged in foreign or interstate commerce" under 9 U.S.C. § 1, which has a particular statutory history that is not relevant here. *See Saxon*, 142 S. Ct. at 1789–90; *Circuit City*, 532 U.S. at 111–21.

2002) ("By minimizing *acquisition*, Congress envisioned that, for example, 'where a switchboard line is tapped but only one person in the organization is the target, the interception should probably be discontinued where the target is not a party' to the communication." (quoting H. Rep. No. 95–1283, at 55–56)).[12]  Acquisition thus refers to the information collection phase of FISA.

A helpful parallel can be found in the "physical search" provision of FISA.  Like an electronic surveillance, a physical search can occur only after the FISC approves an application that establishes probable cause that the target is a foreign power or agent of a foreign power.  50 U.S.C. §§ 1823(a)(3)(A), 1824(a)(2)(A).[13]  But a person is liable for an unlawful physical search only if he "intentionally . . . under color of law for the purpose of obtaining foreign intelligence information, *executes* a physical search within the United States except as authorized by statute." *Id.* § 1827(a) (emphasis added).  Section 1828 allows "any aggrieved person . . . whose premises, property, information, or material has been subjected to a physical search" to sue "any person who committed such violation."  *Id.* § 1828.  Congress thus created a remedy only against those who execute, or "carry out," the unlawful search, as opposed to those who procure the order that allows the search to happen.  *Execute*, Oxford English Dictionary (2d ed. 1989).

---

[12] The government properly minimizes information during the acquisition phase if, for instance, "before executing the FISC order the FBI verified the facilities subject to the approved" surveillance and "subsequently, the collections were conducted during the approved times using the least physical intrusion necessary." *United States v. Turner*, 840 F.3d 336, 342 (7th Cir. 2016). On the other hand, minimization at the retention stage includes "destroy[ing]" information that has already been collected, if it "is not necessary for obtaining[,] producing, or disseminating foreign intelligence information." *In re Sealed Case*, 310 F.3d at 717 (quoting H. Rep. at 56) (second alteration in original).  And at the dissemination stage, minimization requires "restrict[ing]" collected information "to those officials with a need for such information."  *Id.*

[13] A "physical search" means "any physical intrusion within the United States into premises or property (including examination of the interior of property by technical means) that is intended to result in a seizure, reproduction, inspection, or alteration of information, material, or property, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes[.]"  50 U.S.C. § 1821(5).

The Wiretap Act also serves as a useful comparison.[14]   A person violates the Act if he "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" unless it is authorized by statute.  18 U.S.C. § 2511(1)(a).  The definition of "intercept" is nearly identical to one for "electronic surveillance": "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). By prohibiting both intercepting (i.e., acquiring) and procuring another to intercept, the Act implies that "acquisition" itself does not include a procurement component.  And unlike the Wiretap Act, FISA does not include the procurement phrase, supporting the conclusion that FISA covers only acquisition, not the procurement of others to acquire the target's communications.

Accordingly, one who "engage[s] in electronic surveillance" under §§ 1809(a) and 1810 is one who participates in *collecting* the target's communications using certain devices.[15]  To be sure,

---

[14] The Wiretap Act, enacted in 1968, "provided procedures for obtaining electronic surveillance warrants in certain criminal investigations."  *United States v. Belfield*, 692 F.2d 141, 144 (D.C. Cir. 1982).  FISA was passed ten years later to address electronic surveillance in the national security space.  *Id.* at 145.  The Wiretap Act and FISA prescribe "the exclusive means by which electronic surveillance, as defined in [FISA], and the interception of domestic wire, oral, and electronic communications may be conducted."  18 U.S.C. § 2511(2)(f).

[15] The Court has found, and the parties have provided, very little caselaw on §§ 1809 and 1810.  Although the few relevant cases do not analyze the meaning of phrase "engage in electronic surveillance," as the Court has done here, they are generally consistent with the Court's ruling.  *See United States v. Koyomejian*, 946 F.2d 1450, 1459 n.16 (9th Cir. 1991) ("[Section] 1809(a) is best understood as subjecting to criminal liability anyone who *performs* electronic surveillance as defined by FISA" without authorization (emphasis added)).  In *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), *rev'd on other grounds*, 142 S. Ct. 1051 (2022), the court found that allegations that agents "had audio surveillance" in their house, "were responsible for planting [the] devices," and had once entered the mosque where they had electronic surveillance devices, plausibly stated a claim under § 1810 for "install[ing] or us[ing] . . . [a] device . . . for monitoring to acquire information."  *Id.* at 1038; 50 U.S.C. § 1801(f)(4).  That court went further by implying that supervising agents might have been liable had the complaint alleged that they "ordered or arranged for[] the planting of the recording devices," *id.* at 1039, but the court did not decide that issue.  And it did not perform a textual analysis of the meaning of "engage in electronic surveillance," as the Court does here.

surveillance pursuant to a warrant cannot occur absent an application and order of approval from the FISC. *See* Pl.'s Omnibus Opp'n at 49. But Congress chose to create individual liability only for the actors involved in conducting the surveillance, rather than those responsible for gaining approval to do so. Those who work on the FISA applications may "aid[], abet[], counsel[], command[], induce[], or procure[]" the eventual surveillance, *see* 18 U.S.C. § 2, but as explained above, Congress did not provide for aiding and abetting liability in § 1810, and the statutory terms are not broad enough to encompass those actions.

This plain-text understanding—that Congress allowed suit against only those who conduct unauthorized surveillance, and not those who at the application stage mislead the FISC to approve that surveillance—may seem odd. But it is not so "absurd when considered in the particular statutory context," as the Court must. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). FISA was enacted in 1978 to address the issue of warrantless surveillance in the national security context. In *Katz*, the Supreme Court held that the Fourth Amendment applied to electronic surveillance, 389 U.S. at 353, but left open whether the warrant requirement applied "when the President was acting pursuant to his powers to protect the national security or to conduct the nation's foreign affairs," *Belfield*, 692 F.2d at 145 (citing *Katz*, 389 U.S. at 358 n.23). Later, in *Keith*, the Court explained that there was no national security exception to the warrant requirement with regard to "domestic threats to national security," and left open whether warrants were required "with respect to activities of foreign powers or their agents." 407 U.S. at 321–22. Congress, in response to *Keith* and "to post-Watergate concerns about the Executive's use of warrantless electronic surveillance," enacted FISA to "establish a regularized procedure" for such surveillance "in the foreign intelligence and counterintelligence field." *Belfield*, 692 F.2d at 145. FISA generally, with a few exceptions, "requires a court order authorizing foreign intelligence

electronic surveillance," and details numerous steps that must be followed to get an order. *Id.* at 145–46.

In sum, FISA was passed to counter the abuses of *warrantless* surveillance. This historical context helps explain why § 1809(a) applies to agents who conduct unauthorized surveillance— typically, that means without a court order—rather than those who help obtain faulty warrants. This gap in coverage seems evident now, but it likely was not in 1978. Accordingly, the Court's understanding of § 1809(a)'s ordinary meaning is bolstered by FISA's history.

Further, those aggrieved by surveillance conducted pursuant to a warrant lacking in probable cause are not entirely without a remedy. As discussed, they can sue the agents who conduct the search, if the agents act intentionally. And if the government seeks to use FISA-obtained evidence against them in a criminal trial, they may move to suppress such evidence on the grounds that it was unlawfully acquired. *See* 50 U.S.C. § 1806(e).

c. Allegations Against Individual Defendants

Having defined FISA's scope, the Court now turns to Page's allegations against the individual defendants.[16] Though his allegations are troubling, Page does not allege that any of the

---

[16] Many of the defendants ask the Court to consider the Horowitz Report in full, claiming that its conclusions conflict with some of Page's allegations. *See, e.g.*, Strzok Mot. to Dismiss at 4 n.3, 13; Pientka Mot. to Dismiss at 2 n.3, 14–15; Somma Mot. to Dismiss at 3 n.2, 16–17. At the hearing, the plaintiff did not oppose this request. Rough Hr'g Tr. at 71. The Court, however, declines to consider the entire Report. True, the Report is extensively referenced in the complaint. But the Court cannot wholly incorporate it by reference because it is not "integral to [Page's] claim." *Banneker*, 798 F.3d at 1133 (citation omitted). That is, it is not akin to a contract "that is a necessary element of [a breach of contract] claim." *Id.* Rather, Page references it "to show how [he] learned some facts in the complaint." *Id.* at 1134. He does "not purport to and [is] not required to adopt the factual contents of the report wholesale." *Id.* Indeed, he alleges that some of its contents are inaccurate. SAC ¶ 250. The Court can certainly consider the Report to "show any inaccuracy in [Page's] allegations about its contents." *Id.* at 1134 n.6. But it cannot, as some of the individual defendants argue, "tak[e] . . . as true" all of the Report's contents, including its conclusions about the individual defendants' intent and motivations, to contradict Page's allegations. *Id.*

individual defendants personally conducted the surveillance or acquired or collected his communications.  For this reason, his FISA claims must be dismissed.

<u>Comey, McCabe, Strzok, and Lisa Page</u>.  Some of the defendants, such as Comey, McCabe, Strzok, and Lisa Page, allegedly approved, encouraged, and facilitated Page's investigation and the warrant applications.

James Comey, the FBI director during the first three FISA warrant applications, SAC ¶ 26, read the first application and signed all three, *id.*  ¶¶ 150, 152, 153.  His "certification" confirmed to the FISC that the information sought was foreign intelligence information that could not reasonably be obtained by normal investigative techniques, and that a "significant purpose of the surveillance [was] to obtain foreign intelligence information." 50 U.S.C. § 1804(a)(6).  According to Page, Comey gave a "green light" to apply for the first FISA warrant "without further scrutiny" of Steele, despite some concerns about his bias.  SAC ¶¶ 91, 159.  He also was aware of certain key information that was not fully disclosed in the various applications, including, among others, Hillary Clinton's plan to connect Trump and Russian election interference, Steele's funding source, and Page's previous status as a CIA operational contact.  *Id.* ¶¶ 73, 81, 144, 146, 148, 153.

Andrew McCabe, the Deputy Director of the FBI during the Page surveillance, signed the foreign-intelligence certification for fourth FISA application.  *Id.* ¶ 27.  His alleged actions are similar to Comey's—he too gave the "green light" to proceed with the FISA application despite the concerns about Steele's bias, *id.* ¶ 91, and "ignored warnings that more information about [his] motives was needed before relying on his allegations," *id.* ¶ 157.  He was told that Steele's work was political opposition research for a political party.  *Id.* ¶ 94.  DOJ supposedly would not approve the FISA application "without a call from McCabe."  *Id.* ¶ 158.

Peter Strzok was the Deputy Assistant Director of Counterintelligence at the FBI and supervised the Page investigation until January 2017.  *Id.* ¶ 29.  Like Comey, he knew about Clinton's plan to connect Trump and Russia, *id.* ¶ 73, and that Page denied meeting with Russian officials and had previously worked with the CIA and FBI, *id.* ¶¶ 81, 166.  He too "pushed to proceed with the application without further scrutiny of Steele" and "[fought] with [the DOJ attorney] for" it.  *Id.* ¶¶ 168, 170.  As the investigation continued, he learned more about Steele's questionable credibility.  *Id.* ¶¶ 105–106, 171–172.  Lisa Page, an FBI lawyer and Special Counsel to McCabe during the Page investigation, also learned about Steele's bias, including that his work was political opposition research.  SAC ¶ 94, 106, 195.  The complaint alleges that she "facilitated obtaining the initial FISA warrant for Dr. Page in the face of doubts voiced by the DOJ and others," *id.* ¶ 195, and exchanged text messages with Strzok indicating a political motivation, *id.* ¶ 197.

Absent from the complaint is any claim that these four defendants participated in drafting or substantively reviewing the faulty applications themselves, let alone that they performed the FISA surveillance and acquired Page's communications.

Pientka, Auten, Somma, and Clinesmith.  Even for the four defendants who did contribute to the material errors in the applications, Page does not claim that they "engage[d] in electronic surveillance," as defined above.

Joe Pientka, a Supervisory Special Agent in the FBI's Washington Field Office, signed an authorization to submit the first application that confirmed compliance with the FBI's "Woods Procedures," which are "designed to ensure the accuracy of the factual assertions in a [FISA] application."  SAC ¶¶ 31, 60, 198.  He was responsible for reviewing the "Woods File" to confirm that there was appropriate documentation for each factual assertion in the application.  *Id.* ¶ 198. But the file was "inaccurate, incomplete, and unsupported by appropriate documentation," *id.*, and

Pientka allegedly "failed to verify and correct the false statement" that "Steele's reporting had been corroborated and used in criminal proceedings," *id.* ¶ 199.

Auten and Somma were allegedly responsible for that false statement, along with numerous other material omissions. *Id.* ¶¶ 179, 206. Brian Auten was an FBI Supervisory Intelligence Analyst who worked on the Crossfire Hurricane investigation from its start in July 2016 through 2017. *Id.* ¶¶ 33, 175. He helped the agents prepare the applications by reviewing the probable cause sections for accuracy, filling in gaps, and providing information about Steele and his sub-sources. *Id.* ¶¶ 175–176. He "falsely enhanced [Steele's] credibility" by writing the misstatement discussed above and failing to disclose that Steele's colleagues gave negative feedback about his judgment and that some of his reporting was inaccurate. *Id.* ¶¶ 179–181. In January 2017, he interviewed Danchenko, one of Steele's key sub-sources, and found that he "contradicted key claims in Steele's reports"; this was not reported to the FISC. *Id.* ¶¶ 184, 209.

Stephen Somma was an FBI counterintelligence investigator and "Case Agent 1" on the Page investigation. *Id.* ¶ 201. He allegedly failed to disclose exculpatory statements from Page and other witnesses that he did not, contrary to Steele's reports, meet with sanctioned Russians. *Id.* ¶ 203. And he misled and withheld information from DOJ attorneys regarding Page's status as a CIA operational contact and Steele's political bias and funding source. *Id.* ¶¶ 205, 207. Like Auten, he "mischaracterized the extent to which the FBI had previously relied on . . . Steele's prior reporting" and did not disclose that Danchenko contradicted assertions made in the initial FISA application. *Id.* ¶¶ 206, 209. According to the OIG, Somma was "primarily responsible for some of the most significant errors and omissions in the FISA applications." *Id.* ¶ 32.

Finally, Kevin Clinesmith was an FBI Assistant General Counsel during the Page investigation who provided support to the Crossfire Hurricane team. SAC ¶¶ 28, 122, 185. The

affiant for the fourth warrant application asked him whether Page had ever been a "source (operational contact) for the CIA."  *Id.* ¶ 129.  Clinesmith knew that if Page had been a source, that fact needed to be disclosed to the FISC, but including it "would expose the material omission of this information" from the first three warrants.  *Id.* ¶ 130.  A CIA liaison told him that Page had been a source, *id.*, but Clinesmith told the affiant that Page was a "sub source" and "never a source," ultimately altering the liaison's email to that effect, *id.* ¶ 131.  The affiant relied on the doctored email to sign the fourth application, which did not include "information about [Page's] history or status as a CIA operational contact."  *Id.* ¶ 191–194.

If proven, these allegations clearly demonstrate wrongdoing.  *See Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) ("When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." (quotation marks omitted and alteration adopted)); *Daoud*, 755 F.3d at 489 (Rovner, J., concurring) ("[I]t has been widely assumed, if not affirmatively stated, in the decisions of other courts that *Franks* applies to FISA applications.").  Indeed, Clinesmith entered a plea in *United States v. Clinesmith* for making a false statement, in violation of 18 U.S.C. § 1001.[17]  But Page does not allege that *any* of the individual defendants, including the unknown John Doe defendants and those most responsible for the applications' critical errors, took part in obtaining the surveillance information, either by setting up the devices or gathering or listening to Page's communications.[18]

---

[17] *See supra* note 2.

[18] In his opposition brief and at the hearing, Page concedes that he "has not named as a defendant any FBI who personally engaged in the physical execution of the unlawful warrants as these persons are as yet unknown and unknowable to him."  Pl.'s Omnibus Opp'n at 32 n.5; Rough Hr'g Tr. at 24–25.

Thus, the Court cannot plausibly infer from this complaint that any of the individual defendants, known or unknown, "engaged in electronic surveillance," in violation of §§ 1809(a) and 1810.

### iii.   Using or Disclosing Information from Electronic Surveillance

Sections 1809(a) and 1810 also create a remedy against those who intentionally "disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know" that the surveillance was unauthorized.  Page's additional allegations that the individual defendants used and disclosed the fruits of the allegedly unlawful surveillance in numerous ways, SAC ¶¶ 229–230, are conclusory and thus do not state an actionable use or disclosure claim.

According to Page, the defendants used and disclosed FISA-acquired information to obtain the renewal warrants and other investigative measures against him or others; to investigate and prosecute others; to request assistance from other law enforcement and intelligence agencies; to include in government databases; and to justify his ongoing surveillance to other officials.  *Id.* ¶ 230.  But he does not allege that any particular defendant took any of these actions.  *Id.*; *see also id.* ¶ 229.  And "a plaintiff cannot satisfy the minimum pleading requirements under Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct."  *Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (citation and internal quotation marks omitted).  Indeed, Page cannot show that a defendant *intentionally* used or disclosed information obtained through unlawful surveillance, as required by 50 U.S.C. §§ 1809(a) and 1810, without providing any details about his or her individual actions.  To the extent Page claims that the defendants aided and abetted each other's use or disclosure violations, *cf.* Pl.'s Omnibus Opp'n at 16–18, that claim also fails for the reasons explained above in Part III.A.1.ii.a.

Page's allegations are also vague in other respects: they do not explain what information was leaked, to whom it was leaked, or when or how it was leaked. And his allegations that the surveillance produced "no evidence at all" that he acted as a Russian agent undercuts his claim that its results were used to procure the renewal warrants. SAC ¶¶ 123, 136. Accordingly, the Court cannot "draw the reasonable inference that [any of] the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although Page's media leak allegations are stated with particularity, they too fail to state a claim for another reason. He asserts that Comey, McCabe, Strzok, Lisa Page, and others disclosed "the existence of the FISA Warrants, the contents of the warrant applications, and the results of the Warrants" to the New York Times, the Washington Post, and others. SAC ¶ 226. But only the use or disclosure of information "obtained" by the electronic surveillance, not the fact of the surveillance or the basis for the warrants, violates § 1809(a). Neither the Times nor the Post article cited in the complaint contains any mention of the fruits of Page's surveillance. *See id.* ¶¶ 221, 224; Wash. Post Article; Comey Mot. to Dismiss, Ex. 6 (N.Y. Times Article), Dkt. 87-8. And the complaint does not cite any other media reports that contained FISA-obtained information, nor do the Strzok/Lisa Page text messages mention a plan to leak such information. SAC ¶¶ 220, 222–223. Page's bare allegation that the defendants disclosed the results of his surveillance to the media, without any further detail, does not raise his "right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The Court will thus dismiss the FISA claims in Counts One through Four against each individual defendant. Because the Court concludes that Page fails to state a claim that the defendants engaged in electronic surveillance, or used or disclosed its results, it need not address

the defendants' arguments that they are protected by a statutory defense and/or qualified immunity.[19]

### 2. *Bivens Claims*

The defendants move to dismiss the *Bivens* claim for failure to state a claim, both on the merits and on statute of limitations grounds.  For the reasons explained above in Part III.A.1.i, the Court disagrees that the claim is time-barred.  Page's *Bivens* claim is governed by the three-year limitations period in D.C. Code § 12-301(8), *see Berman*, 293 F. Supp. 3d at 56, and the complaint does not show that the claim accrued before November 27, 2017.  The Court will nevertheless dismiss the claim because an extension of the *Bivens* remedy to this "new context" is unwarranted. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017).

The Supreme Court has set forth a two-step inquiry that governs whether an extension of *Bivens* is appropriate.  First, a court must "inquire whether the request involves a claim that arises in a new context or involves a new category of defendants."  *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citation and internal quotation marks omitted).  The Supreme Court's understanding of what constitutes "a new context" is "broad."  *Id.* (internal quotation marks omitted).  The test is whether "the case is different in a meaningful way from previous *Bivens* cases" decided by the Supreme Court.  *Abbasi*, 137 S. Ct. at 1859.  Second, if the claim arises in a new context, the *Bivens* claim must be rejected if there are "special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed."  *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (citation and internal quotation marks

---

[19] As noted, § 1809 includes a statutory defense to prosecution if "the defendant was a law enforcement or investigative officer engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction." 50 U.S.C. § 1809(b).

omitted).  A court cannot recognize a *Bivens* remedy "[i]f there is even a single reason to pause" before applying it in a new context.  *Id.* (citation and internal quotation marks omitted).  Page's claims arise in a new context, and there are several reasons to pause.

Page's *Bivens* claim presents a new context because it is based on unlawfully obtained FISA warrants. SAC ¶ 287.  Although Page, like the plaintiff in *Bivens*, alleges a Fourth Amendment violation as the basis for his constitutional claim, *see* 403 U.S. at 389, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," *Hernandez*, 140 S. Ct. at 743.  In *Bivens*, the Supreme Court created an implied damages remedy under the Fourth Amendment for an allegedly unconstitutional search and arrest carried out in an apartment.  403 U.S. at 389.  But as the Fourth Circuit has recognized, "a claim based on unlawful electronic surveillance presents wildly different facts and a vastly different statutory framework from a warrantless search and arrest." *Attkisson v. Holder*, 925 F.3d 606, 621 (4th Cir. 2019).  And here, some of the defendants, such as Comey and McCabe, are high-ranking officials, unlike the "line-level" agents sued in *Bivens*. *Id.*  In this case, both the nature of Page's Fourth Amendment claim and the "rank of the officers involved," *Abbasi*, 137 S. Ct. at 1860, signal a new context.

Special factors also counsel against creating a *Bivens* remedy in this new context.  Page's surveillance occurred as part of a high-level investigation into alleged foreign interference in a presidential election.  SAC ¶¶ 5–6, 221, 224.  "[A] *Bivens* cause of action may not lie where, as here, national security is at issue." *Egbert*, 142 S. Ct. at 1805.  Plus, a court cannot extend *Bivens* if Congress has already provided "an alternative remedial structure." *Id.* at 1804 (quoting *Abbasi*, 137 S. Ct. at 1858).  Congress has comprehensively legislated in the electronic surveillance space "without authorizing damages for a Fourth Amendment violation." *Attkisson*, 925 F.3d at 621.  It

has instead created several private causes of actions under a number of statutes governing surveillance, including FISA, 50 U.S.C. § 1810, the Wiretap Act, 18 U.S.C. § 2520(a), the Stored Communications Act, *id.* § 2707(a), (g), and the PATRIOT Act, *id.* § 2712. These alternatives "alone" are "reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Egbert*, 142 S. Ct. at 1804 (citation and internal quotation marks omitted).

Accordingly, the Court will dismiss the *Bivens* claim in Count Six against each individual defendant.

## B.    Institutional Defendants

Page brings claims against the United States under the FTCA and the PATRIOT Act. SAC ¶¶ 275–282, 303–311. He also asserts a Privacy Act claim against DOJ for failure to amend his records, *id.* ¶¶ 290–295, and a Privacy Act claim against DOJ and the FBI for unlawful disclosures, *id.* ¶¶ 296–302. The Court will address each claim in turn.

### 1.    *FTCA Claim*

The FTCA "waive[s] the sovereign immunity of the United States for certain torts committed by federal employees." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citing 28 U.S.C. § 1346(b)). Federal courts have jurisdiction over these claims if they are "actionable" under § 1346(b). *Id.* at 477. The claim must be

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (alteration in original) (quoting § 1346(b)). Under the FTCA, "all elements of a meritorious claim are also jurisdictional." *Brownback v. King*, 141 S. Ct. 740, 749 (2021). Accordingly, for

a court to have subject-matter jurisdiction, and "to state a claim upon which relief can be granted," the "plaintiff must plausibly allege all six FTCA elements." *Id.*

Page has not plausibly pleaded the sixth element: that the United States, if a private person, would be liable under D.C. law. He alleges that the individual defendants committed an "abuse of process" by acting with an "ulterior motive to use the FISA warrant process to accomplish an end not permitted by law: to obtain the surveillance of . . . Page and the Trump presidential campaign without probable cause." SAC ¶ 280 (emphasis omitted); *see* 28 U.S.C. § 2680(h). Under D.C. law, however, abuse of process occurs when "process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Jacobson v. Thrifty Paper Boxes, Inc.*, 230 A.2d 710, 711 (D.C. 1967). That an official has acted "spitefully, maliciously, or with an ulterior motive in instituting" process is not enough. *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1996). Instead, the process must be *used* "for an immediate purpose other than that for which it was designed and intended." *Id.* (quoting Restatement (Second) of Torts § 682 cmt. b). For example, "[t]he usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Id.* at 755–56 (quoting Restatement (Second) of Torts § 682 cmt. b).

Here, Page points only to the defendants' "unlawful end" or "ulterior motive" "to obtain the surveillance of Dr. Page and the Trump presidential campaign without probable cause." SAC ¶¶ 16, 280 (emphasis omitted); *see also* Pl.'s Opp'n at 21, Dkt. 99 ("[The SAC] alleges that the Government's agents perverted the FISA warrant process by making material misstatements and omissions to obtain four successive warrants without probable cause for the ulterior motive of

surveilling . . . Page and the Trump presidential campaign."). As D.C. courts have held, that alone is insufficient to state a claim for abuse of process. *See Bown v. Hamilton*, 601 A.2d 1074, 1080 (D.C. 1992); *Scott*, 101 F.3d at 755. True, Page alleges that the defendants made false statements in the FISA application process so that the warrants would be granted in the absence of probable cause. SAC ¶ 16. But neither allegation suffices to state an abuse of process claim. *See Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 33 (D.D.C. 2011) (granting summary judgment for defendants on an abuse of process claim even though the officers lacked probable cause to arrest the plaintiff); *Rauh v. Coyne*, 744 F. Supp. 1186, 1194 (D.D.C. 1990) (explaining that abuse of process "does not arise from a misrepresentation to the Court"); *Moradi v. Protas, Kay, Spivok & Protas, Chartered*, 494 A.2d 1329, 1330, 1333 n.7 (D.C. 1985) (noting that the plaintiff did not state a claim for abuse of process where (1) the defendant's agent had "negligently or falsely swor[n] that he had served summonses" on him in three cases, (2) the defendant had then obtained a default judgment and writ of attachment in each case, and (3) the defendant, knowing the plaintiff was not served, had obtained a judgment of condemnation (internal quotation marks omitted)).

Page's reliance on out-of-jurisdiction cases, *see* Pl.'s Opp'n at 21–22, cannot overcome clear authority from D.C. courts, as the proper inquiry is only whether a private person would be liable under D.C. law. 28 U.S.C. § 1346(b). Page cites one D.C. case, *Hall v. Field Enterprises, Inc.*, 94 A.2d 479 (D.C. 1953),[20] but it also does not help. In that case, the defendants had

---

[20] Page also cites *Whelan v. Abell*, 953 F.2d 663 (D.C. Cir. 1992), and *Neumann v. Vidal*, 710 F.2d 856 (D.C. Cir. 1983), but both cases "have been superceded by more recent decisions embracing the more restrictive standard of" *Bown,* 601 A.2d at 1079–80, and *Morowitz v. Marvel,* 423 A.2d 196, 198–99 (D.C. 1980). *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 161 (D.D.C. 2008) (citing *Moore v. United States,* 213 F.3d 705 (D.C. Cir. 2000); and *Scott v. District of Columbia,* 101 F.3d 748 (D.C. Cir. 1996)). In these cases, the D.C. Court of Appeals decided that simply initiating a legal proceeding with an ulterior motive is in and of itself insufficient to give rise to an abuse of process claim; the process instead must be used to accomplish "some end not

"fraudulently" and "without legal justification" filed suit against the plaintiff, achieved a fraudulent judgment, "without proper justification caused to be issued a writ of attachment predicated" on that judgment, and unlawfully seized his wages. *Id.* at 480–81. Initially, the court held that these allegations stated an abuse of process claim. *Id* at 481. But later, on a second appeal, the court held that the plaintiff's abuse of process claim failed because the process "was used for its legally intended purpose: to obtain a judgment against the plaintiff and to obtain satisfaction of that judgment" by garnishing his wages. *Hall v. Field Enters., Inc.*, 114 A.2d 840, 841 (D.C. 1955). Here, too, the warrants were used for their legally intended purpose: to surveil Page. *See* SAC ¶ 3.

"[T]he gist of the [abuse of process] action lies in the improper use after issuance" of process. *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959). As noted, Page's complaint does not allege that the defendants *used* the warrants wrongfully, "to accomplish some end which the process was not intended by law to accomplish." *Hall*, 94 A.2d at 481. Instead, it merely alleges that he was surveilled pursuant to the warrants, SAC ¶ 3, and such surveillance is the "ordinary purpose" of a FISA order. *See Morfessis v. Baum*, 281 F.2d 938, 940 (D.C. Cir. 1960). Although Page claims that the purpose of the surveillance was to monitor the Trump campaign, the complaint does not allege that the agents obtained the warrants to, for instance, monitor campaign staffers who were not the proper targets of the warrants. Nor does it allege that the defendants used the FISA process to "pressure [Page] into taking any action or prevent him from taking action, or to achieve any other collateral purpose." *Scott*, 101 F.3d at 755. Because

---

contemplated in the regular prosecution of the charge." *Bown*, 601 A.2d at 1080 (quoting *Morowitz*, 423 A.2d at 198).

Page has failed to allege an actionable abuse of process claim, the Court will dismiss the FTCA claim in Count Five for lack of jurisdiction under Rule 12(b)(1).

2.   *PATRIOT Act Claim*

In the PATRIOT Act, Congress created a civil cause of action against the United States to recover damages for willful violations of certain sections of FISA.  18 U.S.C. § 2712(a).  As relevant here, § 2712(a) allows a person to sue if he has been "aggrieved by any willful violation of . . . [FISA] section[] 106(a) [50 U.S.C. § 1806(a)]."[21]  Section 1806(a), in turn, states that "information acquired from [FISA] electronic surveillance" about "any United States person may be used and disclosed by Federal officers and employees" without that person's consent "only in accordance with [FISA] minimization procedures" and only "for lawful purposes.  *See also Fikre v. FBI*, 142 F. Supp. 3d 1152, 1169 (D. Or. 2015) (listing the elements that a plaintiff must allege to state a PATRIOT Act claim for a § 1806(a) violation).  Before bringing an action under § 2712(a), the plaintiff must first present it to "the appropriate department or agency" within two years after the claim accrues.  18 U.S.C. § 2712(b)(1)–(2); *see Schuler v. United States*, 628 F.2d 199, 201 (D.C. Cir. 1980) (interpreting identical language in the FTCA).  The claim accrues "on the date upon which the claimant first has a reasonable opportunity to discover the violation."  18 U.S.C. § 2712(b)(2).

The basis for Page's PATRIOT Act claim is that "the individual Defendants, acting in violation of the FISA, obtained, disclosed, or used information obtained by electronic surveillance of Mr. Page knowing or having reason to know that the information was obtained through electronic surveillance not lawfully authorized by the FISA."  SAC ¶ 307.  But this language

---

[21] An aggrieved person can also sue for violations of 50 U.S.C. § 1825(a), concerning physical searches, and 50 U.S.C. § 1845(a), concerning pen registers or trap and trace devices.  18 U.S.C. § 2712(a).

merely restates the elements for a violation under § 1809(a), rather than one under § 1806(a).  And Congress did not include a sovereign immunity waiver for § 1809(a) violations.  *See* 50 U.S.C. § 1810 ("an aggrieved person . . . shall have a cause of action against any *person* who committed such violation") (emphasis added);[22] *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 851–53 (9th Cir. 2012) (Under § 2712(a), a plaintiff "can bring a suit for damages against the United States for [unlawful] *use* of the collected information, but cannot bring suit against the government for collection of the information itself.").  Thus, to the extent that Page brings a PATRIOT Act claim for the unlawful acquisition of information, the Court lacks jurisdiction to hear it.

Relying on the same allegations that underlie his "use and disclosure" FISA claim against the individual defendants, Page presents several theories to support his PATRIOT Act claim: (1) the media leaks; (2) the use of the warrant results in renewal applications; and (3) disclosures for a host of investigative purposes—to obtain other investigative measures against him or others, to investigate and prosecute others, to request assistance from other law enforcement and intelligence agencies, to include the information in government databases, and to justify his ongoing surveillance to other officials.  SAC ¶¶ 229–230; Pl.'s Opp'n at 11–12.

As an initial matter, Page failed to present his third theory (about other investigative uses) to DOJ when he filed his administrative claim on September 30, 2020.  *See* Gov't Mot. to Dismiss, Ex. 1 (Page Admin. Claim) to Ex. T (Don Decl.), Dkt. 88-22; *see also* Gov't Mot. To Dismiss at 55.  Page does not contest this fact.  *See* Pl.'s Opp'n at 9–19.  The Court therefore treats this argument as conceded and finds that Page cannot bring a claim based on the disclosure of his

---

[22] "Person" is defined as "any individual, including any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power."  50 U.S.C. § 1801(m).  It does not include the United States.

information for other investigative uses. *Davis v. TSA*, 264 F. Supp. 3d 6, 10 (D.D.C. 2017) (noting that a court may treat as conceded arguments in a motion to dismiss that a plaintiff failed to address in its response).

The Court will not dismiss the remainder of Page's claim as time-barred. Although it is true that Page had notice of the alleged violations before September 30, 2018 (two years prior to his administrative claim), *see* Gov't Mot. to Dismiss at 47–50, the face of the complaint does not conclusively reveal when he could have reasonably discovered every alleged violation. 18 U.S.C. § 2712(b)(2). Simply because Page knew about the FISA renewals does not mean that he knew that the applications contained FISA-obtained information. At least at this stage, the Court cannot determine that Page's entire PATRIOT Act claim has expired under the statute of limitations, and thus, it will not dismiss it on this basis.

The Court will, however, dismiss the PATRIOT Act claim on the merits. First, Page's media leak theory fails for the reasons described in Part III.A.1.iii.[23] Section 1806(a) prohibits the disclosure of information "obtained" from FISA surveillance, but neither the Post nor the Times article revealed any results from the FISA warrants. *See* SAC ¶¶ 221, 224; Gov't Mot. to Dismiss, Ex. F. (Wash. Post Article), Dkt. 88-8; Gov't Mot. to Dismiss, Ex. G (N.Y. Times Article), Dkt. 88-9.[24] And Page does not point to any other media reports containing FISA information. It is not enough to say, as Page does in his opposition, that it is "not clear what unlawful disclosures of FISA-related information were made to the reporters who wrote these articles," Pl.'s Opp'n at 12.

---

[23] For the reasons explained below in Part III.B.3.ii, the Court could also dismiss the media-leak claim as time-barred, because Page knew of the alleged leaks by April 2017. SAC ¶¶ 221, 224.

[24] As explained above, *see supra* note 7, the Court may consider these articles, referenced in the complaint, in full, without converting the motion to dismiss into one for summary judgment.

To survive a motion to dismiss, he must allege facts in his complaint that allow the Court to plausibly infer that the defendants disclosed FISA-acquired information.  He has not.

Second, Page's alternate theory that the defendants violated the PATRIOT Act because they knowingly used the unlawfully obtained information from the FISA warrants to obtain later warrants, SAC ¶¶ 229, 307; Pl.'s Opp'n at 13, rests on a faulty legal premise.  To plead a violation of the PATRIOT Act relying on § 1806(a), Page must allege that the FISA information was used or disclosed in violation of the statutory minimization procedures or *for an unlawful purpose*.  The complaint does neither.  SAC ¶ 303–311.  Page instead claims that the federal officers knew that the disclosed information had been *acquired* through unauthorized surveillance.  *See* SAC ¶ 307; Pl.'s Opp'n at 11, 13 (misstating the applicable standard for a PATRIOT Act claim based on a violation of § 1806(a)).  This is an element of §§ 1809(a) and 1810—but not § 1806(a)—claims.  And Congress has waived the United States's sovereign immunity for § 1806(a) claims only.  *See Al-Haramain Islamic Found.*, 705 F.3d at 851–53.  The use of information knowingly obtained through unauthorized surveillance *itself* does not, as Page argues, *see* Pl.'s Opp'n at 13, qualify as an unlawful purpose.  Absent clear statutory language, which does not exist here, the Court rejects Page's invitation to graft § 1809(a)'s elements onto § 1806(a).[25]  *See Loughrin v. United States*, 573 U.S. 351, 357 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another . . . this Court presumes that Congress intended a difference in meaning." (internal citation and quotation marks omitted)); *Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on

---

[25] Page's citation to legislative history is irrelevant.  *See* Pl.'s Opp'n at 13 (quoting H.R. Rep. No. 95-1720, at 33 (1978), a Committee Report that discusses the criminal penalty in § 1809(a), not the use of information provision in § 1806(a)).

its face."). The unlawful *collection* of information is not equivalent to *using* the information, once obtained, for an unlawful purpose, in violation of § 1806(a).

Plus, this theory rests on factually thin and internally contradictory allegations. As explained in Part III.A.1.iii, Page's unadorned allegation that the FISA warrant results were used to procure the renewal warrants is undercut by his other assertions that the second application "did not outline any foreign intelligence information that had been gathered during the first three months" and that the surveillance under each warrant produced "no evidence at all" that he acted as a Russian agent. SAC ¶¶ 114, 123, 136; *see also* Pl.'s Opp'n at 13 (merely speculating that the applications included FISA-acquired information). Taken together, these are not "enough to raise [his] right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Finally, Page offers no factual detail that supports his single, conclusory assertion that the United States has conceded that it has used and disclosed the FISA information in some ways "which were then specifically prohibited by the FISC." SAC ¶ 231. He points to only one specific admission from the government—that it lacked probable cause for the third and fourth FISA warrants. SAC ¶ 43; *see also* Gov't Mot. to Dismiss at 58. Beyond that, he does not identify any government concessions about improper disclosures, failures to minimize, or violations of specific FISC prohibitions. SAC ¶ 231. Nor does he reference any filings before the FISC. *Id.* Without more, the Court cannot plausibly infer from the complaint that the government used or disclosed FISA information in violation of the minimization procedures or for an unlawful purpose.

The Court will therefore dismiss Page's PATRIOT Act claim in Count Nine.

### 3. *Privacy Act Claims*

"The Privacy Act regulates the collection, maintenance, use, and dissemination of information about individuals by federal agencies." *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir.

2008) (citation and internal quotation marks omitted); *see* 5 U.S.C. § 552a.  An "agency that maintains a system of records shall," upon request, permit an individual to access and/or amend records pertaining to him.  *Id.* § 552a(d).  The Act also "requires that an agency 'permit' an individual 'who disagrees with the refusal of the agency to amend his record' to request a review of that decision."  *Doe v. Rogers*, 498 F. Supp. 3d 59, 71 (D.D.C. 2020) (quoting 5 U.S.C. § 552a(d)(3)).  And it allows individuals to file a civil action for injunctive relief against the agency if it has "refuse[d] to comply with" a request for access or has made a final determination "not to amend an individual's record in accordance with his request."  *Id.* §§ 552a(g)(1)(A)–(B), (g)(2)–(3).  The Act also sets rules for the disclosure of records contained in a system of records.  *Id.* § 552a(b).  An individual may bring a claim for improper disclosure under § 552a(g)(1)(D) and receive monetary damages if the agency acted intentionally or willfully.  *Id.* § 552a(g)(1)(D), (g)(4).

Page brings two counts under the Privacy Act.  SAC ¶¶ 290–302.  He seeks injunctive relief to compel DOJ to amend inaccurate records, *id.* ¶ 294, and requests damages from DOJ and the FBI for unlawful disclosures to media outlets.  *Id.* ¶¶ 297, 300.  The Court will address each in turn.

### i.      Failure to Amend

According to Page, the Horowitz Report "contains numerous errors," and he requests an order requiring DOJ to amend it to correct those unspecified inaccuracies.  SAC ¶¶ 250, 292–294; 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A).

After an individual requests an amendment of a record, the Privacy Act requires the agency to either correct any portion "which the individual believes is not accurate, relevant, timely, or complete," or explain its refusal to amend.  5 U.S.C. § 552a(d)(2)(B).  The individual can then

request a review of any refusal.  *Id.* § 552a(d)(3).  And he may sue after the agency makes a final

determination not to amend or fails to comply with the statute's review provisions.  *Id.*

§ 552a(g)(1)(A).

The parties disagree about whether Page has properly exhausted his administrative

remedies for his failure to amend claim.  The government contends that the exhaustion of

administrative remedies is jurisdictional.  Gov't Mot. to Dismiss at 29–31 (citing, *e.g.*, *Dick v.

Holder*, 67 F. Supp. 3d 167, 187 (D.D.C. 2014)).  Page argues instead that exhaustion is an

affirmative defense that the complaint must reveal on its face.  Pl.'s Opp'n at 29.[26]

The Court agrees with the government.  Under D.C. Circuit precedent, "[e]xhaustion of

[Privacy Act] administrative remedies is a prerequisite to bringing civil suit to compel

amendment."  *Nagel v. U.S. Dep't of Health, Educ. & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir.

1984); *see also Haase v. Sessions*, 893 F.2d 370, 373 (D.C. Cir. 1990) (same for access claims).

Courts in this circuit treat Privacy Act exhaustion as jurisdictional.  *See Barouch v. DOJ*, 962 F.

Supp. 2d 30, 67 (D.D.C. 2013) (collecting cases).

Page nonetheless asserts that he exhausted his administrative remedies before the

Horowitz Report was publicly released.  SAC ¶¶ 233, 238–244.  In particular, in fall 2019, after

the Inspector General's investigation was nearly finished and was about to enter the "review and

comment phase," *id.* ¶ 237, Page sent multiple emails to DOJ, the OIG, and various officials at

---

[26] That is true for certain statutes.  *See, e.g.*, *Jones v. Bock*, 549 U.S. 199, 216 (2007) (holding that
the Prison Litigation Reform Act's exhaustion requirement for prisoner actions under 42 U.S.C.
§ 1983 is an affirmative defense).  But under others, exhaustion requirements may be
jurisdictional, and a court will dismiss an unexhausted claim under Rule 12(b)(1).  *See Thompson
v. DEA*, 492 F.3d 428, 438 (D.C. Cir. 2007).  The authority that Page cites in support of his view
that exhaustion is an affirmative defense appears to be an outlier and relies on a Title VII, rather
than Privacy Act, case.  Pl.'s Opp'n at 29 (citing *Ramstack v. Dep't of the Army*, 607 F. Supp. 2d
94, 104 (D.D.C. 2009)).

those agencies asking to view and amend the "forthcoming report" pursuant to the Privacy Act.
*Id.* ¶¶ 238, 240, 242, 244 (referring to three emails from October 10, 16, and 21, and "no fewer
than two emails" from September).  On October 16, a DOJ official responded that his request was
under review.  *Id.* ¶ 243.  And on November 12, Page was told only that he would not be contacted
for an OIG interview.  *Id.* ¶ 249.

Page received the final Horowitz Report when it was made public on December 19.  *See
id.* ¶ 233.[27]  But Page does not allege that he has contacted anyone at DOJ to seek an amendment
of the *finalized* Horowitz Report.  *See generally* SAC.  And the government offers undisputed
evidence that he did not.  *See* Gov't Mot. to Dismiss, Ex. DD (Malis Decl.) ¶ 8, Dkt. 88-32; Pl.'s
Opp'n at 28–29 (not claiming otherwise).[28]  Thus, the agency has not been given the chance "in
the first instance," *Dickson v. Off. of Pers. Mgmt.*, 828 F.2d 32, 40 (D.C. Cir. 1987), to correct any
portion of the final report that Page might identify as "not accurate, relevant, timely, or complete,"
5 U.S.C. § 552a(d)(2)(B)(i).  Without having asked DOJ to make "specific amendments" to the
public report, his amendment claims are premature.  *Hill v. U.S. Air Force*, 795 F.2d 1067, 1069
(D.C. Cir. 1986).

To be sure, DOJ never informed Page of his right to appeal.  Pl.'s Opp'n at 29–30 (citing
*Harper v. Kobelinski*, 589 F.2d 721, 723 (D.C. Cir. 1978)).  But he does not allege that he received
a denial (either for access or amendment) in the first place, a prerequisite for an appeal.  SAC ¶ 249
(quoting the November 12 response letter from the DOJ official: "This letter does not address his

---

[27] Page does not assert an access claim under the Privacy Act for the draft Horowitz Report.  *See*
SAC ¶¶ 290–295; Pl.'s Opp'n at 28–38.  Nor does he seek damages for the agency's failure to
maintain accurate records under 5 U.S.C. § 552a(g)(4), a claim that does not require exhaustion.
*Nagel*, 725 F.2d at 1441 n.2.

[28] The Court may consider facts in the record outside the pleadings to determine the exhaustion
question because it must assure itself of its own jurisdiction.  *Settles*, 429 F.3d at 1107.

requests under the Privacy Act[.]").  And "[t]he statute provides no exemption from administrative review when an agency fails, even by several months, to abide by a deadline [to respond to an amendment request]." *Dickson*, 828 F.2d at 40 (plaintiff could not file civil action before appealing the agency's denial, even though the agency was late to respond to the request for correction). Therefore, DOJ's failure to fully respond to Page's access claims does not excuse him from participating in the administrative process (which, in any event, he only initiated for the draft report).  Plus, a review of Page's email requests reveals that he did not ask for any specific amendments to either the draft or the final report.  *See* Malis Decl. Exs. A–C (for example, asking on October 10, 2019 to "review . . . the FISA abuse Inspector General report draft" for "accuracy purposes").[29]  Thus, he never identified any inaccuracies in the report for DOJ to consider.

Page can still, however, request that DOJ fix any mistakes in the final Horowitz Report through the normal administrative process.  *See Hill*, 795 F.2d at 1071 ("[N]othing in our disposition of this case prevents appellant from seeking to have his official agency records corrected.").  But, at least as of now, Page has not exhausted his administrative remedies.  Because "failure to exhaust administrative remedies under the Privacy Act is a jurisdictional deficiency," *see Barry v. Haaland*, No. 19-cv-3380, 2021 WL 1177798, at *7 (D.D.C. Mar. 29, 2021) (citation omitted), the Court will dismiss his Privacy Act claim in Count Seven for lack of jurisdiction.[30]

---

[29] The Court may consider these documents to assure itself of its jurisdiction, *see Settles*, 429 F.3d at 1107, and because they are documents on which the complaint necessarily relies, *see Hinton v. Corrs. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).  *See Sandoval v. DOJ,* 296 F. Supp. 3d 1, 12 (D.D.C. 2017) (considering the plaintiff's administrative requests, produced by the defendant, to determine whether he exhausted).

[30] Page's earlier Privacy Act suit against DOJ does not affect the exhaustion analysis because that case alleged different Privacy Act violations from previous years.  *See* Compl., Dkt. 1, *Page v. DOJ*, 19-cv-3149 (D.D.C. Oct. 21, 2019).

ii.      Unlawful Disclosures

Page also sues DOJ and the FBI for leaks of his information in violation of the Privacy Act. SAC ¶¶ 226, 296–302.  He alleges that the defendants, including Comey, McCabe, Strzok, and Lisa Page, unlawfully disclosed "the existence of the FISA Warrants, the contents of the warrant applications, and the results of the Warrants" to media outlets such as the New York Times, the Washington Post, and "possibly others."  *Id.* ¶ 226.  The Court concludes that Page's unlawful disclosure claim is time-barred because he knew about the alleged disclosures to the media for more than two years before he filed this action.

"Privacy Act claims for monetary damages based on improper disclosure . . . have four elements: '1) the disclosed information is a record contained within a system of records; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff.'"  *Doe v. DOJ*, 660 F. Supp. 2d 31, 44–45 (D.D.C. 2009) (quoting *Logan v. Dep't of Veterans Affs.*, 357 F. Supp. 2d 149, 154 (D.D.C. 2004)).  An action under the Privacy Act "may be brought . . . within two years from the date on which the cause of action arises."  5 U.S.C. § 552a(g)(5).  "[T]he cause of action does not arise and the statute of limitation does not begin to run until the plaintiff knows or should know of the alleged violation."  *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir. 1987).

The Privacy Act section of the complaint identifies only two media reports: the April 11, 2017 Washington Post article and the April 22, 2017 New York Times article.  SAC ¶¶ 221, 224; Pl.'s Opp'n at 39 (not identifying any other disclosures).  The Post article, which broke the story about the FISA warrants, cites anonymous "law enforcement and other U.S. officials" for details about the Page investigation.  SAC ¶ 221; Wash. Post Article at 2.  The Times article, which is mainly about then-FBI Director Comey, mentions Page only once.  Citing a "former senior

American intelligence official," it describes how Page's trips to Russia "rais[ed] new concerns among counterintelligence agents."  SAC ¶ 224; N.Y. Times Article at 11.[31]  The rest of the article was sourced from "interviews with more than 30 current and former law enforcement, congressional and other government officials."  *Id.* at 2.  Page himself is quoted in both articles.  *See* Wash. Post Article at 3 (explaining that the FISA surveillance was "unjustified" and "politically motivated"); N.Y. Times Article at 11 (describing the Russians he met as "mostly scholars").

Page certainly had "inquiry notice," if not actual notice, of these articles, and thus the alleged leaks, when they were published in April 2017.  *See Agelli v. Burwell*, 164 F. Supp. 3d 69, 75 (D.D.C. 2016) (Privacy Act claim may accrue before the plaintiff "acquires actual knowledge of the agency's alleged misconduct").  And nowhere in Page's complaint or opposition brief does he claim that he was unaware of the articles, or the potential leaks, at the time.  *See generally* SAC; Pl.'s Opp'n at 39.  Therefore, his Privacy Act disclosure claims expired two years after publication—on April 11 and April 22, 2019.  *See Hill v. DOD,* 981 F. Supp. 2d 1, 8 (D.D.C. 2013) ("Each disclosure of protected information represents a separate violation" that might trigger a separate limitations period.).  This is true even though Page did not necessarily have "knowledge of the precise details of the disclosure."  *Id.* at 7.

Thus, contrary to his contention otherwise, Pl.'s Opp'n at 39, Page's cause of action accrued, and the clock started to run, on April 11 and April 22, 2019, even though he did not then know the identities of the leakers.  True, a Privacy Act plaintiff must eventually show that the disclosure was intentional or willful, which may require knowing who leaked the information.

---

[31] As explained above, *see supra* note 7, the Court may consider the Post and Times articles, referenced in the complaint, in full, without converting the motion to dismiss into one for summary judgment.

*Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012).  But a Privacy Act claim runs against the agency, so a plaintiff does not need to name the responsible individual to sue.  And more importantly, while a plaintiff will need to establish more detail at the summary judgment stage, *see id.*, he does not have to "allege the full details of . . . a disclosure at the pleading stage." *Feldman v. CIA*, 797 F. Supp. 2d 29, 41 (D.D.C. 2011) (denying motion to dismiss where the plaintiff alleged that the record was protected by the Privacy Act and pled sufficient facts to infer its leak because various agency employees learned of its details though they had no connection to the underlying investigation).  After all, "a plaintiff can hardly be expected to know the full details behind an improper disclosure prior to discovery, since those details are most likely to be under the control of the defendant," *id.*, particularly here, where the articles disclosed sensitive information possessed only by law enforcement and intelligence agencies.

In sum, Page's complaint shows that he knew of the alleged disclosure violations in April 2017, yet he did not file suit until November 2020.  It is evident from the face of the complaint that the statute of limitations period ran in April 2019, well before Page filed suit.  *See Kursar v. TSA*, 751 F. Supp. 2d 154, 166 (D.D.C. 2010).  For this reason, the Court will dismiss Page's Privacy Act claim in Count Eight as time-barred.

***

As alleged, the FBI's conduct in preparing the FISA warrant applications to electronically surveil Page was deeply "troubling."  *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, Order at 2, Misc. No. 19-02 (FISA Ct. Dec. 17, 2019).  Indeed, the government has conceded that it lacked probable cause for two of the warrants.  *In re Carter W. Page*, Op. and Order Regarding Use and Disclosure of Information at 2 (FISA Ct. June 25, 2020).  And the FISC has found that the government violated its "duty of candor in all four applications."  *Id.* at 3.

Similarly, Page alleges that the individual defendants intentionally provided false information and omitted material facts in all four applications. SAC ¶¶ 16–20. To the extent these allegations are true, there is little question that many individual defendants, as well as the agency as a whole, engaged in wrongdoing. Even so, Page has brought no actionable claim against any individual defendant or against the United States.

In part, that is because Page faces at least three statutory roadblocks. First, Congress has not created a private right of action against those who prepare false or misleading FISA applications. Both the plain language and the structure of FISA make clear that civil liability under 50 U.S.C. § 1810 attaches only to those who conduct or perform electronic surveillance. Second, Congress has not provided for damages claims against federal officers for constitutional violations stemming from unlawful electronic surveillance in the national security context. And third, Congress has not waived the United States's sovereign immunity for this kind of claim.

For those claims that *are* available to Page under the law, he has failed to sufficiently allege or exhaust them. He has not adequately pled that any FISA-obtained information was improperly used or disclosed. To the extent that he has a viable claim under the Privacy Act, he has neither exhausted his administrative remedies nor filed a timely claim. And his abuse of process claim, as alleged, is not cognizable under D.C. law.

When it comes to Page's core claim—that the defendants misled the FISC to obtain surveillance warrants without probable cause—the Court cannot create a cause of action that Congress did not enact. "[P]rivate rights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and courts may not usurp that power "no matter how desirable that might be as a policy matter," *id.* at 287. Any future remedy for these alleged FISA abuses must come from Congress, not this Court.

## CONCLUSION

For the foregoing reasons, the Court grants the individual defendants' motions to dismiss and the government's motion to dismiss. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 1, 2022

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CARTER PAGE,

       *Plaintiff,*

   v.

JAMES B. COMEY *et al.*,

       *Defendants.*

No. 20-cv-3460 (DLF)

<u>**ORDER**</u>

For the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that the plaintiff's motion to alter or amend the judgment and for relief from

the judgment, Dkt. 119, is **DENIED.**

The case remains closed.

**SO ORDERED.**

_____
DABNEY L. FRIEDRICH
United States District Judge

January 18, 2023

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CARTER PAGE, | |
| *Plaintiff,* | |
| v. | No. 20-cv-3460 (DLF) |
| JAMES B. COMEY *et al.*, | |
| *Defendants.* | |

<u>**MEMORANDUM OPINION**</u>

Following the Court's order granting the defendants' motions to dismiss and closing this case, Carter Page filed a motion to alter or amend the judgment under Rule 59(e) and for relief from the judgment under Rule 60(b) of the Federal Rules of Civil Procedure.  Pl.'s Mot. for Recons., Dkt. 119.  For the reasons that follow, the Court will deny the motion.

I.    **BACKGROUND**[1]

As explained at length in the Court's initial opinion, *see* Mem. Op. at 1–9, Dkt. 115, this case arises out of various FBI agents' alleged actions to obtain four successive Foreign Intelligence Surveillance Act (FISA) warrants to electronically surveil Page during the Trump 2016 campaign, despite there being no probable cause to do so.  *Id.* at 2.  Among other things, Page alleged that the FBI used reports by Christopher Steele, who "was paid by the Democratic National Committee and/or the Clinton campaign to perform political opposition research," as a basis to obtain the FISA warrants "without adequately investigating [Steele's] reliability and motives."  *Id.* at 2–3.  And as relevant here, the complaint alleged that Igor Danchenko, "one of Steele's key sub-

---

[1] The Court assumes familiarity with the extensive discussion of the facts set forth in its initial opinion.  *See* Mem. Op. at 1–10, Dkt. 115.

sources," provided information to the FBI that "contradicted key claims in Steele's reports" but "was not reported" in the FISA applications. *Id.* at 31.

Page's Second Amended Complaint brought claims under the FISA and *Bivens* against individual defendants James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Joe Pientka, Stephen Somma, and Brian Auten, all individuals who worked at the FBI. Second Am. Compl. (SAC) ¶¶ 256–274, 283–289, Dkt. 73. The complaint also listed John Does 1–10 as individual defendants "whose identities or specific involvement in the conduct alleged in this Complaint may not yet be known to the Plaintiff." *Id.* ¶¶ 34–35. Finally, Page sued the United States under the Federal Tort Claims Act (FTCA) and PATRIOT Act, *id.* ¶¶ 275–282, 303–311, and DOJ and the FBI under the Privacy Act, *id.* ¶¶ 290–302.

Each of the named individual defendants and the institutional defendants moved to dismiss. Dkts. 80–88. The Court granted the motions. *See* Order, Dkt. 114. It dismissed the FISA, *Bivens*, FTCA, and PATRIOT Act counts for failure to state a claim under Rule 12(b)(6). Mem. Op. at 34–35, 38–39, 43–44. It further dismissed one Privacy Act count for failure to exhaust administrative remedies, *id.* at 49, and the other as time-barred, *id.* at 50. Although the Court dismissed all claims without prejudice except for the *Bivens* claim, the Court directed that the case be closed.[2] Order at 1. On September 29, 2022, Page moved to alter or amend the judgment under Rule 59(e) and for relief from the judgment under Rule 60(b) based on newly discovered evidence about the FBI's relationship with Danchenko. Pl's Mem. of Law in Supp. of Mot. for Recons. at 2–3, Dkt. 119-1.

---

[2] The Order constituted "[t]he dismissal without prejudice of [the] *action* (or 'case')," which "is final and appealable." *Ciralsky v. CIA*, 355 F.3d 661, 666 (D.C. Cir. 2004) ("That the dismissal was without prejudice to filing another suit does not make the cause unappealable, for denial of relief and dismissal of the case ended this suit as far as the District Court was concerned." (quoting *United States v. Wallace & Tiernan Co.*, 336 U.S. 793, 794–95 n.1 (1949)).

## II.   LEGAL STANDARDS

Rule 59(e) permits a party to file a "motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).   "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (quotation marks omitted).  A movant cannot use a Rule 59(e) motion to raise new issues, theories, or arguments that could have been presented in the course of the litigation.  *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020); *Fox v. Am. Airlines, Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004).  Instead, such a motion "must address new evidence or errors of law or fact and cannot merely reargue previous factual and legal assertions," and it will be granted "[o]nly if the moving party presents new facts or a clear error of law which compel a change in the court's ruling."  *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995) (quotation marks omitted).

Similarly, under Rule 60(b), "the court may relieve a party . . . from a final judgment" on grounds including "mistake, inadvertence, surprise, or excusable neglect"; "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; "fraud . . . , misrepresentation, or misconduct by an opposing party"; or "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(1), (2), (3), (6).  "[A] district court enjoys significant discretion in deciding whether to grant or deny a Rule 60(b) motion . . . ."  *Computer Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996).  Like Rule 59(e), "Rule 60(b) is not a vehicle for presenting theories or arguments that could have been raised previously."  *Walsh v. Hagee*, 10 F. Supp. 3d 15, 19 (D.D.C. 2013) (quotation marks omitted).

### III.   ANALYSIS

In his motion for reconsideration, Page asks the Court to reopen the case to "correct mistakes of fact and law" and grant him "leave to amend his SAC" based on newly discovered evidence.  Pl.'s Mem. at 13–14.  He also requests authorization to conduct "targeted discovery." *Id.* at 13.  The Court will address each in turn.

#### A.   Reopening the case based on newly discovered evidence

Page alleges that, after the Court's opinion and order issued, new evidence came to light that Danchenko was a paid source for the FBI from March 2017 to October 2020 and thus had "been paid to assist each of the Defendants' perpetration of their illegal activities," which the defendants "conceal[ed] . . . from this Court throughout the course of the current litigation." *Id.* at 2, 5.  Page understands this new information to imply that the individual defendants "deliberately put one of the fabricators of the Steele Dossier on FBI payroll in order to keep him quiet and further cover up the individual FBI Defendants' misdeeds." *Id.* at 17 (emphasis omitted); *see also id.* at 16–19.  Based on this new evidence, Page "moves the Court to alter and/or amend the final order" dismissing his Second Amended Complaint and closing the case. *Id.* at 13.

Such relief is not warranted.  Troubling as the Danchenko allegation may be, it does not "compel the court to change its prior position" on any count. *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000).  Rather, the alleged new evidence would not affect the analyses dismissing the claims against either the individual or institutional defendants.

As to the individual defendants, the new facts have no bearing on the Court's rationale for dismissing the FISA claims.[3]  The Court reasoned that Page's FISA claims "fail[ed] for two reasons":  (1) FISA "does not allow for aiding and abetting liability," Mem. Op.  at 19–20; and

---

[3] Page does not challenge the dismissal of the *Bivens* claims against the individual defendants.

(2) it applies only to those "who participate[] in *collecting* the target's communications using certain devices," which Page's complaint did not allege for any individual defendant, *id.* at 26, 28–29.  Even assuming the new allegations about a coverup involving Danchenko are true, those two legal conclusions remain unaffected.  While Page suggests that the Danchenko evidence supports a "civil conspiracy" theory of liability, *see* Pl.'s Reply at 4–5, Dkt. 124, that argument fails for the same reason his aiding-and-abetting theory failed.  Mem. Op. at 20 ("[S]tatutory silence on the subject of secondary liability means there is none." (quotation marks omitted)); *see also Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-0150, 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021) ("The same principle applies to bar recovery from coconspirators . . . .").

Moreover, Page's assertion that Danchenko himself was a "device" by which the defendants collected communications, Pl.'s Reply at 17, is likewise unconvincing.  Page defines "device" to include "[a] scheme to trick or deceive."  *Id.* (quoting Black's Law Dictionary (11th ed. 2019)).  But his definition is plainly at odds with the statutory language, which speaks of "the installation of . . . an *electronic*, *mechanical*, or other surveillance device," 50 U.S.C. § 1801(f)(1), (4) (emphasis added), and the Court's explanation of that term, which emphasizes that using a device "is distinct from the process of getting a warrant," Mem. Op. at 22–23.  Therefore, even if a coverup helped secure the warrants, it cannot be considered a "device" for purposes of FISA.

As to the institutional defendants, the new evidence does not impact the statute of limitations analysis for dismissing Page's Privacy Act claim.[4]  *See id.* at 50–52.  The Court reasoned that Page knew about alleged leaks to media outlets "when [the relevant articles] were published in April 2017," even if "he did not then know the identities of the leakers" or details of

---

[4] Page does not challenge the dismissal of his other Privacy Act claim due to failure to exhaust.

the leaks. *Id.* at 51. Thus, the Court concluded, Page's "Privacy Act disclosure claims expired two years after publication," *id.*, and his suit (brought more than three-and-a-half years later) was time-barred. *Id.* at 52. Again, the Danchenko allegations are irrelevant. Even if the new evidence did show that the defendants engaged in "material and willfull [*sic*] misrepresentations," Pl.'s Reply at 23, those misrepresentations would not negate Page's inquiry notice of any Privacy Act violations when the articles containing alleged leaks were published. *See* Mem. Op. at 51. Page's arguments to the contrary reference the portion of the Court's opinion discussing—and rejecting— whether the *FISA claims* were time barred, *see* Pl.'s Mem. at 25–26 (citing Mem. Op. at 16), and are inapposite for the Privacy Act conclusion.[5]

To the extent Page challenges the dismissal of the remaining claims against the institutional defendants, *see* Pl.'s Reply at 12–13 (FTCA claim); *id.* at 18–22 (PATRIOT Act claim), he did not raise those arguments in his motion and the Court will not consider "issues raised for the first time in a reply brief." *Rollins Env't Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991). And even if the Court did consider them, the arguments would fail for the same reason: whether or not Danchenko was a paid FBI informant does not impact the analyses as to either claim. *See* Mem. Op. at 40 (dismissing FTCA claim because Page did not allege that "the defendants *used* the warrants wrongfully"); *id.* at 41–45 (dismissing PATRIOT Act claim due to sovereign immunity, failure to exhaust, and failure to plausibly allege that the government improperly "used or disclosed FISA information").

---

[5] Page's remaining arguments about FISA's legislative history and statutory interpretation, *see* Pl.'s Mem. at 20–23; Pl.'s Reply at 18–19, and the Privacy Act's statute of limitations, *see* Pl.'s Mem. at 26–27, are legal theories that "could have [been] raised before the decision issued" and the Court will not address them now. *Banister*, 140 S. Ct. at 1703.

Because the newly discovered information about Danchenko would not "compel a change in the court's ruling" on any claim, it does not support altering, amending, or granting relief from the Court's order dismissing Page's complaint and closing the case. *New York*, 880 F. Supp. at 38 (quotation marks omitted). As a result, Page's motion for leave to amend necessarily fails. *See* Pl.'s Mem. at 17, 19–20. "[O]nce a final judgment has been entered, a court cannot permit an amendment unless the plaintiff 'first satisfies Rule 59(e)'s more stringent standard' for setting aside that judgment." *Ciralsky*, 355 F.3d at 673 (quoting *Firestone*, 76 F.3d at 1208 (alteration omitted)). "Since the court decline[s] to set aside the judgment under Rule 59(e)," Page's "motion to amend under Rule 15(a) [is] moot." *Id.*[6]

## B.      Conducting targeted discovery

Page also asks for discovery to enable him "to learn sufficient details to plead the relevant causes of action." Pl.'s Mem. at 13. Specifically, he seeks to uncover "[w]hat exactly the [d]efendants . . . disclosed to journalists," "[w]hat . . . the [d]efendants kn[ew] about the partisan, political motivations of the surveillance of Page," and the identities of John Does 1–10, "the individuals who 'engaged in' the mechanics of the FISA surveillance." *Id.* at 24–25. The Court will deny these requests.

First, Page has not provided grounds for this relief under Rule 59(e) or Rule 60(b). These discovery requests are not related to the newly discovered evidence, nor has Page identified any "intervening change of controlling law . . . or the need to correct a clear error or prevent manifest

---

[6] To the extent Page wishes to bring new causes of action, *see, e.g.*, Pl.'s Reply at 14–15 (quoting 42 U.S.C. § 1985(3)), the Court notes that his Second Amended Complaint was dismissed without prejudice to refiling a new suit. *See* Order at 1. Page has provided no argument or reason to believe that that dismissal unfairly prejudiced him due to, for example, a statute of limitations concern. *See Ciralsky*, 355 F.3d at 674 (remanding for the district court to consider "the [statute of limitations] consequences of denial" of a Rule 59(e) decision, but ultimately "leav[ing] the choice entirely in the hands of the district court" (quotation marks omitted)).

injustice." *Firestone*, 76 F.3d at 1208 (quotation marks omitted).  Rules 59(e) and 60(b) are thus not the proper vehicle for these requests, which could have been presented earlier. *Id.*; *Walsh*, 10 F. Supp. 3d at 19.

In any event, Page's discovery requests fail for a second reason.  "A plaintiff may not 'use discovery to obtain the facts necessary to establish a claim that is plausible on its face pursuant to [the] *Twombly* and *Iqbal* [pleading standards]—even when those facts are only within the head or hands of the defendant.'"  *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 83 (D.D.C. 2019), *aff'd*, No. 19-7124, 2020 WL 873574 (D.C. Cir. Feb. 14, 2020) (quoting *Felder v. WMATA*, 105 F. Supp. 3d 52, 59 (D.D.C. 2015)).  Page is not entitled to conduct "a fishing expedition" to discover new potential claims he may bring against the defendants.  *Id.* at 82 (quoting *Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997)); *see also Mama Cares Found. v. Nutriset Societe Par Actions Cimplifiee*, 825 F. Supp. 2d 178, 184 (D.D.C. 2011) ("[T]he discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim." (quotation marks omitted)).

Page's request for discovery to learn the identities of the John Does fares no better.  Courts do sometimes allow cases to proceed against "'John Doe' defendants, but only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery."  *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010).  That exception is not applicable here.  Page's complaint does not detail any alleged wrongdoing by the John Does.  *See* SAC ¶¶ 34–35 (stating that Does' "specific involvement in the conduct alleged in this Complaint [was] not yet [] known to the Plaintiff").  The complaint later states that unknown individuals engaged in surveillance of Page pursuant to the FISA warrants, *id.* ¶¶ 140–141, but makes no

attempt to link that action to any cause of action.[7]  Thus, this is a very different case from *Malibu Media, LLC v. Doe*, 64 F. Supp. 3d 47, 48–50 (D.D.C. 2014), which permitted jurisdictional discovery "to learn the identity of putative defendants."  *See* Pl.'s Mem. at 23.  There, the complaint plausibly alleged that John Doe violated the Copyright Act, and discovery was permitted to uncover his identity and ensure personal jurisdiction.  *Malibu Media*, 64 F. Supp. 3d at 48–50.  By contrast, Page has not alleged any claim against John Does 1–10.  Thus, discovery would, once again, "amount to nothing more than a fishing expedition" to uncover wrongdoing that he has not already plausibly alleged.  *Bastin*, 104 F.3d at 1396.  Page's "[m]ere conjecture or speculation" of wrongdoing by John Does 1–10 "is not enough to justify jurisdictional discovery."  *Malibu Media*, 64 F. Supp. 3d at 48 (quotation marks omitted); *see also Landwehr v. FDIC*, 282 F.R.D. 1, 4–5 (D.D.C. 2010) (explaining that plaintiffs could not "maintain their claims against the 'Doe' defendants" given "the complete absence of any specific allegations against" them).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to alter or amend the judgment and for relief from the judgment is denied.  A separate order consistent with this decision accompanies this memorandum opinion.

*Dabney L. Friedrich*

January 18, 2023

DABNEY L. FRIEDRICH
United States District Judge

---

[7] Notably, FISA exempts from liability those who engage in electronic surveillance that "was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction."  50 U.S.C. §§ 1809(b), 1810.